UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROGER J. GOSSELIN, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | Case Number |
| Plaintiff, | ) ) | <u>CLASS ACTION</u> |
| vs. | ) ) ) | |
| FIRST TRUST ADVISORS L.P., HILLIARD LYONS ASSET MANAGEMENT, VALHALLA CAPITAL PARTNERS LLC, FIRST TRUST PORTFOLIOS L.P., FIRST TRUST STRATEGIC HIGH INCOME FUND, FIRST TRUST STRATEGIC HIGH INCOME FUND II, FIRST TRUST STRATEGIC HIGH INCOME FUND III, JAMES A. BOWEN, MARK R. BRADLEY, RICHARD E. ERICKSON, THOMAS R. KADLEC, ROBERT F. KEITH, NIEL B. NIELSON and DAVID M. OSTER, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | `FILED: SEPTEMBER 12, 2008` `08CV5213` `JUDGE DER YEGHIAYAN` `MAGISTRATE JUDGE MASON` `EDA` |
| Defendants. | ) ) ) | |
| | ) | <u>DEMAND FOR JURY TRIAL</u> |

**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

**INTRODUCTION**

1.      This is a securities class action on behalf of all persons or entities who purchased or

otherwise acquired the shares of certain mutual funds offered by First Trust Portfolios L.P. ("First

Trust Portfolios"), including shares of the First Trust Strategic High Income Fund (the "FHI Fund"),

First Trust Strategic High Income Fund II (the "FHY Fund") and First Trust Strategic High Income

Fund III (the "FHO Fund") (collectively referred to as the "Funds"), between July 26, 2005 and July

7, 2008, inclusive (the "Class Period"), against the Funds and the Funds' registrants, the Funds'

adviser, First Trust Advisors L.P., the Funds' sub-advisers, Hilliard Lyons Asset Management

("Hilliard Lyons") and Valhalla Capital Partners LLC ("Valhalla") (collectively referred to as the "Sub-Advisers"), and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act"), and on behalf of all persons or entities who purchased or otherwise acquired shares of the Funds issued in connection with the Funds' initial public offerings ("IPOs") seeking to pursue remedies under the Securities Act of 1933 ("1933 Act").

2.      The FHI Fund is a diversified closed-end management investment company.  The FHI Fund's primary investment objective is to seek a high level of current income.  It seeks capital growth as a secondary objective.

3.      The FHY Fund is a diversified, closed-end management investment company.  The FHY Fund's primary investment objective is to seek a high-level of current income.  The FHY Fund seeks capital growth as a secondary objective. The FHY Fund seeks to achieve its investment objectives by investing in a diversified portfolio of below-investment grade and investment grade debt securities, and equity securities.

4.      The FHO Fund is a diversified, closed-end management investment company.  The FHO Fund's primary objective is to seek a high level of current income. The FHO Fund seeks capital growth as a secondary objective.  The FHO Fund seeks to achieve its objective by investing in a diversified portfolio of below-investment grade and investment grade debt securities and equity securities that the investment Sub-Adviser believes offer attractive yield and/or capital appreciation potential.

5.      First Trust Advisors L.P. ("First Trust" or the "Adviser"), a registered investment adviser, is the investment adviser to the Funds.  First Trust serves as investment adviser or portfolio supervisor to investment portfolios.  The Adviser is an affiliate of First Trust Portfolios, which specializes in the underwriting, trading and distribution of unit investment trusts and other securities.

6.      A large portion of the Funds' portfolios was invested in structured finance securities, including securities backed by subprime mortgages to higher-risk borrowers.  Investors were not informed of the level of risk associated with the Funds' exposure to mortgage-backed and distressed securities and the Funds' liquidity risk.  Investors were further not informed that the Funds lacked adequate internal controls to ensure that the Funds would remain in compliance with their restrictions and limitations related to their investment portfolios and strategies and to ensure that the Funds maintained proper hedging techniques to minimize the risks associated with the Funds' portfolios.

7.      During the Class Period, defendants issued materially false and misleading statements regarding the Funds' portfolios and financial results.  As a result of defendants' false statements, the Funds' shares traded at artificially inflated prices during the Class Period.

8.      In the first half of August, the Funds' shares declined in tandem with other closed-end fund shares as the credit crunch exposed the poor underlying fundamentals of the financial sector's mortgage risk management and problems with structured finance vehicles.  As a result of these concerns, the Fund's shares began to slide.  Beginning in August 2007 and continuing through July 2008, the Funds began to acknowledge the serious deterioration in the Funds' portfolios.  As a result of these disclosures, the price of the Funds' shares collapsed.  Prior to any negative disclosures, each of the Funds traded within a narrow trading band.  For example, the FHI Fund traded within the $18 and $20 per share range from July 2005 through July 2007.  In contrast, by August 2008, the FHI Fund was trading in the $8 per share range.  Note the following chart:



9.      The true facts which were omitted from the Registration Statements/Prospectuses or were known by the defendants but concealed from the investing public during the Class Period were as follows:

(a)      The Funds lacked effective controls and hedges to minimize the risk of loss from mortgage delinquencies which affected a large part of their portfolios;

(b)      The Funds lacked effective internal controls to ensure that the Funds would remain in compliance with restrictions and limitations related to their investment portfolios and strategies;

(c)      The extent of the Funds' liquidity risk due to the illiquid nature of a large portion of the Funds' portfolios was omitted;

- 4 -

(d)     The extent of the Funds' risk exposure to mortgage-backed assets was misstated; and

(e)     The extent to which the Funds' portfolios were subject to fair value procedures was misstated.

## JURISDICTION AND VENUE

10.     Certain of the claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5]. Certain of the other claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the 1933 Act [15 U.S.C. §§77k, 77l(a)(2) and 77o].

11.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the 1934 Act as well as 28 U.S.C. §1331 and §22 of the 1933 Act.

12.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because the defendants maintain an office in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

13.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

14.     Plaintiff Roger J. Gosselin purchased FHO Fund shares as described in the attached certification and was damaged thereby.

15.     Defendant First Trust is, and at all relevant times, was, adviser and manager to the Funds. First Trust, as adviser of the Funds, supervises the Sub-Advisers.

16.     Defendant Hilliard Lyons was investment Sub-Adviser of the FHI Fund until May 2006.

17.     Defendant Valhalla is, and at all relevant times was, Sub-Adviser to the FHY Fund and the FHO Fund.  Valhalla succeeded Hilliard Lyons as Sub-Adviser to the FHI Fund in May 2006.  Valhalla is a boutique asset management firm focused on managing high-yield portfolios with an emphasis on structured finance securities.

18.     Defendant First Trust Portfolios is an affiliate of First Trust.  First Trust Portfolios provided a variety of investment services, including asset management, financial advisory services, municipal and corporate investment banking, and unit investment trust sponsorship.  First Trust Portfolios operates nationwide and across the globe.

19.     Defendant FHI Fund is a closed-end management investment company.  The FHI Fund's primary investment objective is to seek a high level of current income and seeks capital growth as a secondary objective.  The FHI Fund's portfolio includes residential mortgage-backed securities ("RMBS") franchise loans, collateralized debt obligations ("CDOs"), commercial mortgage-backed securities ("CMBS"), manufactured housing securities, corporate bonds, equity investments and equipment lease receivables.  The FHI Fund invests a significant portion of its assets in below-investment grade debt securities, including MBSs, asset-backed securities ("ABS"), corporate bonds and CDOs.

20.     Defendant FHY Fund is a closed-end management investment company.  The FHY Fund's primary investment objective is to seek a high-level of current income.  The FHY Fund seeks capital growth as a secondary objective.  The FHY Fund seeks to achieve its investment objectives by investing in a diversified portfolio of below-investment grade and invests a significant portion of its assets in below-investment grade debt securities, including MBS, ABS, corporate bonds and CDOs.

