# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ROGER J. GOSSELIN, individually and on behalf of all others similarly situated

        Plaintiff

    v.

FIRST TRUST ADVISORS L.P., *et al.*

        Defendants

**Consolidated Action No. 08-CV-05213**

Honorable Samuel Der-Yeghiayan

---

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

**KRISLOV & ASSOCIATES, LTD.**
Clinton A. Krislov
Jeffrey M. Salas
20 North Wacker Drive
Suite 1350
Chicago, Illinois 60606
Telephone: (312) 606-0500
Facsimile: (312) 606-0207

*Liaison Counsel for Plaintiffs and the Classes*

**BROWER PIVEN**
  A Professional Corporation
Charles J. Piven
Yelena Trepetin
World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202
Telephone: (410) 332-0030
Facsimile: (410) 685-1300

*Counsel for Plaintiffs and Lead Counsel for the Classes*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ………………………………………………… iii

INTRODUCTION…………………………………………………………. 1

STATEMENT OF FACTS……………………………………………… 3

    The Funds and Their Management ………………………………….................. 3

    Misrepresentations About the Funds' NAVs, Valuations, Controls and
      GAAP Compliance ……………………………….…………………………… 4

    Materially False and Misleading Statements About Investment Strategies
      And Risks…………………………………….…………………………….. 5

    Materially False and Misleading Statements About the Funds' Management
      Fees……..…………………………..……………………………………… 6

    Plaintiffs and Members of the Classes Were Damaged by the
      Misrepresentations………………………………………………………… 6

ARGUMENT …………………………………………………………… 7

  I.     LEGAL STANDARD ON A MOTION TO DISMISS……………………… 7

  II.    PLEADING REQUIREMENTS FOR A SECURITIES ACT CLAIM……… 8

  III.   PLEADING REQUIREMENTS FOR A SECTION 10(b) CLAIM…………. 10

  IV.   PLAINTIFFS ALLEGE ACTIONABLE MISTATEMENTS AND
       OMISSIONS UNDER THE SECURITIES ACT AND EXCHANGE ACT… 11

      A.   Materially False and Misleading Statements About the Funds'
          Valuations and Internal Controls ……………………………….. 12

      B.   Materially False and Misleading Statements About the Funds'
          Investment Strategies and Risks........................................... 19

      C.   Materially False and Misleading Statements About the Funds' Fees….. 23

  V.    PLAINTIFFS HAVE ALLEGED FACTS GIVING RISE TO A STRONG
      INFERENCE OF *SCIENTER* FOR VIOLATIONS OF THE EXCHANGE
      ACT……………………………………………………………………… 24

A.  Defendants Were Aware of Facts and/or Had Access to Information Contrary to Their Public Statements............................................ 25

B.  Defendants' GAAP Violations Provide Evidence of *Scienter*.............. 28

C.  The Replacement of Hilliard Lyons Provides Evidence of *Scienter*...... 29

D.  The SOX Certifications Provide Evidence of *Scienter*..................... 30

E.  Motive Has Been Adequately Pleaded......................................... 30

F.  Defendants' "Good Faith" Argument is Premature and Has No Basis.... 32

VI.  THE COMPLAINT IS NOT PREDICATED ON MISMANAGEMENT...... 34

VII.  PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS.......................................................................... 37

VIII.  PLAINTIFFS DID NOT HAVE KNOWLEDGE................................. 41

IX.  PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION................ 43

X.  PLAINTIFFS ADEQUATELY ALLEGE CONTROL PERSON LIABILITY............................................................................ 49

CONCLUSION............................................................................... 50

# TABLE OF AUTHORITIES

## CASES

*In re 2007 Novastar Fin., Inc.*, No. 07-0139, 2008 U.S. Dist. LEXIS 44166
    (W.D. Mo. June 4, 2008) ...................................................................................7, 47

*7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211
    (5th Cir. 1994).............................................................................................34, 35

*AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC*, No. 01-11448, 2005
    U.S. Dist. LEXIS 21605 (S.D.N.Y. Sept. 26, 2005).....................................28

*Abrams v. Van Kampen Funds, Inc.*, No. 01-7538, 2002 U.S. Dist. LEXIS 9814
    (N.D. Ill. May 29, 2002) ...................................................14, 36, 38, 40, 41

*Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372 (E.D.N.Y. 2009) ...................34

*In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005) ...................28

*Alvarado v. Litscher*, 267 F.3d 648 (7th Cir. 2001)..........................................42

*In re Am. Bank Note Holographics Sec. Litig.*, 93 F. Supp. 2d 424
    (S.D.N.Y. 2000)................................................................................................32

*Antell v. Arthur Andersen LLP*, No. 97-3456, 1998 U.S. Dist. LEXIS 7183
    (N.D. Ill. Apr. 30, 1998) .................................................................................38

*In re Apollo Group Inc. Sec. Litig.*, 395 F. Supp. 2d 906 (D. Ariz. 2005) ........31

*In re Apple Computer Sec. Litig.*, 886 F.2d 1109 (9th Cir. 1989) .....................39

*Ashcroft v. Iqbal*, No. 07-1015, __ U.S. __, 129 S. Ct. 1937 (2009)..................7

*In re Aspeon Sec. Litig.*, No. 04-55651, 2006 U.S. App. LEXIS 4673
    (9th Cir. Feb. 23, 2006).................................................................................28

*Atchley v. Qonaar Corp.*, 704 F.2d 355 (7th Cir. 1983)....................................35

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474
    (S.D.N.Y. 2004)........................................................................................26, 28

*Basic, Inc. v. Levinson*, 485 U.S. 224 (1988)......................................11, 12, 47

*Bastian v. Petren Res. Corp.*, 892 F.2d 680 (7th Cir. 1990).................................................49

*Beck v. Dobrowski*, No. 06-6411, 2007 U.S. Dist. LEXIS 84093
    (N.D. Ill. Nov. 14, 2007)........................................................................................45

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).........................................................7

*Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008)................................47

*Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65 (S.D.N.Y. 2000)................................42

*Betz v. Trainer Wortham & Co.*, 519 F.3d 863 (9th Cir. 2008).....................................39

*Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502 (7th Cir. 2007).........................9

*Caterpillar v. Great Am. Ins. Co.*, 62 F.3d 955 (7th Cir. 1995)....................................25

*Cent. Laborers' Pension Fund v. Sirva, Inc.*, No. 04-7644, 2006 U.S. Dist. LEXIS
    73375 (N.D. Ill. Sept. 22, 2006)..............................................................................49

*In re Centocor, Inc. Sec. Litig. III*, No. 98-260, 1998 U.S. Dist. LEXIS 18909
    (E.D. Pa. Dec. 1, 1998).........................................................................................32

*Chalverus v. Pegasys., Inc.*, 59 F. Supp. 2d 226 (D. Mass. 1999)..................................29

*In re Charles Schwab Corp. Sec. Litig.*, No. 08-01510, 2009 U.S. Dist. LEXIS
    8125 (N.D. Cal. Feb. 4, 2009)...............................................................................23

*Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815 (N.D. Ill. 2000).......................................28

*City of Brockton Ret. Sys. v. Shaw Group Inc.*, 540 F. Supp. 2d 464
    (S.D.N.Y. 2008)..................................................................................................25

*City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245 (10th Cir. 2001)............................11

*In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314 (S.D.N.Y. 2001).............26, 30, 32

*In re CornerStone Propane Partners., L.P. Sec. Litig.*, 416 F. Supp. 2d 779
    (N.D. Cal. 2005)..............................................................................................25, 26

*Cosmas v. Hassett*, 886 F.2d 8 (2d Cir. 1989)............................................................26

*In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008).......7, 47

*In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34 (D. Mass. 2006).......................46

*Danis v. USN Commc'ns., Inc.*, 73 F. Supp. 2d 923 (N.D. Ill. 1999) ................................9

*In re Daou*, 411 F.3d 1006 (9th Cir. 2005) ..........................................................28, 47, 48

*Davidco Investors, LLC v. Anchor Glass Container Corp.*, No. 8:04-2561, 2006
    U.S. Dist. LEXIS 11527 (M.D. Fla. Mar. 6, 2006) ...................................................16

*DeMarco v. Lehman Bros., Inc.*, 309 F. Supp. 2d 631 (S.D.N.Y. 2004) ..........................46

*Denny v. Barber*, 576 F.2d 465 (2d Cir. 1978) ................................................................37

*Deutschman v. Beneficial Corp.*, 132 F.R.D. 359 (D. Del. 1990) ....................................43

*In re Digi Int'l Inc. Sec. Litig.*, 6 F. Supp. 2d 1089 (D. Minn. 1998) ..............................16

*In re Donna Karan Int'l Sec. Litig.*, No. 97-2011, 1998 U.S. Dist. LEXIS 22435
    (E.D.N.Y. Aug. 14, 1998) ..........................................................................................34

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98-4318, 2000 U.S. Dist.
    LEXIS 94 (S.D.N.Y. Jan. 6, 2000) .............................................................................23

*Duane v. Altenburg*, 297 F.2d 515 (7th Cir. 1962) .........................................................14

*Dugan v. Selco Indus.*, No. 96-8404, 1997 U.S. Dist. LEXIS 17737
    (N.D. Ill. Nov. 4, 1997) ..............................................................................................50

*Dunn v. Borta*, 369 F.3d 421 (4th Cir. 2004) ..................................................................42

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ..........................................43, 44, 45

*In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88 (S.D.N.Y. 2006) ..........30

*Eckstein v. Balcor Film Investors*, 8 F.3d 1121 (7th Cir. 1993) ......................................22

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189
    (2d Cir. 2003) .............................................................................................................44

*Endo v. Albertine*, 863 F. Supp. 708 (N.D. Ill. 1994) ...............................................8, 43

*Engel v. Sexton*, No. 06-10447, 2009 U.S. Dist. LEXIS 12778
    (E.D. La. Feb. 11, 2009) .............................................................................................33

*In re Envoy Corp. Sec. Litig.*, 133 F. Supp. 2d 647 (M.D. Tenn. 2001) .....................12, 45

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ...........................................................8

*Evergreen Fund, Ltd. v. McCoy*, No. 00-0767, 2000 U.S. Dist. LEXIS 16876
(N.D. Ill. Nov. 1, 2000)..................................................................................9, 10

*Feiner v. SS&C Techs., Inc.*, 11 F. Supp. 2d 204 (D. Conn. 1998) ................................22

*Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544 (E.D.N.Y. 1971) .........41

*In re First Merchs. Acceptance Corp. Sec. Litig.*, No. 97-2715, 1998 U.S. Dist.
LEXIS 17760 (N.D. Ill. Nov. 4, 1998) ...................................................................8, 9

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 411 F. Supp. 2d 377
(S.D.N.Y. 2006)..................................................................................................43

*Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957 (D. Wis. 2003)...............................9, 10

*Fry v. UAL Corp.*, 895 F. Supp.1018 (N.D. Ill. 1995)......................................................35

*Fujisawa Pharm. Co. v. Kapoor*, 115 F.3d 1332 (7th Cir. 1997).................................38

*GE Cap.Corp. v. Lease Resolution Corp.*, 128 F.3d 1074 (7th Cir. 1997).......................8

*Gallagher v. Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001)...............................................11

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2nd Cir. 2000) ...........................................12

*Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597 (S.D.N.Y. 2008) ...............................45

*Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824 (8th Cir. 2003) ...................................48

*Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10 (D. Mass. 2000)....................................29

*Giarraputo v. Unumprovident Corp.*, No. 99-301, 2000 U.S. Dist. LEXIS 19138
(D. Me. Nov. 8, 2000).......................................................................................12, 45

*Gray v. First Winthrop Corp.*, 82 F.3d 877 (9th Cir. 1996) ............................................49

*Greenwald v. Integrated Energy, Inc.*, 102 F.R.D. 65 (S.D. Tex. 1984).......................41

*Gross v. Medaphis Corp.*, 977 F. Supp. 1463 (N.D. Ga. 1997)......................................32

*Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212
(S.D.N.Y. 2008)................................................................................................29, 30

*Haralson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014 (5th Cir. 1990), *overruled on
other grounds by Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1995) .......................42

*Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392 (7th Cir. 1995)..........................11

*Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873 (7th Cir. 1992)..........................50

*Hefferman v. Bass*, 467 F.3d 596 (7th Cir. 2006) ...............................................................11

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983) ..................................................8

*Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753 (7th Cir. 2007) ....................................28

*In re Hollinger Int'l, Inc. Sec. Litig.*, No. 04-0834, 2006 U.S. Dist. LEXIS 47173
    (N.D. Ill. June 28, 2006) .............................................................................................34

*Hubbard v. BankAtlantic Bancorp, Inc.*, No. 07-61543 ....................................................26

*Hunt v. Alliance North Am. Gov't Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998).........23

*In re Ibis Tech. Sec. Litig.*, 422 F. Supp. 2d 294 (D. Mass. 2006)....................................32

*In re Immucor Inc. Sec. Litig.*, No. 1:05-2276, 2006 U.S. Dist. LEXIS 72335
    (N.D. Ga. Oct. 4, 2006).................................................................................................19

*In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983 (S.D. Cal. 2005)................22, 48

*In re TyCom Ltd. Sec. Litig.*, No. 03-1352, 2005 U.S. Dist. LEXIS 19154
    (D.N.H. Sept. 2, 2005) .................................................................................................48

*In re Indep. Energy Holdings, PLC Sec. Litig.*, 154 F. Supp. 2d 741
    (S.D.N.Y. 2001).............................................................................................................22

*In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003)..................41

*In re JDS Uniphase Corp. Sec. Litig.*, No. 02-1486, 2005 U.S. Dist. LEXIS 20831
    (N.D. Cal. Jan. 6, 2005) ...............................................................................................16

*In re JPMorgan Chase & Co. Sec. Litig.*, No. 06-4674, 2007 U.S. Dist. LEXIS
    93877 (N.D. Ill. Dec. 18, 2007) ...................................................................................31

*Joffee v. Lehman Bros., Inc.*, 410 F. Supp. 2d 187 (S.D.N.Y. 2006)................................16

*Jones v. Simek*, 193 F.3d 485 (7th Cir. 1999) ......................................................................7

*Klein v. PDG Remediation*, 937 F. Supp. 323 (S.D.N.Y. 1996).......................................12

*Knowles v. Hopson*, No. 07-6131, 2008 U.S. Dist. LEXIS 46106

(N.D. Ill. June 12, 2008) .......................................................................11

*LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148 (2d Cir. 2003) ........39

*In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230 (N.D. Cal. 2008) ..............................48

*Sloman v. Presstek*, No. 06-377, 2007 U.S. Dist. LEXIS 69475
(D.N.H. Sept. 18, 2007) ......................................................................48

*Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221 (S.D.N.Y. 2006)..................46

*In re Lattice Semiconductor Corp. Sec. Litig.*, No. 04-1255, 2006 U.S. Dist.
LEXIS 262 (D. Or. Jan. 3, 2006) ..............................................17, 30, 32

*Law v. Medco Research, Inc.*, 113 F.3d 781 (7th Cir. 1997)...........................................40

*Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02-5893, 2006 U.S.
Dist. LEXIS 36603 (N.D. Ill. Apr. 24, 2006) ..............................................44

*Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005) ..................................44

*Lerner v. FNB Rochester Corp.*, 841 F. Supp. 97 (W.D.N.Y. 1993)................................36

*Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268 (S.D.N.Y. 2007)................................43, 44

*In re Loewen Group, Inc. Sec. Litig.*, 395 F. Supp. 2d 211 (E.D. Pa. 2005) ...................45

*In re Bristol Myers Squibb*, No. 00-1990, 2005 U.S. Dist. LEXIS 18448
(D.N.J. Aug. 17, 2005).......................................................................45

*Lyne v. Arthur Andersen & Co.*, 772 F. Supp. 1064 (N.D. Ill. 1991) ..............................43

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702 (7th Cir. 2008).....25, 26, 27, 34

*Marks v. CDW Computer Ctrs., Inc.*, 122 F.3d 363 (7th Cir. 1997)................................38

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452
(S.D.N.Y. 2006)..................................................................................11

*Mayer v. Oil Field Sys. Corp.*, 803 F.2d 749 (2d Cir. 1986) ...........................................41

*In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248 (N.D. Cal. 2000).......30, 31

*McMahan & Co. v. Wherehouse Enter.*, 65 F.3d 1044 (2d Cir. 1995).............................43

*In re Merrill Lynch & Co. Res. Reports Sec. Litig.*, 272 F. Supp. 2d 243
  (S.D.N.Y. 2003) ..................................................................................41

*In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260 (E.D. Wash. 2007) ..................................38

*In re MicroStrategy Inc. Sec. Litig.*, 115 F. Supp. 2d 620 (E.D. Va. 2000) ...............28, 31

*Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164
  (C.D. Cal. 2007)....................................................................................30

*In re Miller Indus. Sec. Litig.*, 12 F. Supp. 2d 1323 (N.D. Ga. 1998) .............................15

*Miller v. Apropos Tech., Inc.*, No. 01-8406, 2003 U.S. Dist. LEXIS 5074
  (N.D. Ill. Mar. 31, 2003).......................................................................47

*In re MoneyGram Int'l, Inc. Sec. Litig.*, No. 08-883, 2009 U.S. Dist. LEXIS
  43613 (D. Minn. May 20, 2009) .........................................................14

*In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501 (N.D. Ill. 2007) ..............................44, 45

*In re Motorola Sec. Litig.*, No. 03-287, 2004 U.S. Dist. LEXIS 18250
  (N.D. Ill. Sept. 9, 2004) .......................................................................25

*Myers v. MedQuist, Inc.*, No. 05-4608, 2006 U.S. Dist. LEXIS 91904 (D.N.J.
  Dec. 20, 2006)........................................................................................3

*In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314 (3d Cir. 2002) ............................................38

*In re National Indus. Chem. Co.*, No. 98-4081, 1998 U.S. Dist. LEXIS 19591
  (N.D. Ill. Dec. 11, 1998) ........................................................................8

*In re Newell Rubbermaid Sec. Litig.*, No. 99-6853, 2000 U.S. Dist. LEXIS 15190
  (N.D. Ill. Oct. 2, 2000)...........................................................................9

*Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F. Supp. 243
  (S.D.N.Y. 1993)....................................................................................38

*Norfolk County Ret. Sys. v. Ustian*, No. 07-7014, 2009 U.S. Dist. LEXIS 65731
  (N.D. Ill. July 28, 2009)...........................................24, 25, 29, 32, 33, 46

*In re Northfield Labs., Inc. Sec. Litig.*, No. 06-1493, 2008 U.S. Dist. LEXIS
  76804 (N.D. Ill. Sept. 23, 2008) ..........................................................10

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ..........................................................15, 25

*Nursing Home Pension Fund v. Oracle Corp.*, No. 01-00988, 2006 U.S. Dist.
  LEXIS 94470 (N.D. Cal. Dec. 20, 2006)....................................................45

*In re Nuveen Fund Litig.*, No. 94-360, 1996 U.S. Dist. LEXIS 8071
  (N.D. Ill. June 5, 1996) ...............................................................................45

*Ong v. Sears, Roebuck & Co.*, 459 F. Supp. 2d 729 (N.D. Ill. 2006)...............................48

*In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236 (S.D.N.Y. 2007)...........................48

*Orlando v. United of Omaha Life Ins. Co.*, No. 06-3758, 2007 U.S. Dist. LEXIS
  75199 (N.D. Ill. Sept. 30, 2007) ..................................................................7

*In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133 (S.D.N.Y. 1999).................16

*In re PMA Capital Corp. Sec. Litig.*, No. 03-6121, 2005 U.S. Dist. LEXIS 15696
  (E.D. Pa. July 27, 2005)................................................................................17

*In re PSS World Med., Inc. Sec. Litig.*, 250 F. Supp. 2d 1335 (M.D. Fla. 2002) .............47

*Panter v. Marshall Field & Co.*, 646 F.2d 271 (7th Cir. 1981).........................................35

*In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668 (S.D.N.Y. 1990)............................11

*In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y. 2005).............................43, 44

*In re Petco Animal Supplies, Inc. Sec. Litig.*, No. 05-0823, 2006 U.S. Dist. LEXIS
  97927 (S.D. Cal. July 31, 2006)....................................................................26

*Phillips v. Kidder. Peabody & Co.*, 782 F. Supp. 854 (S.D.N.Y. 1991) ..........................39

*Premier Capital Mgmt., L.L.C. v. Cohen*, No. 02-5368, 2003 U.S. Dist. LEXIS
  14137 (N.D. Ill. Aug. 13, 2003)......................................................................9

*In re Prestige Brands Holding, Inc.*, No. 05-06924, 2006 U.S. Dist. LEXIS 46667
  (S.D.N.Y. July 10, 2006) ...............................................................................9

*In re ProQuest Sec. Litig.*, 527 F. Supp. 2d 728 (E.D. Mich. 2007) ...............................30

*In re Prudential Sec. Ltd. P'ships Litig.*, 930 F. Supp. 68 (S.D.N.Y. 1996)....................22

*In re RAIT Fin. Trust Sec. Litig.*, No. 07-03148, 2008 U.S. Dist. LEXIS 103549
  (E.D. Pa. Dec. 22, 2008) .........................................................................19, 24

*Ray v. Citigroup Global Mkts.*, 482 F.3d 991 (7th Cir. 2007)..........................................44

*Ray v. Karris*, 780 F.2d 636 (7th Cir. 1985) ....................................................................35

*In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131 (D. Mass. 2001) ...................................16

*In re Rediff.com India Ltd. Sec. Litig.*, 358 F. Supp. 2d 189 (S.D.N.Y. 2004)..................22

*Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246 (N.D. Ill. 1997) .......................................29

