**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROGER J. GOSSELIN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | **Case Number:  08-cv-05213** |
| FIRST TRUST ADVISORS L.P., FIRST TRUST PORTFOLIOS L.P., FIRST TRUST STRATEGIC HIGH INCOME FUND, FIRST TRUST STRATEGIC HIGH INCOME FUND II, FIRST TRUST STRATEGIC HIGH INCOME FUND III, JAMES A. BOWEN, and MARK R. BRADLEY, | ) ) ) ) ) ) ) ) | Honorable Samuel Der-Yeghiayan |
| Defendants. | ) ) ) | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT**

Bryan Cave LLP
　Steven R. Smith
　Derek S. Holland
161 North Clark Street, Suite 4300
Chicago, IL 60601-3206

Milbank, Tweed, Hadley & McCloy LLP
　James N. Benedict
　Sean M. Murphy
　Robert R. Miller
　Andrew W. Robertson
1 Chase Manhattan Plaza
New York, NY 10005-1413

*Attorneys for Defendants First Trust Advisors L.P.,*
*First Trust Portfolios L.P., First Trust Strategic*
*High Income Fund, First Trust Strategic High*
*Income Fund II, First Trust Strategic High Income*
*Fund III, James A. Bowen, and Mark R. Bradley*

# <u>TABLE OF CONTENTS</u>

Page(s)

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ...................................................................................................................... 3

I.  PLAINTIFFS FAIL TO ALLEGE ACTIONABLE MISREPRESENTATIONS
    OR OMISSIONS. ....................................................................................................... 3

    A.  Plaintiffs' Pricing Allegations Do Not State a Claim for Securities Fraud. .......... 5

        1.  Plaintiffs Cannot State a Claim Based on Their Hindsight
            Challenge to the Timing of the Funds' Write-Downs. ............................. 5

        2.  Plaintiffs Do Not Allege Facts Supporting a Reasonable Inference
            that Defendants Misvalued the Funds' Holdings of Mortgage-
            Related Securities...................................................................................... 6

        3.  Plaintiffs Fail to Allege that Defendants Violated the Funds' Fully
            Disclosed Valuation Policies and Procedures........................................... 7

    B.  No Reasonable Investor Would Have Been Misled by the Funds'
        Disclosures Regarding Investment Strategies and Risks. .................................... 10

        1.  Defendants' Description of the Funds as "Diversified" Was Not
            False or Misleading.................................................................................. 10

        2.  Defendants' Disclosures Regarding the Funds' Use of Hedging
            Were Not False or Misleading. ................................................................ 11

        3.  Defendants' Disclosures Regarding the Funds' Use of Leverage
            Were Not False or Misleading. ................................................................ 13

    C.  Plaintiffs' Disagreement with Defendants' Assessment of the Impact of
        Market Developments Does Not State a Claim for Securities Fraud. ................. 13

    D.  Defendants Appropriately Disclosed the Funds' Advisory Fees. ........................ 14

II.  PLAINTIFFS' SCIENTER ALLEGATIONS ARE INSUFFICIENT TO
     SURVIVE A MOTION TO DISMISS. ..................................................................... 15

    A.  Plaintiffs' Motive Allegations Are Economically Irrational. ............................. 15

    B.  Plaintiffs' Allegations of Circumstantial Evidence Do Not Support a
        Strong Inference of Scienter. .............................................................................. 16

    C.  The More Plausible Inference Is that Defendants Acted In Good Faith.............. 19

III.  PLAINTIFFS' LOSSES WERE NOT CAUSED BY THE ALLEGED FRAUD.......... 20

IV.  PLAINTIFFS' CLAIMS UNDER THE 1933 ACT AND SECTION 14(A) OF
     THE 1934 ACT ARE TIME-BARRED. ..................................................................... 22

V.      PLAINTIFFS HAD KNOWLEDGE OF THE ALLEGED
        MISREPRESENTATIONS AT THE TIME THEY PURCHASED THEIR
        SHARES OF THE FUNDS. ........................................................................... 24

VI.     PLAINTIFFS' CONTROL PERSON CLAIMS MUST BE DISMISSED. .................... 25

CONCLUSION ....................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

## CASES

Abrams v. Van Kampen Funds, Inc.,
No. 01-C-7538, 2002 U.S. Dist. LEXIS 9814 (N.D. Ill. May 29, 2002) ............... 7, 9, 15, 23

ACA Fin. Guar. Co. v. Advest, Inc.,
512 F.3d 46 (1st Cir. 2008) ............................................................................................ 4

AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC,
No. 01-11448, 2005 U.S. Dist. LEXIS 21605 (S.D.N.Y. Sept. 26, 2005) .......................... 18

Bastian v. Petren Res. Corp.,
892 F.2d 680 (7th Cir. 1990) .................................................................................... 20, 21

Borsellino v. Goldman Sachs Group, Inc.,
477 F.3d 502 (2007) ...................................................................................................... 4

Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.,
394 F.3d 126  (3d Cir. 2004) ............................................................................................ 4

City of Brockton Ret. Sys. v. The Shaw Group, Inc.,
540 F. Supp. 2d 464 (S.D.N.Y. 2008) ............................................................................. 15

Cozzarelli v. Inspire Pharm. Inc.,
549 F.3d 618 (4th Cir. 2008) ........................................................................................... 4

Cronau v. Asche,
No. 01 C 50057, 2002 WL 832569 (N.D. Ill. May 1, 2002) ............................................... 17

Deutschman v. Beneficial Corp.,
132 F.R.D. 359 (D. Del. 1990) ...................................................................................... 22

DiLeo v. Ernst & Young,
901 F.2d 624 (7th Cir. 1990) .......................................................................... 5, 6, 16, 17

Dura Pharms., Inc. v. Broudo,
544 U.S. 336 (2006) ..................................................................................................... 22

Ellington Mgmt. Group, LLC v. Ameriquest Mortgage Co.,
No. 09 Civ. 0416, 2009 WL 3170102 (S.D.N.Y. Sept. 29, 2009) ....................................... 17

Fry v. UAL Corp.,
895 F. Supp. 1018 (N.D. Ill. 1995) ................................................................................... 3

Grassi v. Info. Res., Inc.,
63 F.3d 596 (7th Cir. 1995) ............................................................................................. 3

Gross v. Medaphis Corp.,
977 F. Supp. 1463 (N.D. Ga. 1997) ................................................................................. 16

Hunt v. Alliance N. Am. Gov't Income Trust, Inc.,
159 F.3d 723 (2d Cir. 1998) ........................................................................................... 12

In re 2007 Novastar Fin., Inc.,
No. 07-0139, 2008 U.S. Dist. LEXIS 44166 (W.D. Mo. June 4, 2008) ............................... 20

In re Am. Express Co. Sec. Litig.,
No. 02 Civ. 5533 (WHP), 2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008) ........................... 17

In re Charles Schwab Corp. Sec. Litig.,
  No. 08-01510, 2009 U.S. Dist. LEXIS 8125 (N.D. Cal. Feb. 4, 2009) ............................... 12

In re Citigroup Auction Rate Sec.,
  No. 08 Civ. 3095, 2009 WL 2914370 (S.D.N.Y. Sept. 11, 2009) ....................................... 20

In re Citigroup, Inc. S'holder Deriv. Litig.,
  No. 07 Civ. 9841, 2009 WL 2610746 (S.D.N.Y. Aug. 25, 2009) ....................................... 17

In re Complete Mgmt.,
  153 F. Supp. 2d 314 (S.D.N.Y. 2001).................................................................................... 16

In re Cornerstone Propane Partners, L.P., Sec. Litig.,
  416 F. Supp. 2d 779 (N.D. Cal. 2005) .................................................................................. 18

In re Countrywide Fin. Corp. Sec. Litig.,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................................ 20

In re Dreyfus Aggressive Growth Mut. Fund Litig.,
  No. 98-4318, 2000 U.S. Dist. LEXIS 94 (S.D.N.Y. Jan. 6, 2000) ..................................... 12

In re Ibis Tech. Sec. Litig.,
  422 F. Supp. 2d. 294 (D. Mass. 2006) .................................................................................. 16

In re Merrill Lynch & Co. Research Reports Sec. Litig.,
  No. 02 Civ. 9690 (JFK), 2008 U.S. Dist. LEXIS 44344 (S.D.N.Y. June 4,
  2008) ...................................................................................................................................... 21

In re Merrill Lynch & Co. Research Reports Sec. Litig.,
  273 F. Supp. 2d 351 (S.D.N.Y. 2003).................................................................................... 23

In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.,
  434 F. Supp. 2d 233 (S.D.N.Y. 2006).................................................................................... 20

In re MoneyGram Int'l, Inc. Sec. Litig.,
  626 F. Supp. 2d 947 (D. Minn. 2009).................................................................................. 7, 9

In re Parmalat Sec. Litig.,
  375 F. Supp. 2d 278 (S.D.N.Y. 2005).................................................................................... 21

In re Petco Animal Supplies Inc. Sec. Litig.,
  No. 05-CV-0823-H (RBB), 2006 U.S. Dist. LEXIS 97927 (S.D. Cal. July 31,
  2006) ...................................................................................................................................... 18

In re Suprema Specialties, Inc. Sec. Litig.,
  438 F.3d 256 (3d Cir. 2006)..................................................................................................... 4

In re Williams Sec. Litig.,
  339 F. Supp. 2d 1206 (N.D. Okla. 2003) ................................................................................ 5

Joffee v. Lehman Bros., Inc.,
  410 F. Supp. 2d 187 (S.D.N.Y. 2006).............................................................................. 20, 21