21.     Defendant FHO Fund is a closed-end management investment company.  The FHO Fund's primary investment objective is to seek a high level of current income.  It seeks capital

growth as a secondary objective. The FHO Fund invests in a diversified portfolio of below investment-grade and investment-grade debt securities, and equity securities. Its portfolio includes CDOs, corporate bonds, RMBS and equity securities.

22. Defendant James A. Bowen ("Bowen") is, and at all relevant times was, Chairman of the Board, President, Chief Executive Officer ("CEO") and a Trustee of the Funds. Additionally, Bowen is President of First Trust and First Trust Portfolios. Defendant Bowen signed the FHI Fund's Registration Statement and Prospectus and the pre-effective amendments to the FHI Fund's Registration Statement and Prospectus on the following dates: April 19, 2005, June 24, 2005 and July 26, 2005. Defendant Bowen signed the FHY Fund's Registration Statement and Prospectus and the pre-effective amendment to the FHY Fund's Registration Statement and Prospectus on the following dates: January 20, 2006, February 27, 2006 and March 28, 2006, and signed the FHO Fund's Registration Statement and Prospectus and the post-effective amendment to the FHY Fund's Registration Statement on March 29, 2006. Furthermore, defendant Bowen signed the FHO Fund's Registration Statement and Prospectus and the pre-effective amendments to the FHO Fund's Registration Statement and Prospectus on the following dates: December 21, 2006, February 22, 2007 and March 27, 2007.

23. Defendant Mark R. Bradley ("Bradley") is, and at all relevant times was, Chief Financial Officer ("CFO"), Controller and Treasurer of the Funds. Additionally, defendant Bradley is CFO and Managing Director of First Trust and First Trust Portfolios. Defendant Bradley signed the FHI Fund's Registration Statement and Prospectus and the pre-effective amendments to the FHI Fund's Registration Statement and Prospectus on the following dates: April 19, 2005, June 24, 2005 and July 26, 2005. Defendant Bradley signed the FHY Fund's Registration Statement and Prospectus and the pre-effective amendments to the FHY Fund's Registration Statement and Prospectus on the following dates: January 20, 2006, February 27, 2006 and March 28, 2006, and

signed the post-effective amendment to the FHY Fund's Registration Statement on March 29, 2006. Furthermore, defendant Bradley signed the FHO Fund's Registration Statement and Prospectus and the pre-effective amendments to the FHO Fund's Registration Statement and Prospectus on the following dates:  December 21, 2006, February 22, 2007 and March 27, 2007.

24.     Defendant Richard E. Erickson ("Erickson") is, and at all relevant times was, a Trustee of the Funds.  Defendant Erickson signed the pre-effective amendments to the FHI Fund's Registration Statement and Prospectus on the following dates:  June 24, 2005 and July 26, 2005. Defendant Erickson signed the pre-effective amendments to the FHY Fund's Registration Statement and Prospectus on the following dates:  February 27, 2006 and March 28, 2006, and signed the post-effective amendments to the FHY Fund's Registration Statement on March 29, 2006.  Furthermore, defendant Erickson signed the pre-effective amendments to the FHO Fund's Registration Statement and Prospectus on the following dates:  December 21, 2006, February 22, 2007 and March 27, 2007.

25.     Defendant Thomas R. Kadlec ("Kadlec") is, and at all relevant times was, a Trustee of the Funds.  Defendant Kadlec signed the pre-effective amendments to the FHI Fund's Registration Statement and Prospectus on the following dates:  June 24, 2005 and July 26, 2005.  Defendant Kadlec signed the pre-effective amendments to the FHY Fund's Registration Statement and Prospectus on the following dates:  February 27, 2006 and March 28, 2006, and signed the post-effective amendments to the FHY Fund's Registration Statement on March 29, 2006.  Furthermore, defendant Erickson signed the pre-effective amendments to the FHO Fund's Registration Statement and Prospectus on the following dates:  December 21, 2006, February 22, 2007 and March 27, 2007.

26.     Defendant Robert F. Keith is, and at all relevant times was, a Trustee of the FHO Fund.  Additionally, Keith became a Trustee of the FHI Fund and the FHY Fund on April 16, 2007

27.     Defendant Niel B. Nielson ("Nielson") is, and at all relevant times was, a Trustee of the Funds.  Defendant Nielson signed the pre-effective amendments to the FHI Fund's Registration

Statement and Prospectus on the following dates: June 24, 2005 and July 26, 2005. Defendant Nielson signed the pre-effective amendments to the FHY Fund's Registration Statement and Prospectus on the following dates: February 27, 2006 and March 28, 2006, and signed the post-effective amendments to the FHY Fund's Registration Statement on March 29, 2006. Furthermore, defendant Nielson signed the pre-effective amendments to the FHO Fund's Registration Statement and Prospectus on the following dates: December 21, 2006, February 22, 2007 and March 27, 2007.

28.     Defendant David M. Oster ("Oster") was a Trustee of the FHI Fund and the FHY Fund. Defendant Oster signed the pre-effective amendments to the FHI Fund's Registration Statement and Prospectus on the following dates: June 24, 2005 and July 26, 2005. Furthermore, defendant Oster signed the pre-effective amendments to the FHY Fund's Registration Statement and Prospectus on February 27, 2006.

29.     The defendants referenced above in ¶¶22-28 are referred to herein as the "Individual Defendants."

## THE FALSE AND DEFECTIVE REGISTRATION STATEMENTS AND PROSPECTUSES

30.     First Trust Portfolios first offered the FHI Fund in July 2005. The FHI Fund filed its initial prospectus included as part of an SEC Form N-2 Registration Statement on April 19, 2005, and on June 24, 2005 and July 26, 2005, filed amendments to the Registration Statement and Prospectus on Form N-2/As. The initial Registration Statement relating to the fund became effective July 27, 2005. The offering raised $165 million for the closed-end fund managed by the Adviser and Sub-Advisers.

31.     On March 28, 2006, First Trust Portfolios accomplished the offering of the FHY Fund, which raised $188 million for the closed-end fund managed by the Adviser and Valhalla. The offering was accomplished pursuant to a Form N-2 Registration Statement and Prospectus.

32. On March 28, 2007, First Trust Portfolios accomplished the offering of the FHO Fund, which raised $155 million for the closed-end fund managed by the Adviser and Valhalla. The offering was accomplished pursuant to a Form N-2 Registration Statement and Prospectus.

33. The FHI Fund's Registration Statement and amendments thereto did not provide sufficient and adequate disclosures concerning the FHI Fund's risks related to its exposure to mortgage-backed, asset-backed and distressed securities and the FHI Fund's liquidity risk. Further, the Registration Statement and amendments thereto failed to disclose that the FHI Fund lacked adequate internal controls to ensure that it would remain in compliance with its restrictions and limitations related to its investment portfolio and strategies and to ensure that it maintained proper hedging techniques to minimize the risks associated with the FHI Fund's portfolio. The Registration Statement provided that the FHI Fund had certain investment restrictions in place, including a restriction that prohibited it from investing more than 25% of its total assets in any one industry, except for certain investment vehicles issued or guaranteed by the United States Government. Shareholders' approval would be needed in order to change this restriction. The Registration Statement additionally provided a breakdown of composition of the FHI Fund, including limitations on the amount, type and grade of investments that the fund could invest in. The FHI Fund could only invest up to 15% of its total assets in distressed securities. The Registration Statement also indicated that the FHI Fund would employ hedging and other risk management strategies to reduce its exposure to certain types of risk.

34. The FHY Fund's Registration Statement and amendments thereto had similar omissions in that they did not provide proper disclosures. Further, the Registration Statement made similar statements concerning the FHY Fund's restrictions and limitations on the amount and type of investments and concerning the FHY Fund's hedging and risk management strategies.