*In re Retek, Inc. Sec.*, No. 02-4209, 2005 U.S. Dist. LEXIS 35734
    (D. Minn. Mar. 7, 2005)..............................................................................................45

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 05-1898,
    2005 U.S. Dist. LEXIS 19506 (S.D.N.Y. Sept. 6, 2005)............................................30

*In re Rhythms Sec. Litig.*, 300 F. Supp. 2d 1081 (D. Colo. 2004) ...................................47

*Rodney v. KPMG Peat Marwick*, 143 F.3d 1140 (8th Cir. 1998)....................................14

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ...........................................................22

*Roth v. Aon Corp.*, No. 04-6835, 2008 U.S. Dist. LEXIS 18471
    (N.D. Ill. Mar. 7, 2008)........................................................................................10, 25

*Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791 (N.D. Ill. 2007)........................................28

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)............................................................29

*SEC v. Baxter*, No. 05-03843, 2007 U.S. Dist. LEXIS 52829
    (N.D. Cal. July 11, 2007) ....................................................................................15, 27

*SEC v. Caserta*, 75 F. Supp. 2d 79 (E.D.N.Y. 1999).......................................................17

*SEC v. DCI Telecomms.*, 122 F. Supp. 2d 495 (S.D.N.Y. 2000).....................................28

*SEC v. Delphi Corp.*, No. 06-14891, 2008 U.S. Dist. LEXIS 78671
    (E.D. Mich. Oct. 8, 2008) ..........................................................................................26

*Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977).......................................................34

*Schleicher v. Wendt*, 529 F. Supp. 2d 959 (S.D. Ind. 2007) .....................................31, 44

*Schnall v. Annuity & Life Re (Holdings), Ltd.*, No. 3:02-2133, 2004 U.S. Dist.
    LEXIS 2859 (D. Conn. Feb. 22, 2004)...................................................................7, 47

*In Re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001) ..................................28, 29

*Schultz v. TomoTherapy Inc.*, No. 08-314, 2009 U.S. Dist. LEXIS 58631
(D. Wis. July 8, 2009) ............................................................................................10

*Schuster v. Anderson*, 413 F. Supp. 2d 983 (D. Iowa 2005)............................................45

*In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370 (S.D.N.Y. 2007) .....................30

*In re Sears, Roebuck & Co.*, 291 F. Supp. 2d 722 (N.D. Ill. 2003).................................26

*Selbst v. McDonald's Corp.*, No. 04-2422, 2005 U.S. Dist. LEXIS 23093
(N.D. Cal. Sept. 21, 2005) .......................................................................................26

*Serabian v. Amoskeag Bank Shares*, 24 F.3d 357 (1st Cir. 1994) ...................................36

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996) ............................................8

*Shields v. Amoskeag Bank Shares*, 766 F. Supp. 32 (D.N.H. 1991)................................36

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) ....................................31

*Shirk v. Fifth Third Bancorp*, No. 05-49, 2007 U.S. Dist. LEXIS 26534
(S.D. Ohio Apr. 9, 2007).....................................................................................12, 45

*Siemers v. Wells Fargo & Co.*, No. 05-04518, 2006 U.S. Dist. LEXIS 60858
(N.D. Cal. Aug. 14, 2006).........................................................................................24

*Silverman v. Motorola, Inc.*, No. 07-4507, 2008 U.S. Dist. LEXIS 76799
(N.D. Ill. Sept. 23, 2008) ..........................................................................................48

*Simon v. Am. Power Conversion Corp.*, 945 F. Supp. 416 (D.R.I. 1996) ........................16

*Simons v. Dynacq Healthcare, Inc.*, No. 03-05825, 2006 U.S. Dist. LEXIS 46503
(S.D. Tex. July 10, 2006)......................................................................................15, 18

*In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350 (S.D. Fla. 2005) .....................29

*In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989 (N.D. Ill. 2004) ...............................12

*Stark Trading & Shepherd Inv. v. Falconbridge Ltd.*, No. 05-1167, 2008 U.S.
Dist. LEXIS 2677 (E.D. Wis. Jan. 14, 2008)...............................................................32

*State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645 (8th Cir. 2001)...................17

*Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180 (D. Nev. 2009) ..............................33

*In re StockerYale Sec. Litig.*, 453 F. Supp. 2d 345 (D.N.H. 2006)...................................48

*Strougo v. Bassini*, 282 F.3d 162 (2d Cir. 2002) ............................................................24

*In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir. 2006) ...........................9

*Sussman v. Paradigm Partners, Inc.*, No. 91-2891, 1992 U.S. Dist. LEXIS 16426
(S.D.N.Y. Oct. 23, 1992) ...........................................................................................19

*In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*, 941 F. Supp. 326
(S.D.N.Y. 1996) .................................................................................................14, 22

*T. Rowe Price New Horizons Fund, Inc. v. Preletz*, 749 F. Supp. 705
(D. Md. 1990) ...........................................................................................................10

*Tatz v. Nanophase Techs. Corp.*, No. 01-8440, 2002 U.S. Dist. LEXIS 19467
(N.D. Ill. Oct. 9, 2002) ...............................................................................................43

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d
190 (2d Cir. 2008) ......................................................................................................25

*Tellabs v. Makor Issues & Rights, Ltd*, 551 U.S. 308 (2007) ...............................10, 25, 30

*In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259 (2d Cir. 1993) .........................................31

*In re Ulta Salon, Cosmetics & Fragrance, Inc.*, 604 F. Supp. 2d 1188
(N.D. Ill. 2009).......................................................................................................8, 10

*In re VMS Sec. Litig.*, 752 F. Supp. 1373 (N.D. Ill. 1990)................................................49

*Vachon v. Baybanks, Inc.*, 780 F. Supp. 79 (D. Mass. 1991) ...........................................36

*In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388
(S.D.N.Y. 2005) .........................................................................................................47

*In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220 (S.D.N.Y. 2006)....................22

*Virginia Bankshares v. Sandberg*, 501 U.S. 1083 (1991).........................11, 16, 19, 21, 39

*In re Vivendi Universal, S.A. Sec. Litig.*, No. 02-5571, 2004 U.S. Dist. LEXIS
7015 (S.D.N.Y. April 22, 2004)................................................................................32

*In re WRT Energy Sec. Litig.*, No. 96-3610, 2005 U.S. Dist. LEXIS 18701
(S.D.N.Y. Aug. 30, 2005) ..........................................................................................43

*In re Wal-Mart Stores, Inc.*, 505 F. Supp. 2d 609 (N.D. Cal. 2007)...................................3

*In re Wells Fargo Sec. Litig.*, 12 F.3d 922 (9th Cir. 1993)................................................34

*In re Westinghouse Sec. Litig.*, 90 F.3d 696 (3rd Cir. 1996) ...........................................17

*In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206 (N.D. Okla. 2003)...............15, 17, 30, 31

*In re Winstar Commc'ns*, No. 01-3014, 2006 U.S. Dist. LEXIS 7618
(S.D.N.Y. Feb. 24, 2006).................................................................................28, 30

*Wojtunik v. Kealy*, No. 03-2161, 2006 U.S. Dist. LEXIS 73448
(D. Ariz. Sept. 30, 2006)...................................................................................48

*In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208 (D. Conn. 2001) ........................26, 37

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) ........................29

## STATUTES

15 U.S.C. §77k ......................................................................................... passim

15 U.S.C. § 77l..............................................................................................8

15 U.S.C. § 77m............................................................................................37

15 U.S.C. § 78i(e) .........................................................................................37

15 U.S.C. §78u-4 ............................................................................................9

17 C.F.R. §240.10b-5......................................................................................11

Fed. R. Civ. P. 8(a) ...............................................................................9, 10, 43

Fed. R. Civ. P. 9(b) ...................................................................................7, 9

Rule 2a-4, 17 C.F.R. §270.2a-4 .......................................................................13

Rule 10b-5, 17 C.F.R. 240.10b-5(b) .......................................................... passim

15 U.S.C. §78j(b) ................................................................................. passim

Plaintiffs[1] respectfully submit this memorandum in opposition to the motion to dismiss the Consolidated Class Action Complaint for Violations of Federal Securities Laws (the "Complaint")[2] filed by First Trust Strategic High Income Fund (the "FHI Fund"), First Trust Strategic High Income Fund II (the "FHY Fund"), First Trust Strategic High Income Fund III (the "FHO Fund") (collectively referred to as the "Funds"), the Funds' registrant, First Trust Portfolios L.P. ("First Trust Portfolios"), the Funds' adviser, First Trust Advisors L.P., President of First Trust Portfolio and First Trust, James Allen Bowen ("Bowen"), and Chief Financial Officer, Controller and Treasurer of the Funds, the Managing Director and Chief Financial Officer at First Trust Advisors L.P, and the Chief Financial Officer and Managing Director at First Trust Portfolios L.P, Mark Raymond Bradley ("Bradley") (collectively the "Defendants").[3]

## INTRODUCTION

Defendants' arguments on their motion to dismiss are baseless, and in many instances, premature. First, Defendants argue that Plaintiffs have not alleged material misstatements or omissions. This argument ignores that during the Class Periods,[4] Defendants disseminated materially false and misleading Prospectuses/Registration Statements ("Registration Statements") and proxy materials, as well as annual, semi-annual, and quarterly reports. Specifically, the Complaint alleges that Defendants' statements were false and misleading because Defendants concealed from the investing public the following facts, discussed in detail below, during the Class Periods: that Defendants ignored observable market data when valuing the Funds' mortgage-related securities in contravention of Generally Accepted Accounting Principles ("GAAP"), the Securities and Exchange Commission ("SEC") Rules, and the Funds' disclosed policies, which overstated the value of their portfolios and net asset values ("NAVs"), concealing from investors the true financial condition and value of the Funds, and thus, fundamentally misrepresented the ability of the Funds to make distributions to the Funds' shareholders; that the Funds lacked effective internal controls to ensure that the Funds would value their securities in accordance with GAAP and monitor and manage the risks inherent in the portfolios; that Defendants

---

[1] Robert Valenti Revocable Trust, under Trust Agreement dated 8/3/06, acting through Robert A. Valenti, Trustee, Aaron Wolkstein, Anthony Duda, and Compass Recruiting Company (collectively, "Plaintiffs").

[2] Paragraph references (¶) shall be to those in the Complaint.

[3] The Memorandum in Support of Defendants' Motion to Dismiss (Dkt. No. 104) will be referred to as "Def. Br."

[4] From July 26, 2005 to July 7, 2008 for the FHI Fund ("FHI Class Period"); from March 28, 2006 to July 7, 2008 for the FHY Fund ("FHY Class Period"); from March 28, 2007 to July 7, 2008 for the FHO Class Period") (collectively, the "Class Periods").

did not "generally seek" and did not in fact implement effective hedges to mitigate the risks, but instead Defendants compounded the risks of the FHI Fund's and FHY Fund's investment strategies by utilizing leverage, resulting in forced liquidation of assets at low values; and that Defendants were motivated to overstate the value the Funds' investments and inflate the NAVs in order to inflate investment advisory fees. Thus, Plaintiffs have adequately alleged material and actionable misstatements and omissions.[5]

Second, Defendants' attempt to counter the well-pled *scienter* allegations must fail. Defendants' contention that they acted in good faith is a fact issue which cannot be decided on a 12(b)(6) motion and that is in direct conflict with the actual allegations in the Complaint. The Complaint alleges that Defendants were aware of facts and/or had ready access to information contrary to their statements during the Class Periods, and that they were motivated to improperly value the Funds' investments in order to inflate the investment advisory fees and to feign compliance with applicable regulations and the Funds' disclosed policies. Further, the Complaint alleges that Bowen and Bradley's compensation was linked to First Trust's performance, which in turn, was linked to the advisory fees received from the Funds, and thus, they were also motivated to overvalue and leverage to increase the fees. The *scienter* allegations are further bolstered by the fact that the statements concerned the Funds' key assets, the magnitude of the fraud, and the corporate reshuffling.

Third, in addition to the cogent and compelling allegations of *scienter*, Plaintiffs have adequately pled loss causation by alleging that on July 7, 2008 investors were finally alerted to the misstatements and omissions during the Class Periods, including that the portfolios and NAVs were overstated. Following the disclosures on that day, the Funds' share prices continued their descent from their respective Class Period highs of 51% for the FHY Fund, 52% for the FHI Fund, and 59% for the FHO Fund. ¶278. The fact that there may have been other factors in force is a matter for proof at trial, and Plaintiffs do not have to sort out the extent of the impact of other factors that may have exacerbated and contributed to the effect of the fraud at the pleading stage.[6]  Further, the existence of inadequate partial

---

[5] Additionally, the Court need not linger over the argument that the Complaint impermissibly alleges nothing more than mismanagement. To the contrary, the Complaint alleges that Defendants did not merely make bad business decisions or mismanage the Company, but released to investors information they knew to be misleading, including the overstated NAVs, while representing that they were in compliance with the Funds' policy, GAAP and SEC regulations, which is fraud – not mismanagement.

[6] Loss causation is not an element of a Section 11 or 12(a)(2) claim, but rather an affirmative defense that raises numerous factual issues which cannot be decided on a motion to dismiss. In any event, the Complaint adequately pleads that the Funds' shares declined as a result of the alleged misrepresentations and omissions. *See* ¶278.

disclosures during the Class Periods does not affect loss causation, but only damages.

Defendants' arguments regarding whether the Securities Act and the Section 14(a) claims are barred by the applicable statute of limitations require the Court to make a premature and improper factual determination of when inquiry notice of the allegedly false and misleading statements and omissions accrued. Not only is such an analysis premature at this stage, but Defendants' arguments are completely contrary to the well-plead allegations in the Complaint. Finally, the Section 15 of the Securities Act and the Section 20(a) of the Exchange Act claims should also be sustained because not only have Plaintiffs adequately pled a primary violation, but Plaintiffs have properly alleged that Bowen, First Trust, and Bradley are control persons. For these reasons, and those more fully discussed below, this Court should deny Defendants' motion to dismiss in its entirety.

## STATEMENT OF FACTS

This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired the shares of the Funds during the Class Periods against Defendants for violations of the Exchange Act, and on behalf of all persons or entities who purchased or otherwise acquired shares of the FHY Fund and the FHO Fund issued in connection with or traceable to those Funds' initial public offerings ("IPOs"), as well as all persons or entities who purchased or otherwise acquired shares of the Funds through the Funds' Dividend Reinvestment Plans, seeking to pursue remedies under the Securities Act.[7]

**The Funds and Their Management**

The Funds are all closed-end management investment companies, with primary investment objectives to seek high-levels of current income. Each Fund's secondary objective is to seek capital growth. ¶¶3-5. The Funds also represented during the Class Periods that they were "diversified," but were actually not, as explained in more detail below.  During the Class Periods, First Trust Portfolios,

---

[7] Defendants' challenge to the class action allegations, Def. Br. at 4 n.1, are not appropriate before discovery. *See In re Wal-Mart Stores, Inc.*, 505 F. Supp. 2d 609, 616 (N.D. Cal. 2007) ("Nevertheless, Wal-Mart has not answered in this case, discovery has not yet commenced, and no motion for class certification has been filed. In the absence of any discovery or specific arguments related to class certification, the Court is not prepared to rule on the propriety of the class allegations and explicitly reserves such a ruling. While plaintiffs' class definitions are suspicious and may in fact be improper, plaintiffs should at least be given the opportunity to make the case for certification based on appropriate discovery"); *Myers v. MedQuist, Inc.*, No. 05-4608, 2006 U.S. Dist. LEXIS 91904, at *18 (D.N.J. Dec. 20, 2006) (declining to strike class allegations because discovery had not yet commenced and observing that most courts deny such motions if brought prior to discovery). All cited unreported cases are attached hereto in the Compendium of Unreported Cases.

the registrant of the Funds, provided a variety of investment services, including asset management, financial advisory services, municipal and corporate investment banking, and unit investment trust sponsorship. As the registrant of the Funds, First Trust Portfolios is liable under the Exchange Act and the Securities Act for the content of all the statements issued during the Class Periods. ¶29.

First Trust is an affiliate of First Trust Portfolios, and during the Class Periods was adviser and manager to the Funds, responsible for supervising the Funds' Subadviser, monitoring the Funds' investment portfolio, managing the Funds' business affairs, and providing certain clerical, bookkeeping and other administrative services. ¶30. Each of the Funds paid for the services and facilities provided by the Adviser at the annual rate of 0.90% of Managed Assets. *Id.* During the Class Periods, Bowen was President of First Trust Portfolio and First Trust, the Managing Director of First Trust Portfolios, and a Trustee of each of the Funds. ¶¶34, 468. Bowen signed and certified the Funds' false and misleading SEC filings during the Class Periods. During the Class Periods, Bradley was the Chief Financial Officer, Controller and Treasurer of the Funds, and the Managing Director and Chief Financial Officer at First Trust Advisors L.P. He was also the Chief Financial Officer and Managing Director at First Trust Portfolios L.P. ¶35. Bradley also signed and certified the Funds' false and misleading SEC filings during the Class Periods. *Id.* Additionally, Bowen and Bradley had the ability to influence the valuations of the Funds' mortgage-related investments valued by First Trust and the Funds' Board of Trustees. ¶504. Moreover, Bowen and Bradley's compensation was linked to First Trust's performance, which was, in turn, linked to advisory fees received from the Funds, and thus, they were motivated during the Class Periods to commit fraud by aggressively valuing the Funds' mortgage-related securities, and thus inflating the Funds' NAVs, and by improperly using leverage, all of which acted to increase the advisory fees. *Id.*

**Misrepresentations About the Funds' NAVs, Valuations, Controls and GAAP Compliance**

For a closed-end investment company fund, NAV "represents book value and is computed by subtracting the fund's liabilities . . . from the fund's total assets . . . The resulting figure can also be divided by the total number of common shares outstanding to arrive at the NAV per share." ¶229. The market price per share can trade at a premium to or a discount from the NAV per share depending on market participants' assessment of the future performance of the fund's assets and management, and therefore it is essential for investors of a closed-end fund to have an accurate NAV figure so they know the value of the assets they are buying, and in particular, the future distributions the funds will make. *Id.*

Beginning at each of the Fund's inception and continuing throughout the respective Class Periods,

Defendants represented that each Fund's investments are valued daily at market value or, in the absence of market value, with respect to any portfolio's securities, at fair value according to procedures adopted by the Fund's Board of Trustees. ¶235. However, Defendants ascribed their own values to the Funds' portfolios and failed to give effect to the actual value of its mortgage-related securities. ¶237. Defendants' valuations also accorded little or no weight to Accounting Series Release ("ASR") 118 (which sets forth factors to be considered in making fair value determinations) or the Funds' own valuation procedures, including considering the general economic conditions affecting the U.S. residential sub-prime market and market prices at which identical and similar investments were being sold. ¶240. Therefore, Defendants' calculated NAVs, which were based on inflated values for the Funds' securities portfolio, were materially inflated during the Class Periods, and this inflated value was reported in the annual, semi-annual, and quarterly reports disseminated during the Class Periods, rendering them materially false and misleading. ¶242. The material inflation continued through the end of the Class Periods, and "Plaintiffs and other members of the Classes purchased the Funds' shares justifiably relying . . . upon the promised (but not delivered) integrity of the Funds' valuations practices and have been damaged thereby." ¶243.

Further, Defendants made statements during the Class Periods about the Funds having effective internal controls and being in compliance with GAAP, ¶¶116, 160-61, 184, which were materially false and misleading when made because the Funds lacked effective internal controls: (1) to provide reasonable assurances that the Funds would value their securities in accordance with GAAP; and (2) to monitor and manage the risks inherent in the Funds' investments in the securities.

**Materially False and Misleading Statements About Investment Strategies and Risks**

Defendants also made false and misleading statements about diversification and hedging during the Class Periods. While falsely representing that the Funds were diversified, in fact, the similarity of the risks and the subordinated position of the Funds' investments meant that losses would be duplicated by losses in other assets. ¶263. This was later revealed by the disclosures on July 7, 2008. ¶¶220-21.

The Complaint also alleges that at the time when the Funds' investments called for a reduction in risk, Defendants, while representing that they were pursuing a prudent defensive strategy, instead, concealed the true extent of the Funds' deteriorating condition by increasing risk through acceleration of the purchase of toxic securities on margin. ¶¶148-49. Defendants stated that the Funds "generally seek" to use derivative instruments and transactions as a portfolio management or hedging technique to protect against possible adverse changes in the market value of securities held in the Funds' portfolios,

but instead, during the Class Periods, Defendants turned to leverage, compounding the risks, and "represented to the Funds' investors that leverage presented opportunities for profits when, in fact, leverage merely delayed (and ultimately increased) the losses the Funds would incur." ¶¶146, 150.

The Complaint also states that the Joint Proxy Statement contained a unanimous Recommendation of the Board of Trustees of both the FHI Fund and FHY Fund for shareholders of those Funds to approve a change from the stated investment restrictions and policies. The proposal stated that "residential mortgage-backed securities have historically offered very compelling risk/reward characteristics within the structured finance area. Valhalla believes that removing the limitation on residential mortgage-backed securities will bring the Strategic Funds in line with the original intent of their investment strategy" and that "the changes in the industry concentration policies were in the best interests of the Strategic Funds."    ¶429. Induced by false and misleading proxies, shareholders approved a change in concentration that discussed the investment strategies under normal market conditions. *See* ¶185. What Defendants, however, did not disclose was that there were no "normal market conditions" and that the residential mortgage-backed securities market at the time of the proposed change in the investment restriction would substantially increase the risks to the Funds. ¶186. Defendants also, although providing information about internal controls, did not disclose that the FHI Fund and FHY Fund lacked effective internal controls to provide reasonable assurances that the Funds would value these securities in accordance with GAAP and that would allow the Funds to monitor and manage the risks inherent in the Funds' investments in mortgage-related securities. *Id.* Defendants also did not disclose, among other things discussed more fully below, that the recommendation and other positive statements concerning the vote were made without adequate basis. ¶430. Thus, the Proxy Materials were materially false and misleading.