Kalnit v. Eichler,
  264 F.3d 131 (2d Cir. 2001)................................................................................................... 17

Lentell v. Merrill Lynch & Co., Inc.,
  396 F.3d 161 (2d Cir. 2005)................................................................................................... 21

Melder v. Morris,
  27 F.3d 1097 (5th Cir. 1994) ................................................................................................... 4

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,
  547 U.S. 71 (2006).................................................................................................................... 3

Novak v. Kasaks,
  216 F.3d 300 (2d Cir. 2000)................................................................5

Olkey v. Hyperion 1999 Term Trust,
  98 F.3d 2 (2d Cir. 1996).................................................................12

Panter v. Marshall Field & Co.,
  646 F.2d 271 (7th Cir. 1981) ............................................................3

Rombach v. Chang,
  355 F.3d 164 (2d Cir. 2004)..............................................................4

Roth v. OfficeMax, Inc.,
  527 F. Supp. 2d 791 (N.D. Ill. 2007) ................................................17

Rubke v. Capitol Bancorp, Ltd.,
  551 F.3d 1156 (9th Cir. 2009) ...........................................................4

Schaufenbuel v. InvestForClosures Fin., LLC,
  No. 09 C 1221, 2009 WL 3188222 (N.D. Ill. Sept. 30, 2009).............4

SEC v. Baxter,
  No. 05-03843, 2007 U.S. Dist. LEXIS 52829 (N.D. Cal. July 11, 2007) ............6

Sheppard v. TCW/DW Term Trust 2000,
  938 F. Supp. 171 (S.D.N.Y. 1996)....................................................12

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.,
  531 F.3d 190 (2d Cir. 2008)..............................................................17

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
  551 U.S. 308 (2007)..........................................................3, 15, 19

Tregenza v. Great Am. Commc'ns Co.,
  823 F. Supp. 1409 (N.D. Ill.), aff'd, 12 F.3d 717 (7th Cir. 1993) ........23

Virginia Bankshares, Inc. v. Sandberg,
  501 U.S. 1083 (1991)......................................................................7, 13

Wagner v. First Horizons Pharm. Corp.,
  464 F.3d 1273 (11th Cir. 2006) ..........................................................4

Zucco Partners, LLC v. Digimarc Corp.,
  552 F.3d 981 (9th Cir. 2009) .......................................................15, 16

## STATUTES

15 U.S.C. § 80a-5(b)(1) ...........................................................1, 10

## OTHER AUTHORITIES

Investment Company Institute, SEC No-Action Letter (Dec. 8, 1999) ..................9, 10

SEC Release No. AS-118, Accounting for Investment Securities by Registered
  Investment Companies, 1970 WL 10502 (Dec. 23, 1970) .................9, 10

## PRELIMINARY STATEMENT

Much like the Complaint,[1] Plaintiffs' Opposition is long on content, but falls far short on substance.  Despite running on for fifty tightly-packed pages, the Opposition does little more than repeat, often verbatim, the Complaint's conclusory allegations.  In addition, in an effort to create the impression that their claims are well-supported, Plaintiffs clutter the Opposition with citations to and quotations from over 200 cases, but the vast majority of those cases either are irrelevant or actually support Defendants' arguments in favor of dismissal.

Moreover, the Opposition is replete with misstatements of the law and demonstrably false assertions regarding the Funds' disclosures and other relevant facts.  For example:

- Plaintiffs contend that "[a]s the registrant of the Funds, First Trust Portfolios is liable under the Exchange Act and the Securities Act for the content of all the statements issued during the Class Periods."  (Opp. at 4.)  However, as is apparent from the face of the registration statements, First Trust Portfolios is not the registrant for the Funds.  Rather, each Fund is the registrant for its own shares.  (See, e.g., Supp. Ex. FF at 1 (identifying "First Trust High Income Fund" as "Exact Name of Registrant").)

- Plaintiffs challenge Defendants' designation of the Funds as "diversified" closed-end management investment companies, but they simply ignore that the term "diversified" is defined by statute, see 15 U.S.C. § 80a-5(b)(1), and make no effort to argue that the Funds do not qualify as diversified under the statutory definition.  Instead, they fabricate an entirely new meaning of the term, but even under that definition, they cannot establish that a reasonable investor would have been misled about the Funds' level of diversification in light of concededly accurate disclosures regarding the types of securities in which the Funds would invest and in which the Funds actually did invest.

- Plaintiffs contend that Defendants misrepresented the Funds' investment strategies and risks because the sub-adviser did not "generally seek" to use hedging techniques and failed to implement "effective hedges."  However, Plaintiffs fail to address the prospectuses' clear statements that the sub-adviser "is not required to" use hedging techniques and that "no assurance can be given" that it would do so, much less that any hedging techniques would be "effective."

- Plaintiffs attempt to establish an inference of scienter based on the change in the Funds' sub-adviser in April 2006, asserting that "[n]o reason was provided" for the change.  In fact, however, Defendants plainly disclosed the reason for the change: The individuals responsible for managing the Funds changed employers.  There is

---

[1]     Unless otherwise defined herein, capitalized and abbreviated terms have the same meaning as defined in Defendants' moving brief.  As in the moving brief, references in the form "Ex. __" are to the Declaration of Steven R. Smith in Support of Defendants' Motion to Dismiss the Consolidated Complaint, dated July 29, 2009.  References in the form "Supp. Ex. __" are to the Supplemental Declaration of Steven R. Smith in Further Support of Defendants' Motion to Dismiss the Consolidated Complaint, dated November 16, 2009.

nothing suspicious about that change, and it certainly does not support a strong inference that Defendants acted with intent to defraud.

For all its content, however, the Opposition is most notable for what it does not say: Plaintiffs nowhere contest that they knew the Funds were high-risk investments. Indeed, Plaintiffs make no effort to rebut Defendants' showing that the Funds' prospectuses disclosed that the Funds would invest primarily in "junk bonds," including mortgage-related securities, and that such investments carried significant risk, including the risk that fund shareholders could lose the "entire principal amount" of their investments.

Unable to contend that they were misled about the nature of their investments, Plaintiffs ground their claims on hindsight challenges to Defendants' carrying out of discretionary responsibilities. For example, Plaintiffs challenge the sub-adviser's decisions about how to allocate the Funds' assets across different types of securities and when to employ leverage and hedging techniques. Plaintiffs also challenge Defendants' implementation of the Funds' fully disclosed and concededly compliant pricing policies, including decisions about when securities were required to be fair value priced and the fair value of those securities. These are the very type of mismanagement allegations that Plaintiffs concede are not actionable under the federal securities laws, regardless of Plaintiffs' attempts to cloak them in the language of disclosure.

Even if properly considered as disclosure claims, however, Plaintiffs' allegations fail to state a claim under the federal securities laws because: (i) Plaintiffs fail to allege fraud with particularity; (ii) Plaintiffs fail to allege facts supporting the requisite strong inference of scienter; (iii) Plaintiffs seek to recover losses that were caused by adverse market developments, not by any alleged fraud or misrepresentations; (iv) certain of Plaintiffs' claims are barred by the statute of limitations; and (v) three of the four Plaintiffs are precluded from asserting claims because they purchased shares of the Funds with knowledge of the alleged misrepresentations and omissions.

Faced with these many deficiencies in their claims, Plaintiffs primarily respond that Defendants' legal challenges to the sufficiency of the Complaint's allegations are "premature" and raise "issues of fact" that cannot be resolved on a motion to dismiss. This argument is unavailing. Indeed, in the last two decades, Congress and the Supreme Court have taken substantial steps—including, most notably, enacting the PSLRA's heightened pleading requirements—to empower district courts to assess the legal sufficiency of securities fraud allegations at the pleadings stage and "quickly dispose of" meritless lawsuits. Merrill Lynch,

Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 82 (2006); see also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 320-21 (2007) ("[T]he PSLRA installed both substantive and procedural controls" "to curb perceived abuses of the § 10(b) private action."). Application of governing pleading standards here requires that the Complaint be dismissed because it is apparent on the face of the Complaint, the Funds' disclosures, and other materials integral to the Complaint that Plaintiffs' allegations are legally deficient and do not state a claim.

## ARGUMENT

### I.  PLAINTIFFS FAIL TO ALLEGE ACTIONABLE MISREPRESENTATIONS OR OMISSIONS.

The Complaint fails to allege actionable misrepresentations and omissions for two independent, but equally dispositive, reasons.

First, Plaintiffs' hindsight challenges to Defendants' business judgment in managing the Funds and valuing the Funds' mortgage-related securities are not actionable under the federal securities laws.  (See Br. at 15-17.)  Indeed, Plaintiffs concede that they may not bring a securities claim based on allegations of mismanagement or failure to disclose alleged mismanagement.  (See Opp. at 34-35 & n.53.)  Their only argument against dismissal is that they have alleged that "Defendants misled the public" and "failed to disclose materially adverse facts" regarding the Funds' investment strategies and pricing of mortgage-related securities.  (Id. at 35-36.)  As discussed below, however, each of the supposed misrepresentations and omissions is, at bottom, a challenge to Defendants' business judgment in performing their discretionary responsibilities pursuant to the Funds' fully disclosed investment strategies and pricing policies. Because the central thrust of these allegations is a claim for mismanagement, they cannot state a claim under the federal securities laws.  See Fry v. UAL Corp., 895 F. Supp. 1018, 1043 (N.D. Ill. 1995) ("[I]f the central thrust of a claim . . . arises from acts of corporate mismanagement, the claims are not cognizable under federal law.  To hold otherwise would be to eviscerate the obvious purpose of the Santa Fe decision, and to permit evasion of that decision by artful legal draftsmanship." (quoting Panter v. Marshall Field & Co., 646 F.2d 271, 289 (7th Cir. 1981)) (alteration in original).