35.     The FHO Fund's Registration Statement and amendments thereto had similar omissions in that they did not provide proper disclosures.  Further, the Registration Statement made similar statements concerning the FHO Fund's restrictions and limitations on the amount and type of investments and concerning the FHO Fund's hedging and risk management strategies, except that the FHO Fund altered the restriction that prohibited it from investing more than 25% of the FHO Fund's total assets in any one industry to exclude RMBS.

36.     The true facts which were omitted from the Registration Statements/Prospectuses were as follows:

(a)     The Funds lacked effective controls and hedges to minimize the risk of loss from mortgage delinquencies which affected a large part of their portfolios;

(b)     The Funds lacked effective internal controls to ensure that the Funds would remain in compliance with their restrictions and limitations related to their investment portfolio and strategies;

(c)     The extent of the Funds' liquidity risk due to the illiquid nature of a large portion of the Funds' portfolios; and

(d)     The extent of the Funds' risk exposure to mortgage-backed assets was misstated.

## DEFENDANTS' FALSE AND MISLEADING
## STATEMENTS DURING THE CLASS PERIOD

37.     On July 26, 2005, the FHI Fund commenced trading on the New York Stock Exchange ("NYSE").  The initial offering price was $20.00 per share and the Net Asset Value ("NAV") at inception was $19.10 per share.

38.     In October 2005, the FHI Fund issued a document concerning frequently asked questions about the fund and its investments.  The frequently asked question document provided the

following in pertinent part concerning what structured finance securities are and the reasons why the

FHI Fund should invest in them over other types of high-yield investment vehicles:

> Q.      What is unique about this Fund versus most other High-Yield Funds?

> A.      This Fund is unique in that it is not a traditional high-yield fund that focuses primarily on corporate bonds. This Fund is a diversified high-income strategy with a primary focus on structured finance securities and limited exposure to corporate bonds and convertible securities. While the Fund may use leverage in the future, the Fund currently does not, nor does it anticipate, using leverage in the near term through the issuance of Preferred Shares, commercial paper or notes and/or borrowings.

> Q.      What are "structured finance securities" as compared to corporate bonds?

> A.      A corporate bond is a general obligation of the issuer/corporation and generally not tied to the assets of the corporation.

> A structured finance security is a security that is collateralized by pools of loans and/or leases on assets such as residential real estate, commercial real estate, automobiles, etc. The loans or leases against the assets are placed in a bankruptcy remote trust, thus removing it from any default risk of the issuing entity. A servicer is employed by the trust to ensure that timely payments are made on these loans/leases. In the event a borrower defaults on a loan/lease, the servicer will repossess the underlying asset, sell it, and distribute the proceeds to the bond-holders.

> Q.      Why are you primarily investing in these securities versus more traditional, high-yield corporate bonds?

> A.      Currently, structured finance securities offer superior yields to corporate bonds, often at substantial discounts to par, and at wider spreads. In addition, investing in these securities provides greater diversification than corporate bonds alone by spreading risk across a broader range of asset classes, which include both corporate and consumer debt.

39.      On January 6, 2006, the FHI Fund filed its Form N-CSR[1] for year ending October 31,

2005. In the Annual Report, the fund reported NAV of $168.4 million or $19.13 per share and a net

---

[1]      SEC Form N-CSR is a Certified Shareholder Report for registered management investment companies. It is filed on a semiannual basis.

realized and unrealized loss on investments of $1.5 million for the year. The letter to shareholders contained in the Annual Report provided in part:

> As you know, the Fund's primary investment objective is to seek a high level of current income and, as a secondary objective, the Fund seeks capital growth. The Fund currently pursues this strategy by investing at least 80% of its Managed Assets in a diversified portfolio of high income producing securities that Hilliard Lyons Asset Management ("HLAM") believes offer attractive yield and capital appreciation potential. The Fund's primary focus is on structured finance securities with limited exposure to corporate bonds and convertible securities. Investing in these securities provides greater diversification than corporate bonds alone by spreading risk across a broader range of asset classes, which include both corporate and consumer debt.

> HLAM's portfolio management team has been able to attain such a high yield without employing leverage because of their strategy of investing in multiple areas of the high-yield market, including structured finance securities. Currently, structured finance securities offer superior yield to corporate bonds. I encourage you to read the commentary from the HLAM portfolio management team found on the following page. It includes a review of the Fund's performance and the portfolio managers' outlook for the markets.

40.     The FHI Fund's Annual Report further provided in pertinent part the following concerning the fund's performance and outlook for the period:

OVERVIEW

First Trust Strategic High Income Fund (the "Fund") commenced trading on the New York Stock Exchange on July 26, 2005 under the ticker symbol "FHI." The initial offering price of the Fund was $20.00 a share, and the net asset value ("NAV") at inception was $19.10. The Fund came to market in the midst of a challenging environment for fixed-income instruments in general, and closed-end funds in particular. Investors were concerned that rising rates would erode fixed-income returns and put closed-end fund dividends under pressure. At the same time, the appetite for yield had compressed credit spreads, limiting the appeal of much of the below-investment grade market. Despite these challenges, the Fund reached full investment in approximately 30 days, with an initial yield at the high end of its anticipated range.

PERFORMANCE REVIEW

Performance to date has been solid with regard to NAV. From inception through October 31, 2005, the Fund posted a +1.03% NAV total return. Over the comparable period, the Lehman Brothers Ba U.S. High Yield Index posted a -1.18% total return. Stable-to-improving collateral performance in many of its structured finance positions helped drive the Fund's positive NAV move. Overall, the Fund's collateralized debt obligation ("CDO") positions, as well as its aircraft lease backed

bonds, produced positive price performance. The Fund's corporate high-yield positions, in contrast, moved down in tandem with the overall market, despite a solid credit profile.

FHI's market-price performance did not keep pace with the NAV, as the Fund returned -5.28% for the period since inception. Steadily rising rates from late August through the end of October took a heavy toll on much of the closed-end fund universe, particularly those with a focus on below-investment grade debt. Investors, already anxious about the negative effects of leverage, seemed to paint most of the "high-yield" universe with the same brush and sell. We believe this contributed to FHI's decrease in market price from its initial $20.00 offering price to $18.79 at fiscal year-end. Over time, the absence of leverage, combined with a competitive yield, may help to differentiate the Fund from its competitors and bolster its market price performance.

OUTLOOK

Looking ahead, we believe the markets appear to be at a tipping point. Interest rates remain below long-term averages and may move higher, but at the same time, the economy may be losing steam. An aggressive Federal Reserve could limit consumers' options as debt burdens increase and home refinancing opportunities fade. Such a slowdown in consumer spending could affect both corporate balance sheets and the economy in general. To insulate against these risks, the Fund remains broadly diversified in "seasoned" paper and maintains a significant allocation to floating-rate bonds. We believe, this selective exposure to both consumer and corporate balance sheets should help the Fund withstand a moderate downturn in credit trends, while its floating rate allocation serves as a hedge against sharply rising rates.

41.     On March 28, 2006, the FHY Fund commenced trading on the NYSE.  The initial offering price was $20.00 per share and the NAV at inception was $19.10 per share.

42.     On July 7, 2006, the FHI Fund filed its Form N-CSRS for the six-month period ending April 30, 2006.  In the Semi-Annual Report, the fund reported a NAV of $169.1 million or $19.13 per share and a net realized and unrealized gain on investments of $1.0 million for the period. The letter to shareholders contained in the Semi-Annual Report provided in part:

As you know, the Fund's primary investment objective is to seek a high level of current income. As a secondary objective, the Fund seeks capital growth. The Fund currently pursues this high income strategy by investing at least 80% of its managed assets in a diversified portfolio of high income producing securities that Valhalla believes offer attractive yield and capital appreciation potential. The Fund's primary focus is on structured finance securities with limited exposure to corporate bonds and convertible securities. Investing in these securities provides greater

diversification than corporate bonds alone by spreading risk across a broader range of asset classes, which include both corporate and consumer debt.