**Materially False and Misleading Statements About the Funds' Management Fees**

The Complaint alleges that during the Class Periods, because of the inflated NAVs and values of the Funds' portfolios, the reported advisory fees were also inflated. ¶152. Defendants were motivated to inflate the value of the mortgage-related securities and NAVs in order to increase their compensation, which was based on the value of the Funds' holdings. ¶472. Defendants were also motivated to improperly increase the advisory fees through the use of leverage. ¶487. Thus, Defendants' statements during the Class Periods regarding fees were materially false and misleading.

**Plaintiffs and Members of the Classes Were Damaged by the Misrepresentations**

Defendants' misstatements and omissions of material fact caused and maintained the artificial

inflation in the Funds' share prices throughout the Class Periods and until the truth was fully revealed to the market. Following Defendants' disclosures on July 7, 2008: the FHI Fund's share price fell to $10.23, a total of 52% from the FHI Class Period high of $21.35 per share; the FHY Fund's share price fell to $10.52, a total of 51% from the FHY Class Period high; and the FHO Fund's share price fell to $8.46, a total of 59% from the FHO Class Period high. ¶¶276-78. Thus, investors suffered millions of dollars of damages as a result of Defendants' misstatements and omissions during the Class Periods.[8]

## ARGUMENT

## I.    LEGAL STANDARD ON A MOTION TO DISMISS

When considering a motion to dismiss, the complaint is liberally construed, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor. *Jones v. Simek*, 193 F.3d 485, 489 (7th Cir. 1999). A complaint need only allege "enough factual matter (**taken as true**)" to suggest that a violation occurred, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (emphasis added; citation omitted). The pleading need only contain "[f]actual allegations. . . [sufficient] to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 556.  As here, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, No. 07-1015, __ U.S. __, 129 S. Ct. 1937, 1940-41 (2009).[9]

Further, the Court must limit itself to facts in the Complaint, documents attached to the complaint as exhibits, and documents incorporated by reference. *See, e.g., Orlando v. United of Omaha Life Ins. Co.*, No. 06-3758, 2007 U.S. Dist. LEXIS 75199, at *4-5 (N.D. Ill. Sept. 30, 2007). Even those narrow

---

[8] Defendants' attempt to recast the Complaint's specific, well-pled allegations, and assert that the Funds were simply victims of an economic crisis must fail. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1173-74 (C.D. Cal. 2008) ("It is not the Court's role to speculate on the causes of the current economic situation . . . The Court will not be distracted by liquidity versus solvency and other macroeconomic arguments."); *In re 2007 Novastar Fin., Inc.*, No. 07-0139, 2008 U.S. Dist. LEXIS 44166, at *5-6 (W.D. Mo. June 4, 2008) ("while the Court can take judicial notice of the fact that the Company's industry suffered reversals, the Court cannot take judicial notice of the impact of those industry-wide reversals on the Company."); *Schnall v. Annuity & Life Re (Holdings), Ltd.*, No. 3:02-2133, 2004 U.S. Dist. LEXIS 2859, at *28-29 (D. Conn. Feb. 22, 2004) ("While a trier of fact might blame market forces . . . the allegations in the Complaint are sufficient to withstand Burke's motion to dismiss").

[9] "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft*, 129 S. Ct. at 1949. Thus, *Ashcroft* makes clear that, for elements of claims subject to Rule 8(a), *Twombly* requires more than pleading the "bare elements of [the] cause of action," but far less than the particularity of pleading required under Fed. Civ. P. 9(b). *See id.* at 1954.

categories of documents extraneous to a complaint that a court may consider in addition to the complaint may only be considered for the fact that they say what they say – not for the truth of the statements made in them. *See GE Cap.Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082 n.6 (7th Cir. 1997). When "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as a Rule 56 motion for summary judgment." *In re National Indus. Chem. Co.*, No. 98-4081, 1998 U.S. Dist. LEXIS 19591, at *5-6 (N.D. Ill. Dec. 11, 1998).

## II.     PLEADING REQUIREMENTS FOR A SECURITIES ACT CLAIM

Section 11 imposes liability on, *inter alia*, the issuer of a security, as well as any person who signed the registration statement and/or served as a director of the issuer or performed similar functions, if: the registration statement as of its effective date contained an untrue statement of a material fact; omitted to state a required material fact; or omitted to state a material fact necessary to make the statements therein not misleading. *See* 15 U.S.C. §77k(a); *see also Endo v. Albertine*, 863 F. Supp. 708, 734 (N.D. Ill. 1994). The securities laws recognize that the issuer's disclosure of material information is "crucial in the context of a public offering, where investors typically must rely . . . on an offering price determined by the issuer and/or the underwriters of the offering[.]" *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1208 (1st Cir. 1996).[10]

Under Section 11, "[l]iability against an issuer of a security is virtually absolute, even for innocent misstatements," while "[o]ther defendants bear the burden of demonstrating due diligence." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983); *see also In re First Merchs. Acceptance Corp. Sec. Litig.*, No. 97-2715, 1998 U.S. Dist. LEXIS 17760, at *34-35 (N.D. Ill. Nov. 4, 1998). Pleading a Section 11 claim is not difficult: "[t]o establish a prima facie § 11 claim, a plaintiff need show only that he bought the security and that there was a material misstatement or omission." *See id.* (citing *Herman*, 459 U.S. at 382).

Similarly, Section 12(a)(2) of the Securities Act holds any person liable who offers or sells a security by means of a materially false "prospectus or oral communication." *See* 15 U.S.C. § 77l(a)(2). Moreover, neither Sections 11 nor 12(a)(2) require pleading or proof that a defendant acted with intent to defraud or even knew that misrepresentations or omissions had been made. *See In re Ulta Salon, Cosmetics & Fragrance, Inc.*, 604 F. Supp. 2d 1188, 1192 (N.D. Ill. 2009) ("scienter is not required");

---

[10]    Defendants are held to a heightened duty to disclose with respect to a public offering. *See, e.g.*, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976). Indeed, "the disclosure requirements associated with a stock offering are more stringent than, for example, the regular periodic disclosures called for in the company's annual Form 10-K or quarterly Form 10-Q filings . . . ." *Shaw*, 82 F.3d at 1208.

*see also In re Newell Rubbermaid Sec. Litig.*, No. 99-6853, 2000 U.S. Dist. LEXIS 15190, at *18 (N.D. Ill. Oct. 2, 2000).

Furthermore, the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") expressly do not apply to claims under the Securities Act. *See* 15 U.S.C. §78u-4(b)(1) ("under this chapter" – *e.g.*, Exchange Act claims only); *see also Premier Capital Mgmt., L.L.C. v. Cohen*, No. 02-5368, 2003 U.S. Dist. LEXIS 14137, at *7-8 (N.D. Ill. Aug. 13, 2003). Instead, a Section 11 claim is subject only to traditional notice pleading standards under Fed. R. Civ. P. 8(a), and a short and plain statement of the claim will suffice. *See Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 981 (D. Wis. 2003). As discussed below, these claims do not sound in fraud, and are therefore, not even subject to Fed. R. Civ. P. 9(b)'s particularity pleading requirement. *See Danis v. USN Commc'ns., Inc.*, 73 F. Supp. 2d 923, 932 (N.D. Ill. 1999) ("Because claims under §§11 [and 12] do not require proof of fraud for recovery, Rule 9(b)'s pleading requirements are inapplicable.") (citation and internal quotations omitted); *see also Evergreen Fund, Ltd. v. McCoy*, No. 00-0767, 2000 U.S. Dist. LEXIS 16876, at *14 (N.D. Ill. Nov. 1, 2000) ("If a Complaint does not 'sound in fraud,' plaintiffs should not be required to plead particular facts to support §§ 11 or 12"). As pleaded, the Complaint's Sections 11 and 12(a)(2) claims explicitly disavow any allegations of intent on the part of any Defendant.  ¶¶280, 290, 300, 308, 324, 244, 264, 284, 294.[11]

Importantly, Plaintiffs' Securities Act claims – even if the Court finds they "sound in fraud" -- are **not** governed by the heightened pleading standards of the PSLRA. Further, the Seventh Circuit has never endorsed Defendants' arguments that Rule 9(b) applies to claims under Section 11 or 12.[12]  As one court stated:

> In my view, the parties miss the mark in focusing on whether a complaint "sounds in fraud" . . . For the purpose of plaintiffs' claims under the 1933 Act, **it does not matter**

---

[11] Courts in this Circuit and others have repeatedly disagreed with Defendants' claim that it is irrelevant that the Complaint expressly disavow the fraud claim. *See, e.g., First Merchants*, 1998 U.S. Dist. LEXIS 17760, at *36. *See also In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 272-73 (3d Cir. 2006); *In re Prestige Brands Holding, Inc.*, No. 05-06924, 2006 U.S. Dist. LEXIS 46667, at *24 (S.D.N.Y. July 10, 2006).

[12] The only Seventh Circuit decision Defendants cite for their proposition, Def. Br. at 18, had nothing to do with Section 11 or Section 12(a). Out of the six claims in the case, five sounded in fraud, and the last claim for negligent spoliation of evidence failed because plaintiff could not prevail in the underlying suit and could not prove damages. *See Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) ("the plaintiffs filed this suit . . . claiming: (1) violations of the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. §§ 1029 & 1343; (2) tortious interference with economic advantage; (3) tortious interference with fiduciary relationship; (4) civil conspiracy; (5) willful and wanton spoliation of evidence; and (6) negligent spoliation of evidence").

*whether defendants acted with an intent to deceive; plaintiffs must prove only that defendants made a material misstatement*. Plaintiffs cannot add an element to a claim by making unnecessary allegations. In claims under the 1933 Act or in any other claim that does not include fraud as an element, inadequate allegations of fraud do not require dismissal for failure to state a claim. *Rather, to the extent that the allegations of fraud are insufficiently particular, the proper judicial response is to ignore them . . . It makes little sense to scrutinize allegations that ultimately will have no bearing on defendants' liability* . . . Thus, it is unnecessary to consider whether plaintiffs' claims under the 1933 Act "sound in fraud" and, if so, whether the allegations of fraud satisfy Rule 9(b). *Rather, it is necessary only to determine whether plaintiffs have stated a claim under Rule 12(b)(6), that is, whether plaintiffs have alleged sufficient facts to put defendants on notice . . . and whether there is any set of facts . . . that would entitle plaintiffs to relief*.

*Friedman*, 295 F. Supp. 2d at 979 (internal citations omitted; emphasis added). *See also In re Ulta Salon*, 604 F. Supp. 2d at 1193 ("this court questions the soundness of any decision requiring a plaintiff to plead fraud and scienter with particularity when neither is an element of the claim"); *Schultz v. TomoTherapy Inc*., No. 08-314, 2009 U.S. Dist. LEXIS 58631, at *30-31 (D. Wis. July 8, 2009) ("In a case like this one, where fraud has been disavowed  for that claim, the proper approach is to hold plaintiffs to their word: the § 11 claim shall not proceed on a theory of fraud"). However, even if Rule 9(b) was applicable, particularity pleading merely requires that the Complaint "specify the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Evergreen Fund*, 2000 U.S. Dist. LEXIS 16876, at *15. *Scienter* only needs to be alleged generally. *T. Rowe Price New Horizons Fund, Inc. v. Preletz*, 749 F. Supp. 705, 710 (D. Md. 1990).  Indeed, the Complaint meets these criteria, even as to the Securities Act claims asserted herein.

## III.    PLEADING REQUIREMENTS FOR A SECTION 10(b) CLAIM

Under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5(b), a plaintiff must plead six elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See In re Northfield Labs., Inc. Sec. Litig.*, No. 06-1493, 2008 U.S. Dist. LEXIS 76804, at *10 (N.D. Ill. Sept. 23, 2008) (citation omitted). The heightened pleading standard under the PSLRA and *Tellabs v. Makor Issues & Rights, Ltd,* 551 U.S. 308 (2007) applies only to the element of *scienter*; all other elements are governed by traditional pleading standards under Fed. R. Civ. P. 8(a) or 9(b). *See Roth v. Aon Corp.*, No. 04-6835, 2008 U.S. Dist. LEXIS 18471, at *12-14 (N.D. Ill. Mar. 7, 2008). As previously stated, all that is required is "that facts such as the

identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff be alleged in detail." *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006). A plaintiff is not required to plead evidence. *See Knowles v. Hopson*, No. 07-6131, 2008 U.S. Dist. LEXIS 46106, at *7 (N.D. Ill. June 12, 2008).

## IV.    PLAINTIFFS ALLEGE ACTIONABLE MISTATEMENTS AND OMISSIONS UNDER THE SECURITIES ACT AND EXCHANGE ACT

Rule 10b-5(b) prohibits "mak[ing] any untrue statement of material fact or . . . omit[ting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. §240.10b-5. "[O]nce corporate officers undertake to make statements, they are obligated to speak truthfully and to make such additional disclosures as are necessary to avoid rendering the statements made misleading." *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 675 (S.D.N.Y. 1990). *See also Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1098 n.7 (1991) (when a company chooses to speak, "there can be no question that the statement [it] do[es] make carrie[s] with it no option to deceive"); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) ("corporations have a duty to disclose all facts necessary to ensure the completeness and accuracy of their public statements"). A statement is misleading if a reasonable investor would have received a false impression from it. *Par Pharm.*, 733 F. Supp. at 677.

Additionally, an offeror of securities has a duty to disclose certain information in the context of a public offering under two circumstances. First, an offeror has a duty to disclose all material information required to be disclosed by statute. *Gallagher v. Abbott Labs.*, 269 F.3d 806, 808-09 (7th Cir. 2001).[13] Second, an offeror has a duty to disclose any additional information required to make another statement, whether required or voluntarily made, not misleading. *See* 15 U.S.C. §77k; *see also City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1267 (10th Cir. 2001) ("Plaintiffs correctly argue that it is possible for securities fraud defendants to comply technically with SEC reporting requirements . . . and yet still be omitting information that is material and should [ ] be disclosed.") (citation omitted); *Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392, 1400 (7th Cir. 1995).

A misrepresentation or omission is material when a reasonable investor would attach importance to it in making an investment decision. *See Va. Bankshares*, 501 U.S. at 1090 (citation omitted); *Basic,*

---

[13] Form N-2 states that the "[t]he purpose of the prospectus is to provide essential information about the Registrant in a way that will help investors make informed decisions about whether to purchase the securities being offered." Form N-2, at 4.

*Inc. v. Levinson*, 485 U.S. 224, 231 (1988) ("there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available") (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U. S. 438, 449 (1976)). The materiality requirement poses a very low burden. "To fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Id.* at 232 (citation omitted). Further, "a complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2nd Cir. 2000). Thus, the trier of fact usually decides the issue of materiality.[14] Material facts include not only information disclosing financial results, "but also facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." *Klein v. PDG Remediation*, 937 F. Supp. 323, 327 (S.D.N.Y. 1996) (citation omitted). Courts have found that "a misstatement or omission that concerns only a small fraction of the company's revenues or assets" can be material. *See, e.g., In re Envoy Corp. Sec. Litig.*, 133 F. Supp. 2d 647, 662 (M.D. Tenn. 2001).[15] As such, dismissal is improper here, where the Complaint sufficiently alleges that Defendants made actionable false and misleading statements and/or omissions of material facts during the Class Periods that fundamentally misrepresented the investment quality of the Funds.

### A. Materially False and Misleading Statements About the Funds' Valuations and Internal Controls

During the Class Periods, Defendants represented that the Funds' financial statements were prepared in conformity with GAAP. However, Defendants used improper accounting practices in violation of GAAP, SEC reporting requirements, and their own publicly disclosed policies to falsely inflate the Funds' mortgage-related securities and NAVs in the Registration Statements, annual, semi-

---

[14] *See Basic*, 485 U.S. at 240 (materiality is inherently an intensely "fact-specific inquiry" that "depends on the significance the reasonable investor would place on the withheld or misrepresented information"); *In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1028 (N.D. Ill. 2004) (materiality may be characterized as a mixed question of law and fact, and is generally inappropriate for determination at the pleading stage).

[15] *See also Giarraputo v. Unumprovident Corp.*, No. 99-301, 2000 U.S. Dist. LEXIS 19138, at *47-48 (D. Me. Nov. 8, 2000) (unable to conclude that 3.9% of the overall reserves, or even less than 1.5% of the reserves, is immaterial); *Shirk v. Fifth Third Bancorp*, No. 05-49, 2007 U.S. Dist. LEXIS 26534, at *38-39 (S.D. Ohio Apr. 9, 2007) (declining to hold on a motion to dismiss that a particular financial misstatement could not possibly be significant to a reasonable investor due to its small magnitude).

annual, and quarterly reports filed with the SEC during the Class Periods. Under SEC requirements (specifically Rule 2a-4, 17 C.F.R. §270.2a-4), Defendants were obligated to compute the Funds' NAVs based on market quotations where such quotations were "readily available" and based upon a "fair value" computation where market quotations were not "readily available." ¶231. Defendants knew that this was their obligation and represented to investors that the Funds' investments "are valued daily at market value or, in the absence of market value . . . at fair value." ¶235. However, although ASR 118 set forth factors to consider in making fair value determinations, ¶236, Defendants "ascribed their own values to the Funds' security portfolios that failed to give effect to the actual value of its mortgage-related securities, in order to maintain a false impression of capital appreciation, one of the Funds' objectives.[16] In so doing, Defendants completely ignored proper valuation considerations set forth in ASR 118," resulting in the mortgage-related securities being overvalued and too close to par. ¶¶237, 240.[17] Defendants did not employ "mark to market" pricing procedures for the Funds' investments in mortgage-related securities due to their failure to determine in good faith the "fair value" of the Funds' mortgage-related securities by considering all indications of value based on what the Funds could actually receive for those securities from a current sale, and as a result, trading of the Funds' shares during the Class Periods was based on materially inflated asset values. ¶¶242-43. *See also* ¶249 ("Many of the ABS-issuing entities in Funds' portfolio indicated a high degree of risk in the mortgage-related securities which the Funds purchased. Defendants did not incorporate these risks into their valuation . . . and thereby materially overstated the value of the mortgage-related securities and the corresponding NAV of the [Funds] during their respective Class Periods").[18]

Defendants' improper valuations is in part evidenced by Defendants reporting stable NAVs during the Class Periods despite obvious deterioration in the housing and sub-prime mortgage markets as early

---

[16] The Funds' primary objective is to seek a high level of current income. The Funds' secondary objective is seeking capital growth. *See, e.g.,* ¶5.

[17] Defendants also represented that a large percentage of the Funds' portfolios' value was determined based on prices supplied by dealers when readily determinable values were not available. However, there was evidence throughout the Class Periods of readily determinable deterioration in values, which Defendants chose to ignore when calculating the Funds' NAVs. ¶16. Defendants' failure to calculate the Funds' NAVs using quotations from a "readily available" market caused the Funds' NAVs to be artificially inflated throughout the Class Periods and, as a result, misled investors regarding the true value of their investment and the Funds' compliance with applicable rules and their own policies.

[18] The Complaint alleges that Defendants ignored relevant factors with respect to the sub-prime mortgage market in making their valuations and ignored other factors with respect to specific entities, which caused the overstatement of the Funds' portfolios. ¶¶248-62.

as December 2006. ¶238.[19]   Further evidencing the improper valuations during the Class Periods is that, although the Funds admitted that their underlying securities tend to be volatile, the Valuation Committee only met four times for the FHI Funds and three times for the FHY Fund during the calendar year ended December 31, 2007. ¶241. Because Defendants failed to properly use "readily available" market quotations, and other market information, or properly calculate the Funds' NAVs at "fair value," each and every disclosure of the Funds' then current NAV disseminated during the Class Periods was false and misleading because the it was artificially inflated. *See Abrams v. Van Kampen Funds, Inc.*, No. 01-7538, 2002 U.S. Dist. LEXIS 9814, at *34-35 (N.D. Ill. May 29, 2002) ("the Fund did not use market pricing for all loans for which market pricing was readily available. Therefore, it was an inaccurate representation that market pricing was being used as it developed to a reliable degree. It is also alleged that the Fund omitted disclosing that it was not complying with SEC regulations requiring the use of market pricing where readily available. Additionally, it is alleged that, in determining 'fair value,' the Fund also misvalued the loans. Plaintiffs have alleged false representations or omissions as to valuing the loans").[20]   Moreover, by inflating the Funds' NAVs, Defendants concealed from investors the true financial condition and value of the Funds, and thus, inherently misrepresented the ability of the Funds to make distributions to the shareholders. ¶14. *See In re MoneyGram Int'l, Inc. Sec. Litig.,* No. 08-883, 2009 U.S. Dist. LEXIS 43613, at *60-61, 79 (D. Minn. May 20, 2009) (holding that complaint alleged actionable and materially false and misleading

---

[19] Defendants' reliance on *Duane v. Altenburg*, 297 F.2d 515 (7th Cir. 1962) for the claim that Defendants' valuations are not fraudulent is misplaced because *Duane* was a breach of fiduciary duty case. *See id.* at 519.