Second, even if considered as disclosure claims, the Complaint fails to comply with federal pleading standards requiring Plaintiffs to allege particularized facts supporting a reasonable inference that the Funds' disclosures were materially false or misleading.  Plaintiffs concede, as they must, that Rule 9(b) and the PSLRA require them to make particularized factual

allegations for purposes of their claims under the 1934 Act.  Plaintiffs also must satisfy Rule 9(b)'s requirement to allege fraud with particularity for purposes of their claims under the 1933 Act because those claims "sound in fraud," both because Plaintiffs have employed the language of fraud and because the very nature of Plaintiffs' claims, which challenge the veracity of Defendants' statements of opinion and judgment, implies a charge of fraud.  (See Br. at 18.)

Plaintiffs' efforts to remove their 1933 Act claims from the purview of Rule 9(b) are unavailing.  As an initial matter, the Seventh Circuit has held that Rule 9(b) applies to all claims that "sound in fraud," regardless of whether fraud is a necessary element of the claim.  See Borsellino v. Goldman Sachs Group, Inc., 477 F.3d 502, 507 (2007) ("Although [plaintiffs'] claims . . . are not by definition fraudulent torts . . . [,] whether [Rule 9(b)] applies will depend on the plaintiffs' factual allegations."); see also Schaufenbuel v. InvestForClosures Fin., LLC, No. 09 C 1221, 2009 WL 3188222, at *3 (N.D. Ill. Sept. 30, 2009) ("The law in this Circuit is well-settled that the applicability of Rule 9(b)'s heightened pleading standard turns not on the title of the claim but on the underlying facts alleged in the complaint.") (Supp. Ex. KK).[2]  The contrary cases cited by Plaintiffs are inapposite because they either fail to address, or were decided before, Borsellino.  (See Opp. at 9-10.)

Furthermore, contrary to Plaintiffs' representations (see id. at 9 n.11), "a conclusory disclaimer cannot alter the substance of plaintiffs' allegations" when determining whether a particular claim "sounds in fraud."  Cozzarelli, 549 F.3d at 629.  Rather, as Plaintiffs' own cases explain, there must be a "clear, conceptual separation between claims sounding in negligence and those sounding in fraud."  In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 273 (3d Cir. 2006) (cited Opp. at 9 n.11).  Here, there is no such separation:  The substantive allegations that form the basis for Plaintiffs' 1933 Act claims are identical to those alleged in support of the 1934 Act claims.  See Rubke, 551 F.3d at 1161 ("Where . . . a complaint employs the same exact factual allegations to allege a violation of section 11 as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act, we can assume it sounds in fraud.").

---

[2]      Accord ACA Fin. Guar. Co. v. Advest, Inc., 512 F.3d 46, 68 (1st Cir. 2008); Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004); Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 161 (3d Cir. 2004); Cozzarelli v. Inspire Pharm. Inc., 549 F.3d 618, 629 (4th Cir. 2008); Melder v. Morris, 27 F.3d 1097, 1100 (5th Cir. 1994); Rubke v. Capitol Bancorp, Ltd., 551 F.3d 1156, 1161 (9th Cir. 2009); Wagner v. First Horizons Pharm. Corp., 464 F.3d 1273, 1277 (11th Cir. 2006).

A.  **Plaintiffs' Pricing Allegations Do Not State a Claim for Securities Fraud.**

1.  **Plaintiffs Cannot State a Claim Based on Their Hindsight Challenge to the Timing of the Funds' Write-Downs.**

As demonstrated in Defendants' initial brief, Seventh Circuit precedent forecloses Plaintiffs' attempt to state a claim for securities fraud based on their disagreement with the timing of the Funds' write-downs.  (See Br. at 21.)

Plaintiffs argue that Defendants "mischaracterize the Complaint as simply criticizing the timing of the write downs" (Opp. at 15), but they fail to explain how their claim that Defendants should have begun to take write-downs in December 2006, as opposed to a few months later in early 2007, is anything more than that.  Although Plaintiffs contend that "notwithstanding Defendants' small insufficient portfolio value adjustment, the NAVs and the Funds' portfolios continued to be substantially overvalued" (id.), this, too, is a challenge to the timing of Defendants' write-downs.  Indeed, Plaintiffs acknowledge that Defendants continued to take write-downs throughout 2007 and 2008, and that the July 2008 shareholder reports "finally accounted for the significant deterioration in the Funds' mortgage-related securities." (Id. at 46; see also, e.g., Compl. ¶ 255 (showing security price decreased from 95% of par in January 2007 to 1% of par in October 2008); id. ¶ 261 (decrease from 95% of par in January 2007 to 14% of par in October 2007); id. ¶ 264 (decrease from 90% of par in April 2006 to 1% of par in October 2008).)  As such, Plaintiffs' contention that "Defendants overvalued the Funds' NAVs and portfolios throughout the Class Periods" (Opp. at 15) is nothing more than an argument that Defendants should have taken the later write-downs earlier in the Class Period.

Plaintiffs' alternative argument that their challenge to the timing of Defendants' write-downs is actionable (id.) fails because it is inconsistent with clear Seventh Circuit precedent. See Grassi v. Info. Res., Inc., 63 F.3d 596, 600 (7th Cir. 1995); DiLeo v. Ernst & Young, 901 F.2d 624, 627-28 (7th Cir. 1990).  Plaintiffs' cases from other jurisdictions are inapposite because plaintiffs in those cases alleged particularized facts demonstrating that defendants knew the write-downs should have been taken earlier.  See In re Williams Sec. Litig., 339 F. Supp. 2d 1206, 1223-24 (N.D. Okla. 2003) (cited Opp. at 15) (defendants' competitors and business partners had taken write-downs many months before defendants; market prices for products had decreased substantially); Novak v. Kasaks, 216 F.3d 300, 304 (2d Cir. 2000) (cited Opp. at 15) (weekly management reports showed significant and growing excess inventory); SEC v. Baxter,

No. 05-03843, 2007 U.S. Dist. LEXIS 52829, at *17 (N.D. Cal. July 11, 2007) (cited Opp. at 15) (management had identified unsubstantiated balances and commenced a project to reconcile those balances more than a year before write-downs were taken) (Supp. Ex. KK).  The Complaint does not include any similarly particularized allegations.

> **2.     Plaintiffs Do Not Allege Facts Supporting a Reasonable Inference that Defendants Misvalued the Funds' Holdings of Mortgage-Related Securities.**

In any event, any challenge to the magnitude of the Funds' write-downs fails because Plaintiffs have not alleged particularized facts supporting a reasonable inference that Defendants' valuations were objectively or subjectively false.  (See Br. at 21-23.)

Plaintiffs contend that they "have alleged that Defendants' valuation opinions were both subjectively and objectively false" (Opp. at 17 (citing Compl. ¶¶ 225-271)), but the cited paragraphs from the Complaint belie this assertion.  None of the cited paragraphs says anything at all about Defendants' subjective opinions regarding the value of the Funds' mortgage-related securities.  With respect to objective falsity, the paragraphs merely recount adverse developments in the subprime mortgage and housing markets and assert, in wholly conclusory fashion, that Defendants' valuations were incorrect in light of those developments.  Totally absent, however, are any particularized factual allegations—such as concurrent trading prices for the securities or values assigned to those securities by other investors—that would support a reasonable inference that the adverse market developments rendered Defendants' valuations objectively false or unreasonable.

Similarly, Plaintiffs contend that Defendants' valuations were objectively false because "Defendants report[ed] stable NAVs during the Class Periods despite obvious deterioration in the housing and sub-prime mortgage markets as early as December 2006."  (Id. at 13-14.)  To begin with, the Funds' NAVs were not "stable."  They began to decrease in early 2007 and continued to decrease through the end of the Class Period.  (See Br. Appendices 2-4.)  Furthermore, Plaintiffs' characterization of the NAVs as stable is just another unsupported conclusion, as Plaintiffs nowhere contend that the Funds' NAVs were less volatile than those of other similarly managed funds.

Plaintiffs' conclusory assertions are insufficient under any pleading standard, much less the heightened standards of Rule 9(b) and the PSLRA.  See, e.g., DiLeo, 901 F.2d at 627.

Plaintiffs' contentions to the contrary (see Opp. at 16) simply misstate the law.[3]  Indeed, even Plaintiffs' own authorities require particularized factual allegations supporting a reasonable inference of objective falsity.  See Abrams v. Van Kampen Funds, Inc., No. 01-C-7538, 2002 U.S. Dist. LEXIS 9814, at *12 (N.D. Ill. May 29, 2002) (cited Opp. at 14) (plaintiffs alleged specific examples of misvalued securities by comparing defendants' valuations to concurrent market prices) (Supp. Ex. KK); In re MoneyGram Int'l, Inc. Sec. Litig., 626 F. Supp. 2d 947, 970 (D. Minn. 2009) (cited Opp. at 14) (holding that plaintiff's challenge to MoneyGram's valuations was "deficient" because, inter alia, "the complaint [did] not identify market participants with securities of similar kind and quality whose recognition of unrealized losses substantially differed from MoneyGram's").[4]

### 3. Plaintiffs Fail to Allege that Defendants Violated the Funds' Fully Disclosed Valuation Policies and Procedures.

Unable to muster any factual support for their claim that Defendants' valuations were fraudulent, Plaintiffs shift focus and contend that Defendants violated the Funds' disclosed policies and the law governing pricing of the Funds' portfolio holdings.  (See Opp. at 12-15.)[5] Plaintiffs' argument fails because (1) Defendants fully complied with applicable law and the Funds' stated policies and (2) Plaintiffs' hindsight second-guessing of Defendants' implementation of those policies is not actionable under the federal securities laws.