The emphasis on structured finance securities within the portfolio has helped to stabilize the NAV. Structured finance securities exhibited less volatility, in general, than the corporate holdings over this reporting period. I encourage you to read the portfolio commentary found on the following page. It includes a review of the Fund's performance and the portfolio managers' outlook for the markets.

43.     The FHI Fund's Semi-Annual Report further provided in pertinent part the following

concerning the fund's performance and outlook for the period:

OVERVIEW

For the six month period ended April 30, 2006, the bond and equity markets produced a mix of returns reflective of the overall macroeconomic landscape. The interest-rate environment was mildly negative for bonds, as rates rose roughly 0.50% in the intermediate and long parts of the yield curve, but economic data, inflation numbers, and corporate earnings were mostly favorable. Consequently, the more interest-rate sensitive sectors of the bond market struggled, while stocks and lower-rated bonds outperformed. This divergence is evident in the most recent six month numbers of several key indices. The Lehman Brothers Intermediate U.S. Aggregate Index posted a near flat total return of only 0.95%; the Lehman Brothers U.S. Corporate High Yield Index returned 4.96%; and the S&P 500 and Russell 2000 indices generated 9.64% and 18.93%, respectively for the six months ended April 30, 2006. In short, the market's appetite for higher returns, combined with its positive outlook, drove the performance of the major segments of the market.

PERFORMANCE REVIEW

The First Trust Strategic High Income Fund ("FHI" or the "Fund") benefited from these trends, which helped it post a solid six month performance. The total return performance based on net asset value ("NAV") was 6.43% for the six months ended April 30, 2006. The Fund's Benchmark, the Lehman Brothers Ba U.S. High Yield Index, produced a 2.90% total return over the same period. The Fund's outperformance was attributable to both its net, annualized yield advantage over the Index of roughly 3.30% and relative stability. This stability came from a mixed, but balanced price performance across some of the Fund's larger sectors. For example, aircraft leased-backed bonds and commercial mortgage-backed securities generally experienced positive movements over the six month period, while corporate bonds and residential mortgage-backed securities were flat to slightly negative. This was evidenced by the NAV which started the period at $19.13 and ended it at $19.13. In contrast, the Index declined 0.79% in value over the same time period. Most of the NAV stability came from [the] Fund's emphasis on structured finance securities, which exhibited less volatility, in general, than its corporate holdings.

The market price performance was also positive. Negative trends in the closed-end fund space reversed from the fourth quarter of 2005, helping the Fund produce an even stronger total return of 9.77% for the six months ended April 30, 2006. This was driven by a greater than 3.00% increase in the stock price. Near the end of January, the market price traded above the NAV, and the Fund remained at a premium for the rest of the calendar quarter. As of April 30, 2006, the yield stood at 9.91%, versus 10.38% at calendar year-end.

OUTLOOK

Favorable economic trends may keep yields depressed and prices high, making diversification critical to future performance. The strong bid for riskier assets will remain intact only if investors maintain their confidence in the economy. If the market's chief concern shifts from rising interest rates to deteriorating credit metrics, lower-rated assets will likely come under pressure. With the preponderance of its portfolio in seasoned structured finance securities, the Fund is well-positioned for such an environment.

44. On July 7, 2006, the FHY Fund filed its Form N-CSRS for the six-month period ending April 30, 2006. In the Semi-Annual Report, the fund reported an NAV of $179.9 million or $19.13 per share and a net realized and unrealized loss on investments of $176,556 for the period. The Semi-Annual Report further provided substantially similar statements concerning the FHY Fund's performance and outlook as were contained in the FHI Fund's Semi-Annual Report.

45. On January 5, 2007, the FHI Fund filed its Form N-CSR for year ending October 31, 2006. In the Annual Report, the fund reported an NAV of $176.4 million or $19.82 per share and a net realized and unrealized gain on investments of $6.7 million for the year. The Annual Report further provided in pertinent part the following concerning the fund's performance and outlook for the period:

PERFORMANCE OVERVIEW

First Trust Strategic High Income Fund completed its first full fiscal year in excellent fashion as demonstrated by its absolute and relative performance, both of which have been solid based on NAV and market price. From commencement of operation (July 19, 2005) through October 31, 2006, the Fund posted a 16.91% NAV total return. Over the comparable period, the Lehman Brothers Ba U.S. High Yield Index posted a 7.24% total return.

\*       \*       \*

The first half of the Fund's fiscal year was a challenging environment for closed-end funds due to rising interest rates. Investors were concerned that rising rates would erode returns on fixed-income securities and put fund dividends under pressure. These concerns kept a downward pressure on closed-end funds' market prices, to which the Fund was not immune. Consequently, its market price reached a low of $17.36 in December 2005. This quickly changed, however, as investors saw the Fund's positive NAV performance and pushed the market price of the Fund up to $21.19 by fiscal year-end, October 31, 2006. This was a 6.91% premium to the Fund's NAV of $19.82. FHI's market-price performance exceeded that of the NAV and came in at 19.49% from the inception of the Fund through October 31, 2006.

The Fund's performance was primarily driven by its structured finance holdings. In the structured finance space, manufactured housing and franchise loan backed bonds were among the strongest performers. Over the twelve-month period, the Fund's exposure to corporate bonds increased from less than 10% of the portfolio to almost 17%. While the spread differential between corporate and structured finance securities has remained more favorably weighted toward structured finance, the Fund's performance has benefited from finding pockets of value in the corporate area.

OUTLOOK

Currently, the economic outlook remains quite mixed. On the positive side, productivity growth, unemployment and default performance within the corporate and consumer sectors continue to be strong. The exceptionally low default rates among consumers and corporations for the last few years have kept bond prices historically high and yields well below long-term averages. On the negative side, energy prices remain high, the housing market has weakened, and corporate margins look set to contract. Should the economy falter and credit trends worsen, broad diversification will be critical to positive relative performance.

The investment objective of the Fund is to seek a high level of income. The Fund seeks capital growth as a secondary objective. The Fund seeks to achieve its objectives by investing at least 80% of its Managed Assets in a diversified portfolio of high income producing securities that the Fund's Sub-Advisor believes offer attractive yield and capital appreciation potential. In furtherance of this policy, the Fund's Sub-Advisor has utilized a value strategy of investing in a diversified portfolio of primarily below investment-grade structured finance securities. The Fund will utilize a broad array of corporate securities as well. At fiscal year-end, the Fund was well diversified in "seasoned" paper and maintained a significant allocation to floating-rate bonds. This selective exposure to both consumer and corporate balance sheets should help the Fund withstand a downturn in credit trends, while its floating-rate allocation should help to hedge against rising rates. If credit-sensitive assets cheapen in price, the Fund should see new attractive opportunities emerge in segments of the market that were previously expensive. This would be a welcome change from the last several quarters that have seen spreads tighten and the investable universe narrow.

46.     On January 5, 2007, the FHY Fund filed its Form N-CSR for year ending October 31, 2006.  In the Annual Report, the fund reported an NAV of $190.1 million or $20.18 per share and a net realized and unrealized gain on investments of $7.3 million for the year.  The Annual Report further provided substantially similar statements concerning the FHY Fund's performance and outlook as were contained in the FHI Fund's Annual Report.

47.     On or about March 28, 2007, the FHO Fund commenced trading on the NYSE.  The initial offering price was $20.00 per share and the NAV at inception was $19.10 per share.

48.     On July 9, 2007, the FHI Fund filed its Form N-CSRS for the six-month period ending April 30, 2007.  In the Semi-Annual Report, the fund reported an NAV of $173.1 million or $19.33 per share and a net realized and unrealized loss on investments of $4.7 million for the period. The Semi-Annual Report further provided in pertinent part the following concerning the fund's performance and outlook for the period:

FUND RECAP

Over the six-month period ending April 30, 2007, the primary news affecting the Fund was the negative events surrounding sub-prime residential mortgage-backed securities. While the headlines generally made it appear that all sub-prime mortgages were in trouble, the primary problems in sub-prime mortgages were generally limited to those mortgages originated in late 2005 and throughout 2006. The Fund had minimal exposure to these vintages and less than 15% of its total holdings in the sub-prime mortgage market. However, the entire sub-prime mortgage market was negatively impacted in sympathy to the problems in those vintages. In the end, this sell-off should create a number of buying opportunities in oversold mortgage market segments that the Fund can take advantage of in the months to come.