[20] *See also Rodney v. KPMG Peat Marwick*, 143 F.3d 1140, 1145 (8th Cir. 1998) ("Reasonable investors reading the Fund's prospectuses . . . would conclude that, whatever risks they were accepting by investing in a mutual fund that traded in derivatives and engaged in forward commitments, they were not encountering the enhanced risks created by violations of the Fund's own basic investment policies . . . If they are right, and viewing the record in their favor we have to assume they are, we cannot say [that the non-disclosure of] these matters did not deprive them of information that would have made a difference to a reasonable investor"); *In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*, 941 F. Supp. 326, 339 (S.D.N.Y. 1996) ("Plaintiffs' complaint also alleges that failure to disclose the inherent illiquidity of the market for CMOs was a material omission. Defendants argue that such disclosure was made by pointing to a sentence, in the section of the prospectus labeled 'Determination of Net Value,' that states in relevant part: 'When market quotations are not readily available, including circumstances under which it is determined by the Adviser that sale or bid prices are not reflective of a security's market value, portfolio securities are valued at their fair value . . .' While this sentence makes a general observation about all securities in the Fund, because it neither specifically refers to, or even suggests reference to, CMOs, nor discusses illiquidity explicitly, the Court cannot conclude as a matter of law that it constitutes adequate disclosure of the alleged inherent illiquidity of the CMO market. Therefore, unless no reasonable investor would find disclosure of this alleged omission important in making an investment decision, defendants' motion to dismiss this claim must be denied").

statements in alleging, *inter alia,* that company overstated the value and quality of mortgage-backed assets in its investment portfolio, understated its exposure to subprime and Alt-A collateral, and misrepresented its valuation processes and standards and internal controls).

Defendants attempt to mischaracterize the Complaint as simply criticizing the timing of the write downs, stating that Plaintiffs allege that the write-downs should have occurred as early as December 2006, but actually happened a few months later. Def. Br. at 20-24. However, Plaintiffs actually allege that Defendants overvalued the Funds' NAVs and portfolios throughout the Class Periods, and thus, notwithstanding Defendants' small insufficient portfolio value adjustment, the NAVs and the Funds' portfolios continued to be substantially overvalued.[21]　Further, even if Defendants' mischaracterization of the Complaint was correct, courts have found that a failure to take an appropriate write-down at the right time makes the reported financial results false and misleading. *See In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1222-24 & n.4 (N.D. Okla. 2003) ("Many of the factors which admittedly caused the write-downs were operative throughout the Class Period, but their impact were not properly reflected"; financial results were materially false and misleading because assets were overstated . . . due to failure to take write-downs); *see also Novak v. Kasaks*, 216 F.3d 300, 312-13 (2d Cir. 2000) (write-off after class period, with other facts, probative of false statement on value); *SEC v. Baxter*, No. 05-03843, 2007 U.S. Dist. LEXIS 52829, at *16-18 (N.D. Cal. July 11, 2007) (statement that company's write-off was the result of a sale of one of its business units was false and misleading where SEC alleged that

---

[21] Defendants' statements that "Plaintiffs nowhere allege what value Defendants should have instead assigned to any particular mortgage-related securities," Def. Br. at 21, and that Plaintiffs do not allege "by how much Defendants' valuations were overstated," Def. Br. at 23, simply ignore the well-pled allegations of those figures in the Complaint. *See* ¶¶268-71. Further, although Plaintiffs do quantify the financial improprieties here, courts do not require it. *See, e.g., In re Miller Indus. Sec. Litig.*, 12 F. Supp. 2d 1323, 1328 (N.D. Ga. 1998) (a plaintiffs "need not specify the exact dollar amount of each accounting error"); *Simons v. Dynacq Healthcare, Inc.*, No. 03-05825, 2006 U.S. Dist. LEXIS 46503, at *17-18 (S.D. Tex. July 10, 2006). Additionally, Defendants' arguments that the ABX index does not show that the value of the holdings should have been written down because such indices should not be relied on as a valuation tool is a disingenuous argument considering that Defendants claim they used another similarly available index, the Lehman Brothers Ba U.S. High Yield Index, as a benchmark during the Class Periods. ¶¶163, 168. As the Complaint alleges, the ABX index further shows, with all the other allegations, that Defendants failed to provide, in good faith, fair value valuations of investment securities using all appropriate factors relevant to such valuations and accordingly overstated the mortgage-related investments and corresponding NAVs of the Funds during the Class Periods. *See* ¶267 ("As the ABX is a synthetic index consisting of credit default swaps on sub-prime ABS, its decline in price and increase in spread represent a quantifiable, market-based measure of the cost to insure against default on the underlying ABS based on investors' perception of the increased likelihood of loss. The ABX, as previously mentioned, deteriorated throughout the course of 2007, well before Defendants meaningfully reduced the valuation of its ABS as [a] percentage of par"). Defendants' argument, the weight to give to the ABX index, is a matter for trial and premature at this pleading stage.

write-off was necessitated by years of poor record keeping and lack of internal controls and that information on lack of internal controls was available to defendants at time they made statements).[22]

"It is no answer to argue . . . that the quoted statement . . . did not express a reason in dollars and cents, but focused instead on the "indefinite and unverifiable" term, "high" value, [] like the similar claim that the merger's terms were "fair" . . . The objection ignores the fact that such conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading. Provable facts either furnish good reasons to make a conclusory commercial judgment, or they count against it, and expressions of such judgments can be uttered with knowledge of truth or falsity just like more definite statements." *Va. Bankshares,* 501 U.S. at 1093-94.[23] Thus, to the extent Defendants seek to characterize their valuations as opinions, Defendants' failure to consider that the Funds were heavily invested in risky mortgage-backed securities that had already declined in actual value and were continuing to do so (as well as the other observable market data that Defendants publicly differentiate themselves from in statements during the Class Periods) renders them actionable and in violation of GAAP, SEC rules and their own policies. ¶223. *See, e.g., In re Raytheon Sec. Litig.,* 157 F. Supp. 2d 131, 148 (D. Mass. 2001) ("There are indeed numerous occasions for judgment calls in the application of GAAP. But GAAP are intended to provide a reliable degree of predictability, and an application of GAAP that strays beyond the boundaries of reasonableness will provide evidence from which scienter can be inferred."); *In re Digi Int'l Inc. Sec. Litig.,* 6 F. Supp. 2d 1089, 1098 (D. Minn. 1998) (rejecting claim that "accounting principles are complex and subject to differing interpretations" because "[t]he

---

[22] *See also In re JDS Uniphase Corp. Sec. Litig.,* No. 02-1486, 2005 U.S. Dist. LEXIS 20831, at *24 (N.D. Cal. Jan. 6, 2005) (JDS' sudden write-off of $270 million in excess inventory supported allegation that revenue recognition was false and misleading when made); *Simon v. Am. Power Conversion Corp.,* 945 F. Supp. 416, 431 (D.R.I. 1996) ("Even if, as APC argues, they were not able to quantify the exact impact of the defect at the time of the filing, at the very least this was a 'known uncertainty' that APC would have reasonably expected to influence its operations. . . . [B]ecause APC was under an affirmative duty to disclose the discovery of the defect and did not, . . . this omission [is] . . . actionable"). Defendants' cases are distinguishable because those plaintiffs did not point "to facts suggesting that the failure to write down the assets sooner was attributable to fraud," like here. *See Davidco Investors, LLC v. Anchor Glass Container Corp.,* No. 8:04-2561, 2006 U.S. Dist. LEXIS 11527, at *60-61 (M.D. Fla. Mar. 6, 2006) (distinguishing the same cases cited by Defendants here).

[23] *See also Joffee v. Lehman Bros., Inc.,* 410 F. Supp. 2d 187, 193 (S.D.N.Y. 2006) ("[S]tatements of opinion are actionable ... to the extent that they are not honestly held"); *In re Oxford Health Plans, Inc. Sec. Litig.,* 187 F.R.D. 133, 141 (S.D.N.Y. 1999) (holding that statements based upon defendants' "beliefs" were actionable because there was "evidence that the defendants were aware of undisclosed facts that seriously undermined the accuracy of their alleged opinions or beliefs"). Here, the Complaint alleges that Defendants did not genuinely or reasonably believe that the valuations they assigned were accurate. Thus, the statements are actionable.

evidence, in the form of expert testimony or otherwise, ultimately may prove defendants to be correct, but the Court cannot resolve this issue on a motion to dismiss").[24] Whether GAAP itself has been violated is generally not appropriate for a motion to dismiss,[25] but courts have found GAAP violations during motions to dismiss in similar cases. *See, e.g.*, *In re Williams*, 339 F. Supp. 2d at 1223 (defendants' failure to timely write-down assets violated GAAP because "Defendants allegedly had information concerning negative industry trends that rendered it 'probable' that the assets were impaired"). Further, to the extent that Defendants' valuations are considered opinions, Plaintiffs have alleged that Defendants' valuation opinions were both subjectively and objectively false. ¶¶225-71.[26]

Moreover, during the Class Periods, each of the SOX certifications,[27] signed by Bowen and Bradley, contained statements that "the registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Rule 30a-3(c) under the Investment Company Act of 1940) for the registrant" and that they have: (a) [d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our

---

[24] Defendants also contend that Plaintiffs do not allege that the information provided by dealers was known or believed to be erroneous. Def. Br. at 22. However, the Complaint states that "Defendants represented that a large percentage of the Funds' portfolios value [was] determined based on prices supplied by dealers in the absence of readily determinable values. In fact, there was evidence throughout the Class Periods of readily determinable deterioration in values, but Defendants chose to ignore this evidence when calculating the Funds' NAV." ¶16. Further, the Complaint states that Defendants knew or recklessly disregarded that the values based on prices supplied by dealers ignored various factors that reflected material deterioration in the value of the Funds' mortgage-related securities. ¶207.

[25] Whether the Company violated GAAP is a factual question, requiring expert testimony, which should not be addressed at the motion to dismiss stage. *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 709 n.9 (3rd Cir. 1996) (characterizing GAAP proof as a battle of experts); *State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001) (same). However, "[e]ven if [the Company's] statements are ultimately determined to have accorded with GAAP, it does not necessarily follow that a finding of fraud would thereby be precluded." *SEC v. Caserta*, 75 F. Supp. 2d 79, 92 n. 7 (E.D.N.Y. 1999) (citations omitted).

[26] Defendants' argument that Defendants did not ignore the developments in the mortgage and housing markets because they discussed them in filings, *see* Def. Br. at 24, misses the point. First, although Defendants discussed the adverse facts, they mislead investors by differentiating the Funds' holdings from what was happening in the market. *See, e.g.*, ¶189. Further, even if the disclosures about the market were not false and misleading, Defendants' statements during the Class Periods were false and misleading because the reported NAVs, of material importance to investors, ¶¶229-34, were artificially inflated during the Class Periods and thus nullified any discussion of the adverse information. *See In re Williams*, 339 F. Supp. 2d at 1224, 1226 ("even as Defendants recognized that market conditions had deteriorated for telecom companies, they continued to portray WCG as being unaffected by these conditions, downplayed the negative impacts of the market on WCG"; finding that financial statements were false and misleading due to improper accounting).

[27] Several courts have found that SOX certifications provide evidence of both the false and misleading nature of the statements and *scienter*. *See, e.g.*, *In re PMA Capital Corp. Sec. Litig.*, No. 03-6121, 2005 U.S. Dist. LEXIS 15696, at *32-33 (E.D. Pa. July 27, 2005); *In re Lattice Semiconductor Corp. Sec. Litig.*, No. 04-1255, 2006 U.S. Dist. LEXIS 262, at *50-51 (D. Or. Jan. 3, 2006).

supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;" and "[e]valuated the effectiveness of the registrant's disclosure controls and procedures." *See, e.g.*, ¶160. Further, the N-CRS Forms (each Fund used the Form to file its Registration Statement) claimed compliance with GAAP and stated that the internal controls were effective. *See, e.g.*, ¶161. Also, in Exhibit A to the Proxy Materials, the FHI Fund and FHY Fund disclosed that the Audit Committee's responsibilities included "oversee[ing] the accounting and financial reporting processes of each Fund and its internal controls and, as the Audit Committee deems appropriate, to inquire into the internal controls of certain third-party service providers" and "oversee[ing] or, as appropriate, assist Board oversight of, each Fund's compliance with legal and regulatory requirements that relate to the Fund's accounting and financial reporting, internal controls and independent audits." *See, e.g.*, ¶184. Finally, an exhibit to each of the Funds' registration statements stated that the "Fund maintains, or causes its custodian to maintain, a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorization and in accordance with the 1940 Act; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain accountability for assets and to maintain compliance with the books and records requirements under the 1940 Act." *See, e.g.*, ¶116.[28] All of these representations were materially false and misleading. *See, e.g.,* ¶¶155, 186.  *See also Simons*, 2006 U.S. Dist. LEXIS 46503, at *17-18 (finding internal control statements to be actionable even when plaintiff has not alleged the financial impact of the internal controls).

Defendants' statements about the Funds' internal controls and GAAP compliance were materially false and misleading when made because the Funds lacked effective internal controls to provide reasonable assurances that the Funds would value their securities in accordance with GAAP and

---

[28] Defendants' self-contradictory argument that they had no duty to provide the Underwriting Agreements (an exhibit to each of the Registration Statements), in which the statements appeared, to investors upon purchase of the Funds, and therefore, investors did not rely on the statements, Def. Br. at 24 n.13, is baseless, especially in light of Defendants then admitting that investors could have read the statements and relied on them. *See id.* Furthermore, whether Plaintiffs read the statements is a factual question, not appropriate for this stage, especially since Plaintiffs could have easily accessed the information, as it was required to be filed with the SEC, and the Underwriting Agreements were referenced throughout the Registration Statements. Additionally, Defendants' argument that the statements do not guarantee that the Funds' internal controls will always function, Def. Br. at 25, is contrary to Defendants' SOX certifications in which they specifically state that they have disclosed any weaknesses and deficiencies in internal controls. ¶161.

monitor and manage the risks inherent in the Funds' investments in mortgage-related securities. *See, e.g.*, ¶44. For instance, despite the adverse developments that existed as early as December 2006 which indicated the deteriorating values of the mortgage-related investments, Defendants ignored such factors and failed to properly reflect the deterioration when valuing the Funds' mortgage-related securities. ¶17.[29] These statements are material and actionable, especially because investors in the Funds did not monitor or comprehend the risks inherent in such portfolios and relied on the Funds' management to have the skills and adequate controls in place to monitor and manage such risks. ¶7. *See In re RAIT Fin. Trust Sec. Litig.*, No. 07-03148, 2008 U.S. Dist. LEXIS 103549, at *24 (E.D. Pa. Dec. 22, 2008) (denying motion to dismiss and stating: "[i]t is one thing to say that a company is unavoidably exposed to credit risk…, while it is another thing to say [as plaintiffs do, that the] company lack[ed] the ability to detect the presence and extent of the risk" due to its inadequate monitoring processes); *In re Immucor Inc. Sec. Litig.*, No. 1:05-2276, 2006 U.S. Dist. LEXIS 72335, at *36-37 (N.D. Ga. Oct. 4, 2006) ("A reasonable investor would have been swayed had Immucor identified to the public (as it admits that it identified internally) weaknesses in its internal controls…"). *Accord Va. Bankshares*, 501 U.S. at 1091.

### B.   Materially False and Misleading Statements About the Funds' Investment Strategies and Risks

Defendants made false and misleading statements about diversification and hedging during the Class Periods. Diversification entails "investing in uncorrelated or negatively correlated assets so that losses in one asset are offset by gains in another, thus reducing the volatility of investment returns." ¶263. The Funds, in contrast, invested in highly correlated assets (the subordinated mezzanine and equity tranches of sub-prime ABS trusts) where the underlying mortgages all faced similar risks. *Id.* The similarity of these risks and the subordinated position of the Funds' investments meant that losses would be duplicated, not offset, by losses in other assets, thus utterly contradicting Defendants' representations that the Funds were "diversified." *Id. See Sussman v. Paradigm Partners, Inc.*, No. 91-2891, 1992 U.S. Dist. LEXIS 16426, at *12 (S.D.N.Y. Oct. 23, 1992) ("Plaintiffs first allege that the language of the Prospectus includes the material misrepresentation that defendants would diversify . . . Therefore, the court finds that plaintiffs' claim that the Prospectus misrepresented that defendants would diversify . . . has a basis in the Prospectus and the court declines to dismiss that allegation").

---

[29] Thus Defendants' argument that the internal controls were adequate because the write-downs were identified and taken during the proper reporting period, Def. Br. at 24, is contrary to the allegations in the Complaint, which state that throughout the Class Periods, the Funds' holdings and NAVs were improperly overvalued (even if some write-downs occurred).

The Complaint further alleges that the negative macroeconomic developments in the real estate market and the subordinated position of the Funds' investments called for a reduction in risk by limiting the purchase of the more toxic securities and/or utilizing hedging techniques to limit the losses, or potentially even gain from the decline in asset prices. ¶148. However, Defendants, while representing that they were pursuing prudent defensive strategy, instead, concealed the true extent of the Funds' deteriorating NAVs by opting to increase risk by accelerating the purchase of toxic securities on margin. *Id.* Defendants' failure to use the prudent strategies and diversify is further evidenced by Defendants beginning to use significant amounts of borrowed funds to cover up their losses and try to save the Funds.  ¶149. The lack of diversification became even clearer with the disclosures on July 7, 2008. The FHI Fund's Form N-CSRS showed that the FHI Fund still had over 20% of its assets invested in distressed securities below CCC rating. ¶220. The majority, over 60%, was invested in below "BBB" rated securities or below investment grade debt. "This FHI Fund's portfolio still did not appear to represent the defensive tactics in place to invest in higher credit quality investments and curtailing on investments in mortgage-related securities." *Id.* The FHY Fund's Form N-CSRS showed that almost 50% of the FHY Fund was invested in below-investment grade securities, below a BBB rating and over 30% was invested in distressed securities below a CCC rating. The FHY Fund Portfolio did not represent a significant investment change to reflect the defensive tactics in place due to the tumultuous investment market. ¶221. The Complaint further provides two very clear and detailed examples showing the lack of diversifications. *See* ¶¶252-59 (discussing HarborView Trusts and ACE 2005-HE5 Trust).[30]

Defendants specifically target the proxy materials for the FHI and FHY Funds claiming that the materials contained proper disclosures and that Plaintiffs "fail to offer any explanation why they were

---

[30] The Complaint specifically states:

The high geographic concentration of mortgages in California and Florida meant that a decline in the residential real estate market in either state would have a correspondingly adverse impact on the Funds' portfolio compared to a geographically diversified portfolio. Similarly, the temporal concentration of interest rate re-settings to a handful of months meant that the Funds exposed themselves to the risk that a recession or period of increased unemployment could coincide with an upwards adjustment in interest rates, thus imperiling many borrowers' ability to repay at the same time. The high proportion of mortgages with low FICO scores, stated documentation, high LTV ratios, and use of the loans for cash-out refinancing as opposed to home purchase further contributed to credit risk in the underlying mortgages, and the Funds' concentration of investments at the bottom of the credit structure of the trusts ensured that most of these investments had correlated, undiversified risk if the cash flow of the underlying mortgage payments was insufficient to pay down all tranches. [¶266].

insufficient to alert investors to the risks of the Funds' mortgage related securities." Def. Br. at 26. Defendants' argument must fail. The Complaint states that the Joint Proxy Statement (filed on March 16, 2007, sent to shareholders of record as of February 12, 2007) contained a unanimous Recommendation of the Board of Trustees of both the FHI Fund and FHY Fund to vote "For" the proposal stating that "residential mortgage-backed securities have historically offered very compelling risk/reward characteristics within the structured finance area. Valhalla believes that removing the limitation on residential mortgage-backed securities will bring the Strategic Funds in line with the original intent of their investment strategy" and that "the changes in the industry concentration policies were in the best interests of the Strategic Funds." ¶429. This was at a time when the deteriorating value of mortgage-related investments called for a defensive strategy. Nevertheless, shareholders were made to approve, based on false and misleading proxies, a change in concentration that discussed the investment strategies under normal market conditions. *See* ¶185. However, Defendants did not disclose that there were no "normal market conditions" and that the residential mortgage-backed securities market at the time of the change in the investment restriction would substantially increase the risks to the Funds. ¶186. Also, while providing information regarding the Audit Committee's responsibilities as to the internal controls, which implied that those areas were being monitored, when in fact, Defendants failed to disclose that the FHI and FHY Funds lacked effective internal controls to provide reasonable assurances that the Funds would value these securities in accordance with GAAP and to monitor and manage the risks inherent in the Funds' investments in mortgage-related securities. *Id.*

Additionally, the Proxy Materials omitted to disclose the accelerating deterioration of the Funds' residential mortgage-backed securities and otherwise failed to accurately portray how severe such deterioration in their own portfolios had actually become. ¶430. Further, Defendants failed to disclose that the recommendation and other positive statements concerning the vote were made without adequate basis. *Id. See also Va. Bankshares*, 501 U.S. at 1090-91, 1096. The Proxy Materials also did not disclose that Defendants did not in fact implement effective hedges to mitigate or reduce the risks related to the Funds' investments in mortgage-related securities, or that many of the holdings had declined and were continuing to decline in value at a significant rate. ¶186. Thus, the Proxy Materials contained material misstatements and omissions because they failed to disclose material facts necessary for shareholders to cast fully informed votes with respect to the change in concentration.