---

[3]     Plaintiffs' quotation from Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083 (1991), is grossly misleading.  The Court did not hold that a plaintiff can state a claim based on "indefinite and unverifiable" allegations that the values were "high" or "not fair," as Plaintiffs suggest.  (Opp. at 16.) Rather, the Court held that representations in a proxy statement that the company's board of directors had determined that the price at which stock was to be purchased in a planned merger was "high" and "fair" were actionable as misrepresentations.  See Va. Bankshares, 501 U.S. at 1090-96.  Critically, however, in order to establish that the representations were materially misleading, the Court required plaintiffs to provide evidence that "the statement was misleading about its subject matter and a false expression of the directors' reasons," such as evidence that there in fact was no premium over the company's book value and that others had valued the company at a substantially higher price.  See id. at 1091.

[4]     Despite the deficiencies in plaintiffs' challenge to MoneyGram's valuations, the court found that plaintiffs nevertheless stated a claim because the complaint included other allegations, not present here, including that "MoneyGram's general accounting ledger remained open throughout the class period in violation of internal controls," thus "permit[ting] an inference that defendants had access to valuation information contradicting the public financial statements and left the general ledger open to facilitate later alteration of MoneyGram's financials."  MoneyGram, 626 F. Supp. 2d at 974.

[5]     Plaintiffs repeat essentially the same allegations in contending that Defendants misrepresented the Funds' internal controls.  (Opp. at 17-19.)  This claim fails for the same reasons discussed below.

### a.  The Funds' Valuation Policies Comply with Applicable Law.

The Funds plainly disclosed that they "value[d] mortgage-backed securities . . . on the basis of valuations provided by dealers who make markets in such securities or by an independent pricing service approved by the Board of Trustees." (Ex. I at 15.)  The Funds further disclosed that if "the pricing service or dealer [did] not provide a valuation for a particular security [or] the valuations [were] deemed unreliable," First Trust Advisors "may use a fair value method to value the Fund's securities." (Id.)  Plaintiffs concede that these disclosed policies comply with the requirements of the Investment Company Act of 1940 Act (the "1940 Act") and SEC regulations. (See Opp. at 13.)

### b.  Defendants' Reliance on Third-Party Pricing Information Does Not Give Rise to a Federal Securities Claim.

Plaintiffs do not contest that Defendants adhered to the fully disclosed policy of using pricing information provided by independent third parties.  To the contrary, Plaintiffs criticize Defendants' adherence to this policy, contending that Defendants should have disregarded the third-party pricing information as unreliable and independently determined the fair value of the Funds' mortgage-related securities because "there was evidence throughout the Class Periods of readily determinable deterioration in values." (See id. at 13 n.17, 17 n.24.)

Whether third-party pricing information was "unreliable" clearly is a business judgment, and Plaintiffs' hindsight disagreement with Defendants' conclusions regarding the reliability of that information cannot serve as the basis for a claim under the federal securities laws.  In any event, Plaintiffs do not allege any particularized facts supporting an inference that the third-party pricing information for any particular security was objectively unreliable or that Defendants believed it to be so.  Tellingly, Plaintiffs do not even attempt to explain why an independent pricing service or dealer would have provided valuation information that failed to account for the supposed "readily determinable deterioration in values."

### c.  Plaintiffs' Hindsight Criticism of Defendants' Fair Value Pricing Does Not State a Federal Securities Claim.

Similarly, Plaintiffs cannot state a claim by challenging Defendants' "fair value" determinations with respect to those securities for which reliable third-party pricing information was not available. (See id. at 12-13.)  Fair value pricing of securities is a quintessential business

judgment.  The SEC, for example, has explained that "[n]o single standard for determining 'fair value . . . in good faith' can be laid down," SEC Release No. AS-118, <u>Accounting for Investment Securities by Registered Investment Companies</u>, 1970 WL 10502, at *4 (Dec. 23, 1970) (Ex. AA), and that fair valuation is "a flexible concept that can accommodate many different considerations, including the incorporation of a variety of sources of information."  Investment Company Institute, SEC No-Action Letter, at 5, 7 (Dec. 8, 1999) (Supp. Ex. HH).  Indeed, the SEC recognized that fair valuation involves such a significant degree of judgment that "different fund boards . . . , when fair value pricing identical securities, could reasonably arrive at prices that were not the same."  <u>Id.</u> at 6-7.  Consistent with this, the Funds disclosed that First Trust Advisors would fair value portfolio securities based on a non-exclusive list of factors and that the resulting fair value prices were matters of "judgment" and could be different from prices assigned to the same securities by others.  (<u>See</u> Ex. I at 15.)

In light of the judgment involved in fair valuation, even Plaintiffs' own authorities recognize that hindsight challenges to fair value pricing at most constitute a mismanagement claim and are not actionable under the federal securities laws.  <u>See</u> <u>Abrams</u>, 2002 U.S. Dist. LEXIS 9814, at *36 (cited Opp. at 14, 36 n.55) ("[I]n those situations where market pricing was not available and plaintiffs allege defendants simply misvalued the loan using the 'fair value' method, plaintiffs may be alleging nonactionable corporate mismanagement.") (Supp. Ex. KK)[6]; <u>see also</u> <u>MoneyGram</u>, 626 F. Supp. 2d at 970 (cited Opp. at 14).

Even if Plaintiffs' disagreement with Defendants' fair value pricing could serve as the basis for a claim, the Complaint does not allege any particularized facts supporting a reasonable inference that Defendants failed to value the securities in good faith.  Although Plaintiffs contend that "Defendants completely ignored proper valuation considerations," such as adverse developments in the subprime mortgage and housing markets (Opp. at 13 & n.18), they do not allege any facts about Defendants' valuation deliberations or the factors that Defendants actually considered in connection with those deliberations.

---

[6]      In response to defendants' motion to dismiss, plaintiffs in <u>Abrams</u> clarified that they were not challenging defendants' fair value pricing, but rather were challenging defendants' representations that they would use readily available market quotations to value portfolio securities, as required by the 1940 Act and governing regulations.  The court held that those allegations could properly be asserted as a federal securities claim.  <u>Abrams</u>, 2002 U.S. Dist. LEXIS 9814, at *35-*36 (Supp. Ex. KK).  Here, by contrast, the Complaint does not allege that Defendants failed to consider readily available market quotations.  Indeed, Plaintiffs do not allege the market value of any particular security on any day.

Instead, Plaintiffs contend that Defendants must not have considered the adverse market developments because "the Valuation Committee only met four times for the FHI Fund and three times for the FHY Fund during the calendar year ended December 31, 2007." (Id. at 14.)  This argument fails because the Funds plainly disclosed that the Valuation Committee's role was only to oversee the Funds' pricing policies (see Ex. B at 41 ("The Valuation Committee is responsible for the oversight of the pricing procedures of the Fund.")) and that First Trust Advisors was responsible for making fair value determinations on a day-to-day basis.[7]  (See Ex. I at 15 ("First Trust Advisors L.P. . . . may use a fair value method to value the Fund's securities."); see also Ex. A at 34 ("When applicable, fair value of securities . . . is determined by the Board or a committee of the Board or a designee of the Board.").)  Plaintiffs do not allege that First Trust Advisors failed to fair value the Funds' mortgage-related securities on a daily basis.

Plaintiffs also make the conclusory argument that Defendants must not have taken into account proper valuation considerations because they assigned prices to mortgage-related securities that Plaintiffs now contend were too high in light of those considerations.  As discussed above, however, this argument fails because Plaintiffs have not alleged any facts supporting a reasonable inference that the adverse market developments rendered Defendants' valuations objectively false or unreasonable.  See § I.A.2, supra.

## B.    No Reasonable Investor Would Have Been Misled by the Funds' Disclosures Regarding Investment Strategies and Risks.

### 1.    Defendants' Description of the Funds as "Diversified" Was Not False or Misleading.

As set forth in Defendants' initial brief, Plaintiffs' claim that Defendants' description of the Funds as "diversified" was false or misleading fails as a matter of law because the term "diversified" is defined by statute, see 15 U.S.C. § 80a-5(b)(1), and Plaintiffs have not alleged

---

[7]    The SEC has recognized this as the typical practice in the industry.  See Investment Company Institute, SEC No-Action Letter, at 7 (Dec. 8, 1999) ("Mutual fund boards . . . typically are only indirectly involved in the day-to-day pricing of a fund's portfolio securities.  Most boards fulfill their obligations by reviewing and approving pricing methodologies, which may be formulated by the board, but more typically are recommended and applied by fund management.") (Supp. Ex. HH); SEC Release No. AS-118, 1970 WL 10502, at *4 ("[T]he board may appoint persons to assist them in the determination of [fair] value, and to make the actual calculations pursuant to the board's direction.") (Ex. AA).  At any rate, any claim that the Valuation Committee failed to fulfill its responsibilities is at best a breach of fiduciary duty claim that must be asserted derivatively under state law, not as a class action under the federal securities laws.

that the Funds did not comply with the statutory definition.  (See Br. at 26 n.14.)  The Opposition simply ignores this fundamental defect in Plaintiffs' claim.