*       *       *

SUB-ADVISOR Q&A

HOW DID THE FUND PERFORM OVER THE LAST SIX MONTHS?

The Fund's diversification across both structured finance and corporate high-yield securities and its value strategy, which enabled it to purchase these securities at excellent values, has contributed to the Fund's performance since inception. FHI's exposure to sub-prime residential mortgage-backed securities was the primary source of its relative underperformance in 2007. In our opinion, negative headlines, an

increase in delinquency pressure due to slowdown in housing price appreciation and the failure of a number of specialty, sub-prime lenders drove down bids and sparked a panic that hurt these bonds.

*     *     *

WILL THESE FACTORS CONTINUE TO HURT THE MARKET?

The downdraft in the sub-prime mortgage market did not affect the Fund's entire mortgage allocation. Its prime mortgage holdings posted positive performance, as investors were quick to differentiate among the various segments of the residential mortgage sector. In addition, a number of other asset classes remained unaffected by the sub-prime wave. Collateralized debt obligations (CDOs), corporate bonds, and commercial mortgage-backed securities (CMBS) all generally produced positive performance over the fiscal year-to-date period and continued to provide attractive yields and significant diversification to the Fund.

WHAT IS YOUR OUTLOOK FOR THE MARKET AND THE FUND?

The overall economic outlook remains solid. While the drag from housing could continue into the second half of the year, the potential impact on consumer spending is still the biggest cause for concern for 2007. The Federal Reserve (the "Fed") may allow the consumer to feel some pain relating to housing, but it is unlikely to allow a prolonged slump to occur in that sector. Even with inflation risk on the horizon, we believe the Fed may be likely to step in and lower rates if necessary to prevent a recession. The challenge the Fund now faces is navigating a fixed-income landscape of tight spreads, while safeguarding against highly susceptible credit positions should the economy pull back.

49.     On July 9, 2007, the FHY Fund filed its Form N-CSRS for the six-month period ending April 30, 2007. In the Semi-Annual Report, the fund reported an NAV of $190.7 million or $20.19 per share and a net realized and unrealized loss on investments of $2.1 million for the period. The Semi-Annual Report further provided substantially similar statements concerning the FHY Fund's performance and outlook as were contained in the FHI Fund's Semi-Annual Report.

50.     On July 9, 2007, the FHO Fund filed its Form N-CSRS for the six-month period ending April 30, 2007. In the Semi-Annual Report, the fund reported an NAV of $148.5 million or $19.15 per share and a net realized and unrealized loss on investments of $2,550 for the period. The Semi-Annual Report further provided substantially similar statements concerning the FHO Fund's performance and outlook as were contained in the FHI Fund's Semi-Annual Report.

51.     In the first half of August 2007, the Funds' shares declined in tandem with other closed-end fund shares as the credit crunch exposed the poor underlying fundamentals of the financial sector's mortgage risk management and problems with structured finance vehicles.  As a result of these concerns, the Fund's shares began to slide.  For example, FHI opened the month trading at $17.00 per share on August 1, 2007, and traded as low as $13.32 on August 15, 2007.  Thereafter, on August 17, 2007, as a result of positive actions taken by the Federal Open Market Committee in reducing the federal funds rate, the FHI Fund's shares began to climb, hitting the $15 range by the end of the month.

52.     On or about the twentieth of every month, the Funds report their regularly scheduled monthly distribution and the NAV of the Funds.  The NAV of the Funds remained relatively consistent up until August 2007.  For example, from September 2005 through July 2007, the FHI Fund reported an NAV in the $18 to $19 per share range.  However, on August 20, 2007, the FHI Fund reported an NAV of $16.12 per share.  Thereafter, the FHI Fund continued to report a lower NAV each month.  By August 2008, the FHI Fund reported an NAV of $8.52 per share.

53.     On January 10, 2008, the FHI Fund filed its Form N-CSR for year ending October 31, 2007.  In the Annual Report, the fund reported an NAV of $136.1 million or $15.16 per share and a net realized and unrealized loss on investments of $43.5 million for the year.  The Annual Report further provided in pertinent part the following concerning the fund's performance and outlook for the period:

MARKET RECAP

The six months ending October 31, 2007 have been the most treacherous the worldwide credit markets have seen in at least a decade, and perhaps ever. The problems that began earlier in the year in the sub-prime mortgage space spread to affect virtually every segment of the capital markets. Unprecedented supply and demand imbalances, combined with outright fear, drove prices down across the credit sectors, including corporate debt. In addition, the media focus that began last quarter intensified, generating waves of negative stories which frequently contained as much conjecture as they did fact. In short, by the end of the quarter, volatility and

illiquidity had reached unprecedented levels in the structured-finance universe. Due to these adverse market conditions, in early August the Sub-Advisor adopted a temporary defensive posture. While in such posture, the Fund curtailed its purchase of additional structured-finance securities, including residential mortgage-backed securities ("RMBS").

\* \* \*

FUND RECAP

The Fund was not immune to the massive downdraft in pricing across the credit sectors. The Fund's net asset value ("NAV") total return was -14.65% (1) for the twelve-month period ended October 31, 2007. The months of August and September were the most severe. Not surprisingly, RMBS experienced the greatest price pressure; however, virtually every asset class in the Fund produced negative price performance during the second half of the period. In the end, it was the Fund's diversification across multiple asset-backed sectors that helped offset the severe price declines in RMBS. These negative market conditions, along with investor fear, also punished the Fund's market price total return, which was -25.30% (2) for the twelve-month period covered by this report. Since the Fund's fiscal year-end, the credit markets have continued to experience significant volatility. These difficult conditions have continued to pressure market prices and have caused a significant decline in the Fund's NAV through December 28, 2007. The duration of this difficult time period is uncertain.

\* \* \*

MANAGER Q&A

HOW DID THE NEGATIVE FACTORS IN THE CREDIT MARKETS HURT THE MARKET?

The negative momentum, which started in the second quarter, picked up tremendous speed over the months of July and August and continued through the Fund's fiscal year ended October 31, 2007. Rating agencies announced that billions of dollars of mortgage-backed securities were being put on watch for a downgrade. In addition, continued forced liquidations dramatically increased the amount of bonds offered in the secondary market, often without any bid available. These trends significantly affected high yield fixed-income pricing and set the table for the subsequent meltdown. Over the next ten weeks, several prominent banks around the world faced insolvency crises; central banks would inject billions into the financial system; the commercial paper markets would seize up; the Federal Reserve would cut both the discount rate and the Fed Funds rate; and Wall Street would begin to announce billions of dollars of write-downs. We believe these events, among others, unleashed destructive forces in the mortgage and asset-backed sectors.

WHAT IS YOUR OUTLOOK FOR THE MARKET AND THE FUND?

Today, market participants are eagerly awaiting a return to normalcy in both secondary-market trading and primary issuance. This will be critical to ending this capital-market crisis and restoring a normal mortgage-lending environment. We believe the latter is an especially important variable in the Fund's longer-term performance for one simple reason: individual mortgage obligors of all types must have re-financing options. Without that liquidity in place, the capital markets will continue to struggle. In our opinion, most of the economic data shows the economy remains on solid footing, albeit with slower growth projected. With that intact, we believe the markets should be able to push through the storm and eventually re-establish liquidity for both the mortgage investor and borrower alike.