Defendants erroneously argue that any alleged omissions and misrepresentations regarding the use of hedging are protected under the bespeaks caution doctrine because of the so-called risk disclosures in

the Registration Statements. Def. Br. at 28. To be a "meaningful" risk disclosure, however, a "cautionary statement must discredit the alleged misrepresentations to such an extent that the 'risk of real deception drops to nil.'" *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1033 (S.D. Cal. 2005) (citation omitted). True cautionary language must "warn[] investors of *exactly* the risk that plaintiffs claim was not disclosed." *In re Indep. Energy Holdings, PLC Sec. Litig.,* 154 F. Supp. 2d 741, 755 (S.D.N.Y. 2001) (emphasis in original; citation omitted). *See also In re Prudential Sec. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("Cautionary language ... must precisely address the substance of the specific statement or omission that is challenged."). Generic or boilerplate statements are not sufficient. *See In re Veeco Instruments, Inc. Sec. Litig.,* 235 F.R.D. 220, 235 (S.D.N.Y. 2006). The Complaint details how the risk disclosures related to the hedging techniques were inadequate and misleading, *see* ¶15, and thus, actionable. *See In re TCW/DW*, 941 F. Supp. at 330-31 (denying motion to dismiss because although defendants clearly and accurately depict the type of risk borne by the Fund, they do not accurately depict the extent of the risk). The bespeaks caution doctrine also does not insulate for risk that has already materialized, and therefore, Defendants are not insulated for any risk disclosure related to the mortgage-related securities because the risks disclosed had already occurred. *See, e.g.*, *In re Prudential*, 930 F. Supp. at 72 (the "bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away").[31]

Defendants also made false and misleading statements regarding leverage. Defendants stated that the Funds "generally seek" to use derivative instruments and transactions as a portfolio management or

---

[31] *See also Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."); *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1127 (7th Cir. 1993) ("A prospectus stating a risk that such a thing could happen is a far cry from one stating that this had happened. The former does not put an investor on notice of the latter."); *Feiner v. SS&C Techs., Inc.*, 11 F. Supp. 2d 204, 209 (D. Conn. 1998) (holding that a risk disclosure which warned that a delay could materially affect the "business, financial condition, and results of operations" failed to nullify a misleading omission as to the delay's impact on historical financial statements); *In re Rediff.com India Ltd. Sec. Litig.*, 358 F. Supp. 2d 189, 211-12 (S.D.N.Y. 2004) (generalized warnings about potential problems with email system were not sufficient, given allegation that email system was failing at the time of the offering). Here, the general risk disclosures with respect to mortgage-related securities only *discussed potential risks, and not known risks* and events that had already occurred. For instance, Defendants failed to disclose that Funds were heavily invested in risky mortgage-backed assets, the risks from which the Funds lacked the required controls to effectively monitor and manage, that many of the holdings of the Funds had declined in actual (as opposed to reported) value and were continuing to do so at a very significant rate, and that based upon facts existing at that time concerning problems with the real estate and mortgage industries, the Funds materially overstated the value of their portfolios and NAVs by failing to properly value their investments in mortgage-related securities. ¶223.

hedging technique to protect against possible adverse changes in the market value of securities held in the Fund's portfolio, but instead, during the Class Periods, Defendants did not utilize these hedging strategies, but chose to turn to leverage and "represented to the Funds' investors that leverage presented opportunities for profits when, in fact, leverage merely delayed (and ultimately increased) the losses the Funds would incur." ¶150. During the Class Periods, Defendants recklessly compounded the risks of the investment strategies, without adequate disclosure to investors, by utilizing leverage to buy securities on margin in a falling market, inevitably resulting in forced liquidation of assets at low values. ¶146. As the Complaint alleges, the FHI Fund and FHY Fund began to use leverage at the beginning of 2007 and accelerated the purchase of mezzanine and equity tranches of mortgage-related securities, the ones most likely to suffer as delinquency and foreclosure mounted on the underlying collateral. *Id.* Finally, rather than admit the deterioration in the value of the Funds' mortgage-related securities, Defendants attempted to misleadingly differentiate the Funds' portfolios from the problems in sub-prime mortgages. ¶189. These statements are actionable. *See Hunt v. Alliance North Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 730 (2d Cir. 1998) ("Plaintiffs claim the prospectuses promised the Fund would attempt to use hedging devices when in fact it could not. Because we agree a reasonable investor could have been misled by the prospectuses, and would have considered the availability of hedging devices important in deciding whether to purchase Fund shares . . . we find the . . . Complaint states a claim for which relief can be granted"); *In re Charles Schwab Corp. Sec. Litig.*, No. 08-01510, 2009 U.S. Dist. LEXIS 8125, at *22 (N.D. Cal. Feb. 4, 2009) (motion to dismiss denied where plaintiffs alleged that defendants represented that the fund was much less risky than it actually was, while the fund took on significantly greater risk by extending its average portfolio duration beyond two years and by concentrating a significant portion of its portfolio in riskier assets such as mortgage-backed securities).[32]

### C.    Materially False and Misleading Statements About the Funds' Fees

The Complaint alleges that during the Class Periods, the Funds' public filings contained inflated values for the Funds' holdings of mortgage-backed assets and the Funds' NAVs, and as a result of the inflated values, the advisory fees were overstated. ¶152. The Complaint further alleges that because the price of the shares tracks the NAV, an accurate valuation of a closed-end fund's portfolio and the

---

[32] *See also In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98-4318, 2000 U.S. Dist. LEXIS 94, at *4-6 (S.D.N.Y. Jan. 6, 2000) *(*denied motion to dismiss for misrepresentations in the prospectus because the excessive concentration on micro-cap stocks, extreme volatility, and highly illiquid nature of the Fund's portfolios were never fully or adequately disclosed).

corresponding NAV are material to investors. The NAV must be calculated accurately so that Funds pay the correct amount in fees. ¶234. Due to the inflation of the NAVs during the Class Periods, in 2007, for example, the advisory fees paid were $4.27 million, as compared to $0.39 million paid out in 2005. ¶508. Additionally, the Complaint alleges that because the advisory fees were based on the value of each of the Fund's Managed Assets, Defendants were motivated to inflate the value of the mortgage-related securities and NAVs in order to increase their compensation. ¶472. Defendants were also motivated to improperly use leverage to increase the advisory fees, which are higher when leverage is utilized. ¶487.[33] Thus, Defendants' statements during the Class Periods regarding the fees were materially false and misleading because Defendants did not disclose that the fees paid were inflated due to the overvaluations,[34] and that Defendants' use of leverage was motivated by the increased fees.[35]

## V.   PLAINTIFFS HAVE ALLEGED FACTS GIVING RISE TO A STRONG INFERENCE OF *SCIENTER* FOR VIOLATIONS OF THE EXCHANGE ACT

"The 'requisite state of mind' in 10b-5 claims is 'intent to deceive, manipulate, or defraud.'" *Tellabs v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 319 (2007) (citation omitted). The Seventh Circuit has found that recklessness satisfies the *scienter* requirement. Recklessness is defined as "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious that the defendant must have been aware of it." *Norfolk County Ret. Sys. v. Ustian*, No. 07-7014, 2009 U.S. Dist. LEXIS 65731, at *21-22

---

[33] Thus, although Defendants disclosed that the use of leverage would increase fees, they did not inform investors that leverage would compound the risks and cause the Funds further losses, simply to increase fees. In fact, Defendants, instead of admitting that leverage was a reckless strategy and a failure, concealed the results by utilizing improper accounting for mortgage-related investments to hide losses and inflate each of the Fund's NAV during the Class Periods. ¶9.

[34] Defendants are simply incorrect that the additional disclosure that the overstatement of assets would lead to an overstatement of fees would not materially alter the total mix of information. Def. Br. at 29. *See Siemers v. Wells Fargo & Co.*, No. 05-04518, 2006 U.S. Dist. LEXIS 60858, at *23-22 (N.D. Cal. Aug. 14, 2006) ("the distinction between a firm, already-extant kickback arrangement and a mere possibility of additional compensation sufficiently alleges a material omission, at least at the pleading stage"). *In re RAIT*, 2008 U.S. Dist. LEXIS 103549, at *30 (Defendants argued that "because the nature of and the risks associated with RAIT's investments were fully disclosed, any misstatements involving RAIT's accounting practices did not significantly alter the total mix of information available to investors . . . But even with the knowledge that RAIT's investments inevitably carry risks, surely a reasonable investor would find important the accurate reporting . . . Therefore, we cannot say that Plaintiffs failed to plead materiality").

[35] Thus, Defendants are incorrect that Plaintiffs need to bring their claims for recovery of advisory fees derivatively, Def. Br. at 29 n.16, because the Complaint adequately alleges false and misleading statements regarding the fees. Defendants' reliance on *Strougo v. Bassini*, 282 F.3d 162 (2d Cir. 2002), is misplaced because in *Strougo*, plaintiff alleged breach of duties under the Investment Company Act, not claims like those here. *See id.* at 166.

(N.D. Ill. July 28, 2009) (citation omitted).

The inquiry on *scienter* "*is whether all of the facts alleged, taken collectively*, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323 (underlined emphasis omitted; bold added). This requisite "holistic" approach, *see id.* at 326, no longer permits courts to ignore any factual allegations that could support *scienter* because, standing alone, that fact would not suffice to meet the requisite standard; rather each fact must be given some weight, and all facts are weighed together to determine whether the totality of the facts alleged give rise to a strong inference of *scienter*. *See Roth*, 2008 U.S. Dist. LEXIS 18471, at *14-25 (citing *Tellabs*); *see also Norfolk*, 2009 U.S. Dist. LEXIS 65731, at *34 ("defendants cannot defeat a complaint by 'cherry picking' particular allegations that, standing alone, might not meet the heightened pleading standard under Rule 9(b) or the PSLRA"). "The inference that the defendant acted with *scienter* need not be irrefutable, *i.e.,* of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324 (citations omitted). An inference "at least as likely as competing inferences" warrants recovery. *Id.* at n.5. *See also City of Brockton Ret. Sys. v. Shaw Group Inc.*, 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008) ("the 'tie . . . goes to the plaintiff'").

### A.    Defendants Were Aware of Facts and/or Had Access to Information Contrary to Their Public Statements

"One of the 'classic fact patterns' that gives rise to a strong inference of scienter is where 'defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate.'" *In re Motorola Sec. Litig.*, No. 03-287, 2004 U.S. Dist. LEXIS 18250, at *92 (N.D. Ill. Sept. 9, 2004) (citations omitted). Further, "allegations of recklessness [can] be sufficient where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor." *Novak*, 216 F.3d at 309. Plaintiffs have far exceeded this requisite standard for pleading *scienter* here.[36]

The Complaint alleges that Defendants were active participants in the fraud and had full knowledge that the statements made during the Class Periods were false and misleading. *See In re CornerStone Propane Partners., L.P. Sec. Litig.*, 416 F. Supp. 2d 779, 791 (N.D. Cal. 2005) (finding

---

[36] Furthermore, at the pleading stage, a plaintiff need not identify a specific culpable officer or director to establish corporate scienter. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008); *Caterpillar v. Great Am. Ins. Co.*, 62 F.3d 955, 962 (7th Cir. 1995); *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 196 (2d Cir. 2008).

*scienter* because defendant was "implicated as an author of CornerStone financials as well as a primary perpetrator of a fraudulent scheme").[37]   *See also In re Petco Animal Supplies, Inc. Sec. Litig.*, No. 05-0823, 2006 U.S. Dist. LEXIS 97927, at *45 (S.D. Cal. July 31, 2006) (finding the allegation sufficient to state a claim for primary liability; "Though [individual defendants] are not alleged to have made any statements about the stock value, Plaintiffs allege that they participated in the scheme to defraud investors by causing or permitting [the Company] to overstate its earnings by recklessly disregarding proper accounting procedures for the distribution centers. The Consolidated Complaint contains sufficient specific facts of their participation"). Bowen was the President of First Trust and First Trust Portfolio, and a Trustee of the Funds. ¶¶34, 468. Bradley was the CFO, Controller and Treasurer of the Funds; Managing Director and CFO at First Trust; and CFO and Managing Director at First Trust Portfolios. ¶35. First Trust was the advisor and manager of the Funds, responsible for supervising the Funds' Subadvisor, **monitoring the Fund's investment portfolio**, managing the Funds' business affairs, as well as providing certain clerical and bookkeeping and other administrative services. ¶30. First Trust was also responsible for the **Funds' overall investment strategy** and overseeing its implementation. ¶416.  The portfolios and NAVs were improperly valued by First Trust and the Board of Trustees; Bradley and Bowen had the ability to influence the valuations. ¶¶487, 503.[38]

---

[37] *See SEC v. Delphi Corp.*, No. 06-14891, 2008 U.S. Dist. LEXIS 78671, at *26 (E.D. Mich. Oct. 8, 2008) (finding scienter because "[s]he is alleged to have been responsible for GAAP accounting . . . yet she participated in a scheme to mischaracterize the $20 million payment as income. In other words, the documents Kudla created are alleged to have been used in the preparation of misstatements and omissions to investors"); *Hubbard v. BankAtlantic Bancorp, Inc.*, No. 07-61543, Order, at 7 n.6 (S.D. Fla. May 11, 2009) (finding scienter based on position as CFO because his job would be to monitor loan loss reserves and therefore he either knew or was reckless in not knowing that the loss reserves were materially understated).

[38] The inference that the Individual Defendants and First Trust knew about the fraudulent schemes is simply common sense. Because the false statements at issue concerned the value of the Funds' portfolios and their key assets, there is a strong inference of *scienter* that top management and the advisor and manager of the Funds, First Trust, knew that proper valuation methods were not being used. *See, e.g., Makor Issues*, 513 F.3d at 711 ("it is exceedingly unlikely" that CEO "was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives"); *In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314, 325-326 (S.D.N.Y. 2001) (courts reasonably assume "that principal managers [] are aware of matters central to that business's operation") (citing cases); *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (strong inference was raised that directors had knowledge of import restrictions that eliminated a "potentially significant source of income for the company"); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig*, 324 F. Supp. 2d 474, 488 (S.D.N.Y. 2004) (scienter found where "defendants ignored red flags relating to the core operations . . . that should have alerted them to the fact that the . . . financial statements were false"); *In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 218, 223 (D. Conn. 2001) (scienter adequately alleged because "[t]he problems Xerox was having . . . affected the company's 'core operations' and jeopardized the success of the company's most significant initiative at that time"); *In re Sears, Roebuck & Co.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) ("Officers of a company can be assumed to know of facts 'critical to a business's core

The Complaint alleges that Defendants ignored observable market data in valuing the Funds' mortgage-related securities that showed that there was significant deterioration in the market in contravention of GAAP, SEC Rules, and the Funds' disclosed policies. ¶¶15, 244-71. *See also Makor Issues*, 513 F.3d at 706-07 (finding *scienter* because defendants told investors during the Class Period that the demand for the products was growing, while ignoring and not disclosing the deterioration in the market that was "well under way by December as a result of the bursting of the fiber-optics bubble in the middle of the year," and ignoring that the market for its core products was "evaporating"). "Defendants represented that in fair valuing the Funds' investments, consideration would be given to several factors including, among other things, an evaluation of the forces which influence the market in which the securities of the issuer are purchased and sold and the credit quality and cash flow of the issuer, based on the Subadvisers, or external analysis," however there were adverse developments in the markets for the securities in which the Funds invested that existed throughout the Class Periods, but were ignored and not adequately disclosed by Defendants. ¶¶15, 226. Furthermore, Defendants represented that a large percentage of the Funds' portfolios value was determined based on prices supplied by dealers in the absence of readily determinable values, however, there was evidence throughout the Class Periods of readily determinable deterioration in values, but Defendants chose to ignore this evidence when calculating the published NAVs. ¶16.[39]

Defendants also ignored numerous relevant factors with respect to the sub-prime mortgage market in general in formulating their valuations, and also ignored other relevant factors with respect to specific entities which had issued asset-backed securities. These failures contributed to the overstatement of the mortgage-related investments and corresponding NAVs of the Funds. ¶248. The Complaint also alleges that many of the ABS-issuing entities in the Funds' portfolios indicated a high degree of risk in the mortgage-related securities which the Funds purchased. Defendants did not incorporate these risks into their valuation of these investments, and thereby materially overstated the value of the mortgage-related securities and the corresponding NAV of the Funds. ¶249. Moreover, the

---

operations or to an important transaction that would affect a company's performance.'"); *Selbst v. McDonald's Corp.*, No. 04-2422, 2005 U.S. Dist. LEXIS 23093, at *63 (N.D. Cal. Sept. 21, 2005) ("'High-level managers . . . may be presumed to have been aware of problems' at their company.' Such a presumption is particularly strong where the specific problem facing the company: (1) affects 'a significant source of income' or a 'core [business] operation'; or (2) would be 'readily recognized by an outsider.'").

[39] *See also Baxter*, 2007 U.S. Dist. LEXIS 52829, at *22-24 (court found that the SEC's allegations that defendant's execution of documents filed with the SRC without disclosing "alarming information" concerning the company's financial condition, for example, the existence of significant unsubstantiated account balances and significant internal accounting discrepancies, established *scienter*).

Complaint alleges that the Valuation Committee for the FHI Fund met only four times and for the FHY Fund only a total of three times during the entire fiscal year ended October 31, 2006 and during the calendar year ended December 31, 2007, respectively, even though the Proxy Materials stated that: "The market values for high yield securities tend to be very volatile, and these securities are less liquid than investment grade debt securities." ¶241. Thus, Plaintiffs have adequately established a strong inference of *scienter* just based on the fact that Defendants had access to contrary information, yet ignored it, and made the false and misleading statements during the Class Periods.[40]

### B.    Defendants' GAAP Violations Provide Evidence of *Scienter*

"GAAP violations, when coupled with evidence of fraudulent intent" provide evidence of *scienter*. *SEC v. DCI Telecomms.*, 122 F. Supp. 2d 495, 500 (S.D.N.Y. 2000); *see also Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815, 824 (N.D. Ill. 2000).[41]    As set forth in the Complaint, Defendants violated

---

[40] The Court should reject Defendants' claims that these detailed allegations of *scienter* amount to no more than fraud by hindsight. Defendants mischaracterize the Complaint to suggest that all it alleges is that Defendants failed to predict the decline in the value of mortgage-backed assets. Def. Br. at 31. That is wrong. The Complaint alleges, among other things, that Defendants knew or were reckless in not knowing that the Funds' portfolio values and NAVs were overstated due to their deficient valuation models that failed to properly take into account various adverse factors as discussed above. Courts routinely reject boilerplate fraud-by-hindsight challenges where, as here, the allegations concern misrepresentation and omissions that were misleading and false at the time they were made. *See In re Atlas Air*, 324 F. Supp. 2d at 494-95 (rejecting defendants' fraud-by-hindsight claim where plaintiffs alleged that "the company failed to take into account information that was available to it" at the time it issued its incorrect financial results sufficiently pleaded fraud); *AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC*, No. 01-11448, 2005 U.S. Dist. LEXIS 21605, at *39-40 (S.D.N.Y. Sept. 26, 2005) (finding that amended complaint resolved fraud by hindsight concerns by new allegations that asset-backed securities collateral value "estimates were shown to be wrong in a subsequent report prepared by a third-party" and that the asset value "was computed in a materially misleading way that was in fact wrong at the time it was issued"). Further, courts have rejected the hindsight defense in cases where "the realization of the risk is, at least in part, the cause of the losses Plaintiffs allege." *See, e.g., In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 454 (S.D.N.Y. 2005). The cases cited by Defendants are distinguishable. In *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753 (7th Cir. 2007), plaintiffs alleged that defendants knew, but their allegations were solely based on a later report, unlike here. *See id.* at 760. In *Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791 (N.D. Ill. 2007), plaintiffs could not allege that defendants knew the statements were false when they were made. *Id.* at 801.

[41] *See also In re Aspeon Sec. Litig.*, No. 04-55651, 2006 U.S. App. LEXIS 4673, at *4 (9th Cir. Feb. 23, 2006) ("'violations of GAAP standards can . . . provide evidence of scienter'") (citation omitted; omission in original); *In re Daou*, 411 F.3d 1006, 1016 (9th Cir. 2005) ("Violations of GAAP standards can also provide evidence of scienter"); *In re MicroStrategy Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 635 (E.D. Va. 2000) ("when the number, size, timing, nature, frequency, and context of the misapplication or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter"); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001) (actions contrary to expressed accounting policy "can form the basis of proof of recklessness"); *In re Winstar Commc'ns*, No. 01-3014, 2006 U.S. Dist. LEXIS 7618, at *27-28 (S.D.N.Y. Feb. 24, 2006) ("the proposed complaint sets forth comprehensive allegations detailing on-going and extensive fraudulent activities conducted by the Winstar

numerous GAAP provisions and the Funds' own stated valuation policies.[42]   ¶¶225-71. Due to the GAAP violations, Defendants were able to overstate the value of the Funds' portfolios and NAVs during the Class Periods. Thus, the GAAP violations here also add to the strength of the *scienter* allegations.[43]

Further, Courts have recognized that the sheer magnitude of the fraud supports a strong inference of *scienter*. *See Norfolk*, 2009 U.S. Dist. LEXIS 65731, at *30 ("the magnitude and nature of accounting errors may belie a defendant's claim that she or it was unaware of any improprieties") (citation omitted); *see also Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (agreeing that the magnitude of write-offs involved "renders less credible" defendants' argument that they acted without scienter).[44]   In the instant case, the combined effect of the realized and unrealized losses led to the Funds' NAVs declining by $244.32 million from July 2007 until the end of the Class Periods. ¶270.  The FHI Fund alone reported a NAV of $96.33 million, representing a 44% decline in FHI Fund's NAV in a one-year period. ¶220.

### C.    The Replacement of Hilliard Lyons Provides Evidence of *Scienter*

Suspicious circumstances of resignations or other allegations of corporate reshuffling support a strong inference of *scienter. See, e.g., Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th

---

defendants in order to improperly recognize revenue in violation of both GAAP and Winstar's own accounting practices. Such allegations constitute strong circumstantial evidence of the Winstar defendant's conscious misbehavior").

[42] "Courts have held that violation of a company's own policy supports an inference of scienter." *Chalverus v. Pegasys., Inc.*, 59 F. Supp. 2d 226, 235 (D. Mass. 1999) (citations omitted); *see also In re Scholastic*, 252 F.3d at 77; *Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10, 18 (D. Mass. 2000) ("While . . . violations of [internal policies] are not materially different from the alleged GAAP violations, they are probative of scienter because they suggest that Defendants' accounting practices recklessly disregarded another red flag -- accounting standards the company adopted").