Instead, Plaintiffs disregard the statutory definition and substitute one of their own invention, contending that Defendants' description of the Funds as "diversified" amounts to a representation that the Funds would "invest[] in uncorrelated and negatively correlated assets so that losses in one asset [would be] offset by gains in another, thus reducing the volatility of investment returns."  (Opp. at 19.)  Plaintiffs do not and cannot cite a single authority in support of this contrived definition.

Even accepting Plaintiffs' definition of the term "diversified," the Funds' disclosures foreclose any claim that the Funds' level of diversification was misrepresented or that a reasonable investor would have been misled into believing that the Funds would make exactly off-setting investments in negatively correlated assets.  The prospectuses stated that the Funds would invest primarily in high-yield debt securities, or "junk bonds," including MBS, ABS, corporate bonds, CDOs, convertible securities, and municipal and foreign government obligations.  (See Ex. A at 4.)  On a quarterly basis, each Fund disclosed its portfolio holdings by name and the percentage of the portfolio represented by each security.  (See, e.g., Ex. E at 4-9; Ex. G at 1-5; Ex. H at 5-9.)  The annual and semi-annual reports also graphically depicted the breakdown of the Funds' portfolio holdings by security type.  (See, e.g., Ex. E at 3; Ex. H at 4.)

Plaintiffs do not contest that these disclosures were made or that they were accurate.  To the contrary, Plaintiffs cite the holdings disclosures themselves as evidence of the supposed lack of diversification.  (See Opp. at 20.)  Critically, however, Plaintiffs fail to explain how, in light of these concededly accurate disclosures, a reasonable investor could have been misled regarding the Funds' level of diversification.

Ultimately, Plaintiffs resort to challenging the sub-adviser's business judgment in making fully disclosed investments in mortgage-related securities.  Plaintiffs contend, for example, that the sub-adviser "fail[ed] to use the prudent strategies and diversify" in light of "negative macroeconomic developments in the real estate market [that] called for a reduction in risk."  (Id.) That plainly is a mismanagement claim and is not actionable under the federal securities laws.

### 2.     Defendants' Disclosures Regarding the Funds' Use of Hedging Were Not False or Misleading.

Plaintiffs' claim that Defendants misrepresented the Funds' use of hedging strategies necessarily fails because the prospectuses (1) expressly stated that hedging strategies would be

employed at the sub-adviser's discretion and (2) cautioned that, even when employed, hedging strategies may not be effective.  (See Br. at 27-28.)

Faced with these disclosures, Plaintiffs merely quote cases discussing the general contours of the bespeaks caution doctrine and assert that "[t]he Complaint details how the risk disclosures related to the hedging techniques were inadequate and misleading."  (Opp. at 22 (citing Compl. ¶ 15).)  Tellingly, the cited paragraph says absolutely nothing about the Funds' use of hedging strategies or Defendants' disclosures.  For that matter, the Complaint nowhere identifies any particular risk of hedging strategies that was not disclosed, nor do Plaintiffs attempt to explain how those risks had materialized before the Funds issued the prospectuses. Moreover, Plaintiffs' back-of-the-hand dismissal of Defendants' risk disclosures as "generic" and "boilerplate" is unavailing.  See Olkey v. Hyperion 1999 Term Trust, 98 F.3d 2, 8 (2d Cir. 1996) (rejecting argument that "all of the warnings in the prospectus should be ignored as boilerplate"); Sheppard v. TCW/DW Term Trust 2000, 938 F. Supp. 171, 175-76 (S.D.N.Y. 1996) (same).

Finally, Plaintiffs' reliance on Hunt v. Alliance North American Government Income Trust, Inc., 159 F.3d 723 (2d Cir. 1998) (cited Opp. at 23), is entirely misplaced.  Plaintiffs in Hunt alleged that defendants' representations that they would employ hedging strategies were false and misleading because "the Fund knew or recklessly disregarded the fact that no hedging techniques were economically feasible and that the Fund would not and could not use hedging techniques to attempt to limit foreign currency risk."  Id. at 727.  Plaintiffs here do not allege that hedging strategies were not available.  They merely contend that the sub-adviser did not implement the available hedging strategies to their satisfaction.  (See Compl. ¶ 148 (alleging that Defendants failed to implement hedges despite market conditions that "called for a reduction in risk").)  That is a claim for mismanagement, not securities fraud.[8]

---

[8]     The other cases Plaintiffs cite are inapposite in light of the prospectuses' uncontested disclosures that the Funds would invest in high-risk junk bonds, including mortgage-related securities.  See In re Charles Schwab Corp. Sec. Litig., No. 08-01510, 2009 U.S. Dist. LEXIS 8125, at *7 (N.D. Cal. Feb. 4, 2009) (cited Opp. at 23) (defendants' representations that fund was "similar to a money market fund with minimal changes in share price" were false and misleading because more than 45% of the funds' assets were invested in risky MBS and ABS) (Supp. Ex. KK); In re Dreyfus Aggressive Growth Mut. Fund Litig., No. 98-4318, 2000 U.S. Dist. LEXIS 94, at *6 (S.D.N.Y. Jan. 6, 2000) (cited Opp. at 23 n.32) (defendants caused funds to invest in "micro-cap" stocks while representing that large- and mid-cap stocks would "dominate" the portfolio) (Supp. Ex. KK).

### 3. Defendants' Disclosures Regarding the Funds' Use of Leverage Were Not False or Misleading.

Plaintiffs' claim that Defendants failed to disclose the risks associated with the Funds' use of leverage fails in light of the prospectuses' extensive disclosures that leverage is "a speculative technique," "creates a greater risk of loss," and "can magnify the effect of any losses." (Br. at 27 (quoting Ex. A at 2, 6, 13).) Unable to rebut these disclosures, Plaintiffs resort to hindsight second-guessing of the sub-adviser's use of leverage in managing the Funds, contending that "Defendants recklessly compounded the risks of the investment strategies" by "us[ing] leverage at the beginning of 2007 and accelerat[ing] the purchase of mezzanine and equity tranches of mortgage-related securities." (Opp. at 23.) Once again, that is a claim for mismanagement, not securities fraud.

### C. Plaintiffs' Disagreement with Defendants' Assessment of the Impact of Market Developments Does Not State a Claim for Securities Fraud.

Plaintiffs also contend that Defendants' discussion of market conditions in the FHI and FHY Funds' joint proxy statement and in the FHI Fund's semi-annual report for the period ending April 30, 2007, were false and misleading. (See id. at 20-21, 23.) These claims must fail because they reflect nothing more than Plaintiffs' hindsight disagreement with Defendants' honestly held views.

With respect to the proxy statement, Plaintiffs challenge the Board's recommendation that shareholders vote in favor of the change in the Funds' concentration policies because "[t]his was at a time when the deteriorating value of mortgage-related investments called for a defensive strategy." (Opp. at 21.) Critically, however, Plaintiffs do not allege that the Board or any of its members did not honestly believe that the change in concentration policy was in the Funds' best interests, notwithstanding recent adverse developments in the mortgage and housing markets. See Va. Bankshares, 501 U.S. at 1091. Furthermore, as discussed in Defendants' initial brief, the proxy statement included an extensive discussion of those same adverse developments, and Plaintiffs fail to explain, with the required particularity, why that discussion was insufficient to advise investors of the risks associated with adopting the concentration policy. (See Br. at 26.)

With respect to the FHI Fund's semi-annual report, Plaintiffs contend that Defendants "attempted to misleadingly differentiate the Funds' portfolios from the problems in subprime mortgages." (Opp. at 23; see also id. at 17 n.26.) To begin with, the report, when read as a whole, clearly conveys that the Funds' holdings of mortgage securities were being impacted by

adverse developments in the subprime mortgage and housing markets.  For example, Defendants stated:

> FHI's exposure to sub-prime residential mortgage-backed securities was the <u>primary source of its relative underperformance</u> in 2007.  In our opinion, negative headlines, an increase in delinquency pressure due to slowdown in housing price appreciation and the failure of a number of specialty, sub-prime lenders drove down bids and <u>sparked a panic that hurt these bonds</u>.

(Ex. H at 3 (emphasis added); <u>see also</u> <u>id.</u> at 2 ("The entire sub-prime mortgage market was negatively impacted.").)

Furthermore, Plaintiffs fail to allege any facts supporting an inference that Defendants did not honestly believe the opinions expressed in the allegedly "differentiating" statements.  To the contrary, Defendants' view that "the primary problems in sub-prime mortgages were limited to those mortgages originated in late 2005 and throughout 2006" (<u>id.</u> at 2) was shared by other market participants, as the news reports and other materials cited in the Complaint demonstrate. (<u>See, e.g.</u>, Supp. Ex. II (cited Compl. ¶ 131 n.16) ("'It's the 2006 book of business that is under most stress,' [Wharton real estate professor Susan M. Wachter] notes.  'That is where the foreclosures are coming from as of now.'"); Supp. Ex. JJ (cited Compl. ¶ 141) (noting downgrades on "subprime mortgage securities originated in late 2005 through 2006" and that indexes "tied to subprime loans made in [2006]'s second half" "posted the worst declines" during 2007).)  Nor do Plaintiffs allege that Defendants' representations that "the Fund had minimal exposure to these vintages and less than 15% of its total holdings in the subprime mortgage market" (Ex. H at 2) were false.

> **D.    Defendants Appropriately Disclosed the Funds' Advisory Fees.**

Plaintiffs cannot contest that the Funds' advisory fees were fully disclosed.  The prospectuses disclosed the advisory fee rates (<u>see, e.g.</u>, Ex. U at 39 ("[T]he Fund has agreed to pay a fee for the services and facilities provided by the Adviser at the annual rate of 0.90% of Managed Assets."), and the Funds' annual reports disclosed the total dollar amount of fees paid each year.  (<u>See, e.g.</u> Supp. Ex. GG at 8-9.)