54.     On January 10, 2008, the FHY Fund filed its Form N-CSR for year ending October 31, 2007. In the Annual Report, the fund reported an NAV of $154.1 million or $16.31 per share and a net realized and unrealized loss on investments of $40.5 million for the year. The Annual Report further provided substantially similar statements concerning the FHY Fund's performance and outlook as were contained in the FHI Fund's Annual Report.

55.     On April 4, 2008, the FHO Fund filed its Form N-CSR for year ending January 31, 2008.[2] In the Annual Report, the fund reported an NAV of $92.2 million or $10.29 per share, representing a 62% decline in the fund's NAV in a nine-month period, and a net realized and unrealized loss on investments of $79.5 million for the year. The Annual Report further provided in pertinent part the following concerning the fund's performance and outlook for the period:

MARKET RECAP

The period from March 27, 2007 (commencement of operations) to January 31, 2008 encompassed one of the most turbulent time periods seen by the financial markets in decades. Multiple factors came together to exacerbate the problems that began with the late 2005 and 2006 vintage sub-prime mortgage sector. In short, the realization of poor loan underwriting, numerous margin calls, and periodic rating agency downgrades resulted in a raft of forced liquidations. This dramatically increased the amount of bonds offered in the secondary market relative to potential buyers and severely curtailed liquidity in the worldwide financial system. In the end,

---

[2]     The FHO Fund's original fiscal year end was October 31st. In January 2008, the fund changed its fiscal year end to January 31st.

all of this worked together to push fixed-income pricing down month after month and created a vicious cycle still affecting the markets today in early 2008.

To date, financial institutions around the world have announced roughly $130 billion in write downs; central banks have injected billions into the financial system; the commercial paper markets have seized up and contracted in size; the Federal Reserve has cut both the discount rate and the Federal funds rate, the latter nearly in half; and large banks have been limited in their ability to lend due to an accumulation of unsold corporate loans. Global issuance of residential mortgage-backed securities and collateralized debt obligations have fallen sharply, down anywhere from 50% to 75%. The private equity market stumbled as well, with nearly $200 billion of acquisitions failing to close. In our opinion, the year 2007 may be one for the history books, as the massive contraction in liquidity created what might be the worst credit market since the Great Depression.

FUND RECAP

The Fund's negative net asset value (NAV) performance (commencement of operations to January 31, 2008) was driven by the unforgiving market conditions. FHO's NAV total return 1 was -40.91% versus the Lehman Brothers Ba Index return of 05% over the same period. The last three months of the reporting period were among the worst for the Fund as the number of sellers increased considerably. This put pressure on every asset class in the portfolio. Residential mortgage-backed securities were the hardest hit, followed by collateralized debt obligations, and then corporate high-yield debt. In the speculative-grade corporate bond universe, overall sentiment was negative as well, despite liquidity that was immeasurably superior to that of structured finance. However, given the widespread fallout of the global liquidity strain, corporate high-yield investors began to position their portfolios for a rise in default rates, and spreads widened accordingly.

FHO's market price declined along with the NAV for most of the period, finishing with a -33.09% market value total return 2 (commencement of operations to January 31, 2008). The Fund has traded at a premium a few times since inception, but has spent most of the time at a discount. At its low the Fund's discount to NAV reached -17.3%, and the average for the period was roughly -1.7% to NAV. Given the breadth of the illiquidity effect, the periodic discount applied by the market is not surprising and price volatility will likely continue for the foreseeable future until the structured markets show they have stabilized.

The Fund has taken a number of steps to shield itself from these damaging trends. First, it halted purchases of structured finance securities for a number of months until prices had fallen sufficiently to justify re-entry into the marketplace. Second, it has maintained a large cash position over this tumultuous period, finishing the fiscal year ended January 31, 2008, with a balance of roughly $17 million, or 18.3% of total assets. Finally, the Fund has not employed any leverage since inception to avoid being forced to sell assets at greatly depressed prices.

\*      \*      \*

PORTFOLIO MANAGER Q&A

WHAT IS YOUR OUTLOOK FOR THE MARKET?

At fiscal year-end, obstacles to a normal market remain in place, in our opinion. First, despite a recent increase in secondary trading, volume is still far below normal, and primary issuance is virtually non-existent. Second, fears of a recession are growing, which keeps investors cautious. Third, with numerous mortgage companies having limited new loan origination, or having ceased operations altogether, large numbers of homeowners have been left unable to re-finance their loans. Tied to that, 2008 will be the year that a steady stream of mortgage resets occur, which we believe the market will watch closely before jumping back into this sector.

As the ultimate impact of these market factors becomes clearer, secondary-market trading and primary issuance should begin to return to normal, in our opinion, gradually restoring liquidity to the markets in general, and the structured-finance space in particular. We believe this will be critical to the long-term performance of the Fund's holdings for one simple reason: individual mortgage holders of all types must have financing options available. Until credit is restored at the homeowner level, the securities backed by these obligors will be subject to amplified credit risk, as will the financial markets as a whole.

While this will likely be a slow process, there is a "silver lining" to this strained environment: favorable buying opportunities started to materialize late in the fourth quarter. For months, bonds had been falling in price, but despite investors' eagerness to buy at these low levels, most sellers refused to trade and take losses, hoping for improved conditions and better prices later. This began to change in November 2007, when, for the first time in months, meaningful trading began to take place. Although in the near-term, the markets are likely to remain volatile and credit risk heightened, this shift should allow the Fund to selectively add to its holdings over the months to come as the markets gradually return to normal.

56.    On July 7, 2008, the FHI Fund filed its Form N-CSRS for the six-month period ending April 30, 2007.  In the Semi-Annual Report, the fund reported an NAV of $96.33 million or $10.71 per share, representing a 44% decline in the fund's NAV in a one-year period, and a net realized and unrealized loss on investments of $41.0 million for the year.  The Semi-Annual Report further provided in pertinent part the following concerning the fund's performance and outlook for the period:

MARKET RECAP

For the First Trust Strategic High Income Fund, the six months ending April 30, 2008 were painfully similar to the previous semi-annual period ending October 31, 2007. Persistent, systemic illiquidity and troublesome macroeconomic conditions kept pricing in all but the safest asset classes under heavy pressure. By period-end, cumulative, global credit losses had grown to more than $300 billion since the crisis began in the summer of 2007. The real story of the last six months, however, was Bear Stearns' abrupt disappearance from the financial landscape. In mid-March fretful clients and customers produced an old-fashioned "run-on-the-bank" and cut its stock price 92% in three trading days. To avert a total catastrophe, the Federal Reserve took decisive action. It forced a sale of the 85-year old, top-five institution to JPMorgan Chase and in its first emergency meeting in almost 30 years, cut the discount rate 25 basis points and became the lender of last resort to all primary dealers. Cumulatively, over the six-month period, the Federal Reserve made significant cuts to rates to help unwind the tight credit conditions; it reduced both the Federal Funds Rate and Discount Rate by 250 and 275 basis points, respectively, cutting each more than 50%.

PERFORMANCE ANALYSIS

These extraordinarily destructive market trends, along with underperformance in several asset sectors in the portfolio, caused negative net asset value (NAV) and market performance for FHI for the period. The Fund's NAV total return was -23.26% and its market-price performance, -2.61%. In contrast, the Lehman Bros. Ba Index returned +0.23%. The Fund's focus on structured finance securities caused the wide divergence in NAV performance from its stated benchmark, which is composed almost entirely of high-yield corporate debentures. In general, corporate debt has experienced less pricing pressure than the structured markets, which have been the focus of much of the fear plaguing financial systems worldwide.

This anxiety hit all of the Fund's holdings, but it was residential mortgage-backed securities (RMBS) that declined the most in price. Liquidity in this asset class remained far below normal for the period and further declines in housing prices led a growing number of obligors to stop paying their mortgages. The result has been a rise in delinquencies and foreclosures nationwide and deterioration in the collateral profile of all types of mortgage-backed securities. The Fund's RMBS have experienced this strain as well, and over the coming quarters may see a reduction in cash flows. While RMBS pricing already reflects a very negative outcome for the residential housing market, any potentially adverse dividend impact will be dictated by the resulting level and timing of losses on the underlying mortgage collateral. Ultimately, the performance of the underlying loans will depend on a host of factors, not the least of which is an improving macroeconomic environment.