[43] Further, a failure to maintain sufficient internal controls to avoid fraud, like here, supports a strong inference of *scienter. See, e.g., In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1362, 1364 (S.D. Fla. 2005) (lack of internal controls is a "red flag" contributing to *scienter*); *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (weaknesses in internal controls probative of *scienter*). Further, this is not a case where Plaintiffs are using the later revelations to show that the Defendants recklessly concealed the internal control and GAAP violations. Def. Br. at 31-32. Additionally, "Plaintiff may rely on the defendant's own disclosures . . . to allege that previously-made statements . . . were materially false or misleading." *Chalverus*, 59 F. Supp. 2d at 233.

[44] *See also Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) ("the more serious the error, the less believable are defendants' protests that they were completely unaware of [the Company's] true financial status and the stronger the inference that defendants must have known about the discrepancy); *In re MicroStrategy*, 115 F. Supp. 2d at 636-37 (understatement of losses by $54.9 million and overstated revenues by $66 million supported inference of *scienter*).

Cir. 2009) ("resignations, terminations, and other allegations of corporate reshuffling may in some circumstances be indicative of scienter"); *Hall*, 580 F. Supp. 2d at 233 (CEO's forced resignation "add[ed] to the overall pleading of circumstantial evidence of fraud"); *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007) (two resignations were "additional highly unusual and suspicious facts," and "add to the overall pleading of circumstantial evidence of fraud"); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1186 (C.D. Cal. 2007) (a resignation leaned "heavily towards a finding of scienter"); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1274 (N.D. Cal. 2000) (termination of key personnel supports a finding of *scienter*). Hilliard Lyons, the investment Subadvisor of the FHI Fund, responsible for day-to-day management of the Fund's portfolio, was replaced with Valhalla in May 2006. ¶36. No reason was provided.  The most plausible explanation is that this replacement related to the fraud.

### D.   The SOX Certifications Provide Evidence of *Scienter*

The alleged falsity of the Sarbanes-Oxley certifications by Bowen and Bradley, which report on the state of internal controls, among other things, ¶¶160, 165-66, 169, 172-73, 175, 180, 188, 190, 192, 199, 202-03, 211, 215-16, 219, 272-75, provide evidence of *scienter. See In re Lattice*, *In re Lattice*, 2006 U.S. Dist. LEXIS 262, at *50-51 ("I conclude that the Sarbanes-Oxley certifications . . . provide evidence . . . that defendants . . . knew that the controls they attested to were inadequate . . . The Sarbanes-Oxley certifications, in combination with plaintiffs' [other] allegations . . . are sufficient to create a strong inference of actual knowledge or of deliberate recklessness"); *In re ProQuest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007) ("The SOX certifications give rise to an inference of Roemer's scienter because they provide evidence either that he knew about the improper accounting practices or, alternatively, knew that the controls he attested to were inadequate").[45]

### E.   Motive Has Been Adequately Pleaded[46]

Personal pecuniary motive is not required to plead *scienter.  See Tellabs* 551 U.S. at 325; *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 99 (S.D.N.Y. 2006) ("Scienter can be

---

[45] Further, high-level corporate officers who sign SEC filings and SOX certifications, such as Bradley and Bowen here, have a duty to familiarize themselves with the operations that would have revealed the improprieties (if unknown). *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 05-1898, 2005 U.S. Dist. LEXIS 19506, at *63 (S.D.N.Y. Sept. 6, 2005) (signatories to SEC filings have a duty to familiarize themselves with facts relevant to the financial reporting of a company's core operations) (citation omitted); *In re Winstar*, 2006 U.S. Dist. LEXIS 7618, at*22-23 (same).

[46] Defendants do not challenge that they had the opportunity to act with *scienter* "because it is apparent . . . by virtue of the[ir] positions." *See In re Complete Mgmt.*, 153 F. Supp. 2d at 327.

alleged in two ways: by pleading facts that evidence conscious misbehavior or recklessness or by pleading facts that evidence defendant's motive and opportunity to commit fraud").[47] However, "the Seventh Circuit has established motive as a 'useful indicator,' and should not be taken lightly . . . As such, the fact that the pleadings allege that [defendant] was motivated to increase his incentive compensation and to guild his reputation are important considerations." *In re JPMorgan Chase & Co. Sec. Litig.*, No. 06-4674, 2007 U.S. Dist. LEXIS 93877, at *24 (N.D. Ill. Dec. 18, 2007). The Complaint here alleges that Defendants were motivated to improperly value the Funds' investments and inflate the NAVs in order to inflate the investment advisory fees. ¶19. Further, the Complaint alleges Bowen and Bradley's compensation as linked to First Trust's performance, which in turn, was linked to the advisory fees received from the Funds, and thus, they were also motivated to overvalue and leverage to increase the fees. *See, e.g.*, ¶504. For example, in 2007, the advisory fees paid were $4.27 million, as compared to $0.39 million paid out in 2005. ¶508.[48]

Further, particularized corporate motives can demonstrate *scienter. See, e.g., In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 269 (2d Cir. 1993). In the instant case, Defendants were motivated to conceal the deterioration of the Funds' investments in order to maintain compliance with applicable regulations and the Funds' disclosed policies. ¶473. This supports a cogent inference of *scienter. See In re Williams*, 339 F. Supp. 2d at 1234 ("the Complaint alleges that Defendants had a strong motive to misrepresent WCG's financial statements because WCG's continued viability was dependent upon certain measures of WCG's financial performance . . . which were directly linked to WCG's debt and bank covenants"); *In re MicroStrategy*, 115 F. Supp. 2d at 648-49 (particularized allegations that company was "further motivated [by a desire] . . . to portray the Company favorably with actual and potential creditors from whom MicroStrategy needed to borrow funds" was sufficient to plead motive);

---

[47] Thus, the absence of motive allegations is not dispositive of *scienter*, like Defendants attempt to argue. *See Schleicher v. Wendt*, 529 F. Supp. 2d 959, 972 (S.D. Ind. 2007); *In re Apollo Group Inc. Sec. Litig.,* 395 F. Supp. 2d 906, 922 n.4 (D. Ariz. 2005) (finding that *scienter* was adequately pled despite failure to allege motive); *In re McKesson*, 126 F. Supp. 2d at 1269 ("[A] motive for fraud, such as personal gain, is not a required element of scienter….").

[48] Defendants' reliance on *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) is misplaced because *Shields* was decided under the pre-*Tellabs* standard in the Second Circuit, when courts could review allegations of varying types of *scienter* in isolation, determining whether each such allegation, standing alone, was sufficient. If the court found it was not, the court would move on to the next type of *scienter* alleged without reference back to the other types of *scienter* alleged that it had found inadequate. *Tellabs*, however, makes clear that *all* allegations of *scienter* are to be considered together. Therefore, unlike prior practice, under *Tellabs,* no possible basis for finding *scienter* is discarded, rather, all are assigned a weight and then considered *in toto* with all other such allegations. Thus, *Shields* and its progeny have been impliedly overruled by *Tellabs*.

*In re Vivendi Universal, S.A. Sec. Litig.*, No. 02-5571, 2004 U.S. Dist. LEXIS 7015, at *28-29 (S.D.N.Y. April 22, 2004) (finding *scienter* where defendants sought to expand their enterprise and were motivated to engage in fraud in order to attain that goal).[49]    As this Court has previously stated, "[s]imple greed is a powerful motivator, as proven by recent events in the marketplace. Personal profit, coupled with professional motives to hide internal weaknesses and paint a rosy picture of the restructuring lend weight to not only a cogent inference of scienter, but a compelling one in light of the alternative suggested by defendants -- that the misstatements and errors were due to bungling management." *Norfolk*, 2009 U.S. Dist. LEXIS 65731, at *32.

Additionally, a motivation to make the Funds appear more profitable and artificially inflate the shares has repeatedly been found, in totality with other allegations, to give rise to a strong inference of *scienter*. *See In re Lattice*, 2006 U.S. Dist. LEXIS 262, at *52-53 ("Defendants argue that many of these alleged motives -- keeping the stock price high, raising capital, increasing the value of stock options and other executive incentives -- are normal goals of every business . . . [however] when viewed in the totality of all the other allegations, [they] add additional weight to the inference of scienter."); *In re Complete Mgmt.*, 153 F. Supp. 2d at 327-28 ("[t]he desire to maintain an inflated stock price may . . . be sufficiently specific support for an allegation of scienter . . . and the analysis is a highly fact-intensive one").

### F.    Defendants' "Good Faith" Argument is Premature and Has no Basis

Defendants raise a fact-based defense by claiming that the allegations "are dwarfed by the inference that Defendants acted in good faith." Def. Br. at 32.[50]    Whether Defendants acted in good faith is a fact-

---

[49] *See also Gross v. Medaphis Corp.*, 977 F. Supp. 1463, 1472 (N.D. Ga. 1997) (finding *scienter* where complaint alleged that defendants knowingly made false statements in order to inflate its share price, which, in turn, allowed it to acquire other companies it would not have otherwise been able acquire); *In re Ibis Tech. Sec. Litig.*, 422 F. Supp. 2d 294, 317 (D. Mass. 2006) (strong *scienter* inference raised where defendants allegedly delayed impairment charge to complete stock offering); *In re Am. Bank Note Holographics Sec. Litig.*, 93 F. Supp. 2d 424, 444-45 (S.D.N.Y. 2000) (motivation to inflate IPO price); *In re Centocor, Inc. Sec. Litig. III*, No. 98-260, 1998 U.S. Dist. LEXIS 18909, at *8-9 (E.D. Pa. Dec. 1, 1998) (allegations that defendants wanted to complete public offering adequately pled *scienter*).

[50] Defendants rely on *Stark Trading & Shepherd Inv. v. Falconbridge Ltd.*, No. 05-1167, 2008 U.S. Dist. LEXIS 2677 (E.D. Wis. Jan. 14, 2008) to show that because the Board of Trustees oversaw the valuations, it shows that Defendants acted in good faith. Def. Br. at 32. *Stark* turned on the fact that the assumptions and methodologies that were used in the valuations were not under the direct control of the defendants. *See id.*, at *25-26. However, even the court stated that "[t]he fact that the valuation was independently conducted and independently supervised would not automatically immunize an entity for misrepresentations contained in a valuation or prevent errors in the valuation from supporting a strong inference of scienter," and the court's analysis was based on the specific facts of the case. *Id.* In the instant case, Bowen is an officer of the Funds and also the trustee of the Funds. Further, the Complaint

32

intensive affirmative defense, which cannot be decided on a 12(b)(6) motion. *See Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009) ("Not only can this Court not make such factual findings [of good faith] when considering a motion to dismiss, but this Court must also draw all inferences in favor of the non-moving party") (citations omitted). Further, Defendants forget that Plaintiffs' inferences of *scienter* need not trump theirs. *See Norfolk*, 2009 U.S. Dist. LEXIS 65731, at *35 ("Defendants' innocent explanations cannot defeat an otherwise sound pleading"); *Engel v. Sexton*, No. 06-10447, 2009 U.S. Dist. LEXIS 12778, at *37 (E.D. La. Feb. 11, 2009) ("In evaluating competing non-culpable inferences from the facts alleged, *Tellabs* does not require the Court to dismiss the complaint merely because there is a cogent inference pointing to an innocent explanation").

The fact that Defendants omitted material adverse facts from statements during the Class Periods and further nullified any so-called disclosures by improperly overstating the value of the Funds' portfolios and NAVs, in order to preclude investors from figuring out the true state of the Funds' financial condition, viewed holistically with all the other allegations, as required by *Tellabs*, raises a strong inference of *scienter*. Further, Defendants' claim that the "candid disclosures create a strong inference that Defendants acted in good faith" is simply factually and legally wrong. Def. Br. at 33. As described above, Defendants' purported disclosures did not come close to revealing the truth. For example, Defendants claim that the Funds began informing investors of problems in the mortgage and housing markets as early as January 2006. Def. Br. at 32-33. But, on January 6, 2006, Defendants diluted the import of the so-called disclosures by the false and misleading statements, including that the Funds had effective internal controls, that the Funds used fair value or market value to value the Funds, that "[p]erformance to date has been solid with regard to NAV," and that the Funds were insulating against any risks by remaining "broadly diversified." ¶¶160-64. However, Defendants' disclosures regarding the mortgage and housing markets constitute an admission for *scienter* purposes that Defendants were fully aware of the market issues, which they nevertheless failed to factor into the value of the Funds' assets. Instead, as late as July 9, 2007, Defendants were still deceptively trying to

---

alleges that First Trust and the Subadvisors attended the board meetings. ¶429. Additionally, what is determined to be in the best interest of the shareholders is determined by the Board, and also by defendant First Trust or the Subadvisor. *Id.* Further, what undermines Defendants' inference even more is that the Valuation Committee for the FHI Fund met only four times and for the FHY Fund only a total of three times during the fiscal year ended October 31, 2006 and during the calendar year ended December 31, 2007, respectively, even though the Proxy Materials stated that: "The market values for high yield securities tend to be very volatile, and these securities are less liquid than investment grade debt securities." ¶241. Finally, the Complaint alleges that Bowen and Bradley as senior officers of First Trust had the ability to influence the evaluations. ¶504.

differentiate themselves from the trouble in the sub-prime mortgages. ¶189.

Like Defendants here, in *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372 (E.D.N.Y. 2009), "defendants urge[d] that the stronger inference here is not fraud but the unimpaired operation of the market in response to corporate disclosures, and the coming to pass of a risk … that investors were fully warned of." *Id.* at 385. The *Arotech* court declined to ignore the fact that the company's stock dropped 27% following the alleged disclosure and noted that "[t]he inferences pointing to a lack of fraud are not without force. But for plaintiffs to survive at this stage, their inferences need only be 'at least as strong as,' not stronger than, any competing inferences." *Id.* (citing *Tellabs*). The court went on to note that given the materiality of the non-disclosures, the inference actually tipped in plaintiffs' favor. *Id.* There, defendants offered no explanation why, in the same document defendants told investors that termination of certain contracts are "materially adverse" events when the termination is for default – they withheld the material fact that the termination was of this materially adverse type. *Id.* *See also Makor Issues*, 513 F.3d at 711 ("Because the alter native hypotheses--either a cascade of innocent mistakes, or acts of subordinate employees, either or both resulting in a series of false statements--are far less likely than the hypothesis of scienter at the corporate level at which the statements were approved, the latter hypothesis must be considered cogent"). Similarly here, Defendants, for example, while disclosing in 2007 the problems in the sub-prime mortgage industry, told investors the Funds' holdings were different, and still provided inflated valuations of their portfolios and NAVs. Based on Plaintiffs' allegations, which must be accepted as true at the pleading stage, there can be no inference from Defendants' misstatements and omissions during the Class Periods other than that they were intentionally or recklessly made.

## VI.     THE COMPLAINT IS NOT PREDICATED ON MISMANAGEMENT

As *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 476 (1977) made clear, where the conduct involves deception related to the mismanagement – and not mismanagement alone, the claims are actionable under the federal securities laws. The "mere fact that the conduct . . . arguably constitutes mismanagement will not preclude a claim . . . if the defendant made a statement of material fact wholly inconsistent with known existing mismanagement or failed to disclose a specific material fact resulting from that mismanagement." *In re Donna Karan Int'l Sec. Litig.*, No. 97-2011, 1998 U.S. Dist. LEXIS 22435, at *28 (E.D.N.Y. Aug. 14, 1998).[51]   Here, Defendants did not merely make bad business

---

[51] *See also 7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 231 (5th Cir. 1994) ("This case therefore falls within the bounds of the Supreme Court's decision in *Santa Fe Indus., Inc. v. Green*, holding

decisions[52] or mismanage the Company; rather, Defendants misled the public by, for example, overstating the Funds' NAVs and falsely representing that the NAVs were calculated in compliance with the Funds' policies, GAAP and SEC regulations. *See, e.g.,* ¶223.[53]

Further, the Complaint does not criticize Defendants' decision-making, like Defendants assert, *see*

that, although mismanagement or breach of fiduciary duty generally would not violate the federal securities laws, an action for securities fraud was appropriate for those cases 'in which the breaches of fiduciary duty held violative of Rule 10b-5 included some element of deception.'") (citation omitted); *In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 927 (9th Cir. 1993) ("we do not believe that the broad corporate management exclusion from § 10(b) and Rule 10b-5, set forth in *Santa Fe*, is implicated when plaintiffs allege specific misrepresentations or material nondisclosures in violation of the federal securities laws"; "Therefore, taking the allegations of the Amended Complaint to be true, as the court must on a Rule 12(b)(6) motion, this is neither a case second-guessing decisions by management nor one alleging 'fraud by hindsight'; rather, the shareholders have specifically identified facts omitted by Wells Fargo, which if subsequently determined to be material, and issued by Wells Fargo with the requisite scienter, will establish a violation of § 10(b) and Rule 10b-5") (citation omitted); *Atchley v. Qonaar Corp.,* 704 F.2d 355, 359 (7th Cir. 1983*)* ("According to the second amended complaint, to accomplish their ends, defendants consciously embarked on a scheme to depress Qonaar's earnings so that they could acquire its stock at a price of $37 per share even though 'at a nominal price/earnings ratio,' it was worth up to $200 per share. Plaintiffs alleged a series of underlying facts which were not disclosed which would have affected the valuation of the stock. . .We hold that plaintiffs have sufficiently alleged that defendants engaged in deceptive and misleading statements and conduct in violation of Section 10(b) and of Rule 10b-5 in contrast to a mere breach of fiduciary duty or corporate mismanagement not covered by that Section and Rule under *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462."); *In re Hollinger Int'l, Inc. Sec. Litig.,* No. 04-0834, 2006 U.S. Dist. LEXIS 47173, at *38 (N.D. Ill. June 28, 2006) ("the conduct alleged here involves numerous material misrepresentations and participation in a deceptive scheme. Plaintiffs allege that there were misrepresentations and omissions in the flow of material information in this case. They claim that defendants were aware of the mismanagement that had occurred. They also claim that at least some defendants made materially misleading statements or failed to disclose mismanagement. Such pleading is sufficient to avoid preclusion on the basis of *Santa Fe*"); *Fry v. UAL Corp.,* 895 F. Supp. 1018, 1045 (N.D. Ill. 1995)(finding that *Santa Fe* does not bar Section 10(b) claims where "(1) the fiduciary misconduct itself involves an element of deception, or (2) the defendant is aware of corporate mismanagement and makes a material public statement inconsistent with the state of corporate affairs").

[52] Not only is Defendants' business judgment argument a fact intensive issue not appropriate for resolution on a motion to dismiss, but Defendants support their defense with the very statements that Plaintiffs are alleging are false and misleading.

[53] This case concerns Defendants' repeated false and misleading public statements. The cases that Defendants rely on to support their "mismanagement" argument, Def. Br. at 15-16, are inapplicable because they involve only the nondisclosure of mismanagement, not the affirmative misrepresentation and concealment of the subject matter of the mismanagement. *See, e.g.*, *Panter v. Marshall Field & Co.*, 646 F.2d 271, 288 (7th Cir. 1981) (claim against directors involved the failure to disclose alleged scheme of "entrenchment"; court held that in order to demonstrate the element of deception required by Rule 10b-5, the cause of action had to be based on the omission or misrepresentation of a material fact); *Fry*, 895 F. Supp. at 1044 (plaintiffs' claim involved defendants' failure to disclose that they had not "adequately investigated the relative merits of a dividend versus self-tender distribution"); *Ray v. Karris*, 780 F.2d 636, 641 (7th Cir. 1985) ("Since the allegations here relate to the decision to sell Realty and the terms of that sale, not the conduct of the offering, plaintiffs' claims implicate only issues of the state law fiduciary duties of the defendants-directors"). Defendants' cases are irrelevant because the case here involves misrepresentations and nondisclosure of material facts, clearly actionable under the securities laws.

Def. Br. at 16-17,[54] but instead alleges that Defendants failed to disclose materially adverse facts that made the statements made during the Class Periods false and misleading. The Complaint alleges that Defendants failed to disclose in filings that, throughout the Class Periods, Defendants ignored observable market data in the valuation of the Funds' mortgage-related securities; that the Funds lacked effective internal controls which made reasonably accurate valuations of the Funds' assets impossible and that resulted in violations of GAAP; that the Funds materially overstated the value of their portfolios and NAVs by failing to properly value their investments in mortgage-related securities in contravention of GAAP and SEC Rules;[55] that Defendants compounded the risks of the FHI Fund's and FHY Fund's investment strategy by utilizing leverage to buy securities on margin in a falling market, without disclosing the risk of that strategy, which ultimately forced liquidation; that Defendants did not "generally seek" and did not in fact implement effective hedges, as they represented they would, to mitigate the risks related to the Funds' mortgage-backed securities; that Defendants were motivated to improperly value the Funds' investments in mortgage-related securities and inflate NAVs in order to inflate investment advisory fees; that the Funds lacked effective internal controls to monitor and manage the risks inherent in the Funds' investments in mortgage-related securities; and that Defendants failed to inform investors of the potential adverse impact on dividend income that would result from the Funds' deteriorating mortgage collateral, including from artificial inflation of the Funds' NAVs that did not reflect the impairment of income that would have been apparent to investors had

---

[54] Defendants' cases, Def. Br. at 16-17, are inapposite. In *Vachon v. Baybanks, Inc.*, 780 F. Supp. 79 (D. Mass. 1991) and *Lerner v. FNB Rochester Corp.*, 841 F. Supp. 97 (W.D.N.Y. 1993), plaintiffs failed to allege any specific, contemporaneous facts in support of their claims, and in fact, the court in *Lerner* harshly stated, that the complaint is "so general that it could have been filed against any financial institution which experienced the economic problems suffered by FNBR during the same time period." *See id.* at 101. *Shields v. Amoskeag Bank Shares*, 766 F. Supp. 32 (D.N.H. 1991) was remanded by *Serabian v. Amoskeag Bank Shares*, 24 F.3d 357, 365 (1st Cir. 1994), in which the court held that plaintiffs, like Plaintiffs here, "stated a claim against Bank Shares and five of the individual defendants based on certain of the allegations" where plaintiffs "present a contrast between what company officials were hearing internally about their loan review effectiveness and the adequacy of their ALL, and what the company was telling the public at the same time."