All that remains is Plaintiffs' contention that the amount of fees paid was inflated due to Defendants' alleged misvaluation of the Funds' mortgage-related securities.  (<u>See</u> Opp. at 23-24.)  As Plaintiffs' own authorities recognize, however, that is not a disclosure claim that can be brought directly on behalf of fund shareholders.  At best, it is a breach of contract or fiduciary

duty claim that must be brought derivatively on behalf of the Funds.  See Abrams, 2002 U.S. Dist. LEXIS 9814, at *38 (cited Opp. at 14) ("The overcharging of management fees affects the corporation as a whole; it does not directly affect individual shareholders.  Such a claim may only be brought as a derivative claim.") (Supp. Ex. KK).

## II.  PLAINTIFFS' SCIENTER ALLEGATIONS ARE INSUFFICIENT TO SURVIVE A MOTION TO DISMISS.

Plaintiffs contend that the Supreme Court's admonition in Tellabs that allegations of scienter must be considered "collectively," 551 U.S. at 323, precludes the Court from evaluating the individual strengths and weaknesses of the Complaint's allegations of scienter.  (Opp. at 25.) This cannot be.  When assessing whether all the allegations, taken collectively, give rise to a strong inference of scienter, the Court still must analyze each individual allegation to determine whether and to what extent it contributes to the overall calculus.

As discussed below and in Defendants' moving brief, each of Plaintiffs' allegations suffers from defects—legal and logical—that require them to be given little or no weight when evaluating the resulting inference of scienter.  Moreover, the many factors that support the contrary inference that Defendants acted in good faith more than overcome any minimal support for an inference of scienter that the Complaint's allegations could provide.  As such, whether considered collectively, or one at a time, Plaintiffs' allegations fail to give rise to the strong inference of scienter required by Tellabs.  See Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1008 (9th Cir. 2009) ("large quantity of otherwise questionable allegations" will not, even when viewed collectively, create a strong inference of scienter); City of Brockton Ret. Sys. v. The Shaw Group, Inc., 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008) ("zero plus zero plus zero . . ." insufficient to allege scienter).

### A.  Plaintiffs' Motive Allegations Are Economically Irrational.

Recognizing that their motive allegations consist of exactly the kind of generalized corporate motives that courts have repeatedly rejected as insufficient to support an inference of scienter (see Br. at 30), Plaintiffs half-heartedly contend that those allegations still can add some weight to the overall scienter analysis.  (See Opp. at 32.)  Even if that were so in certain circumstances, here, Plaintiffs' motive allegations do not lend even the slightest support to an inference of scienter because they are economically irrational.

Plaintiffs contend that Defendants were motivated to artificially inflate the Funds' NAVs "in order to inflate the investment advisory fees," "to maintain compliance with applicable

regulations," and to "make the Funds appear more profitable."  (Id. at 31-32.)  At the same time, however, Plaintiffs allege that Defendants had "full knowledge" that the Funds' holdings of mortgage-related securities were declining in value and would continue to lose value for the foreseeable future.  (See id. at 13-15, 25; Compl. ¶ 142.)  Assuming, arguendo, that Defendants had this knowledge, they could have used it to accomplish exactly the same goals that allegedly motivated the fraud—by implementing an investment strategy that would take advantage of the negative market trends, thereby producing positive investment returns for the Funds, increasing the investment advisory fees (and allegedly the Individual Defendants' compensation[9]), and maintaining the Funds' compliance with asset-coverage requirements and other regulations. Instead, Plaintiffs contend, Defendants did exactly the opposite—using leverage to purchase yet more of the same mortgage-related securities that Defendants supposedly knew would lose value, thereby compounding the Funds' investment losses, reducing advisory fees, and reducing the Funds' asset coverage.  (See Compl. ¶¶ 146-150.)

As recognized by the Seventh Circuit, claims such as these, which depend on defendants acting irrationally or against their own economic self-interest, must be viewed suspiciously and provide little, if any, support for an inference of scienter.  See DiLeo, 901 F.2d at 629.[10]

**B.    Plaintiffs' Allegations of Circumstantial Evidence Do Not Support a Strong Inference of Scienter.**

Plaintiffs' remaining scienter allegations are equally deficient and fail to support a strong inference of scienter, especially in light of Plaintiffs' failure to allege any rational motive for the alleged fraud.[11]  (See Br. at 31-32.)

---

[9]    Plaintiffs fail to address the fact that their motive allegations with respect to the Individual Defendants lack the particularity required by the PSLRA.  (See Br. at 32 n.19.)  See also Zucco Partners, 552 F.3d at 1005 ("'bare assertion' that executive-level bonuses were 'based in part'" on financial performance not pled with enough specificity and too generalized to support inference of scienter).

[10]    The cases cited by Plaintiffs regarding "particularized corporate motives" are inapposite, as each found that a desire to inflate share price can support a strong inference of scienter only if plaintiff alleges that there was a specific reason why defendants would be motivated to do so.  See, e.g., In re Ibis Tech. Sec. Litig., 422 F. Supp. 2d 294, 317 (D. Mass. 2006) (cited Opp. at 32 n.49) (alleging that defendants sought to inflate the stock price in order to complete stock offering); In re Complete Mgmt., 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001) (cited Opp. at 32) (in order to use that stock as currency for acquisitions that would leverage uncollectible receivables); Gross v. Medaphis Corp., 977 F. Supp. 1463, 1472 (N.D. Ga. 1997) (cited Opp. at 32 n.49) (in order to allow defendants "to acquire other companies").  Plaintiffs have alleged no such "particularized" motive here.

[11]    Even if the absence of motive is not dispositive of scienter (see Opp. at 31 n.47), consistent with Plaintiffs' insistence that the Complaint's allegations be considered collectively, the absence of motive

Plaintiffs rely primarily on their allegations that Defendants failed to take into account adverse developments in the subprime mortgage and housing markets when valuing the Funds' mortgage-related securities, which Plaintiffs allege not only resulted in the valuations themselves being fraudulent, but also constituted violations of GAAP and rendered the Individual Defendants' Sarbanes-Oxley certifications false.  (See Opp. at 25-30.)  Just as these allegations are insufficient to support a reasonable inference that the Funds' disclosures were false or misleading, see § I.A, supra, they fail to support a strong inference of scienter because Plaintiffs do not include any particularized factual allegations that Defendants failed to follow the Funds' disclosed valuation policies or knew that the resulting valuations were improper.  Indeed, courts have held that allegations that "do no more than state in conclusory fashion what Defendants should have known" with respect to market developments are insufficient to support a strong inference of scienter.  In re Am. Express Co. Sec. Litig., No. 02 Civ. 5533 (WHP), 2008 WL 4501928, at *6 (S.D.N.Y. Sept. 26, 2008) (Supp. Ex. KK); see also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc., 531 F.3d 190, 196 (2d Cir. 2008) (access to raw data regarding underperformance of loans insufficient to support inference of scienter absent allegation that data had been collected into internal reports that established falsity of defendants' disclosures); Ellington Mgmt. Group, LLC v. Ameriquest Mortgage Co., No. 09 Civ. 0416, 2009 WL 3170102, at *3 (S.D.N.Y. Sept. 29, 2009) (allegations regarding "defendants' ambient knowledge of various loan origination anomalies as reported in the popular press" insufficient to support an inference of scienter) (Supp. Ex. KK); In re Citigroup, Inc. S'holder Deriv. Litig., No. 07 Civ. 9841, 2009 WL 2610746, at *10 (S.D.N.Y. Aug. 25, 2009) ("[M]edia reports about a downturn in the subprime mortgage industry do not, by themselves, permit the inference that [defendants] knew or should have known that any of the statements cited in the complaint were misleading.") (Supp. Ex. KK).[12]

---

must be considered, weighs heavily against an inference of scienter, and requires that other allegations of scienter be particularly compelling.  See DiLeo, 901 F.2d at 629 (plaintiffs must present a "strong case" where no rational motive alleged); Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (absence of motive requires "correspondingly greater" allegations of conscious misbehavior).

[12]   Plaintiffs cannot avoid the requirement to allege particularized facts by recycling the same claims as alleged violations of GAAP or false Sarbanes-Oxley certifications.  See, e.g., Cronau v. Asche, No. 01 C 50057, 2002 WL 832569, at *2 (N.D. Ill. May 1, 2002) (Supp. Ex. KK); Roth v. OfficeMax, Inc., 527 F. Supp. 2d 791, 804-05 (N.D. Ill. 2007).

The cases cited by Plaintiffs merely underscore the insufficiency of their allegations by illustrating the types of particularized factual allegations that are necessary to support a strong inference of scienter, such as allegations that defendants had access to internal reports that were contrary to public statements[13] or testimony by confidential witnesses who were uniquely positioned to attest to defendants' knowledge at the time of the alleged fraud.[14]  The Complaint does not include any similarly particularized allegations.

Plaintiffs also wrongly contend that the change in the Funds' sub-adviser in April 2006 supports an inference of scienter.  (See Opp. at 29-30.)  Critically, Plaintiffs concede that management changes can support an inference of scienter only if accompanied by "suspicious circumstances."  (Id. at 29.)  Plaintiffs attempt to create the appearance of suspicious circumstances by contending that "[n]o reason was provided" for the sub-adviser change and that "[t]he most plausible explanation is that this replacement related to the fraud."  (Id. at 30.)  The Funds' disclosures belie Plaintiffs' assertions and demonstrate that there was nothing suspicious about the sub-adviser change nor any basis to conclude that it was related to the supposed fraud.