These challenging conditions penalized other asset classes in the Fund's portfolio as well. Collateralized debt obligations (CDOs) were, on average, sharply negative over the semi-annual period and second only to mortgage-backed securities in negative price performance. Growing credit concerns worked against this sector

and continue to impede any broad recovery. Commercial mortgage-backed securities (CMBS) and corporate bonds also suffered. Limited buyers and fears of a recession hitting the commercial property market weighed heavily on CMBS, even though the overall collateral performance has remained healthy. Corporate bonds traded off in price due to a deteriorating economic picture and rising default expectations among investors. Finally, asset-backed securities, such as those collateralized by franchise loans, manufactured housing, and aircraft leases, also dropped in price. While most of these assets are "seasoned," older deals that have maintained a favorable credit profile, the market's widespread re-pricing of structured credit risk hurt the Fund's holdings in these categories.

MARKET & FUND OUTLOOK

Obviously, overall market conditions remain difficult. Secondary trading languishes far below normal levels. Primary issuance is virtually non-existent except in credit card, auto, and student loan-backed deals. In addition, the uncertainty of a recession continues to hang over the market. On a positive note, however, we believe attractive assets have begun to reappear, albeit intermittently, as bid lists and forced liquidations hit the market. Over time we anticipate that the Fund should be able to acquire bonds at prices offering the potential for attractive long-term total return. This will be a gradual process but one that should reward patient investors, as the financial world stabilizes and liquidity, at both the corporate and consumer levels, returns to normal.

57.     On July 7, 2008, the FHY Fund filed its Form N-CSRS for the six-month period ending April 30, 2007.  In the Semi-Annual Report, the fund reported an NAV of $117.7 million or $12.44 per share, representing a 38% decline in the fund's NAV in a one-year period, and a net realized and unrealized loss on investments of $37.9 million for the year.  The Semi-Annual Report further provided substantially similar statements concerning the FHY Fund's performance and outlook as were contained in the FHI Fund's Semi-Annual Report.

58.     As a result of these disclosures, the price of the Funds' shares collapsed.  The FHI Fund's shares closed at $10.22 per share on July 7, 2008, an all-time low for the FHI Fund's shares and a decline of over 52% from its Class Period high.  The Funds' shares have continued to decline. The FHI Fund has continued to slide and is currently trading in the $8 per share range, closing as low as $8.02 per share on August 13, 2008.

59. The true facts, which were known by certain of the defendants but concealed from the investing public during the Class Period, were as follows:

(a) The Funds lacked effective controls and hedges to minimize the risk of loss from mortgage delinquencies which affected a large part of their portfolios;

(b) The Funds lacked effective internal controls to ensure that the Funds would remain in compliance with their restrictions and limitations related to their investment portfolios and strategies;

(c) The extent of the Funds' liquidity risk due to the illiquid nature of a large portion of the Funds' portfolios was omitted;

(d) The extent of the Funds' risk exposure to mortgage-backed assets was misstated; and

(e) The extent to which the Funds' portfolios were subject to fair value procedures was misstated.

## THE FUNDS' GAAP VIOLATIONS

60. The Funds' annual reports contained false financial reports through improper accounting entries, which inflated the Funds' reported asset valuations.

61. The Funds' financial statements were not a fair presentation of their results and were presented in violation of Generally Accepted Accounting Principles ("GAAP") and SEC rules.

62. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need

not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

63.    Under GAAP, mutual funds are required to value their portfolios at fair value. For securities that trade on an open market exchange, the fair value of the securities would simply involve the fair market value of the securities based upon the closing price of a security on a given day. Nonetheless, when more exotic securities like mortgage-backed securities are involved, it is a much more complex process in determining fair value of the assets given the assets do not trade on an open-market exchange and thus fair market value is not as readily available or apparent. Accordingly, one of the FHI Fund's most significant accounting policies is its investment valuations. In the FHI Fund's Form N-CSRS for the six-month period ending April 30, 2007, it described its valuation policy as follows:

> The net asset value ("NAV") of the Common Shares of the Fund is computed based upon the value of the Fund's portfolio securities and other assets less any accrued liabilities. The NAV is determined as of the close of regular trading on the NYSE, normally 4:00 p.m. Eastern Time, on each day the NYSE is open for trading. Domestic debt securities and foreign securities are priced using data reflecting the earlier closing of the principal markets for those securities. The Fund calculates NAV per Common Share by subtracting the Fund's liabilities (including accrued expenses, dividends payable and any borrowings of the Fund) from the Fund's Total Assets (the value of the securities and other investments the Fund holds plus cash or other assets, including interest accrued but not yet received) and dividing the result by the total number of Common Shares outstanding.

> The Fund's investments are valued daily at market value or, in the absence of market value with respect to any portfolio securities, at fair value according to procedures adopted by the Fund's Board of Trustees. A majority of the Fund's assets are valued using market information supplied by third parties. In the event that market quotations are not readily available, the pricing service does not provide a valuation for a particular asset, or the valuations are deemed unreliable, or if events occurring after the close of the principal markets for particular securities (e.g., domestic debt and foreign securities), but before the Fund values its assets, would materially affect NAV, First Trust Advisors L.P. ("First Trust") may use a fair value method to value the Fund's securities and investments. The use of fair value pricing by the Fund is governed by valuation procedures adopted by the Fund's Board of Trustees and in accordance with the provisions of the 1940 Act.

Portfolio securities listed on any exchange other than the NASDAQ National Market ("NASDAQ") are valued at the last sale price on the business day as of which such value is being determined. If there has been no sale on such day, the securities are valued at the mean of the most recent bid and asked prices on such day. Securities traded on the NASDAQ are valued at the NASDAQ Official Closing Price as determined by NASDAQ. Portfolio securities traded on more than one securities exchange are valued at the last sale price on the business day as of which such value is being determined at the close of the exchange representing the principal market for such securities. Portfolio securities traded in the over-the-counter market, but excluding securities traded on the NASDAQ, are valued at the closing bid prices. Short-term investments that mature within 60 days are valued at amortized cost.

64. The FHY Fund and the FHO Fund made similar disclosures in their Form N-CSR filings in July 2007 for the semi-annual period ending April 30, 2007.

65. Nonetheless, in violation of GAAP and its own stated policy, the Funds failed to properly value their mortgage-backed assets and distressed securities, thus overstating the Funds' assets. In fact, the mortgage-backed securities could only be valued by requesting bids from trading desks and defendants' supposed "good faith" valuations were not reflective of the underlying weakness in those assets. Similarly, the Funds failed to properly value mortgage-backed assets, thus overstating their NAV in violation of GAAP and their own stated policy.

66. Due to these accounting improprieties, the Funds presented their financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a) The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b) The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered

was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

67.     Further, the undisclosed adverse information is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## LOSS CAUSATION/ECONOMIC LOSS

68.     By misrepresenting the Funds' investing outlook, the defendants presented a misleading picture of the Funds' portfolio and financial prospects. Thus, instead of truthfully disclosing during the Class Period that the Funds' portfolios were not as healthy as represented, the Funds falsely reported their investing outlook and their actual financial prospects going forward.

69.     These claims of profitability caused and maintained the artificial inflation in the Funds' share prices throughout the Class Period and until the truth was revealed to the market.

70.     Defendants' false and misleading statements had the intended effect and caused the Funds' shares to trade at artificially inflated levels throughout the Class Period. The FHI Fund reached its Class Period high of $21.35 per share in October 2006. The FHY Fund reached its Class Period high of $21.42 per share in December 2006. The FHO Fund reached its Class Period high of $20.64 per share in April 2007.