[55] In a case dealing with the issue of improperly valuing funds, the court refused to find that the allegations were simply mismanagement. *See Abrams*, 2002 U.S. Dist. LEXIS 9814, at *35-36 ("As to the alleged misvaluing of loans using the fair value method, defendants contend this is an allegation of corporate mismanagement . . . To the extent plaintiffs allege that it was a misrepresentation to use a 'fair value' instead of available market pricing while representing market pricing was being used where available, that is not nonactionable corporate mismanagement; it is a misrepresentation as to the practices actually being applied. Similarly, defendants ignoring market pricing as a factor in determining fair value would be inconsistent with the representation that this factor was part of the fair value method . . . On the present pleadings, it cannot be determined that any of plaintiffs' allegations constitute mere corporate mismanagement").

Defendants fairly valued the Funds' mortgage-related securities. ¶224.[56]

## VII.    PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

Under Section 13 of the Securities Act, an action for liability under Sections 11 or Section 12(a)(2) must be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. Plaintiff must also bring a Section 14(a) action "within one year after the discovery of the facts" constituting the violation and in any event no later than three years after the violation has occurred. 15 U.S.C. § 78i(e). It is undisputed that the first complaint alleging violations of Securities Act claims was filed on September 12, 2008, less than one year from First Trust's devastating revelations on July 7, 2008 -- less than three years from when the shares in the IPOs were actually offered to the public for sale.[57]    The Complaint, which first brought the Section 14(a) claims, was filed on April 30, 2008. Moreover, as the Complaint alleges, in great detail, the misrepresentations and omissions allegedly contained in the FHY Fund and FHO Fund Registration Statements, the FHI DRIP, FHY DRIP and FHO DRIP Registration Statements, and the Joint Proxy Statement for the FHI Fund and the FHY Fund were only revealed, *for the first time*, on July 7, 2008, and therefore Plaintiffs were not put on inquiry notice of their claims until that date. ¶¶220-22. Further, the Complaint adequately pleads that "less than one year elapsed from the time" Plaintiffs or other Class members "discovered or reasonably could have discovered the facts upon which" the 1933 Act claims were based. ¶¶289, 299, 342, 362, 382. As such, Plaintiffs' Securities Act claims and Section 14(a) claims under the Exchange Act were brought well within the one year statute of limitations.

The statute of limitations begins to run when Plaintiffs actually discovered the alleged materially untrue and/or misleading statements "or after such discovery should have been made," which occurs when Plaintiffs "had 'sufficient information of possible wrongdoing to place them on 'inquiry notice'

---

[56] Thus, the Complaint pleads in exacting detail misstatements made with knowledge of present contrary facts. This case is not like *Denny v. Barber*, 576 F.2d 465 (2d Cir. 1978) where the plaintiff failed to allege contemporaneous facts indicating the falsity of the defendants' statements and instead "simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones." *Id.* at 470. Accordingly, Defendants' "fraud by hindsight" arguments here, Def. Br. at 16-17, mischaracterize the Complaint. *See, e.g.*, *In re Xerox*, 165 F. Supp. 2d at 218 (fraud by hindsight "argument fails to properly characterize the [] complaint," which alleged that defendants made fraudulent statements simultaneously with their knowledge of problems resulting from the restructuring).

[57] The FHY Fund accomplished its public offering on March 28, 2006. ¶109. The FHO Fund accomplished its public offering on March 28, 2007. ¶114. The FHI Fund and FHY Fund filed their Joint Proxy Statement with the SEC on March 16, 2007. ¶428.

or to excite 'storm warnings' of culpable activity.'" *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1326 (3d Cir. 2002) (internal citations omitted). "The test for 'storm warnings' is an objective one, based on whether a 'reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning.'" *Id.* "Inquiry notice . . . must not be construed so broadly that the statute of limitations starts running too soon . . . The facts constituting such notice must be . . . sufficiently advanced beyond the stage of a mere suspicion, sufficiently confirmed or substantiated--not only to incite the victim to investigate but also to enable him to tie up any loose ends and complete the investigation in time to file a timely suit." *Fujisawa Pharm. Co. v. Kapoor*, 115 F.3d 1332, 1335 (7th Cir. 1997). *See also Marks v. CDW Computer Ctrs., Inc.*, 122 F.3d 363, 368 (7th Cir. 1997) ("Inquiry notice does not begin to run unless and until the investor is able, with the exercise of reasonable diligence (whether or not actually exercised), to ascertain the information needed to file suit"). In this context, "defendants bear a heavy burden in establishing that the plaintiff was on inquiry notice as a matter of law. . . Inquiry notice exists only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct." *Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F. Supp. 243, 249 (S.D.N.Y. 1993).

Whether a plaintiff had sufficient facts to place him on inquiry notice of a claim is a question of fact and is not appropriate for resolution on a motion to dismiss. *Marks*, 122 F.3d at 367. *See also Antell v. Arthur Andersen LLP*, No. 97-3456, 1998 U.S. Dist. LEXIS 7183, at *13-14 (N.D. Ill. Apr. 30, 1998) ("At this stage of the proceedings, [the court] must assume the truth of Plaintiffs' allegations and draw all reasonable inferences in their favor. Thus, for purposes of the motion to dismiss we find that Plaintiff had inquiry notice of the instant claim against Arthur Andersen when it received Arthur Andersen's work papers in December 1996 or January 1997. Arthur Andersen's motion to dismiss based on the one-year statute of limitations is, therefore, denied"). Thus, "inquiry notice is a question of fact only appropriate for resolution by the Court 'when uncontroverted [facts] irrefutably demonstrate[] plaintiff discovered or should have discovered the [wrongful] conduct.'" *In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1287 (E.D. Wash. 2007) (citation omitted). *See also Abrams*, 2002 U.S. Dist. LEXIS 9814, at *33-34 ("On defendants' motion to dismiss, plaintiffs' federal claims will not be dismissed based on the statute of limitations. It cannot be held that the facts properly before the court conclusively contradict plaintiffs' allegation that they could not have reasonably discovered their claims more than a year before the filing of the original complaint").

Defendants' assertions that Plaintiffs were on inquiry notice at least as early as August 2007, Def.

Br. at 38-39, is contrary to the allegations in the Complaint. The Complaint alleges that in the July 9, 2007 FHI Fund, FHY Fund, and FHO Fund's Semi-Annual Report, "rather than admit the deterioration in the value of the [] Fund's mortgage-related securities, Defendants deceptively tried to differentiate [the] Funds' portfolio from the 'trouble' in sub-prime mortgages." ¶189. For example, in the FHI Fund's Report, Defendants stated that "[w]hile the headlines generally made it appear that all sub-prime mortgages were in trouble, the primary problems in sub-prime mortgages were generally limited to those mortgages originated in late 2005 and throughout 2006. The Fund had minimal exposure to these vintages and less than 15% of its total holdings in the subprime mortgage market." *Id.* As to whether the economic factors would continue to hurt the market, the Report stated, "the downdraft in the sub-prime mortgage market did not affect the Fund's entire mortgage allocation. Its prime mortgage holdings posted positive performance, as investors were quick to differentiate among the various segments of the residential mortgage sector." *Id. See also Betz v. Trainer Wortham & Co.*, 519 F.3d 863, 874 (9th Cir. 2008) ("In this case, we cannot say that, as a matter of law, a reasonable investor in Betz's position should have discovered the facts giving rise to her claim before July 11, 2001, especially in light of the express assurances made by Defendants that they would remedy the problems with the account, which may have lulled a reasonable investor into inaction"). Considering that "the investing public justifiably places heavy reliance on the statements and opinions of corporate insiders," *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1116 (9th Cir. 1989); *see also Va. Bankshares*, 501 U.S. at 1091, statements by Defendants are sufficient to nullify any argument that articles by third-parties placed Plaintiffs on inquiry notice. *See Phillips v. Kidder. Peabody & Co.,* 782 F. Supp. 854, 864 (S.D.N.Y. 1991) (articles did not trigger duty of inquiry where Defendants were also disseminating positive information); *LC Capital Partners, LP v. Frontier Ins. Group*, Inc., 318 F.3d 148, 155 (2d Cir. 2003) (Investors are not placed on inquiry notice when "the warning signs are accompanied by reliable words of comfort from management").

Even by January 10, 2008, the Complaint alleges that Defendants were still concealing "the potentially adverse impact [of the] losses in the FHI Fund's underlying mortgage collateral would have on distributions to investors in the FHI Fund. Indeed, in 2008 the Funds started including return of capital as part of the distribution to investors because the underlying collateral was not generating sufficient current income – the Funds' primary objective." ¶205. Further, Defendants knew and failed to disclose that their NAVs were overstated because "the values based on prices supplied by dealers ignored various factors that reflected material deterioration in the value of the FHI Fund's mortgage-

related securities," ¶207, and that Defendants did not, as represented, in fact use fair value in valuing the Funds' investments. ¶¶209-10. It was not until July 7, 2008, when, in the semi-annual report, "the FHY Fund reported a NAV of $117.7 million or $12.44 per share, representing a 38% decline in the FHY Fund's NAV in a one-year period, and a net realized and unrealized loss on investments of $37.9 million for the year . . . . [and that] almost 50% of the FHY Fund was invested in below-investment grade securities, below a BBB rating and over 30% was invested in distressed securities below a CCC rating," ¶222, that investors were alerted to the misstatements and omissions during the Class Periods.

Further, even if the Court were to consider Defendants' affirmative defense on a 12(b)(6) motion, to prevail, Defendants would have to establish that a reasonable investor should have known before July 7, 2008 that the NAVs reported were false. *See Law v. Medco Research, Inc.,* 113 F.3d 781, 785-86 (7th Cir. 1997). Defendants fail to describe any fact that would lead a reasonable investor to learn that the reported NAVs were overvalued prior to July 7, 2008. *See Abrams*, 2002 U.S. Dist. LEXIS 9814, at *33 ("Defendants also point to the stable NAV, even during alleged market gyrations, followed by substantial drops in NAV. Again, on the motion to dismiss, it cannot be conclusively determined that the stable NAVs were sufficient to raise enough suspicion to place plaintiffs on inquiry notice. As to the drops in NAV, the Fund provided the explanation that it was due to a large number of loans from health care companies and the financial condition of that industry . . . It cannot be held that it was unreasonable to fail to inquire further when provided with the reported explanation for the drop in NAV").

Defendants further argue that the Securities Act claims should be dismissed because information about the "adverse developments in the mortgage and housing markets" were publicly available. Def. Br. at 38. Defendants' self-incriminating argument notwithstanding, Plaintiffs actually allege that, although information regarding the U.S. mortgage and housing market was publicly available, investors could not know that Defendants failed to take those conditions into account in valuing the Funds' assets; the nature of those underlying assets, and how the market conditions affected them; that many of the holdings of the Funds had declined in actual (but unreported) value and were continuing to do so at a very significant rate; and that based upon facts existing at that time concerning problems with the real estate and mortgage industries, the Funds materially overstated the value of their holdings by failing to properly value their investments in mortgage-related securities. Further, the information available in the media did not inform Plaintiffs that Defendants ignored observable market data in the valuation of the Funds' mortgage-related securities and that Defendants compounded the

risks of the FHI Fund's and FHY Fund's investment strategy by utilizing leverage to buy securities on margin in a falling market, thereby necessitating forced liquidation. Thus although the Complaint alleges that information was available about the credit crunch and the sub-prime mortgage risks, no information was available about the extent of the Funds' involvement in those areas and that those conditions were ignored by Defendants in valuing the assets. Therefore, Plaintiffs could not have known the extent of the exposure the Funds had, that they had no controls to be able to manage the risks, and that the Funds' NAVs and portfolios were overvalued. Additionally, "[i]t would be a factual question as to whether the media coverage was sufficient to place plaintiffs on inquiry notice." *Abrams*, 2002 U.S. Dist. LEXIS 9814, at *32. Moreover, even if the omitted information was otherwise available in the market, under Section 11, the burden is on defendants to prove that the plaintiffs possessed that information when they purchased the subject securities, *see* 15 U.S.C. §77k(a), which Defendants have not done here.[58] Furthermore, this affirmative defense may not be considered at this stage. *See Initial Pub. Offering*, 241 F. Supp. 2d at 346-47.[59]

## VIII.    PLAINTIFFS DID NOT HAVE KNOWLEDGE

Defendants assert that Plaintiffs cannot recover under Section 11 or 12(a)(2) of the Securities Act because Plaintiffs "had knowledge of the alleged misrepresentations or omissions in the prospectus or sales materials." Def. Br. at 39-40.[60] First, reliance is not an element of a Securities Act claim. *See*

---

[58] *See also In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 346-47 (S.D.N.Y. 2003) ("Nor does the allegation that the scheme was 'common knowledge' among those required to participate in the scheme mean that every client knew about it. The fact that some of the Plaintiffs are institutional investors does not necessarily mean that 'at the time of such acquisition [of the securities that they] knew of [the alleged] untruth or omission [in the registration statement].' Perhaps they were one of the few institutional investors who did not know. . . But these are ultimately issues for the trier of fact to resolve."); *Greenwald v. Integrated Energy, Inc.*, 102 F.R.D. 65, 71 (S.D. Tex. 1984) ("This harks back to the reliance question, and again invites the Court to decide the merits of this suit prematurely. What investors knew or should have known on a particular date is a matter for proof at trial"); *Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544, 575 (E.D.N.Y. 1971) ("Section 11(a) does provide all defendants with an affirmative defense that the plaintiff knew of the omission, but no evidence has been introduced that would indicate that either the plaintiff Feit, or any member of the class he represents, knew or had available an estimate of surplus for reliance. Proof that any particular member of the class had such knowledge may be presented at the next stage of the litigation on the issue of whether that individual is entitled to his share of damages.").

[59] Moreover, the case cited by Defendants is inapposite. In *In re Merrill Lynch & Co. Res. Reports Sec. Litig.*, 272 F. Supp. 2d 243 (S.D.N.Y. 2003), a case involving a mutual fund, the court found that defendants did not have to disclose information related to the companies that the fund might invest in or to whom Merrill provided banking services where the plaintiff acknowledged in her complaint that she knew the information before purchasing shares of the fund. *Id.* at 252.

[60] Defendants' cases are distinguishable. For example, *Mayer v. Oil Field Sys. Corp.*, 803 F.2d 749 (2d

*Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 68 n.5 (S.D.N.Y. 2000). Second, as to such an affirmative defense, Plaintiffs do not need to plead facts that would negate the affirmative defense. *Alvarado v. Litscher*, 267 F.3d 648, 651-52 (7th Cir. 2001). Third, Defendants' argument is contrary to the allegations in the Complaint, which the Court must accept as true. The Complaint specifically alleges that until July 7, 2008, Plaintiffs had no knowledge of the omissions and misrepresentation. On July 9, 2007, Defendants attempted to differentiate the Funds' holdings from the problems in the sub-prime mortgage arena. ¶189. Further, in January 10, 2008, Defendants misrepresented how they valued their holdings and that various factors which should have been considered were actually ignored. ¶¶207-10. The omissions and misrepresentations during the Class Periods did not come to light until July 7, 2008. ¶220. Even the paragraph references that Defendants refer to in making their argument make clear that investors did not and could not learn the truth until July 7, 2008. *See, e.g.*, ¶276 ("By misrepresenting the Funds' NAVs, Defendants presented a misleading picture of the Funds' portfolios and financial conditions and prospects. Thus, instead of truthfully disclosing during the Class Periods the Funds' portfolios deteriorating values, Defendants made untrue statements of material fact . . . These misstatements and omissions of material fact caused and maintained the artificial inflation in the Funds' share prices throughout the Class Periods and until the truth was fully revealed to the market"); ¶277 ("The truth about the Funds' portfolios, their true value, investing outlook and financial condition and prospects began to enter the market . . . [but was] ***accompanied by denials and continuing misrepresentations by Defendants***") (emphasis added).

Defendants contend that Plaintiffs cannot assert reliance on the misrepresentations and omissions for their Section 10(b) and Rule 10b-5 claims. *See* Def. Br. at 39-40. However, "[i]n many securities fraud cases, such as this one, reliance is pled under the 'fraud on the market' doctrine . . . . [where] an

---

Cir. 1986) was a summary judgment decision where deposition testimony was provided by plaintiff which revealed that that "she had timely read the documents and understood them." *See id.* at 753, 755. *Haralson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014 (5th Cir. 1990), *overruled on other grounds by Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1995), was also a summary judgment decision after "two years of discovery battles and six days of summary judgment hearings." *See id.* at 1021. Further, even *Haralson*, cited by Defendants, clearly states that "[w]e do not suggest that a purchaser has any duty to find out the truth under section 12(2) . . . Indeed, a purchaser who is actually ignorant that a seller's representation is inaccurate or incomplete may recover even though the full truth is apparent from materials in her possession." *Id.* at 1033 n.10. In other words, investors are permitted to solely rely upon the prospectus for their information regarding the Company and recovery is only precluded if a plaintiff actually knows that a representation is false or knows that existing information has been withheld. *See Dunn v. Borta*, 369 F.3d 421, 429 (4th Cir. 2004) ("we agree . . . that 'the investor has no due diligence obligation to make any investigation concerning the investment or to verify any information'"). As the Complaint alleges, Plaintiffs, relying on the prospectus and/or the sales materials, would not have had knowledge.

investor's reliance on any public material misrepresentations . . . may be presumed." *Tatz v. Nanophase Techs. Corp.*, No. 01-8440, 2002 U.S. Dist. LEXIS 19467, at *21-22 (N.D. Ill. Oct. 9, 2002). To obtain the benefit of the presumption, "plaintiffs first must allege that the relevant market was open and developed or, in other words, efficient." *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 303 (S.D.N.Y. 2005). Although "whether a market is open and developed often is a question of fact," *id.*, Plaintiffs has alleged that it is in the Complaint. *See* ¶¶480, 497, 511. *See also* ¶¶158, 164, 177.[61] Furthermore, as demonstrated above, because the misstatements and omissions did not come to light until July 7, 2008, the element of reliance is met.

## IX.    PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION

Defendants argue that the Complaint should be dismissed for failing to allege loss causation for the Section 11 and Section 12(a)(2) claims. Def. Br. at 33-36. Proof of loss causation, however, is not an element of a Section 11 or 12(a)(2) claim and is not required to be pled. *See* 15 U.S.C. §§77k and 77l.[62] Therefore, Plaintiffs here are not obligated to plead or prove causation, and the burden is on Defendants to disprove loss causation as an affirmative defense.[63]

For the Rule 10b-5 claim, in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), the Supreme Court explained that the pleading rules for loss causation were "not meant to impose a great burden upon a plaintiff," and that plaintiffs need only plead "a short and plain statement," pursuant to Fed. R. Civ. P. 8(a)(2), that provides defendants with "some indication of the loss and the causal

---

[61] "[A] well-developed and impersonal market, such as the New York . . . stock exchange[], will instantaneously incorporate all publicly available information about a given security into the market price of that security." *Deutschman v. Beneficial Corp.,* 132 F.R.D. 359, 368 (D. Del. 1990).

[62] *See also Lyne v. Arthur Andersen & Co.*, 772 F. Supp. 1064, 1067 (N.D. Ill. 1991) ("Unlike the pleading requirements for other securities fraud claims, loss causation is not a necessary element of a *prima facie* section 11 cause of action"); *Endo*, 863 F. Supp. at 734 ("the weight of authority supports a conclusion that loss causation is not an element of a §12(2) claim").

[63] *See McMahan & Co. v. Wherehouse Enter.*, 65 F.3d 1044, 1048 (2d Cir. 1995). Further, "[b]ecause an analysis of causation is often fact-intensive, negative causation is generally established by a defendant on a motion for summary judgment or at trial." *Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 272-73 (S.D.N.Y. 2007); *see also In re WRT Energy Sec. Litig.,* No. 96-3610, 2005 U.S. Dist. LEXIS 18701, at *5 (S.D.N.Y. Aug. 30, 2005) ("[t]o conclude otherwise places a burden of pleading loss causation on the plaintiffs, and removes the burden of establishing negative causation from the defendants, where it properly lies"). At a later stage of the litigation, Defendants may raise this affirmative defense, but even then, they will face a heavy burden. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 411 F. Supp. 2d 377, 382 (S.D.N.Y. 2006) ("In raising this defense, the defendant has a 'heavy burden' of proving that the decline in stock price was caused by factors other than the misstatement(s) in the registration statement. Defendants' heavy burden reflects Congress' desire to allocate the risk of uncertainty to the defendants in these cases."). At this stage, however, Defendants' loss causation arguments are premature for the Section 11 and Section 12(a)(2) claims.

connection that the plaintiff has in mind." *Dura*, 544 U.S. at 346-47 (citations omitted). There is no heightened standard for pleading loss causation. *See Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02-5893, 2006 U.S. Dist. LEXIS 36603, at *9-10 (N.D. Ill. Apr. 24, 2006). For pleading purposes, loss causation exists "if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005).