Specifically, the FHI Fund's semi-annual report for the period ended April 30, 2006 explained that the individuals responsible for management of the Fund had transitioned their employment from Hilliard Lyons Asset Management ("HLAM"), the prior sub-adviser, to Valhalla Capital Partners, LLC ("Valhalla"), the new sub-adviser.  (See Ex. D at 1.)  The report made clear that "[t]he persons responsible for the management of the [Fund] at HLAM [were] the same persons responsible for management of the [Fund] at Valhalla."  (Id. (emphasis added).)  Furthermore, any suggestion of suspicious circumstances also is undermined by the facts that the change (i) was approved by shareholders and (ii) was effective in April 2006, months before Plaintiffs contend Defendants began to inflate the value of the Funds' mortgage-related securities in December 2006.

---

[13]    See, e.g., In re Petco Animal Supplies Inc. Sec. Litig., No. 05-CV-0823-H (RBB), 2006 U.S. Dist. LEXIS 97927, at *21 (S.D. Cal. July 31, 2006) (cited Opp. at 26) (Supp. Ex. KK); In re Cornerstone Propane Partners, L.P., Sec. Litig., 416 F. Supp. 2d 779, 786-87 (N.D. Cal. 2005) (cited Opp. at 25); AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC, No. 01-11448, 2005 U.S. Dist. LEXIS 21605, at *39-*40 (S.D.N.Y. Sept. 26, 2005) (cited Opp. at 28 n.40) (holding that plaintiff resolved "fraud by hindsight" problems of original complaint by alleging that defendants had access to report showing falsity of information) (Supp. Ex. KK).

[14]    See, e.g., Petco, 2006 U.S. Dist. LEXIS 97927, at *20 ("[T]he Consolidated Complaint corroborates the allegations with information from former employees who witnessed and participated in the underlying acts.") (Supp. Ex. KK).

**C.     The More Plausible Inference Is that Defendants Acted In Good Faith.**

As demonstrated in Defendants' initial brief, the timing of the Funds' write-downs relative to other similarly managed funds, the Board's oversight of the Funds' valuation process, and the candid discussion of adverse market developments in the Funds' disclosures, all support the competing inference that Defendants acted in good faith.  (See Br. at 32-33.)

Plaintiffs' argument that this is a "fact-based defense" that "cannot be decided on a 12(b)(6) motion" (Opp. at 32-33) fails as a matter of law.  The facts supporting the inference of good faith all are established on the face of the Complaint and other materials of which the Court may take judicial notice.  Accordingly, as the Supreme Court held in Tellabs and Plaintiffs emphasize in the Opposition, the Court must consider these facts and the resulting inference of good faith in assessing Plaintiffs' allegations of scienter.  See Tellabs, 551 U.S. at 323-26 (court must consider all available facts, including matters appropriate for judicial notice, and any plausible opposing inference that can be drawn from those facts).

In addition, Plaintiffs contend that the Board's oversight of the valuation process does not support an inference of good faith because the Valuation Committee did not meet sufficiently frequently and the Individual Defendants "had the ability to influence the evaluations."  (Opp. at 32 n.50.)  As discussed above, Plaintiffs' criticisms of the frequency of the Valuation Committee's meetings are meritless, see § I.A.3.c, supra, but in any event, Plaintiffs fail to explain how the Valuation Committee's quarterly meetings would not have been sufficient to prevent Defendants from perpetrating a multi-year valuation fraud.  Moreover, the Complaint nowhere alleges that the Individual Defendants personally played any role in the valuation process.

Plaintiffs also contend that the discussions in the Funds' disclosures about adverse market developments do not support an inference of good faith because Defendants "deceptively . . . differentiate[d] themselves from the trouble in sub-prime mortgages."  (Opp. at 33-34.)  However, Plaintiffs fail to explain why Defendants would have bluntly stated that RMBS were "the primary source of [the Funds'] relative underperformance in 2007," that market developments had "sparked a panic that hurt these bonds," and that "the entire sub-prime mortgage market [had been] negatively impacted" (Ex. H at 2-3) if they were trying to conceal the impact of those developments from shareholders.  Plaintiffs also fail to explain why Defendants would have taken substantial write-downs on the Funds' mortgage-related securities

(see, e.g., Compl. ¶¶ 255, 261, 264), or why the Funds' NAVs would have declined "in tandem with" those of other similarly managed Funds (see id. ¶ 194), if Defendants were engaged in a fraudulent scheme to inflate the Funds' NAVs.

Finally, several courts have held that the subprime crisis itself supports an inference of good faith.  See In re Citigroup Auction Rate Sec., No. 08 Civ. 3095, 2009 WL 2914370, at *6 (S.D.N.Y. Sept. 11, 2009) ("[T]he very market conditions—specifically the 'subprime crisis'— that Plaintiff cites in his Complaint . . . , give rise to an opposing and compelling inference that Defendants only engaged in bad (in hindsight) business judgments . . . and did not engage in the alleged conduct with an intent to deceive investors.") (Supp. Ex. KK); In re 2007 Novastar Fin., Inc., No. 07-0139, 2008 U.S. Dist. LEXIS 44166, at *14-*15 (W.D. Mo. June 4, 2008) (in context of subprime crisis, complaint's allegations were "more consistent with a company and executives confronting a deterioration in the business and finding itself unable to prevent it than they [were] with a company and executives recklessly deceiving the investing community") (Supp. Ex. KK).

## III.   PLAINTIFFS' LOSSES WERE NOT CAUSED BY THE ALLEGED FRAUD.

Plaintiffs' claims must be dismissed because their own allegations demonstrate that their losses were caused by adverse developments in the markets for mortgage-related securities, not by any alleged fraud.  (See Br. at 33-36.)

Plaintiffs argue that it would be inappropriate to decide, on a motion to dismiss, that they cannot establish loss causation (see Opp. at 43, 47), but their own authorities recognize that where, as here, "the face of the complaint or judicially noticeable facts demonstrate that the plaintiff cannot establish loss causation[,] . . . 12(b)(6) dismissal may be appropriate" for both 1933 and 1934 Act claims.  In re Countrywide Fin. Corp. Sec. Litig., 588 F. Supp. 2d 1132, 1171 (C.D. Cal. 2008) (cited Opp. at 47 n.70) (discussing "negative causation" affirmative defense for 1933 Act claims); Joffee v. Lehman Bros., Inc., 410 F. Supp. 2d 187, 190-95 (S.D.N.Y. 2006) (cited Opp. at 16 n.23) (dismissing 1934 Act claims); see also, e.g., Bastian v. Petren Res. Corp., 892 F.2d 680, 684 (7th Cir. 1990) (affirming dismissal of 1934 Act claims); In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig., 434 F. Supp. 2d 233, 238 (S.D.N.Y. 2006) (dismissing 1933 and 1934 Act claims).

Plaintiffs further argue that, even if some portion of their losses was caused by adverse market developments, they still may recover any portion that was caused by Defendants'

misrepresentations and omissions.  (See Opp. at 45, 47-48.)  This argument is unavailing because the Complaint does not allege facts supporting a reasonable inference that any portion of Plaintiffs' losses was caused by the alleged fraud such that they would have been spared the loss if the Funds had made more or different disclosures.  See Bastian, 892 F.2d at 684 (affirming dismissal because plaintiffs failed to allege facts suggesting losses were caused by fraud, rather than market downturn); accord Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 175 (2d Cir. 2005) ("[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, . . . a plaintiff's claim fails if it has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events."); In re Merrill Lynch & Co. Research Reports Sec. Litig., No. 02 Civ. 9690 (JFK), 2008 U.S. Dist. LEXIS 44344, at *23 (S.D.N.Y. June 4, 2008) (plaintiffs "must ascribe some rough proportion of the whole loss to the alleged misstatements") (internal quotations omitted) (Supp. Ex. KK).

Plaintiffs' attempts to tie their losses to the Funds' disclosures (see Opp. at 46-48) only confirm that the losses were caused by market developments, not by revelation of previously undisclosed information or materialization of previously undisclosed risk.  Indeed, the supposed "disclosures" consist of nothing more than reports on the adverse market developments (id. at 47 ("Defendants admitted that the subprime mortgage industry was experiencing problems.")) and the losses themselves.  (Id. at 46 ("[T]he Funds finally accounted for the significant deterioration in the Funds' mortgage-related securities.").)  The Funds' disclosures do not become an independent cause of Plaintiffs' losses merely by dint of the fact that they discussed the adverse market developments that actually caused the losses.[15]

Furthermore, Plaintiffs' argument that the Funds' disclosures of NAV decreases in their semi-annual reports for the period ending April 30, 2008 caused the Funds' share prices to decrease in the days following publication of the reports on July 7, 2008 (see id. at 46, 48-49)

---

[15]     Plaintiffs' argument that they are not required to identify a "corrective disclosure . . . tantamount to a confession of fraud" (Opp. at 44) is irrelevant in light of their failure to allege any facts supporting an inference that their losses were caused by materialization of any previously undisclosed risk.  Moreover, courts have required a corrective disclosure where, as here, the claims are based on allegedly false opinions.  See Joffee, 410 F. Supp. 2d at 193-94 (expressly distinguishing In re Parmalat Sec. Litig., 375 F. Supp. 2d 278 (S.D.N.Y. 2005) (cited Opp. at 44), and holding that because "statements of opinion are actionable only to the extent that they are not honestly held," "to plead that such statements of opinion caused Plaintiffs' damages, it is critical for Plaintiffs to allege that the 'relevant truth,' i.e., the alleged dishonesty of the opinions, is revealed to the market").

makes no sense. The Funds publish their NAVs on a daily basis, so the decreases in the Funds' NAVs during the period covered by the reports would have been known to the market and fully incorporated into the Funds' share prices by the time the reports were published more than two months later, as Plaintiffs concede. (See id. at 43 & n.61 (citing Deutschman v. Beneficial Corp., 132 F.R.D. 359, 368 (D. Del. 1990), for the proposition that a "well-developed and impersonal market, such as the New York . . . stock exchange[], will instantaneously incorporate all publicly available information about a given security into the market price of that security") (alterations in Opp.).) Even if the shareholder reports had disclosed new information, Plaintiffs do not allege any facts supporting an inference that the decreases in the Funds' stock prices in the days surrounding publication of the reports were unusual for that time period.