71.     The truth about the Funds' portfolios, investing outlook and financial prospects began to enter the market with a series of partial disclosures and revelations which were accompanied by denials and continuing misrepresentations by defendants. As a result, the artificial inflation in the Funds' shares prices did not come out of the shares all at once, rather the artificial price inflation

came out over time, in bits, pieces, and spurts as the shares continued to trade at artificially inflated, albeit lower, prices through July 2008.

72. As a direct result of defendants' admissions and the public revelations regarding the truth about the Funds' portfolios, investing outlook and actual financial prospects going forward, the FHI Fund's share price plummeted 52%, falling from $21.35 per share in October 2006 – its all time Class Period high – to $10.22 per share on July 7, 2008 – a drop of $11.13 per share. The FHY Fund's share price plummeted 51%, falling from $21.42 per share in December 2006 – its all time Class Period high – to $10.52 per share on July 7, 2008 – a drop of $10.90 per share. The FHO Fund's share price plummeted 59%, falling from $20.64 per share in April 2007 – its all time Class Period high – to $8.46 per share on July 7, 2008 – a drop of $12.18 per share.

## CLASS ACTION ALLEGATIONS

73. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired shares of the Funds during the Class Period, including all persons or entities who acquired shares of the Funds pursuant and/or traceable to the Funds' false and misleading Registration Statements, and who were damaged thereby (the "Class"). Excluded from the Class are defendants.

74. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. The Funds have tens of millions of shares outstanding, owned by hundreds if not thousands of persons.

75. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) whether the federal securities laws were violated by defendants;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the Funds;

(c)    whether statements made by defendants to the investing public in the Registration Statements misrepresented material facts about the Funds;

(d)    whether defendants acted with the required state of mind;

(e)    whether defendants concealed the Funds' exposure to mortgage-related investments made by defendants First Trust, Hilliard and Valhalla; and

(f)    the extent of damage sustained by Class members and the appropriate measure of damages.

76.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

77.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

78.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

79.    Plaintiff incorporates ¶¶1-78 by reference.

80.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

81.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of shares in the Funds during the Class Period.

82.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Funds' shares. Plaintiff and the Class would not have purchased the Funds' shares at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

83.     Plaintiff incorporates ¶¶1-82 by reference.

84.     The Individual Defendants and the Funds' Adviser and Sub-Advisers acted as controlling persons of the Funds within the meaning of §20(a) of the 1934 Act. By reason of their positions and relationship with the Company, the Individual Defendants and the Funds' Adviser and Sub-Advisers had the power and authority to cause the Funds to engage in the wrongful conduct complained of herein. The Funds controlled the Individual Defendants and all of their employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## COUNT III

### Violations of Section 11 of the 1933 Act
### Against All Defendants

85.     Plaintiff repeats and realleges ¶¶14-36 and 73-78 set forth above, emphasizing that plaintiff explicitly excludes any allegation herein that could be construed to allege intentional or reckless misconduct.

86.     This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

87.     The Registration Statements for the offerings were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

88.     First Trust Portfolios is the registrant for the Funds.  The defendants named herein were responsible for the contents and dissemination of the Registration Statements.

89.     As issuers of the shares, the Funds are strictly liable to plaintiff and the Class for the misstatements and omissions.

90.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading.

91.     By reasons of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

92.     Plaintiff acquired the Funds' shares pursuant to the Registration Statements.

93.     Plaintiff and the Class have sustained damages.  The value of the Funds' shares has declined substantially subsequent to and due to defendants' violations.

94.     At the times plaintiff purchased the Funds' shares, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and

could not have reasonably discovered those facts prior to late 2007. Less than one year has elapsed

from the time that plaintiff discovered or reasonably could have discovered the facts upon which this

complaint is based to the time that plaintiff filed this Complaint. Less than three years has elapsed

between the time that the securities upon which this Count is brought were sold to the public and the

time a complaint was filed alleging the violations.

## COUNT IV

### Violations of Section 12(a)(2) of the 1933 Act
### Against All Defendants

95.     Plaintiff repeats and realleges ¶¶14-36, 73-78 and 85-94 set forth above, emphasizing

that plaintiff explicitly excludes any allegation herein that could be construed to allege intentional or

reckless misconduct.

96.     This Count is brought pursuant to §12(a)(2) of the 1933 Act on behalf of the Class,

against all defendants.

97.     Defendants were sellers and offerors and/or solicitors of purchasers of the shares

offered pursuant to the Funds' Prospectuses.

98.     The Funds' Prospectuses contained untrue statements of material facts, omitted to

state other facts necessary to make the statements made not misleading, and omitted to state material

facts required to be stated therein. The Individual Defendants' actions of solicitation included

participating in the preparation of the false and misleading Prospectuses and participating in road

shows to market the Funds to investors.

99.     Defendants owed to the purchasers of the Funds' shares, including plaintiff and other

Class members, the duty to make a reasonable and diligent investigation of the statements contained

in the offering materials, including the Funds' Prospectuses, to ensure that such statements were true

and that there was no omission to state a material fact required to be stated in order to make the

statements contained therein not misleading. Defendants in the exercise of reasonable care should

have known of the misstatements and omissions contained in the offering materials as set forth above.

100.     Plaintiff and other members of the Class purchased or otherwise acquired the Funds' shares pursuant and/or traceable to the defective Prospectuses.  Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses.

101.     Plaintiff, individually and representatively, hereby offers to tender to defendants those securities which plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon.  Class members who have sold their Funds shares are entitled to rescissory damages.

102.     By reason of the conduct alleged herein, these defendants violated, and/or controlled a person who violated, §12(a)(2) of the 1933 Act.  Accordingly, plaintiff and members of the Class who hold the Funds' shares purchased in the offerings have the right to rescind and recover the consideration paid for their shares and hereby elect to rescind and tender their shares to the defendants sued herein.  Plaintiff and Class members who have sold their shares are entitled to rescissory damages.

## COUNT V

### Violations of Section 15 of the 1933 Act
### Against the Individual Defendants

103.     Plaintiff repeats and realleges ¶¶14-36, 73-78 and 85-102 set forth above, emphasizing that plaintiff explicitly excludes any allegation herein that could be construed to allege intentional or reckless misconduct.

104.     This Count is brought pursuant to §15 of the 1933 Act against the Individual Defendants.

105.     Each of the Individual Defendants was a control person of the Funds by virtue of their positions as a trustee and/or senior officer of the Funds.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other trustees and/or officers and/or major shareholders of the Funds.

106.     Each of the Individual Defendants was a culpable participant in the violations of §§11 and 12(a)(2) of the 1933 Act as alleged in Counts III and IV above, based on their having signed the Registration Statements and having otherwise participated in the process which allowed the Funds' offerings to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding plaintiff and the members of the Class damages, including interest;

C.     Awarding rescission or a rescissory measure of damages;

D.     Awarding plaintiff's reasonable costs and attorneys' fees; and

E.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  September 11, 2008                    Attorneys for Plaintiff


                                        s/Marvin A. Miller
_____
MARVIN A. MILLER
LORI A. FANNING
MILLER LAW LLC
115 S. LaSalle Street, Suite 2910
Chicago, IL  60603
Telephone:  312/676-2665
312/686-2676 (fax)

JOHN J. STOIA, JR.
DAVID C. WALTON
CATHERINE J. KOWALEWSKI
COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
 655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

PETER J. MOUGEY
LEVIN, PAPANTONIO, THOMAS,
  MITCHELL, ECHSNER, & PROCTOR, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL  32502
Telephone:  850/435-7072
850/436-6068 (fax)

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

ROGER J. GOSSELIN ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

FIRST TRUST

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _8_ day of _September_, 2008.

_____

ROGER J. GOSSELIN

- 2 -

FIRST TRUST

SCHEDULE A

SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 03/27/2007 | 12,500 | $20.00 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 07/28/2008 | 12,500 | $7.89 |