A "corrective disclosure" is not required under post-*Dura* case law. *See Schleicher*, 529 F. Supp. 2d at 967; *see also In re Parmalat*, 375 F. Supp. 2d at 305-06 ("a corrective disclosure is not necessary where . . . plaintiffs allege that the subject of the misrepresentations and omissions caused their loss"). The materialization of a previously undisclosed risk, coupled with the decline of the shares, is all that is required for pleading of loss causation. *See Dura*, 544 U.S. at 342. *See also Emergent Cap. Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 198-99 (2d Cir. 2003) (cited with approval in *Dura*, 544 U.S. at 344-45).[64] Moreover, neither the Supreme Court in *Dura*, nor any other court addressing the loss causation pleading standard require a corrective disclosure be a "mirror image" tantamount to a confession of fraud. Because corporate wrongdoers rarely admit that they committed fraud, "it cannot ordinarily be said that a drop in the value of a security is 'caused' by the misstatements or omissions made about it, as opposed to the ***underlying circumstance that is concealed or misstated.***" *Lentell*, 396 F.3d at 173 (emphasis added); *see also In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 540 (N.D. Ill. 2007) ("a disclosure . . . can occur in ways other than an announcement that points directly to a

---

[64]As the Defendants here, defendants in *Levine*, 508 F. Supp. 2d 268, attempted to rely on *In re Merrill Lynch & Co. Research Reports Sec. Litig.* to urge the Court to dismiss the complaint. However, at this stage of the proceedings, this is not appropriate. The court in *Levine* stated in pertinent part:

> In support of the contrary position, defendants rely primarily upon *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, in which Judge Pollack granted a motion to dismiss a §11 claim pursuant to Rule 12(b)(6) based on the absence of loss causation, after finding the absence was apparent from the face of the complaint. The court relied on a finding that the decline in plaintiff's share price was proportional to sector-wide declines and plaintiff's losses occurred before the first alleged disclosure of the omission. However, the court cited no other cases in which a Rule 12(b)(6) motion to dismiss was granted based on the absence of loss causation in a §11 claim.

> Rather, the decisions relied on were all distinguishable-either made on motions for summary judgment or after trial or involving claims where the burden of proving loss causation fell on the plaintiff. On a summary judgment motion or at trial, of course, the plaintiff may come forward with evidence suggesting that the price decline, despite first appearances, did in fact result from the alleged nondisclosure.

508 F. Supp. 2d at 273 (internal citations omitted). Further, *Ray v. Citigroup Global Mkts.*, 482 F.3d 991, 992 (7th Cir. 2007) is also distinguishable in that it is a summary judgment decision.

previous representation and proclaims its falsity").[65]  Thus, the **"relevant truth"** required under *Dura* is **not that a fraud was committed** *per se*, but that the "truth" about the company's underlying condition, when revealed, causes the "economic loss."

"Plaintiffs 'need only show 'some causal nexus' between [defendants'] improper conduct and plaintiff's losses.'  In a situation where 'the defendant's misrepresentations artificially altered the price of the stock and defrauded the market, causation is presumed.'"  *In re Retek, Inc. Sec.*, No. 02-4209, 2005 U.S. Dist. LEXIS 35734, at *19-20 (D. Minn. Mar. 7, 2005) (internal citations omitted). Additionally, although the loss must be attributed to the misrepresentation, "it need not be the exclusive or even primary cause." *See Schuster v. Anderson*, 413 F. Supp. 2d 983, 1014 (D. Iowa 2005).[66]

The fact that Defendants made partial inadequate disclosures does not affect loss causation.[67] Partial disclosures can satisfy the loss causation requirement.  *See Dura*, 544 U.S. at 342 (loss causation met where shares sold after "the relevant truth begins to leak out").  *See also Norfolk*, 2009 U.S. Dist.

---

[65] *See also Nursing Home Pension Fund v. Oracle Corp.*, No. 01-00988, 2006 U.S. Dist. LEXIS 94470, at *35 (N.D. Cal. Dec. 20, 2006) (*Dura* does not require a corrective disclosure); *In re Loewen Group, Inc. Sec. Litig.*, 395 F. Supp. 2d 211, 218 (E.D. Pa. 2005) ("'loss causation does not . . . require a corrective disclosure followed by a decline in price.'") (citation omitted); *In re Bristol Myers Squibb*, No. 00-1990, 2005 U.S. Dist. LEXIS 18448, at *52-57 (D.N.J. Aug. 17, 2005) (case law does **not** "stand for the general proposition that an alleged corrective disclosure must be the linguistic mirror image of the alleged fraud").

[66] As to loss causation in connection with the Section 14(a) claims, Defendants' attempt to intersperse facts attributed to SEC filings and arguments premised on the truth of those statements, *see* Def. Br. at 36, should be disregarded for the purposes of the instant motion or the Court should convert their motion to dismiss into one for summary judgment and permit Plaintiffs to proceed with discovery. Furthermore, Defendants admit that the Funds' investments in RMBS did exceed 25%, but they claim it was not material. However, not only is materiality usually decided by a trier of fact, but materiality is also not assessed purely on numerical considerations. *See Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 614 n.5 (S.D.N.Y. 2008) ("I reject defendants' implication that issues of materiality should be considered in strict terms of the omission's relative percentage impact on a company's total assets or revenue. There is no bright-line rule that if an omission or misstatement falls below a certain percentage of a company's total assets or revenue that it is automatically rendered immaterial -- rather a court will assess the entire context of the alleged omission"). Moreover, courts have found that "a misstatement or omission that concerns only a small fraction of the company's revenues or assets" can be material. *See In re Envoy*, 133 F. Supp. 2d at 662; *Giarruputo*, 2000 U.S. Dist. LEXIS 19138, at *47-48 (unable to conclude that even less than 1.5% of the reserves is immaterial); *Shirk*, 2007 U.S. Dist. LEXIS 26534, at *38-39 (declining to hold on a motion to dismiss that a particular financial misstatement could not possibly be significant to a reasonable investor due to its small magnitude). Defendants' reliance on *Beck v. Dobrowski*, No. 06-6411, 2007 U.S. Dist. LEXIS 84093, at *15-16 (N.D. Ill. Nov. 14, 2007) is completely misplaced because, unlike in the present case, the complaint in *Beck* "appears to contain no loss allegations at all." *See id.*, at *15-16. Further, "in light of the policy interests behind SEA 14(a) . . . courts will presume that a misrepresentation or material omission in a proxy statement affected the outcome of the proxy vote." *In re Nuveen Fund Litig.*, No. 94-360, 1996 U.S. Dist. LEXIS 8071 (N.D. Ill. June 5, 1996).

[67] Under Section 10(b), partial disclosures do not bar recovery under the loss causation requirement, but play a role in determining recoverable damages, which is premature at this stage. *See In re Motorola*, 505 F. Supp. 2d at 552. Further, Section 11 does not require a single disclosure. *See* 15 U.S.C. 77k(e).

LEXIS 65731, at *20-21 ("The six partial disclosures highlighted by plaintiffs are among numerous other disclosures made within the Class Period that revealed problems with previously reported financial statements, internal accounting practices, and the on-going audit investigation . . . the series of press releases, statements, rating adjustments, and filings taken together create the backdrop against which the cumulative 30% share loss over seven months is plausibly explained"). Further, the partial disclosures during the Class Periods, here, did not give rise to any notice that there were misstatements or omissions during the Class Periods, but instead covered them up with plausible explanations and assurances.[68]  Finally, on July 7, 2008, Defendants reported a 44% decline in the FHI Fund's NAV and 38% decline in the FHY Fund's NAV in a one-year period.  These partial disclosures alerted investors of the misstatements and omissions during the Class Periods, as the Funds finally accounted for the significant deterioration in the Funds' mortgage-related securities.  *See* ¶¶220-24.  As a result of these final partial disclosures on July 7, 2008, the FHI Fund's share price fell from $10.81 on July 3, 2008 to $10.23 on July 7, 2008, and continued to fall to $10.00 on July 9, 2008; the price of FHY Fund's shares fell from $10.88 on July 3, 2008 to $10.52 on July 7, 2008, and continued to fall to $10.38 on July 8, 2008; and the FHO Fund's share price from $9.00 on July 3, 2008 to $8.47 on July 7, 2008. ¶13.[69]

Further, the Company's misleading statements during the Class Periods contradicted, and thus, nullified any risk disclosures as to the financial position of the Funds. *See, e.g., Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006) (plaintiffs sufficiently pled that defendants' multiple disclosures did not counterbalance defendants' misleading statements); *In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 50 n.17 (D. Mass. 2006) (fact that defendants continued to publish optimistic assessments of the company's financial position was "akin to a statement that the reader need not worry much about the generic risk disclosures that appeared from time to time"); *DeMarco v. Lehman Bros., Inc.*, 309 F. Supp. 2d 631, 634 (S.D.N.Y. 2004) ("the very fact that, notwithstanding the skeptical language, the reports gave [the company] the highest possible 'buy' rating is tantamount to a statement that the reader of the reports should discount the skeptical

---

[68] Defendants' assurances with their so-called disclosures during the Class Periods included deceptively differentiating the Funds' portfolios from the trouble in sub-prime mortgages and stating the Funds were diversified and generally sought to use effective hedges to mitigate risks, together with reporting overstated NAVs. *See* ¶¶220-24. Further, even with the small insufficient portfolio value adjustments that Defendants made during the Class Periods, the Funds' portfolios continued to be substantially overvalued until the end of the Class Periods.

[69] The FHI Fund's share price fell to $10.23, a total of 52% from the FHI Class Period high of $21.35 per share; the FHY Fund's share price fell to $10.52, a total of 51% from the FHY Class Period high; and the FHO Fund's share price fell to $8.46, a total of 59% from the FHO Class Period high. ¶¶276-78.

language"). Thus, any previous so-called "disclosures," like when Defendants admitted that the sub-prime mortgage industry was experiencing problems, did not convey the truth to investors or warn them that the Funds were in trouble, but had the intended opposite effect, because Defendants made a point to differentiate themselves from the trouble in the sub-prime mortgage industry. ¶189; *see, e.g., In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005) (the court denied a motion to dismiss a 10b-5 case because, in the context where plaintiffs alleged widespread violation of trading restrictions, the alleged warning about risks of loss could have mislead investors into believing that defendants complied with NYSE restriction and therefore no risk was involved).

Defendants also attempt to argue that Plaintiffs, at this stage, cannot plead loss causation because there were other factors that could have impacted the market's view of the Funds. *See* Def. Br. at 33-36.[70] This argument is also flatly wrong. As a preliminary matter, loss causation is a fact-based inquiry that is generally not proper to resolve on a motion to dismiss. *In re PSS World Med., Inc. Sec. Litig.*, 250 F. Supp. 2d 1335, 1351 (M.D. Fla. 2002).[71] As the Court explained in *In re Daou*:

> A plaintiff is not required to show "that a misrepresentation was the *sole* reason for the investment's decline in value" . . . "As long as the misrepresentation is one substantial cause . . . other contributing forces will not bar recovery under the loss causation

---

[70] Further, Defendants' attempt to use the current global economic situation to shield themselves from liability, *see* Def. Br. at 33-36, must also fail. *See In re Countrywide*, 588 F. Supp. 2d at 1173-74 ("It is not the Court's role to speculate on the causes of the current economic situation . . . The Court will not be distracted by liquidity versus solvency and other macroeconomic arguments."); *In re 2007 Novastar*, 2008 U.S. Dist. LEXIS 44166, at *5-6 ("while the Court can take judicial notice of the fact that the Company's industry suffered reversals, the Court cannot take judicial notice of the impact of those industry-wide reversals on the Company."); *Schnall*, 2004 U.S. Dist. LEXIS 2859, at *28-29 ("While a trier of fact might blame market forces rather than accounting violations for that decline, the allegations in the Complaint are sufficient to withstand Burke's motion to dismiss"); *Miller v. Apropos Tech., Inc.*, No. 01-8406, 2003 U.S. Dist. LEXIS 5074, at *27 (N.D. Ill. Mar. 31, 2003) ("While it is clear that the stock market has declined over the past few years, on a motion to dismiss, this Court is not prepared to hold as a matter of law that the Plaintiffs could not prove causation of damages. Plaintiffs may have a difficult road ahead in proving loss causation, but they allege the element in their Complaint, which is all they must do at this stage). Moreover, Plaintiffs do not concede that the Funds' shares declined in tandem with the closed-end fund shares. *See* Def. Br. at 36. Instead, the Complaint makes clear that only in the first half of August 2007 the Funds' shares were on par with the other closed-end funds. ¶13.

[71] *See also In re Rhythms Sec. Litig.*, 300 F. Supp. 2d 1081, 1092 (D. Colo. 2004) ("It is not Plaintiffs' burden to prove loss causation in the pleadings. The bulk of Defendants' arguments speak to the merits of the case and turn on competing factual assertions not appropriate for weighing at this stage of the proceedings. In ruling on the instant motion, I accept Brown's allegations as true and conclude loss causation has been adequately pled."). At this stage, the complaint must only give defendants notice of plaintiffs' loss causation theory and give the court "some assurance that the theory has a basis in fact." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989-90 (9th Cir. 2008). "[A]t trial, plaintiffs must prove that defendants 'caused the loss.'" *Id.* at 989 (citations omitted). *See also Basic,* 485 U.S. at 249 n.29.

requirement" but will play a role "in determining recoverable damages."

411 F.3d at 1025 (citation omitted); *see also In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 253 (S.D.N.Y. 2007) ("whether the decline was attributable to some other cause . . . is a matter for proof at trial."); *Silverman v. Motorola, Inc.*, No. 07-4507, 2008 U.S. Dist. LEXIS 76799, at *44 (N.D. Ill. Sept. 23, 2008) ("The possibility that other forces can contribute to a decline in value of the plaintiff's securities always exists. There is no requirement at the pleading stage that a plaintiff 'affirmatively rule out those other factors in its complaint; rather that burden arises at trial.'") (citation omitted).[72]

In the instant case, the loss causation allegations are not only plausible, but there can be no question that the partial disclosures on July 7, 2008 were a substantial reason, if not the sole reason, for the decline in the Funds' share value on that date. The FHI Fund's share price fell 7%, from $10.81 on July 3, 2008 to close at $10.00 on July 9, 2009. The FHY Fund's share price fell 4.5%, from $10.88 on July 3, 2008 to close at $10.38 on July 8, 2008. The FHO Fund's share price fell 5.8%, from $9.00 on July 3, 2008 to close at $8.47 on July 7, 2008. Thus, Plaintiffs have sufficiently alleged loss causation. *See also Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 831 (8th Cir. 2003) ("They . . . plead [that] the stock declined by roughly 4 percent the day after the May announcement. This was a sufficient allegation of a causal link between the company's misbehavior and a subsequent decline, though it was

---

[72] *See also In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1251 (N.D. Cal. 2008) ("A plaintiff is not required to show 'that a misrepresentation was the sole reason for the investment's decline in value' in order to establish loss causation. '[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement'") (citation omitted); *Sloman v. Presstek*, No. 06-377, 2007 U.S. Dist. LEXIS 69475, at *36 (D.N.H. Sept. 18, 2007) ("Even if Presstek's stock declined on September 28 for reasons unrelated to this lawsuit, it would not disprove, as a matter of law, that the overnight decline was not attributable to the defendants' midnight corrective disclosure."); *Ong v. Sears, Roebuck & Co.*, 459 F. Supp. 2d 729, 747 (N.D. Ill. 2006) ("A plaintiff need not prove that all its loss can be attributed to the defendant's misrepresentation, and a complaint is not rendered infirm because the loss could have been caused by other, undisclosed wrongful conduct of the defendant or other factors that influenced the price of the plaintiff's securities."); *In re StockerYale Sec. Litig.*, 453 F. Supp. 2d 345, 359 (D.N.H. 2006) ("Defendants' reference to a wide range of economic and other factors that may have caused or contributed to the decline in price of StockerYale shares raises issues that will be addressed at later stages of this litigation, but those possibilities do not warrant dismissal"); *Wojtunik v. Kealy*, No. 03-2161, 2006 U.S. Dist. LEXIS 73448, at *11 (D. Ariz. Sept. 30, 2006) ("The fact that factors other than the alleged misrepresentations contributed to the investment's decline in value does not bar recovery") (citation omitted); *In re Immune*, 375 F. Supp. 2d at 1025 ("[w]hether the alleged omissions and misstatements actually were a cause-in-fact of the price of [the] stock is a question properly reserved for summary judgment or for the trier of fact.") (citation omitted); *In re TyCom Ltd. Sec. Litig.*, No. 03-1352, 2005 U.S. Dist. LEXIS 19154, at *45-46 (D.N.H. Sept. 2, 2005) ("Even if, as defendants maintain, there had been an intervening event that interrupted the chain of causation, such a determination is . . . not to be decided here on a Rule 12(b)(6) motion to dismiss.") (citations omitted).

a modest one").[73]

## X.    PLAINTIFFS ADEQUATELY ALLEGE CONTROL PERSON LIABILITY

The Complaint alleges that Defendants First Trust, Bowen and Bradley are liable under Section 15 of the Securities Act as control persons of the Funds for the materially untrue and misleading statements made in violation of Section 11 and 12(a), as well as Section 20(a) of the Exchange Act as control person for violations of Section 10(b). *See, e.g.*, ¶¶320-23, 517-19. Defendants seek dismissal of the Section 15 and Section 20(a) claims on the basis that, in their view, the Complaint does not allege primary violations. *See* Def. Br. at 40. As shown above, Plaintiffs' claims are more than adequately pleaded and, therefore, the control person claims against these Defendants should be sustained.

Furthermore, Plaintiffs more than adequately allege that these Defendants exercised control over the primary violator. ¶¶6, 30, 34, 35. The Complaint alleges that First Trust was an advisor and manager to the Funds, responsible for supervising the Funds' Subadvisors, monitoring the Funds' investment portfolios, managing the Funds' business affairs and providing administrative service. *See* ¶30. As to Defendant Bowen, the Complaint alleges that during the Class Periods he was the President of First Trust Portfolio, and the President at First Trust. He is also the Managing Director of First Trust Portfolios. ¶34. Defendant Bradley was the Chief Financial Officer, Controller and Treasurer of the Funds, as well as the Managing Director and Chief Financial Officer at First Trust Advisors L.P. He was also the Chief Financial Officer and Managing Director at First Trust Portfolios L.P. ¶35. Thus, Plaintiffs have adequately pled Section 15 and Section 20(a) liability. *See Cent. Laborers' Pension Fund v. Sirva, Inc.*, No. 04-7644, 2006 U.S. Dist. LEXIS 73375, at *72 (N.D. Ill. Sept. 22, 2006) ("plaintiff's allegation that each defendant 'had direct involvement in the day to day operations of

---

[73] Defendants' heavy reliance on *Bastian v. Petren Res. Corp.*, 892 F.2d 680 (7th Cir. 1990) is misplaced. In that case, the misrepresentations had nothing to do with the reason plaintiffs sustained losses. *See id.* at 683. In the instant case, Plaintiffs allege that due to Defendants' overstatement of the value of the portfolio investments and the NAVs, as well as the failure to disclose pertinent material facts during the Class Periods, when the truth finally came out, Plaintiffs suffered damages. Thus, Plaintiffs have adequately pled loss causation. *See Gray v. First Winthrop Corp.*, 82 F.3d 877, 886 (9th Cir. 1996) ("In this case, by contrast [to *Bastian*], the plaintiffs object to Winthrop's representations of profitability, which shows an intent to invest in a profitable sector of the economy . . . According to the plaintiffs' evidence, honest representations in 1984 would have shown this investment was not a profitable one. Thus, if Winthrop had not made the alleged misrepresentations, the value of the plaintiffs' long-term investment would have been reduced, and the plaintiffs would have made other investments rather than this one. This is sufficient evidence of causation to withstand summary judgment"); *In re VMS Sec. Litig.*, 752 F. Supp. 1373, 1399 (N.D. Ill. 1990) ("Unlike the plaintiffs in *Bastian*, they do not say that 'they have no idea why their investment was wiped out and it does not matter.' Therefore, plaintiffs have adequately alleged loss causation as interpreted in *Bastian*").

[SIRVA] and/or control over major corporate decision and policy making, and, therefore, is presumed to have had the power to control or influence the particular transactions . . . , and exercised the same' . . . is sufficient to satisfy the control element of the section 15 and 20(a) claims"); *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992) (a control person is one who "actually participated in, that is, exercised control over, the operations of the person in general and . . . possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised").

## **CONCLUSION**

For the foregoing reasons, the Motion to Dismiss should be denied.[74]

Dated: October 14, 2009

Respectfully submitted,

**KRISLOV & ASSOCIATES, LTD.**

By: /s/ Jeffrey M. Salas
Clinton A. Krislov
Jeffrey M. Salas
20 North Wacker Drive
Suite 1350
Chicago, Illinois 60606
Telephone: (312) 606-0500
Facsimile:  (312) 606-0207

*Liaison Counsel for Plaintiffs and the Classes*

**BROWER PIVEN**
  A Professional Corporation
David A.P. Brower
Jessica Sleater
488 Madison Avenue
Eighth Floor
New York, New York 10022
Telephone: (212) 501-9000
Facsimile:  (212) 501-0300

---

[74] In the event the motion to dismiss is granted in whole or part, Plaintiffs respectfully requests leave to amend. *Dugan v. Selco Indus.*, No. 96-8404, 1997 U.S. Dist. LEXIS 17737, at *4 (N.D. Ill. Nov. 4, 1997) ("leave to amend the pleadings is liberally granted").

**BROWER PIVEN**
  A Professional Corporation
Charles J. Piven
Yelena Trepetin
World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202
Telephone: (410) 332-0030
Facsimile:  (410) 685-1300

*Counsel for Plaintiffs and Lead Counsel for the Classes*