Unable to plead any facts suggesting the Funds' disclosures caused their losses, Plaintiffs contend that loss causation should be "presumed" because they allege that Defendants' misrepresentations "artificially altered the price of the stock." (Opp. at 45.) That is patently not the law. The Supreme Court expressly rejected such a presumption because a "tangle of factors" affects the price of a security, and the difference between "an initially inflated price" and a later lower price "may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 343 (2006). Under Dura, Plaintiffs' failure to allege any facts that would support an inference that the decrease in the Funds' share prices resulted from the alleged fraud, rather than adverse market developments, requires dismissal of their claims.[16]

## IV. PLAINTIFFS' CLAIMS UNDER THE 1933 ACT AND SECTION 14(A) OF THE 1934 ACT ARE TIME-BARRED.

Plaintiffs' claims under the 1933 Act and Section 14(a) and Rule 14a-9 of the 1934 Act are barred by the statute of limitations because Plaintiffs were on inquiry notice of the core facts

---

[16] Plaintiffs contend that, in assessing whether the alleged misrepresentations and omissions in the FHI and FHY Funds' joint proxy statement caused any portion of Plaintiffs' loss, the Court may not consider asset-allocation information reported in the Funds' annual and semi-annual reports to determine whether and to what extent the Funds' ownership of RMBS ever actually exceeded 25% of Total Assets as a result of the purchase of any security (which it did not). (See Opp. at 45 n.66.) That argument is specious: Plaintiffs themselves included exactly the same information in their Complaint. (See Compl. ¶ 144.)

underlying those claims more than one year before they filed their initial complaint.  (See Br. at 36-39.)

Plaintiffs first contend that the issue of inquiry notice is inappropriate at the initial pleading state (see Opp. at 38), but that clearly is not the law.  Indeed, as Plaintiffs ultimately concede (see id.), courts within the Seventh Circuit and elsewhere routinely dismiss actions as time-barred where the complaint and other materials subject to judicial notice establish that plaintiffs were on inquiry notice prior to the relevant statutory cut-off date.  See, e.g., Tregenza v. Great Am. Commc'ns Co., 823 F. Supp. 1409, 1415 (N.D. Ill.), aff'd, 12 F.3d 717 (7th Cir. 1993); In re Merrill Lynch & Co. Research Reports Sec. Litig., 273 F. Supp. 2d 351, 378-79 (S.D.N.Y. 2003) (collecting cases).

In support of their argument that it would be inappropriate to find inquiry notice here, Plaintiffs cite to several decisions that are inapposite or otherwise distinguishable.  (See Opp. at 38 (citing cases).)  For example, in Abrams, the court determined that, based upon the circumstances of that particular case, a determination of when plaintiffs were placed on inquiry notice of their claims could not be made at the initial pleading stage because the media coverage addressing the alleged misconduct was not sufficiently pervasive and the decrease in the fund's NAV was not sufficiently significant to trigger the duty to inquire.  See Abrams, 2002 U.S. Dist. LEXIS 9814, at *30-*34 (cited Opp. at 38) (Supp. Ex. KK).  Here, however, as demonstrated in Defendants' initial brief, the widespread media coverage of the subprime crisis and the significant decreases in the Funds' NAVs clearly were sufficient to put investors on inquiry notice of the risk of loss from the Funds' mortgage-related securities.  (See Br. at 38-39.)

Next, Plaintiffs make the equally flawed argument that their claims cannot be deemed time-barred because the Complaint alleges otherwise.  (See Opp. at 39.)  Of course, that is not the law.  A court need not credit a plaintiff's bald assertions that the "fraud was revealed" at some artificial date of his choosing when information within the public domain clearly demonstrates otherwise.  Such a rule would render the concept of inquiry notice a legal nullity, as courts would be precluded from considering publicly available information that directly contradicts the plaintiff's self-serving timeline of the alleged fraud's exposition.

Plaintiffs also contend that no reasonable investor could have been aware of the Funds' exposure to mortgage-related securities and the purportedly overvalued NAVs prior to the July 7, 2008 semi-annual report.  (See id. at 40.)  That argument is meritless.  The Funds disclosed

throughout the Class Periods that they had substantial investments in mortgage-related securities and that those securities presented a risk of loss.  Further, the Funds' NAVs began to decrease in early 2007, and each Fund's NAV had declined substantially from its peak by July 2007.  Moreover, the adverse developments in the mortgage and housing markets that caused the Funds' mortgage-related securities to lose value were widely covered in the media throughout 2007, as the Complaint confirms.  Plaintiffs do not identify anything unique about the July 2008 shareholder reports that would support an inference that those disclosures, rather than earlier, similar disclosures, revealed the alleged fraud.

Finally, Plaintiffs argue that the Funds' earlier discussions of adverse market developments in the July 2007 shareholder reports were somehow tempered by accompanying assuring language, rendering them insufficient to constitute the "storm warnings" necessary to trigger inquiry notice.  (See id. at 39.)  Again, however, Plaintiffs fail to explain how Defendants' disclosures that RMBS were "the primary source of [the Funds'] relative underperformance in 2007," that market developments had "sparked a panic that hurt these bonds," and that "the entire sub-prime mortgage market [had been] negatively impacted" (Ex. H at 2-3) were insufficient to put Plaintiffs on notice of their claims.

## V.   PLAINTIFFS HAD KNOWLEDGE OF THE ALLEGED MISREPRESENTATIONS AT THE TIME THEY PURCHASED THEIR SHARES OF THE FUNDS.

The Opposition only confirms that Plaintiffs Valenti Trust, Duda, and CRC had knowledge of the alleged misrepresentations and omissions at the time they purchased shares in the Funds.  Indeed, Plaintiffs do not contest that they made regular and repeated purchases of shares in the Funds during the 2007–2008 period, by which time Defendants had disclosed that the Funds were experiencing losses on their investments in mortgage-related securities and the Funds' NAVs had decreased, in some instances, by more than 50%.  (See Br. at 40 (citing Compl. ¶¶ 25, 27-28).)

Unable to distance themselves from these fatal and unrebutted facts, Plaintiffs argue, without any factual or legal support, that they are not barred from pursuing their securities claims because: (1) they are not required to plead facts negating an affirmative defense; and (2) the Complaint alleges that they were unaware of the alleged misrepresentations and omissions at the time of their purchases.  (See Opp. at 41-42.)  Plaintiffs' arguments cannot withstand scrutiny.  Under Plaintiffs' view, a plaintiff with actual knowledge of the alleged fraud would never be

precluded from asserting securities fraud claims so long as he alleged in the complaint that he was ignorant of the relevant details before his purchases.  That, of course, is not the law, as such a rule would eviscerate the reliance and lack-of-knowledge requirements of the federal securities laws.

## VI.    PLAINTIFFS' CONTROL PERSON CLAIMS MUST BE DISMISSED.

Even if Plaintiffs could otherwise state a claim, the control person claims against the Individual Defendants would fail because the Complaint alleges no facts establishing that those Defendants exercised the requisite control.  Plaintiffs merely assert that the Individual Defendants "exercised control over the primary violator" by dint of their corporate titles.  (See id. at 49-50.)  Such conclusory allegations are wholly insufficient to state a claim.

## CONCLUSION

For the foregoing reasons and those stated in Defendants' initial brief, Plaintiffs' Consolidated Complaint should be dismissed in its entirety and with prejudice.

Dated: November 16, 2009                    Respectfully submitted,
       Chicago, IL

                                 **BRYAN CAVE LLP**

                                 /s/  Steven R. Smith
                                    Steven R. Smith
                                    Derek S. Holland
                                161 North Clark Street, Suite 4300
                                Chicago, IL 60601-3206
                                Tel: (312) 602-5000
                                Fax: (312) 602-5050

**MILBANK, TWEED, HADLEY & McCLOY LLP**
James N. Benedict
Sean M. Murphy (*pro hac vice*)
Robert R. Miller
Andrew W. Robertson
1 Chase Manhattan Plaza
New York, NY 10005-1413
Tel: (212) 530-5000
Fax: (212) 530-5219

*Attorneys for Defendants First Trust Advisors L.P., First Trust Portfolios L.P., First Trust Strategic High Income Fund, First Trust Strategic High Income Fund II, First Trust Strategic High Income Fund III, James A. Bowen, and Mark R. Bradley*

## <u>CERTIFICATE OF SERVICE</u>

I, Steven R. Smith, an attorney, certify that I caused a copy of the foregoing Reply

Memorandum of Law in Further Support of Defendants' Motion to Dismiss the Consolidated

Complaint to be served upon all counsel of record via the Court's CM/ECF system on this 16th

day of November, 2009.


_____/s/ Steven R. Smith_____
Steven R. Smith