# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ROGER J. GOSSELIN, Individually and on Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>FIRST TRUST ADVISORS L.P., FIRST TRUST PORTFOLIOS L.P., FIRST TRUST STRATEGIC HIGH INCOME FUND, FIRST TRUST STRATEGIC HIGH INCOME FUND II, FIRST TRUST STRATEGIC HIGH INCOME FUND III, JAMES A. BOWEN, and MARK R. BRADLEY, )<br><br>Defendants. ) | **Case Number:  08-cv-05213**<br><br>Honorable Samuel Der-Yeghiayan |

## DEFENDANTS' ANSWER TO THE CONSOLIDATED CLASS ACTION COMPLAINT

Defendants First Trust Advisors L.P. ("First Trust Advisors"), First Trust Portfolios L.P. ("First Trust Portfolios"), First Trust Strategic High Income Fund ("FHI Fund"), First Trust Strategic High Income Fund II ("FHY Fund"), First Trust Strategic High Income Fund III ("FHO Fund"), James A. Bowen, and Mark R. Bradley (collectively, "Defendants"), by and through their undersigned attorneys, respond to the Consolidated Class Action Complaint, dated April 30, 2009 (the "Complaint"), as follows:

### GENERAL DENIAL AND RESERVATION OF RIGHTS

1.      Defendants deny that Plaintiffs and the other members of the putative classes and subclasses are entitled to any of the relief requested in the Complaint.

2.      Defendants deny each and every allegation in the Complaint to the extent not specifically admitted herein.

3.     Allegations that constitute a legal conclusion do not require a responsive pleading. To the extent a response is required, Defendants deny such allegations.

4.     The Complaint contains excerpts from and references to a number of documents, including the Funds' public filings with the Securities and Exchange Commission (the "SEC"), news reports, Congressional testimony, speeches by representatives of the SEC, statutes, and SEC rules and regulations.  Defendants lack knowledge or information sufficient to determine whether Plaintiffs have quoted or paraphrased these documents correctly or in their proper context.  Accordingly, Defendants reserve their right to challenge the authenticity of all documents referred to, cited, or quoted in the Complaint, and Defendants refer the Court to the original documents for the full content and context thereof.

5.     Defendants reserve the right to amend or supplement this Answer.

## SPECIFIC RESPONSES

1.     This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired the shares of certain mutual funds offered by First Trust Portfolios L.P. ("First Trust Portfolios"), including shares of the First Trust Strategic High Income Fund (the "FHI Fund"), First Trust Strategic High Income Fund II (the "FHY Fund"), and First Trust Strategic High Income Fund III (the "FHO Fund") between July 26, 2005 and July 7, 2008, inclusive (from July 26, 2005 to July 7, 2008 for the FHI Fund ("FHI Class Period")); from March 28, 2006 to July 7, 2008 for the FHY Fund ("FHY Class Period"); from March 28, 2007 to July 7, 2008 for the FHO Fund ("FHO Class Period"), collectively, the "Class Periods")), against the Funds and the Funds' registrant, First Trust Portfolios L.P., the Funds' adviser, First Trust Advisors L.P., an affiliate of First Trust Portfolios L.P., and certain of First Trust Advisor L.P.'s and/or the Funds' officers and/or directors for violations of the Securities Exchange Act of 1934 ("Exchange Act") for the FHI Fund, the FHY Fund, and the FHO Fund; and on behalf of all persons or entities who purchased or otherwise acquired shares of the FHY Fund and the FHO Fund issued in connection with or traceable to those Funds' initial public offerings ("IPOs") and on behalf of all persons or entities who purchased or otherwise acquired shares of the Funds through the Funds' Dividend Reinvestment Plans ("DRIP"), seeking to pursue remedies under the Securities Act of 1933 ("Securities Act").  The allegations in this Complaint principally pertain to conduct and events occurring during the Class Periods.

Defendants' Response:  Deny the allegations in Paragraph 1, except admit that Plaintiffs purport to bring a securities class action against Defendants pursuant to certain provisions of the

Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the

"Exchange Act") on behalf of various putative classes and subclasses generally consisting of

persons or entities who purchased or otherwise acquired shares of the Funds between July 26,

2005 and July 7, 2008, inclusive (the "Class Period").

2.      The Complaint is alleged upon personal knowledge as to Plaintiffs' own acts, and
upon information and belief as to all other matters, such information and belief being based, in
part, upon Plaintiffs' counsel's investigation, which included, *inter alia*, review of the Funds'
public filings with the United States Securities and Exchange Commission ("SEC"); wire and
press releases published by and regarding the Funds; securities analysts' reports and advisories;
interviews of former employees of First Trust Advisors L.P.; consultation with accounting and
mutual fund experts; and information available in the media and on the Internet.  Additional facts
supporting the allegations contained herein are known only to the Defendants or are exclusively
within their control.  Plaintiffs believe that substantial additional evidentiary support exists for
the allegations set forth in this Complaint that will be revealed after a reasonable opportunity for
discovery.

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 2.

3.      The FHI Fund is a diversified closed-end management investment company.  The
FHI Fund's primary investment objective is to seek a high level of current income.  It seeks
capital growth as a secondary objective.

Defendants' Response:  Admit the allegations in Paragraph 3.

4.      The FHY Fund is a diversified, closed-end management investment company.
The FHY Fund's primary investment objective is to seek a high-level of current income.  The
FHY Fund seeks capital growth as a secondary objective.  The FHY Fund seeks to achieve its
investment objectives by investing in a diversified portfolio of below-investment grade and
investment grade debt and equity securities.

Defendants' Response:  Deny the allegations in Paragraph 4, except admit that the FHY

Fund is a diversified, closed-end management investment company, that the FHY Fund's

primary investment objective is to seek a high level of current income, and that the FHY Fund

seeks capital growth as a secondary objective.

5.      The FHO Fund is a diversified, closed-end management investment company.
The FHO Fund's primary objective is to seek a high level of current income.  The FHO Fund
seeks capital growth as a secondary objective.  The FHO Fund seeks to achieve its objective by

investing in a diversified portfolio of below-investment grade and investment grade debt and equity securities that the investment Subadviser[1] believes offer attractive yield and/or capital appreciation potential.

       <u>Defendants' Response</u>:  Admit the allegations in Paragraph 5.

       6.      First Trust Advisors L.P. ("First Trust" or the "Adviser"), a registered investment adviser, is, and during the Class Periods was, the investment adviser to the Funds.  First Trust serves, and during the Class Periods served, as investment adviser or portfolio supervisor to investment portfolios.  The Adviser is an affiliate of First Trust Portfolios L.P, which specializes in the underwriting, trading and distribution of unit investment trusts and other securities.  First Trust is and during the Class Periods was also responsible for the ongoing monitoring of the Funds' investment portfolios, managing the Fund's business affairs and providing certain clerical, bookkeeping and other administrative services.  During the Class Perios, First Trust improperly valued the Funds' investments and inflated each of the Funds' net asset values ("NAV") in order to inflate its advisory fees, which are tied to the Funds' values.

       <u>Defendants' Response</u>:  Deny the allegations in Paragraph 6, except admit that First Trust

Advisors was the investment adviser to the Funds during the Class Period and that First Trust

Advisors is an affiliate of First Trust Portfolios.

       7.      Each of the Funds invests a significant portion of its Managed Assets in below-investment grade debt securities (commonly referred to as "high-yield" or "junk" bonds).  Below-investment grade securities carry a significant risk and are considered speculative with respect to the issuer's capacity to pay interest and repay principal.  Investors in the Funds do not have the capacity to monitor or manage the risks inherent in such a portfolio.  Accordingly, investors in funds like the Funds rely on the funds' management to have the skills and adequate controls in place to monitor and manage such risks.

       <u>Defendants' Response</u>:  Deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 7, except admit that, during the Class Period, each of the

Funds invested a portion of its assets in below-investment grade debt securities and that

investments in such securities involve risk.

       8.      Throughout the Class Periods, Defendants represented that they had adequate internal controls in place to monitor and manage these risks.  Additionally, Defendants represented that the Funds had systems in place to ensure compliance with legal and regulatory

---

[1] The FHI Fund's Subadviser during a portion of the FHI Class Period Hilliard Lyons Asset Management, a division of J.J.B. Hilliard, W.L. Lyons, LLC ("Hilliard Lyons"). The Funds' Subadvisor other than as set forth in the preceding sentences was Valhalla Capital Partners LLC ("Valhalla"). Hilliard Lyons and Valhalla (collectively "Subadvisers") are not named as defendants in thus Complaint.

requirements that relate to the Funds' accounting and financial reporting.  In fact, contrary to Defendants' representations, the Funds lacked adequate systems to ensure compliance and intentionally or recklessly ignored the risks inherent in their portfolios.  A high proportion of the Funds' investments consisted of mortgage-related securities, defined and described more fully below, but Defendants failed to respond to the impact of the deteriorating real estate market on these securities and, instead, exacerbated the known high risk by using leverage.  Indeed, in January 2007 when the deteriorating value of mortgage-related investments called for a defensive strategy, Defendants unanimously recommended to shareholders that the FHI and FHY Funds increase their exposure to the riskiest type of the mortgage-related securities.

Defendants' Response:  Deny the allegations in Paragraph 8, except admit that, during

the Class Period, each of the Funds invested a portion of its assets in mortgage-related securities,

and refer the Court to the Funds' public filings with the SEC for the complete content and

context of any disclosures regarding the Funds' compliance systems and internal controls.

9.      Additionally, Defendants used leverage to implement this strategy - compounding the risks.  But rather than admit that their reckless strategy was a failure, Defendants concealed the results by utilizing improper accounting for mortgage-related investments to hide losses and inflate each of the Fund's NAV during the Class Periods.  The end result of this conduct was the eventual sale of the securities at significant loss.  Furthermore, in 2008, due to the deterioration in the underlying mortgage collateral, the Funds ceased generating sufficient "current income" from investments, thereby necessitating return of capital to investors to continue paying the dividends.

Defendants' Response:  Deny the allegations in Paragraph 9, except admit that the Funds'

dividend payments in 2008 included tax-basis return of capital.

10.      A large portion of each Fund's portfolio was invested in risky structured finance securities.  The complexity of these products requires preliminary explanation herein to comprehend their inherent risk.  One broad category of structured finance securities consists of Asset-Based Securities ("ABS").  ABS are debt instruments which derive their value and income payments from pools of underlying assets, often mortgages but also receivables from credit cards, auto loans, equipment leases, or franchise loans.  Mortgage-Backed Securities ("MBS") are the sub-category of ABS where the underlying pools of assets are mortgages; they can be further sub-divided into Residential Mortgage-Backed Securities ("RMBS") and Commercial Mortgage-Backed Securities ("CMBS").  Another important category of structured finance securities are Collateralized Debt Obligations ("CDOs").  CDOs are debt consisting of different risk categories called "tranches" which range from the very safe (called "super senior" or "senior") to the moderately safe ("subordinated") to the risky ("mezzanine") to the extremely risky (often called "equity" which, despite the confusing terminology, are in fact still debt).  CDOs aggregate the incoming payments from the underlying pools of collateral and then disburse them to the holders of the tranches in order of seniority.  Delinquencies in the underlying collateral thus wipe out the equity holders first, then the mezzanine holders, and so

forth in reverse order of seniority.  The underlying collateral can consist of bank loans (Collateralized Loan Obligations or "CLOs"), mortgages (Collateralized Mortgage Obligations or "CMOs"), or even other CDOs ("CDO squared").

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10, except admit that, during the Class Period, each of the Funds invested a portion of its assets in structured-finance securities, including Mortgage-Backed Securities ("MBS") and Collateralized Debt Obligations ("CDOs").

11.     The Funds each invested heavily in the riskiest tranches of these aforementioned structured finance securities, the equity and mezzanine, and thus bore the brunt of the impact of the decline in the real estate market as delinquency and foreclosure impaired the value of the underlying collateral of the mortgage-related securities.  Mortgage-related securities encompass all such structured finance investments where the underlying collateral consists of mortgages, regardless of their classification as ABS, MBS, RMBS, CDO, or CMO.  The Funds did not inform their investors of the absence of adequate controls to manage and monitor the risk inherent in these mortgage-related securities, and Defendants subsequently inflated the valuation of the mortgage-related securities during the respective Class Periods in order to conceal the impact of their deteriorating value on the Funds' NAV.

Defendants' Response:  Deny the allegations in Paragraph 11.

12.     During the Class Periods, Defendants disseminated a series of materially false and misleading Prospectuses/Registration Statements ("Prospectuses" or "Registration Statements") as well as annual, semi-annual, and quarterly reports regarding the NAV of the Funds.  Pursuant to § 2(a)(41) of the Investment Company Act of 1940 ("ICA"), Defendants were required, but failed, to provide fair value valuations in good faith of the Funds' investments that did not have market quotations readily available.  As a result of Defendants' untrue statements, the Funds' shares traded at artificially inflated prices during the Class Periods.

Defendants' Response:  Deny the allegations in Paragraph 12, except admit that each of the Funds filed with the SEC a registration statement, including a prospectus and a Statement of Additional Information ("SAI"), annual and semi-annual reports to shareholders, and quarterly disclosures of the Funds' portfolio holdings; and refer the Court to those documents for the complete content and context thereof.

13.     In the first half of August 2007, the Funds' shares declined in tandem with other closed-end fund shares as the credit crunch exposed the poor underlying fundamentals of the financial sector's mortgage risk management and problems with structured finance vehicles.  As a result of these concerns, the Funds' NAVs began to slide.  Beginning in August 2007 and

continuing through July 2008, the Defendants began to acknowledge the serious deterioration in the Funds' portfolios.  As a result of these disclosures, the price of the Funds' shares collapsed.  Prior to any negative disclosures, each of the Funds traded within a narrow trading band.  For example, the FHI Fund traded within the $18 and $20 per share range from July 2005 through July 2007.  The FHY Fund traded within the $18 and $21 share range from March 2006 through July 2007.  The FHO Fund traded within the $17 and $20 share range from March 2007 through July 2007.  In contrast, by July 2008, the FHI Fund was trading at almost $10 per share range, the FHY Fund was trading at about $10 per share range, and the FHO Fund was trading at around the $8 per share range.

Note the following chart for FHI, FHY and FHO from Defendants' website:

FHI



FHY



FHO



Defendants' Response:  Deny the allegations in Paragraph 13, and aver that each Fund's share price is a matter of public record.

14.     The facts which were omitted from the Funds' public filings and/or were known by the Defendants but concealed from the investing public during the Class Periods were as follows:

(a)     During the Class Periods, the Defendants ignored observable market data when calculating the valuation of the Funds' mortgage-related securities which showed that there was significant deterioration in the market for those securities in contravention of Generally Accepted Accounting Principles ("GAAP")[2], SEC Rules, and the Funds' disclosed policies;

(b)     The Funds lacked effective internal controls to provide reasonable assurances that the Funds would value these securities in accordance with GAAP;

(c)     The Funds materially overstated the value of their portfolio and NAV by failing to properly value their investments in mortgage-related securities in contravention of GAAP and SEC Rules;

(d)     The Defendants inappropriately compounded the risks of the FHI Fund's and FHY Fund's investment strategies by utilizing leverage to buy securities on margin in a falling market, thereby necessitating forced liquidation of assets at low values;

(e)     The Defendants did not "generally seek" and did not in fact implement effective hedges to mitigate the risks related to the Funds' investments in mortgage-backed securities;

---

[2] GAAP are the principles which are recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time.

(f)     The Defendants were motivated to improperly value the Funds' investments in mortgage-related securities and inflate the Funds' NAVs in order to inflate investment advisory fees;

(g)     The Funds lacked effective internal controls to monitor and manage the risks inherent in the Funds' investments in mortgage-related securities; and

(h)     By inflating the Funds' NAV, Defendants concealed from investors the true financial condition and value of the Funds, and thus, fundamentally misrepresented the ability of the Funds to make distributions to the Funds' shareholders.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 14 and each of its

subparagraphs.

15.     The Defendants ignored observable market data in valuing the Funds' mortgage-related securities that showed that there was significant deterioration in the market in contravention of GAAP, SEC Rules, and the Funds' disclosed policies.  Defendants represented that in fair valuing the Funds' investments, consideration would be given to several factors including, among other things, an evaluation of the forces which influence the market in which the securities of the issuer are purchased and sold and the credit quality and cash flow of the issuer, based on the Subadvisers, or external analysis.  As discussed more fully below, there were adverse developments in the markets for the securities in which the Funds invested that existed as early as December 2006, and continued through the end of the Class Periods, but were ignored and not adequately disclosed by Defendants.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 15, and refer the Court to the

Funds' public filings with the SEC for the complete content and context of any disclosures

regarding the policies and procedures used to value or price the Funds' portfolio holdings.

16.     Moreover, Defendants represented that a large percentage of the Funds' portfolios value were determined based on prices supplied by dealers in the absence of readily determinable values.  In fact, there was evidence throughout the Class Periods of readily determinable deterioration in values, but Defendants chose to ignore this evidence when calculating the Funds' NAV.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 16, and refer the Court to the

Funds' public filings with the SEC for the complete content and context of any disclosures

regarding the policies and procedures used to value or price the Funds' portfolio holdings.

17.     Defendants represented that the Funds had systems in place to ensure compliance with legal and regulatory requirements that relate to the Funds' accounting and financial reporting.  The Funds, however, lacked effective internal controls to provide reasonable

assurances that the Defendants would value the mortgage-related securities in accordance with GAAP. Indeed, despite the adverse developments that existed as early as December 2006 which indicated the deteriorating values of the mortgage-related investments, Defendants ignored such factors and failed to properly reflect the deterioration when valuing the Funds' mortgage-related securities.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 17, and refer the Court to the

Funds' public filings with the SEC for the complete content and context of any disclosures

regarding the Funds' compliance systems and internal controls.

18.      Instead, the Funds materially overstated the value of their portfolios and NAV by failing to properly value the Funds' investments in mortgage-related securities in contravention of GAAP and SEC Rules. From as early as December 2006, mortgage-related investments were deteriorating at a markedly accelerated pace as a result of poor underwriting, falling real estate prices, and increases in interest rates. Despite this confluence of adverse conditions that negatively affected their portfolios, Defendants intentionally or recklessly ignored all available evidence in evaluating the value of their mortgage-related investments.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 18.

19.      The Defendants were motivated to improperly value the Funds' investments in mortgage-related securities and inflate the Funds' NAVs in order to inflate investment advisory fees. As investment advisor, First Trust charged the Funds a monthly advisory fee at an annual rate of 0.9% of managed assets. Because the advisory fees were based on inflated valuations of the Funds' NAV, the advisory fees were also overstated. In addition, representations throughout the FHI Class Period and the FHY Class Period, as disclosed by Defendants for both the FHI Fund and the FHY Fund, when those Funds used leverage, the investment advisory fees payable to the Advisor would be higher than if the Funds did not use leverage.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 19, except admit that each of

the Funds paid investment advisory (or management) fees to First Trust Advisors at an annual

rate of 0.90% of each Fund's Managed Assets.

20.      Contrary to Defendants' assertions, the Funds either lacked adequate systems to monitor and manage the risks or recklessly disregarded the risks inherent in a portfolio comprised of mortgage-related securities. For example, in January 2007 when mortgage-related investments were deteriorating in value, calling for a defensive strategy, Defendants unanimously recommended to shareholders that the FHI Fund and the FHY Fund increase their exposure to the riskiest types of residential mortgage-backed securities.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 20.

21.     Certain of the claims asserted herein arise under and pursuant to Section 14(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78n(a) and Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated by the SEC under Section 14(a).  Certain of the other claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.  Certain of the other claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the Securities Act, [15 U.S.C. §§77k, 77l(a)(2) and 77o].

Defendants' Response:  Answering Paragraph 21, admit that Plaintiffs purport to assert

claims under Sections 11, 12(a)(2), and 15 of the Securities Act, Sections 10(b), 14(a), and 20(a)

of the Exchange Act, and SEC Rules 10b-5 and 14a-9.

22.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act as well as 28 U.S.C. §1331 and §22 of the Securities Act.

Defendants' Response:  Paragraph 22 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, admit that Plaintiffs

purport to base jurisdiction on Section 22 of the Securities Act, Section 27 of the Exchange Act,

and 28 U.S.C. § 1331.

23.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because the Defendants maintain an office in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

Defendants' Response:  Paragraph 23 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, admit that Plaintiffs

purport to base venue on 28 U.S.C. § 1391(b).

24.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

Defendants' Response:  Deny the allegations in Paragraph 24, except admit that the

means and instrumentalities of interstate commerce were used in connection with the listing and

sale of the Funds' shares.

25.     Lead Plaintiff Robert Valenti Revocable Trust, under Trust Agreement dated 8/3/06 (the "Valenti Trust"), acting through Robert A. Valenti, Trustee, purchased FHI Fund shares during the FHI Class Period as described in the attached certification (Exhibit A) and was damaged thereby.

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25.

26.     Lead Plaintiff Aaron Wolkstein ("Wolkstein") purchased FHY Fund shares during the FHY Class Period as described in the attached certification (Exhibit B) and was damaged thereby.

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26.

27.     Lead Plaintiff Anthony Duda ("Duda") purchased FHI Fund shares during the FHI Class Period and FHY Fund shares during the FHY Class Period as described in the attached certification ("Duda Certification"; Exhibit C) and was damaged thereby.  Plaintiff Duda also participated in the FHI Fund DRIP Plan and FHY Fund DRIP Plan and purchased FHI Fund shares during the FHI Class Period and the FHY Fund shares during the FHY Class Period pursuant and/or traceable to the DRIP Registration Statements and Prospectuses ("DRIP Registration Statement"),[3] the amendments thereto and the documents incorporated therein and thereafter by reference for the FHI Fund and FHY Fund, that contained misrepresentations and/or omissions of material fact, and was damaged thereby.

Defendants' Response:  Deny that the FHI and FHY Funds filed "DRIP Registration Statements and Prospectuses," and deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 27.

28.     Plaintiff Compass Recruiting Company ("CRC"), a Sub-Chapter S Corporation 100% owned by Plaintiff Duda, purchased FHO Fund shares during the FHO Class Period as described in the attached Duda certification and was damaged thereby.  Plaintiff CRC also participated in the FHO Fund DRIP Plan and purchased FHO Fund shares during the FHO Class Period pursuant and/or traceable to the FHO Fund's DRIP Registration Statement, the amendments thereto and the documents incorporated therein and thereafter by reference that contained misrepresentations and/or omissions of material fact, and was damaged thereby.

---

[3] Because the DRIP Registration Statements are substantially identical for each Fund, the Registration Statement for each Fund will be referred to as DRIP Registration Statement.

<u>Defendants' Response</u>:  Deny that the FHO Fund filed a "DRIP Registration Statement,"

and deny knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 28.

29.    Defendant First Trust Portfolios L.P. ("First Trust Portfolios") was established in 1991.  During the Class Periods, First Trust Portfolios provided a variety of investment services, including asset management, financial advisory services, municipal and corporate investment banking, and unit investment trust sponsorship, and during the Class Period specialized, in the underwriting, trading and distribution of unit investment trusts and other securities.  First Trust Portfolios operates, and during the Class Periods operated, nationwide and across the globe. First Trust Portfolios, as the registrant of the Funds, is liable under the Exchange Act and the Securities Act for the content of all the statements issued during the Class Periods, including the false and misleading statements in the Prospectuses, Proxy Materials, quarterly, semi-annual and annual reports.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 29, except admit that First

Trust Portfolios was established in 1991 and specializes in the underwriting, trading, and

distribution of unit investment trusts and other securities.

30.    Defendant First Trust is an affiliate of First Trust Portfolios.  Defendant First Trust Advisors L.P. is, and during the Class Periods was, adviser and manager to the Funds. First Trust Advisors, a registered investment adviser, is an Illinois limited partnership formed in 1991 and an investment adviser registered with the Securities and Exchange Commission under the Investment Advisers Act of 1940.  First Trust Advisors is a limited partnership with one limited partner, Grace Partners of DuPage L.P. ("Grace Partners"), and one general partner, The Charger Corporation.  First Trust, as adviser of the Funds is, and during the Class Periods was, responsible for supervising the Funds' Subadviser, monitoring the Fund's investment portfolio, managing the Funds' business affairs and providing certain clerical and bookkeeping and other administrative services.  Each of the Funds has agreed to pay a fee for the services and facilities provided by the Adviser at the annual rate of 0.90% of Managed Assets.  During the Class Periods, First Trust improperly valued the Funds' investments and inflated the Funds' NAV in order to inflate First Trust's advisory fees, which are tied to the Funds' values, rending the Prospectuses, Proxy Materials, quarterly, semi-annual and annual reports false and misleading in violation of the Exchange and Securities Acts.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 30, except admit that First

Trust Advisors is an affiliate of First Trust Portfolios, is an Illinois limited partnership and a

registered investment adviser, and served as the Funds' investment adviser during the

Class Period; that each of the Funds paid investment advisory (or management) fees to First

Trust Advisors at an annual rate of 0.90% of each Fund's Managed Assets; that Grace Partners

of DuPage L.P. is the limited partner of First Trust Advisors; and that The Charger Corporation

is the general partner of First Trust Advisors.

31.     Defendant FHI Fund is a closed-end management investment company.  A closed-end management investment fund, unlike an open-end management investment company or mutual fund, generally lists their shares for trading on the securities exchange and do not redeem their shares at the option of shareholders or engage in continuous offerings of their shares.  According to the FHI Fund's own description, "closed-end funds generally can stay more fully invested in securities consistent with the closed-end fund's investment objective and policies."  The FHI Fund's primary investment objective is to seek a high level of current income and seeks capital growth as a secondary objective.  The FHI Fund's portfolio includes RMBS, franchise loans, CDO, CMOs, CMBS, manufactured housing securities, corporate bonds, equity investments and equipment lease receivables.  The FHI Fund invests a significant portion of its assets in below-investment grade debt securities, including MBS, ABS, corporate bonds and CDOs.

Defendants' Response:  Deny the allegations in Paragraph 31, except admit that the FHI

Fund is a closed-end management investment company, that the FHI Fund's primary investment

objective is to seek a high level of current income, that the FHI Fund seeks capital growth as a

secondary objective, and that, during the Class Period, the FHI Fund invested a portion of its

assets in below-investment grade debt securities.

32.     Defendant FHY Fund is a closed-end management investment company.  The FHY Fund's primary investment objective is to seek a high-level of current income.  The FHY Fund seeks capital growth as a secondary objective.  The FHY Fund seeks to achieve its investment objectives by investing in a diversified portfolio of below-investment grade and invests a significant portion of its assets in below-investment grade debt securities, including RMBS, ABS, CMOs, corporate bonds and CDOs.

Defendants' Response:  Deny the allegations in Paragraph 32, except admit that the FHY

Fund is a closed-end management investment company, that the FHY Fund's primary investment

objective is to seek a high level of current income, that the FHY Fund seeks capital growth as a

secondary objective, and that, during the Class Period, the FHY Fund invested a portion of its

assets in below-investment grade debt securities.

14

33.     Defendant FHO Fund is a closed-end management investment company.  The FHO Fund's primary investment objective is to seek a high level of current income.  It seeks capital growth as a secondary objective.  The FHO Fund invests in a diversified portfolio of below investment-grade and investment-grade debt securities, and equity securities.  Its portfolio includes corporate bonds, RMBS, CDOs, CMOs, ABS and equity securities.

Defendants' Response:  Deny the allegations in Paragraph 33, except admit that the FHO

Fund is a closed-end management investment company, that the FHO Fund's primary investment

objective is to seek a high level of current income, and that the FHO Fund seeks capital growth

as a secondary objective.

34.     Defendant James Allen Bowen ("Bowen") is, and during the Class Periods was, President of First Trust Portfolio, and during the Class Periods was also the President at First Trust.  He is also the Managing Director of First Trust Portfolios.  Defendant Bowen has been the Chairman, Chief Executive Officer, President, Member of Executive Committee, and Trustee of MBIA Capital First Trust Relative Value Municipal Fund since 2004.  He serves as the Chief Executive Officer, President, Chairman, Member of Executive Committee, Member of Dividend and Pricing Committee, and Trustee of First Trust Energy Income Fund.  Mr. Bowen is the Chairman, Chief Executive Officer, President, and Member of Executive Committee of First Trust Four Corners Senior Floating Rate Income Fund since 2003 and First Trust Four Corners Senior Floating Return Income Fund II since 2004.  He is the Chief Executive Officer, President, Chairman, and Member of Executive Committee of First Trust Value Line and Ibbotson Equity Allocation Fund, First Trust Value Line 100 Fund, and First Trust Value Line Dividend Fund.  Mr. Bowen serves as the Chairman, President, Chief Executive Officer, Trustee, and Member of Executive Committee of Macquarie and First Trust Global Infrastructure/Utilities Dividend and Income Fund since 2003 and Energy Income and Growth Fund and First Trust Fiduciary Asset Management Covered Call Fund since 2004.  He also serves as the Chairman, Chief Executive Officer, President, and Member of Executive Committee of Aberdeen Global Opportunity Income Fund.  Mr. Bowen serves as Chairman of Bond Wave LLC and Stonebridge Advisors LLC.  He has been a Trustee of First Trust Value Line Dividend Fund and First Trust/Four Corners Senior Floating Rate Income Fund since 2003.  Mr. Bowen has been a Trustee of First Trust Value Line 100 Fund (previously First Trust Value Line R 100 Fund) since 2003 and also serves as Member of Executive Committee.  Bowen is also Chairman of the Board of BondWave LLC (Software Development Company/Broker-Dealer) and Stonebridge Advisors LLC (Investment Adviser) during the last five years and Trustee of Wheaton College.  Defendant Bowen signed the FHY Fund's Registration Statement and Prospectus and the pre-effective amendment to the FHY Fund's Registration Statement and Prospectus on the following dates: January 20, 2006, February 27, 2006 and March 28, 2006; and the post-effective amendment to the FHY Fund's Registration Statement on March 29, 2006.  Defendant Bowen also signed the FHO Fund's Registration Statement and Prospectus and the pre-effective amendments to the FHO Fund's Registration Statement and Prospectus on the following dates:  December 21, 2006, February 22, 2007 and March 27, 2007.  Additionally, Defendant Bowen signed FHI's Form NCSRs on the following dates:  January 6, 2006, July 7, 2006, January 5, 2007, July 9, 2007, January 10, 2008 and July 7, 2008.  He also signed FHI's Form N-Qs on the following

dates:  March 29, 2006, September 28, 2006, March 28, 2007, September 26, 2007 and March 26, 2008.  Defendant Bowen signed FHY's Form N-CSRs on the following dates:  July 7, 2006, January 5, 2007, July 9, 2007, January 10, 2008 and July 7, 2008.  He also signed FHY's Form N-Qs on the following dates:  September 28, 2006, March 28, 2007, September 26, 2007 and March 26, 2008.  Defendant Bowen signed FHO's Form N-CSRs on the following dates: July 9, 2007 and April 4, 2008.  He also signed FHO's Form N-Qs on the following dates: September 26, 2007, January 2, 2008 and June 27, 2008.

Defendants' Response:  Answering Paragraph 34, admit that, during the Class Period, Defendant Bowen was President and a Managing Director of First Trust Portfolios and President of First Trust Advisors.  Admit that Bowen holds or held the following positions with other entities:

- Chairman, Chief Executive Officer, President, Trustee, and Member of Executive Committee of First Trust/Four Corners Senior Floating Rate Income Fund since 2003;

- Chairman, Chief Executive Officer, President, and Member of Executive Committee of First Trust/Four Corners Senior Floating Rate Income Fund II since 2004;

- Chairman, President, Chief Executive Officer, Trustee, and Member of Executive Committee of Macquarie/First Trust Global Infrastructure/Utilities Dividend and Income Fund since 2004;

- Chairman, President, Chief Executive Officer, Trustee, and Member of Executive Committee of Energy Income and Growth Fund since 2004;

- Chief Executive Officer, President, Chairman, and Member of Executive Committee of First Trust Value Line and Ibbotson Equity Allocation Fund until that fund's liquidation in December 2006;

- Chief Executive Officer, President, Chairman, and Member of Executive Committee of First Trust/Value Line 100 Exchange-Traded Fund (f/k/a First Trust/Value Line 100 Fund) and First Trust/Value Line Dividend Index Fund (f/k/a First Trust/Value Line Dividend Fund);

- Chairman, President, Chief Executive Officer, Trustee, and Member of Executive Committee of First Trust Enhanced Equity Income Fund (f/k/a First Trust/Fiduciary Asset Management Covered Call Fund);

- Chairman, Chief Executive Officer, President, and Member of Executive Committee of First Trust/Aberdeen Global Income Fund;

16

- Chairman of BondWave LLC;

- Chairman of Stonebridge Advisors LLC; and

- Trustee of Wheaton College.

Admit that Bowen signed the following disclosure documents filed by the Funds with the

SEC:

- FHY Fund Registration Statement and Prospectus and pre-effective amendment to same filed on January 20, 2006, February 27, 2006, and March 28, 2006;

- Post-effective amendment to FHY Fund Registration Statement filed on March 29, 2006;

- FHO Fund Registration Statement and Prospectus and pre-effective amendments to same filed on December 21, 2006, February 22, 2007, and March 27, 2007;

- FHI Fund Forms N-CSR filed on January 6, 2006, July 7, 2006, January 5, 2007, July 9, 2007, January 10, 2008, and July 7, 2008;

- FHI Fund Forms N-Q filed on March 29, 2006, September 28, 2006, March 28, 2007, September 26, 2007, and March 26, 2008;

- FHY Fund Forms N-CSR filed on July 7, 2006, January 5, 2007, July 9, 2007, January 10, 2008, and July 7, 2008;

- FHY Fund Forms N-Q filed on September 28, 2006, March 28, 2007, September 26, 2007, and March 26, 2008;

- FHO Fund Forms N-CSR filed on July 9, 2007 and April 4, 2008; and

- FHO Fund Forms N-Q filed on September 26, 2007, January 2, 2008, and June 27, 2008.

Deny the remaining allegations in Paragraph 34.

35.     Defendant Mark Raymond Bradley ("Bradley") is, and during the Class Periods was, Chief Financial Officer ("CFO"), Controller and Treasurer of the Funds.  Defendant Bradley is, and during the Class Periods was, the Managing Director and Chief Financial Officer at First Trust Advisors L.P.  He is also the Chief Financial Officer and Managing Director at First Trust Portfolios L.P.  Bradley is also the Chief Financial Officer, Chief Accounting Officer, Treasurer, and Controller at MBIA Capital First Trust Relative Value Municipal Fund and First Trust Four Corners Senior Floating Return Income Fund II since 2004.  He is the Chief Financial Officer, Chief Accounting Officer, Treasurer, and Controller of First Trust/Four Corners Senior Floating Rate Income Fund since 2003.  Bradley serves as the Chief Financial Officer, Chief

17

Accounting Officer, Treasurer, and Controller of Aberdeen Global Opportunity Income Fund. He serves as the Chief Financial Officer, Chief Accounting Officer, Treasurer, and Controller of First Trust Value Line R 100 Fund, First Trust Value Line Dividend Fund, First Trust and Fiduciary Asset Management Covered Call Fund, and Energy Income and Growth Fund. Mr. Bradley also serves as Chief Financial Officer, Chief Accounting Officer, Treasurer, and Controller of First Trust Energy Income Fund. He is the Chief Financial Officer of BondWave LLC and Stonebridge Advisors LLC. Defendant Bradley signed the FHY Fund's Registration Statement and Prospectus and the pre-effective amendment to the FHY Fund's Registration Statement and Prospectus on the following dates: January 20, 2006, February 27, 2006 and March 28, 2006; and the post-effective amendment to the FHY Fund's Registration Statement on March 29, 2006. Defendant Bradley also signed the FHO Fund's Registration Statement and Prospectus and the pre-effective amendments to the FHO Fund's Registration Statement and Prospectus on the following dates: March 29, 2006, December 21, 2006, February 22, 2007 and March 27, 2007. Additionally, Defendant Bradley signed FHI's Form N-CSRs on the following dates: January 6, 2006, July 7, 2006, January 5, 2007, July 9, 2007, January 10, 2008 and July 7, 2008. He also signed FHI's Form N-Qs on the following dates: March 29, 2006, September 28, 2006, March 28, 2007, September 26, 2007 and March 26, 2008. Defendant Bradley signed FHY's Form N-CSRs on the following dates: July 7, 2006, January 5, 2007, July 9, 2007, January 10, 2008 and July 7, 2008. He also signed FHY's Form N-Qs on the following dates: September 28, 2006, March 28, 2007, September 26, 2007 and March 26, 2008. Defendant Bradley signed FHO's Form N-CSRs on the following dates: July 9, 2007 and April 4, 2008. He also signed FHO's Form N-Qs on the following dates: September 26, 2007, January 2, 2008 and June 27, 2008.

Defendants' Response: Answering Paragraph 35, admit that, during the Class Period, Defendant Bradley was Chief Financial Officer, Controller, and Treasurer of the Funds; Chief Financial Officer and a Managing Director of First Trust Advisors; and Chief Financial Officer and a Managing Director of First Trust Portfolios. Admit that Bradley holds the following positions with other entities:

- Chief Financial Officer, Chief Accounting Officer, Treasurer, and Controller of First Trust/Four Corners Senior Floating Rate Income Fund since 2003;

- Chief Financial Officer, Chief Accounting Officer, Treasurer, and Controller of First Trust/Four Corners Senior Floating Rate Income Fund II since 2004;

- Chief Financial Officer, Chief Accounting Officer, Treasurer, and Controller of Energy Income and Growth Fund;

- Chief Financial Officer, Chief Accounting Officer, Treasurer, and Controller of First Trust/Aberdeen Global Income Fund;

18

- Chief Financial Officer, Chief Accounting Officer, Treasurer, and Controller of First Trust/Value Line 100 Exchange-Traded Fund (f/k/a First Trust/Value Line 100 Fund) and First Trust/Value Line Dividend Index Fund (f/k/a First Trust/Value Line Dividend Fund);

- Chief Financial Officer, Chief Accounting Officer, Treasurer, and Controller of First Trust Enhanced Equity Income Fund (f/k/a First Trust/Fiduciary Asset Management Covered Call Fund);

- Chief Financial Officer of BondWave LLC; and

- Chief Financial Officer of Stonebridge Advisors LLC.

Admit that Bradley signed the following disclosure documents filed by the Funds with the SEC:

- FHY Fund Registration Statement and Prospectus and pre-effective amendment to same filed on January 20, 2006, February 27, 2006, and March 28, 2006;

- Post-effective amendment to FHY Fund Registration Statement filed on March 29, 2006;

- FHO Fund Registration Statement and Prospectus and pre-effective amendments to same filed on December 21, 2006, February 22, 2007, and March 27, 2007;

- FHI Fund Forms N-CSR filed on January 6, 2006, July 7, 2006, January 5, 2007, July 9, 2007, January 10, 2008, and July 7, 2008;

- FHI Fund Forms N-Q filed on March 29, 2006, September 28, 2006, March 28, 2007, September 26, 2007, and March 26, 2008;

- FHY Fund Forms N-CSR filed on July 7, 2006, January 5, 2007, July 9, 2007, January 10, 2008, and July 7, 2008;

- FHY Fund Forms N-Q filed on September 28, 2006, March 28, 2007, September 26, 2007, and March 26, 2008;

- FHO Fund Forms N-CSR filed on July 9, 2007 and April 4, 2008; and

- FHO Fund Forms N-Q filed on September 26, 2007, January 2, 2008, and June 27, 2008.

Deny the remaining allegations in Paragraph 35.

36.     Hilliard Lyons was the investment Subadviser of the FHI Fund until May 2006. Hilliard Lyons provides, and during part of the FHI Class Period provided, commercial and retail

banking and other financial services in areas of investment banking, asset management, mutual funds, trusts, securities brokerage, insurance, leasing and mortgage banking. Hillard Lyons or its predecessors have been managing assets since 1967. As Subadviser to the FHI Fund, Hilliard Lyons was responsible for the day-to-day management of the FHI Fund's portfolio during part of the FHI Class Period. Hilliard Lyons received a portfolio management fee at the annual rate of 0.40% of FHI Fund's Managed Assets, which is paid by the Adviser out of the Adviser's management fee, during part of the FHI Class Period.

Defendants' Response: Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 36, except admit that Hilliard Lyons Asset Management ("HLAM") served as the subadviser to the FHI Fund until April 28, 2006 and received subadvisory fees at an annual rate of 0.40% of the FHI Fund's Managed Assets, which were paid by First Trust Advisors out of its investment advisory (or management) fees.

37.      Valhalla is, and at all relevant times was, Subadviser to the FHY Fund and the FHO Fund. Valhalla succeeded Hilliard Lyons as Subadvisor to the FHI Fund in May 2006. As Subadviser to the Funds, Valhalla is, and during the Class Periods was, responsible for the day-to-day management of the Funds' portfolio. Valhalla is a boutique asset management firm focused on managing high-yield portfolios with an emphasis on structured finance securities. First Trust Portfolios acquired a minority interest in Valhalla, and First Trust Portfolios is an affiliate of the Adviser. Valhalla received a portfolio management fee at the annual rate of 0.40% of the Funds' Managed Assets, which is paid by the Adviser out of the Adviser's management fee during the Class Periods.

Defendants' Response: Deny the allegations in Paragraph 37, except admit that Valhalla Capital Partners LLC ("Valhalla") succeeded HLAM as subadviser to the FHI Fund effective April 28, 2006, served as subadviser to the Funds during the remainder of the Class Period, and received subadvisory fees at an annual rate of 0.40% of each Fund's Managed Assets, which were paid by First Trust Advisors out of its investment advisory (or management) fees, and that, during the Class Period, First Trust Portfolios owned a minority interest in Valhalla.

38.      Richard E. Erickson ("Erickson") is, and at all relevant times was, a Trustee of the Funds. Erickson is the Managing Director of First Trust, an Investment Advisor of First Trust Energy Income Fund. Defendant Erickson serves as Managing Director of First Trust Portfolios. Mr. Erickson has been Trustee of First Trust Value Line 100 Fund since 2003 and serves as Member of Audit, Nominating and Corporate Governance Committees. He has been Trustee of First Trust/Fiduciary Asset Management Covered Call Fund and First Trust/Aberdeen Global Opportunity Income Fund since 2004. He has been Trustee of First Trust Value Line Dividend

Fund, Macquarie/First Trust Global Infrastructure/Utilities Dividend & Income Fund and First Trust/Four Corners Senior Floating Rate Income Fund since 2003.  He serves as Trustee of First Trust Energy Income Fund.  He has been Trustee of First Trust Four Corners Senior Floating Return Income Fund II, Energy Income & Growth Fund and MBIA Capital First Trust Relative Value Municipal Fund since 2004.  Erickson signed the pre-effective amendments to the FHY Fund's Registration Statement and Prospectus on the following dates:  February 27, 2006 and March 28, 2006, and signed the post-effective amendments to the FHY Fund's Registration Statement on March 29, 2006.  Erickson signed the pre-effective amendments to the FHO Fund's Registration Statement and Prospectus on the following dates:  December 21, 2006, February 22, 2007 and March 27, 2007.  Erickson was also a member of Valuation Committee which is responsible for the oversight of the pricing procedures of the Fund.  Additionally, Erickson was a member of the FHO Funds Audit Committee which is responsible for overseeing the Fund's accounting and financial reporting process, the system of internal controls, audit process and evaluating and appointing independent auditors.

Defendants' Response:  Answering Paragraph 38, admit that, during the Class Period,

Erickson was a Trustee of the Funds and served on the Funds' Audit and Valuation Committees.

Admit that Erickson serves as a Trustee of the Macquarie/First Trust Global Infrastructure/

Utilities Dividend & Income Fund, First Trust/Four Corners Senior Floating Return Income

Fund, First Trust/Four Corners Senior Floating Return Income Fund II, Energy Income &

Growth Fund, First Trust/Value Line 100 Exchange-Traded Fund (f/k/a First Trust/Value Line

100 Fund), First Trust/Value Line Dividend Index Fund (f/k/a First Trust/Value Line Dividend

Fund), First Trust Enhanced Equity Income Fund (f/k/a First Trust/Fiduciary Asset Management

Covered Call Fund), and First Trust/Aberdeen Global Income Fund.  Admit that Erickson signed

the following disclosure documents filed by the Funds with the SEC:

- FHY Fund Registration Statement and Prospectus and pre-effective amendment to same filed on February 27, 2006 and March 28, 2006;

- Post-effective amendment to FHY Fund Registration Statement filed on March 29, 2006; and

- FHO Fund Registration Statement and Prospectus and pre-effective amendments to same filed on December 21, 2006, February 22, 2007, and March 27, 2007.

Deny the remaining allegations in Paragraph 38.

39.     Thomas R. Kadlec ("Kadlec") is, and at all relevant times was, a Trustee of the Funds.  He is has been employed at ADM Investor Services Inc in the position of Senior Vice President since April 2007.  In this role, he is responsible for ADMIS's accounting, treasury, information technology and marketing areas.  He joined ADMIS in 1990, most recently serving as Vice President and Chief Financial Officer.  Mr. Kadlec serves as Registered Representative of Segerdahl & Company Inc. since 2000.  Mr. Kadlec has been a Trustee of First Trust/Aberdeen Global Opportunity Income Fund since 2004.  Mr. Kadlec has been Trustee of First Trust Value Line (R) 100 Fund since 2003 and serves as Member of its Audit, Executive, Nominating and Corporate Governance Committees.  He has been Trustee of First Trust/Four Corners Senior Floating Rate Income Fund since 2003.  Mr. Kadlec has been Trustee of First Trust Value Line Dividend Fund since 2003; Macquarie/First Trust Global Infrastructure/Utilities Dividend & Income Fund since 2003; MBIA Capital First Trust Relative Value Municipal Fund since 2004; First Trust Four Corners Senior Floating Return Income Fund II since 2004; First Trust/Fiduciary Asset Management Covered Call Fund since 2004; and Energy Income & Growth Fund since 2004.  He is Broker-Dealer of Segerdahl & Company Inc., and an NASD member.  He also serves as a Trustee of First Trust Closed-End Funds and First Defined Portfolio Fund LLC.  He serves as Trustee of First Trust Energy Income Fund. Mr. Kadlec has over 25 years experience in the commodity futures industry and received a Bachelor of Science degree in accounting and finance from the University of Iowa.  Kadlec signed the pre-effective amendments to the FHY Fund's Registration Statement and Prospectus on the following dates:  February 27, 2006 and March 28, 2006, and signed the post-effective amendments to the FHY Fund's Registration Statement on March 29, 2006.  Furthermore, Kadlec signed the pre-effective amendments to the FHO Fund's Registration Statement and Prospectus on the following dates:  December 21, 2006, February 22, 2007 and March 27, 2007. Kadlec was also a member of the Funds' Valuation Committees which are responsible for the oversight of the pricing procedures of the Fund.  Additionally, Kadlec was a member of the Funds' Audit Committees which are responsible for overseeing the Funds' accounting and financial reporting process, the system of internal controls, audit process and evaluating and appointing independent auditors.

Defendants' Response:  Answering Paragraph 39, admit that, during the Class Period,

Kadlec was a Trustee of the Funds and served on the Funds' Audit and Valuation Committees.

Admit that Kadlec serves as a Trustee of the Macquarie/First Trust Global Infrastructure/Utilities

Dividend & Income Fund, First Trust/Four Corners Senior Floating Return Income Fund, First

Trust/Four Corners Senior Floating Return Income Fund II, Energy Income & Growth Fund,

First Trust/Value Line 100 Exchange-Traded Fund (f/k/a First Trust/Value Line 100 Fund), First

Trust/Value Line Dividend Index Fund (f/k/a First Trust/Value Line Dividend Fund), First Trust

Enhanced Equity Income Fund (f/k/a First Trust/Fiduciary Asset Management Covered Call

Fund), and First Trust/Aberdeen Global Income Fund. Admit that Kadlec signed the following

disclosure documents filed by the Funds with the SEC:

- FHY Fund Registration Statement and Prospectus and pre-effective amendment to same filed on February 27, 2006 and March 28, 2006;

- Post-effective amendment to FHY Fund Registration Statement filed on March 29, 2006; and

- FHO Fund Registration Statement and Prospectus and pre-effective amendments to same filed on December 21, 2006, February 22, 2007, and March 27, 2007.

Admit the allegations regarding Kadlec's employment at ADM Investor Services and

Segerdahl & Company Inc., work experience in the commodity futures industry, and educational

background.

Deny the remaining allegations in Paragraph 39.

40.     Robert F. Keith ("Keith") is, and at all relevant times was, a Trustee of the FHO
Fund. Additionally, Keith became a Trustee of the FHI Fund and the FHY Fund on April 16,
2007. During the Class Periods, Keith was also a member of the Funds' Valuation Committees
which are responsible for the oversight of the pricing procedures of the Funds. Additionally,
during the Class Periods, Keith was a member of the Funds' Audit Committees which are
responsible for overseeing the Funds' accounting and financial reporting process, the system of
internal controls, audit process and evaluating and appointing independent auditors. Keith has
been the President of Hibs Enterprises (Financial and Management Consulting) since 2003.
Keith served as President of Aramark Service Master Management and Aramark Sm
Management Services, Inc. from 2001 to 2003. He served as Managing Director of TL
Ventures. He also served as the President and Chief Operating Officer of Service Master
Management Services from 1998 to 2003. Keith has been a Trustee of Energy Income &
Growth Fund since June 12, 2006.

Defendants' Response:  Answering Paragraph 40, admit that Keith served as a Trustee of

the FHO Fund from its inception through the end of the Class Period, served as a Trustee of the

FHI and FHY Funds from April 16, 2007 through the end of the Class Period, and served on the

Funds' Audit and Valuation Committees during the same time periods. Admit that Keith serves

as a Trustee of the Energy Income & Growth Fund. Admit the allegations regarding Keith's

employment at Hibs Enterprises, Aramark Service Master Management, Aramark SM

Management Services, Inc., TL Ventrues, and Service Master Management Services.  Deny the

remaining allegations in Paragraph 40.

41.     Niel B. Nielson ("Nielson") is, and at all relevant times was, a Trustee of the
Funds.  He has been President of Covenant College since 2002.  From 1997 until 2002, Nielson
was the Associate Pastor of Outreach for College Church in Wheaton, Illinois.  Nielson was a
partner and trader for Ritchie Capital Markets Group, LLC from 1996 to 1997.  Prior to 1996,
Nielson served as an executive officer in various companies, including serving for two years as
Senior Vice President of Chicago Research and Trading Group, Ltd., a company at which he was
employed for nine years.  He served as the Vice President of The Service-Master Company, a
Residential and Commercial Services Provider from 1995 to 1996.  Nielson is also a Director of
First Defined Portfolio Fund LLC, an open-end management investment company under the
Investment Company Act of 1940.  He has been Trustee of First Trust Value Line 100 Fund
(formerly First Trust Value Line R 100 Fund) since 2003 and serves as Member of Audit,
Nominating and Corporate Governance Committees.  He has been Trustee of First Trust/Four
Corners Senior Floating Rate Income Fund since 2003 and Trustee of First Trust Value Line
Dividend Fund since 2003.  He has been a Trustee of First Trust/Aberdeen Global Opportunity
Income Fund since 2004.  He serves as a Director of Covenant Transport Inc. and is a Member of
Compensation, Nominating and Corporate Governance Committees.  Nielson has been Trustee
of Macquarie/First Trust Global Infrastructure/Utilities Dividend & Income Fund since 2003.
Nielson has been Trustee of MBIA Capital First Trust Relative Value Municipal Fund, First
Trust Four Corners Senior Floating Return Income Fund II, First Trust/Fiduciary Asset
Management Covered Call Fund, and Energy Income & Growth Fund since 2004.  He serves as
Trustee of First Trust Energy Income Fund.  Mr. Nielson served as a Director of Good News
Publishers - Crossway Books.  Nielson signed the pre-effective amendments to the FHY Fund's
Registration Statement and Prospectus on the following dates:  February 27, 2006 and March 28,
2006, and signed the post-effective amendments to the FHY Fund's Registration Statement on
March 29, 2006.  Furthermore, Nielson signed the pre-effective amendments to the FHO Fund's
Registration Statement and Prospectus on the following dates:  December 21, 2006, February 22,
2007 and March 27, 2007.  Nielson was also a member of the Funds' Valuation Committees
which are responsible for the oversight of the pricing procedures of the Fund.  Additionally,
Nielson was a member of the Funds' Audit Committees which are responsible for overseeing the
Funds' accounting and financial reporting process, the system of internal controls, audit process
and evaluating and appointing independent auditors.

Defendants' Response:  Answering Paragraph 41, admit that, during the Class Period,

Nielson was a Trustee of the Funds and served on the Funds' Audit Committees and the

Valuation Committees for the FHY and FHO Funds.  Admit that Nielson serves as a Trustee of

the Macquarie/First Trust Global Infrastructure/Utilities Dividend & Income Fund, First

Trust/Four Corners Senior Floating Return Income Fund, First Trust/Four Corners Senior

Floating Return Income Fund II, Energy Income & Growth Fund, First Trust/Value Line 100

Exchange-Traded Fund (f/k/a First Trust/Value Line 100 Fund), First Trust/Value Line Dividend

Index Fund (f/k/a First Trust/Value Line Dividend Fund), First Trust Enhanced Equity Income

Fund (f/k/a First Trust/Fiduciary Asset Management Covered Call Fund), First Trust/Aberdeen

Global Income Fund, and First Defined Portfolio Fund LLC.  Admit that Nielson signed the

following disclosure documents filed by the Funds with the SEC:

- FHY Fund Registration Statement and Prospectus and pre-effective amendment to same filed on February 27, 2006 and March 28, 2006;

- Post-effective amendment to FHY Fund Registration Statement filed on March 29, 2006; and

- FHO Fund Registration Statement and Prospectus and pre-effective amendments to same filed on December 21, 2006, February 22, 2007, and March 27, 2007.

Admit the allegations regarding Nielson's employment background and service on the

boards of directors of Covenant Transport, Inc. and Good News Publishers/Crossway Books.

Deny the remaining allegations in Paragraph 41.

42.     David M. Oster ("Oster") was a Trustee of the FHI Fund and the FHY Fund for
part of the FHI Class Period and FHY Class Period.  Defendant Oster signed the pre-effective
amendments to the FHY Fund's Registration Statement and Prospectus on February 27, 2006.
Oster was also a member of FHI Fund's Valuation Committee which is responsible for the
oversight of the pricing procedures of the Fund.  Additionally, Oster was a member of the FHI
Fund's Audit Committee which is responsible for overseeing the Fund's accounting and financial
reporting process, the system of internal controls, audit process and evaluating and appointing
independent auditors.  He has been a Self-Employed Trader of Options Trading and Market
Making since 1987.  Oster has been a Trustee of Macquarie/First Trust Global Infrastructure/
Utilities Dividend & Income Fund since 2003, MBIA Capital First Trust Relative Value
Municipal Fund since 2004, First Trust Four Corners Senior Floating Return Income Fund II
since 2004, First Trust/Fiduciary Asset Management Covered Call Fund, since 2004 and Energy
Income & Growth Fund since 2004.  Oster has been Trustee of First Trust Value Line Dividend
Fund since 2003.  He has been a Trustee of First Trust/Four Corners Senior Floating Rate
Income Fund since 2003.  Oster serves as a Trustee of First Trust Energy Income Fund.  Oster
has been Trustee of First Trust Value Line 100 Fund (previously First Trust Value Line R 100
Fund) since 2003 and serves as Member of Audit, Nominating and Corporate Governance
Committees.  Oster has been a Trustee of First Trust/Aberdeen Global Opportunity Income Fund
since 2004.

Defendants' Response:  Answering Paragraph 42, admit that Oster was a Trustee of the

FHI Fund during part of the Class Period and that he served on the Fund's Audit and Valuation

Committees during that time period.  Admit that Oster serves or served as a Trustee of the

Macquarie/First Trust Global Infrastructure/Utilities Dividend & Income Fund, First Trust/Four

Corners Senior Floating Return Income Fund, First Trust/Four Corners Senior Floating Return

Income Fund II, Energy Income & Growth Fund, First Trust/Value Line 100 Exchange-Traded

Fund (f/k/a First Trust/Value Line 100 Fund), First Trust/Value Line Dividend Index Fund (f/k/a

First Trust/Value Line Dividend Fund), First Trust Enhanced Equity Income Fund (f/k/a First

Trust/Fiduciary Asset Management Covered Call Fund), and First Trust/Aberdeen Global

Income Fund.  Admit the allegations regarding Oster's employment background.  Deny the

remaining allegations in Paragraph 42.

43.     Erickson, Kadlec, Keith, Nielson and Oster are referred to herein as the "Non-Management Trustees" and are not named as defendants in this Complaint.

Defendants' Response:  Admit the allegations in Paragraph 43.

44.     Plaintiffs Wolkstein and Duda bring Counts I, III, and V pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a FHY Securities Act Subclass consisting of all those who purchased or otherwise acquired shares of the FHY Fund during the FHY Class Period issued in connection with or traceable to the FHY Fund's IPO, and who were damaged thereby.  Excluded from the FHY Securities Act Subclass are Defendants, the Non-Management Trustees and the Subadvisers; members of their immediate families, their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants, the Non-Management Trustees and/or the Subadvisers have or had a controlling interest.

Defendants' Response:  Answering Paragraph 44, admit that Plaintiffs Wolkstein and

Duda purport to bring Counts I, III, and V on behalf the FHY Securities Act Subclass, as defined

in the Complaint.

45.     The members of the FHY Securities Act Subclass are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  The FHY Fund has millions of shares outstanding, owned by hundreds if not thousands of persons.

<u>Defendants' Response</u>:  Paragraph 45 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 45, except admit that the FHY Fund has millions of shares outstanding.

46.     There is a well-defined community of interest in the questions of law and fact
involved in this case.  Questions of law and fact common to the members of the FHY Securities
Act Subclass which predominate over questions which may affect individual FHY Securities Act
Subclass members include:

(a)     whether the Securities Act was violated by Defendants' acts as alleged
herein;

(b)     whether the Registration Statements and/or Prospectuses issued in
connection with the FHY Fund's IPO contained materially untrue and misleading statements
and/or omissions;

(c)     to what extent the members of the FHY Securities Act Subclass have
sustained damages and the proper measure of damages.

<u>Defendants' Response</u>:  Paragraph 46 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 46 and its subparagraphs.

47.     Plaintiffs Wolkstein's and Duda's claims are typical of those of the FHY
Securities Act Subclass because Plaintiffs Wolkstein and Duda and the FHY Securities Act
Subclass have sustained damages from Defendants' wrongful conduct.

<u>Defendants' Response</u>:  Paragraph 47 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 47.

48.     Plaintiffs Wolkstein and Duda will adequately protect the interests of the FHY
Securities Act Subclass and have retained counsel who are experienced in class action securities
litigation.  Plaintiffs Wolkstein and Duda have no interests which conflict with those of the FHY
Securities Act Subclass.

<u>Defendants' Response</u>:  Paragraph 48 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 48.

49.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

Defendants' Response:  Paragraph 49 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 49.

50.     Plaintiff CRC brings Counts II, IV, and VI pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a FHO Securities Act Subclass, consisting of all those who purchased or otherwise acquired shares of the FHO Fund during the FHO Class Period issued in connection with or traceable to the FHO Fund's IPO, and who were damaged thereby. Excluded from the FHO Securities Act Subclass are Defendants, the Non-Management Trustees and the Subadvisers; members of their immediate families, their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants, the Non-Management Trustees and/or the Subadvisers have or had a controlling interest.

Defendants' Response:  Answering Paragraph 50, admit that Plaintiff Compass

Recruiting Company ("CRC") purports to bring Counts II, IV, and VI on behalf of the FHO

Securities Act Subclass, as defined in the Complaint.

51.     The members of the FHO Securities Act Subclass are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  The FHO Fund has millions of shares outstanding, owned by hundreds if not thousands of persons.

Defendants' Response:  Paragraph 51 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 51, except admit that the FHO Fund has millions of shares outstanding.

52.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the FHO Securities Act Subclass which predominate over questions which may affect individual FHO Securities Act Subclass members include:

(a)     whether the Securities Act was violated by Defendants' acts as alleged herein;

(b)     whether the Registration Statements and/or Prospectuses issued in connection with the FHO Fund's IPO contained materially untrue and misleading statements and/or omissions;

(c)       to what extent the members of the FHO Securities Act Subclass have sustained damages and the proper measure of damages.

Defendants' Response:  Paragraph 52 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 52 and its subparagraphs.

53.     Plaintiff CRC's claims are typical of those of the FHO Securities Act Subclass because Plaintiff CRC and the FHO Securities Act Subclass have sustained damages from Defendants' wrongful conduct.

Defendants' Response:  Paragraph 53 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 53.

54.     Plaintiff CRC will adequately protect the interests of the FHO Securities Act Subclass and has retained counsel who are experienced in class action securities litigation. Plaintiff CRC have no interests which conflict with those of the FHO Securities Act Subclass.

Defendants' Response:  Paragraph 54 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 54.

55.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

Defendants' Response:  Paragraph 55 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 55.

56.     Plaintiff Duda brings Counts VII, X and XIII pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a FHI DRIP Subclass, consisting of all those who participated in FHI Fund's DRIP Plan during the FHI Class Period and received dividend reinvestments pursuant to the FHI DRIP during the FHI Class Period, and who were damaged thereby.  Excluded from the FHI DRIP Subclass are Defendants, the Non-Management Trustees and the Subadvisers; members of their immediate families, their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants, the Non-Management Trustees and/or the Subadvisers have or had a controlling interest.

Defendants' Response:  Answering Paragraph 56, admit that Plaintiff Duda purports to

bring Counts VII, X, and XIII on behalf of the FHI DRIP Subclass, as defined in the Complaint.

57.     The members of the FHI DRIP Subclass are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  The FHI Fund has millions of shares outstanding, owned by hundreds if not thousands of persons.

Defendants' Response:  Paragraph 57 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 57, except admit that the FHI Fund has millions of shares outstanding.

58.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the FHI DRIP Subclass which predominate over questions which may affect individual FHI DRIP Subclass members include:

(a)     whether the Securities Act was violated by Defendants' acts as alleged herein;

(b)     whether the Registration Statement issued in connection with the FHI Fund's IPO, which included the FHI DRIP (all documents incorporated therein and thereafter, including the SEC filings issued during the FHI Class Period that were on record prior to each of the dividend distributions) contained materially untrue and misleading statements and/or omissions;

(c)     to what extent the members of the FHI DRIP Subclass have sustained damages and the proper measure of damages.

Defendants' Response:  Paragraph 58 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 58 and its subparagraphs.

59.     Plaintiff Duda's claims are typical of those of the FHI DRIP Subclass because Plaintiff Duda and the FHI DRIP Subclass have sustained damages from Defendants' wrongful conduct.

Defendants' Response:  Paragraph 59 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 59.

60.     Plaintiff Duda will adequately protect the interests of the FHI DRIP Subclass and has retained counsel who are experienced in class action securities litigation.  Plaintiff Duda has no interests which conflict with those of the FHI DRIP Subclass.

Defendants' Response:  Paragraph 60 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 60.

61.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

Defendants' Response:  Paragraph 61 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 61.

62.     Plaintiff Duda brings Counts VIII, XI and XIV pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a FHY DRIP Subclass, consisting of all those who participated in FHY Fund's DRIP Plan during the FHY Class Period and received dividend reinvestments pursuant to the FHY DRIP during the FHY Class Period, and who were damaged thereby.  Excluded from the FHY DRIP Subclass are Defendants, the Non-Management Trustees and the Subadvisers; members of their immediate families, their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants, the Non-Management Trustees and/or the Subadvisers have or had a controlling interest.

Defendants' Response:  Answering Paragraph 62, admit that Plaintiff Duda purports to

bring Counts VIII, XI, and XIV on behalf of the FHY DRIP Subclass, as defined in the

Complaint.

63.     The members of the FHY DRIP Subclass are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  The FHY Fund has millions of shares outstanding, owned by hundreds if not thousands of persons.

Defendants' Response:  Paragraph 63 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 63, except admit that the FHY Fund has millions of shares outstanding.

64.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the FHY DRIP

Subclass which predominate over questions which may affect individual FHY DRIP Subclass members include:

(a)     whether the Securities Act was violated by Defendants' acts as alleged herein;

(b) whether the Registration Statement issued in connection with the FHY Fund's IPO, which included the FHY DRIP (all documents incorporated therein and thereafter, including the SEC filings issued during the FHY Class Period that were on record prior to each of the dividend distributions) contained materially untrue and misleading statements and/or omissions;

(c)     to what extent the members of the FHY DRIP Subclass have sustained damages and the proper measure of damages.

Defendants' Response:  Paragraph 64 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 64 and its subparagraphs.

65.     Plaintiff Duda's claims are typical of those of the FHY DRIP Subclass because Plaintiff Duda and the FHY DRIP Subclass have sustained damages from Defendants' wrongful conduct.

Defendants' Response:  Paragraph 65 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 65.

66.     Plaintiff Duda will adequately protect the interests of the FHY DRIP Subclass and has retained counsel who are experienced in class action securities litigation.  Plaintiff Duda has no interests which conflict with those of the FHY DRIP Subclass.

Defendants' Response:  Paragraph 66 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 66.

67.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

Defendants' Response:  Paragraph 67 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 67.

68.     Plaintiff CRC brings Counts IX, XII and XV pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a FHO DRIP Subclass, consisting of all those who participated in FHO DRIP Plan during the FHO Class Period and received dividend reinvestments pursuant to the FHO DRIP during the FHO Class Period, and who were damaged thereby.  Excluded from the FHO DRIP Subclass are Defendants, the Non-Management Trustees and the Subadvisers; members of their immediate families, their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants, the Non-Management Trustees and/or the Subadvisers have or had a controlling interest.

Defendants' Response:  Answering Paragraph 68, admit that Plaintiff CRC purports to bring Counts IX, XII, and XV on behalf of the FHO DRIP Subclass, as defined in the Complaint.

69.     The members of the FHO DRIP Subclass are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  The FHO Fund has millions of shares outstanding, owned by hundreds if not thousands of persons.

Defendants' Response:  Paragraph 69 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 69, except admit that the FHO Fund has millions of shares outstanding.

70.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the FHO DRIP Subclass which predominate over questions which may affect individual FHO DRIP Subclass members include:

(a)     whether the Securities Act was violated by Defendants' acts as alleged herein;

(b)     whether the Registration Statement issued in connection with the FHO Fund's IPO, which included the FHO DRIP (all documents incorporated therein and thereafter, including the SEC filings issued during the FHO Class Period that were on record prior to each of the dividend distributions) contained materially untrue and misleading statements and/or omissions;

(c)     to what extent the members of the FHO DRIP Subclass have sustained damages and the proper measure of damages.

Defendants' Response:  Paragraph 70 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 70 and its subparagraphs.

71.     Plaintiff CRC's claims are typical of those of the FHO DRIP Subclass because Plaintiff CRC and the FHO DRIP Subclass have sustained damages from Defendants' wrongful conduct.

Defendants' Response:  Paragraph 71 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 71.

72.     Plaintiff CRC will adequately protect the interests of the FHO DRIP Subclass and has retained counsel who are experienced in class action securities litigation.  Plaintiff CRC has no interests which conflict with those of the FHO DRIP Subclass.

Defendants' Response:  Paragraph 72 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 72.

73.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

Defendants' Response:  Paragraph 73 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 73.

74.     Plaintiff Valenti Trust brings Count XVI pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a FHO 14(a) Subclass, consisting of all persons who purchased or otherwise acquired shares of the FHI Fund during the FHI Class Period.  Excluded from the FHI 14(a) Subclass are Defendants, the Non-Management Trustees and the Subadvisers; members of their immediate families, their legal representatives, heirs, successors, or assigns; and any entity in which Defendants, the Non-Management Trustees and/or the Subadvisers have or had a controlling interest.

<u>Defendants' Response</u>:  Answering Paragraph 74, admit that Plaintiff Robert Valenti

Revocable Trust U/A 8/3/06 ("Valenti Trust") purports to bring Count XVI on behalf of the FHO

14(a) Subclass, as defined in the Complaint.

75.     The members of the FHI 14(a) Subclass are so numerous that joinder of all
members is impracticable.  The disposition of their claims in a class action will provide
substantial benefits to the parties and the Court.  The FHI Fund has millions of shares
outstanding, owned by hundreds if not thousands of persons.

<u>Defendants' Response</u>:  Paragraph 75 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 75, except admit that the FHI Fund has millions of shares outstanding.

76.     There is a well-defined community of interest in the questions of law and fact
involved in this case.  Questions of law and fact common to the members of the FHI 14(a)
Subclass which predominate over questions which may affect individual FHI 14(a) Subclass
members include:

        (a)     whether Section 14(a) of the Exchange Act and Rule 14a-9 promulgated
thereunder were violated by Defendants;

        (b)     whether the Proxy Materials issued to the FHI 14(a) Subclass were false
and/or misleading or misrepresented material facts about the FHI Fund; and

        (c)     the extent of damage sustained by FHI 14(a) Subclass members and the
appropriate measure of damages.

<u>Defendants' Response</u>:  Paragraph 76 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 76 and its subparagraphs.

77.     Plaintiff Valenti Trust's claims are typical of those of the FHI 14(a) Subclass
because Plaintiff Valenti Trust and the FHI 14(a) Subclass sustained damages from Defendants'
wrongful conduct.

<u>Defendants' Response</u>:  Paragraph 77 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 77.

78.     Plaintiff Valenti Trust will adequately protect the interests of the FHI 14(a) Subclass and have retained counsel who are experienced in class action securities litigation. Plaintiff Valenti Trust has no interests which conflict with those of the FHI 14(a) Subclass.

Defendants' Response:  Paragraph 78 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 78.

79.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

Defendants' Response:  Paragraph 79 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 79.

80.     Plaintiffs Wolkstein brings Count XVII pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a FHY 14(a) Subclass, consisting of all persons who purchased or otherwise acquired shares of the FHY Fund during the FHY Class Period.  Excluded from the FHY 14(a) Subclass are Defendants, the Non-Management Trustees and the Subadvisers; members of their immediate families, their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants, the Non-Management Trustees and/or the Subadvisers have or had a controlling interest.

Defendants' Response:  Answering Paragraph 80, admit that Plaintiff Wolkstein purports

to bring Count XVII on behalf of the FHY 14(a) Subclass, as defined in the Complaint.

81.     The members of the FHY 14(a) Subclass are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  The FHY Fund has millions of shares outstanding, owned by hundreds if not thousands of persons.

Defendants' Response:  Paragraph 81 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 81, except admit that the FHY Fund has millions of shares outstanding.

82.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the FHY 14(a) Subclass which predominate over questions which may affect individual FHY 14(a) Subclass members include:

(a)    whether Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder were violated by Defendants;

(b)    whether the Proxy Materials issued to the FHY 14(a) Subclass were false and/or misleading or misrepresented material facts about the FHY Fund; and

(c)    the extent of damage sustained by FHY 14(a) Subclass members and the appropriate measure of damages.

Defendants' Response:  Paragraph 82 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 82 and its subparagraphs.

83.    Plaintiff Wolkstein's claims are typical of those of the FHY 14(a) Subclass because Plaintiff Wolkstein and the FHY 14(a) Subclass sustained damages from Defendants' wrongful conduct.

Defendants' Response:  Paragraph 83 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 83.

84.    Plaintiff Wolkstein will adequately protect the interests of the FHY 14(a) Subclass and have retained counsel who are experienced in class action securities litigation. Plaintiff Wolkstein has no interests which conflict with those of the FHY 14(a) Subclass.

Defendants' Response:  Paragraph 84 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 84.

85.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

Defendants' Response:  Paragraph 85 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 85.

86.    Plaintiffs Valenti Trust and Duda bring Counts XVIII and XXI pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired shares of the FHI Fund during the FHI Class Period.  Excluded from the FHI

10(b) Class are Defendants, the Non-Management Trustees and the Subadvisers; members of their immediate families, their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants, the Non-Management Trustees and/or the Subadvisers have or had a controlling interest.

Defendants' Response:  Answering Paragraph 86, admit that Plaintiffs Valenti Trust and

Duda purport to bring Counts XVIII and XXI on behalf of the FHI 10(b) Class, as defined in the

Complaint.

87.     The members of the FHI 10(b) Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  The FHI Fund has millions of shares outstanding, owned by hundreds if not thousands of persons.

Defendants' Response:  Paragraph 87 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 87, except admit that the FHI Fund has millions of shares outstanding.

88.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the FHI 10(b) Class which predominate over questions which may affect individual FHI 10(b) Class members include:

        (a)     whether Sections 10(b) and 20(a) of the Exchange Act were violated by Defendants;

        (b)     whether statements made by Defendants to the investing public during the FHI Class Period misrepresented material facts about the FHI Fund;

        (c)     whether Defendants acted with the required state of mind; and

        (d)     the extent of damage sustained by the FHI 10(b) Class members and the appropriate measure of damages.

Defendants' Response:  Paragraph 88 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 88 and its subparagraphs.

89.     Plaintiffs Valenti Trust's and Duda's claims are typical of those of the FHI 10(b) Class because Plaintiffs Valenti Trust and Duda and the FHI 10(b) Class sustained damages from Defendants' wrongful conduct.

38

Defendants' Response:  Paragraph 89 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 89.

90.     Plaintiffs Valenti Trust and Duda will adequately protect the interests of the FHI
10(b) Class and have retained counsel who are experienced in class action securities litigation.
Plaintiffs Valenti Trust and Duda have no interests which conflict with those of the FHI 10(b)
Class.

Defendants' Response:  Paragraph 90 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 90.

91.     A class action is superior to other available methods for the fair and efficient
adjudication of this controversy.

Defendants' Response:  Paragraph 91 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 91.

92.     Plaintiffs Wolkstein and Duda bring Counts XIX and XXII pursuant to Rule 23 of
the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise
acquired shares of the FHY Fund during the FHY Class Period.  Excluded from the FHY 10(b)
Class are Defendants, the Non-Management Trustees and the Subadvisers; members of their
immediate families, their legal representatives, heirs, successors, or assigns; and any entity in
which any of the Defendants, the Non-Management Trustees and/or the Subadvisers have or had
a controlling interest.

Defendants' Response:  Answering Paragraph 92, admit that Plaintiffs Wolkstein and

Duda purport to bring Counts XIX and XXII on behalf of the FHY 10(b) Class, as defined in the

Complaint.

93.     The members of the FHY 10(b) Class are so numerous that joinder of all members
is impracticable.  The disposition of their claims in a class action will provide substantial benefits
to the parties and the Court.  The FHY Fund has millions of shares outstanding, owned by
hundreds if not thousands of persons.

Defendants' Response:  Paragraph 93 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 93, except admit that the FHY Fund has millions of shares outstanding.

94.     There is a well-defined community of interest in the questions of law and fact
involved in this case.  Questions of law and fact common to the members of the FHY 10(b) Class
which predominate over questions which may affect individual FHY 10(b) Class members
include:

(a)     whether Sections 10(b) and 20(a) of the Exchange Act were violated by
Defendants;

(b)     whether statements made by Defendants to the investing public during the
FHI Class Period misrepresented material facts about the FHY Fund;

(c)     whether Defendants acted with the required state of mind; and

(d)     the extent of damage sustained by FHY 10(b) Class members and the
appropriate measure of damages.

Defendants' Response:  Paragraph 94 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 94 and its subparagraphs.

95.     Plaintiffs Wolkstein and Duda's claims are typical of those of the FHY 10(b)
Class because Plaintiffs Wolkstein and Duda and the FHY 10(b) Class sustained damages from
Defendants' wrongful conduct.

Defendants' Response:  Paragraph 95 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 95.

96.     Plaintiffs Wolkstein and Duda will adequately protect the interests of the FHY
10(b) Class and have retained counsel who are experienced in class action securities litigation.
Plaintiffs Wolkstein and Duda have no interests which conflict with those of the FHY 10(b)
Class.

<u>Defendants' Response</u>:  Paragraph 96 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 96.

97.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

<u>Defendants' Response</u>:  Paragraph 97 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 97.

98.     Plaintiff CRC brings Counts XX and XXIII pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired shares of the FHO Fund during the FHO Class Period.  Excluded from the FHO 10(b) Class are Defendants, the Non-Management Trustees and the Subadvisers; members of their immediate families, their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants, the Non-Management Trustees and/or the Subadvisers have or had a controlling interest.

<u>Defendants' Response</u>:  Answering Paragraph 98, admit that Plaintiff CRC purports to bring Counts XX and XXIII on behalf of the FHO 10(b) Class, as defined in the Complaint.

99.     The members of the FHO 10(b) Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  The FHO Fund has millions of shares outstanding, owned by hundreds if not thousands of persons.

<u>Defendants' Response</u>:  Paragraph 99 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 99, except admit that the FHO Fund has millions of shares outstanding.

100.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the FHO 10(b) Class which predominate over questions which may affect individual FHO 10(b) Class members include:

(a)     whether Sections 10(b) and 20(a) of the Exchange Act was violated by Defendants;

(b)      whether statements made by Defendants to the investing public during the FHO Class Period misrepresented material facts about the FHO Fund;

(c)      whether Defendants acted with the required state of mind; and

(d)      the extent of damage sustained by FHO 10(b) Class members and the appropriate measure of damages.

Defendants' Response:  Paragraph 100 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 100 and its subparagraphs.

101.    Plaintiff CRC's claims are typical of those of the FHO 10(b) Class because Plaintiff CRC and the FHO 10(b) Class sustained damages from Defendants' wrongful conduct.

Defendants' Response:  Paragraph 101 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 101.

102.    Plaintiff CRC will adequately protect the interests of the FHO 10(b) Class and have retained counsel who are experienced in class action securities litigation.  Plaintiff CRC has no interests which conflict with those of the FHO 10(b) Class.

Defendants' Response:  Paragraph 102 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 102.

103.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

Defendants' Response:  Paragraph 103 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 103.

104.    First Trust Portfolios first offered shares of the FHI Fund to the public on July 27, 2005.  The FHI Fund filed its initial prospectus included as part of an SEC Form N-2 Registration Statement on April 19, 2005, and on June 24, 2005 and July 26, 2005, filed amendments to the Registration Statement and Prospectus on Form N-2/As.  The initial Registration Statement relating to the fund became effective July 27, 2005.  The offering raised

$165 million for the closed-end fund managed by the Adviser and Subadvisers.  The offering's registration materials included a Statement of Additional Information ("SAI").

Defendants' Response:  Deny the allegations in Paragraph 104, except admit that the FHI Fund's registration statement became effective on July 27, 2005, that the registration statement included a prospectus and SAI, and that the FHI Fund completed its public offering on July 27, 2005.

105.    FHI's Prospectus and SAI disclosed the following Investment Objectives

Investment Strategy.  The Fund will seek to achieve its investment objectives by investing at least 80% of its managed assets in a diversified portfolio of high income producing securities that the sub-adviser believes offer attractive yield and capital appreciation potential.  High income producing securities in which the Fund will invest consist of below-investment grade debt securities (commonly referred to as "high-yield" or "junk" bonds) and investment grade securities which offer yields comparable to below- investment grade securities.  High-yield bonds are considered speculative with respect to the issuer's capacity to pay interest and repay principal.

Defendants' Response:  Answering Paragraph 105, admit that Plaintiffs purport to quote a portion of the prospectus and SAI for the FHI Fund, and refer the Court to the prospectus and SAI for the full content and context thereof.

106.    The Prospectus also asserted the following related to the FHI Fund internal controls:

(j) The Company maintains, or causes its custodian, PFPC Trust Company, to maintain, ***a system of internal accounting controls sufficient to provide reasonable assurances*** that (i) ***transactions are executed in accordance with management's general or specific authorization and in accordance with the 1940 Act;*** (ii) ***transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain accountability for assets and to maintain compliance with the books and records requirements under the 1940 Act;*** (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with existing assets at reasonable intervals and appropriate action is taken with respect to any differences.[4]

---

[4] All emphasis added [by Plaintiffs] unless otherwise noted.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 106, and refer the Court to the

FHI Fund's public filings with the SEC for the full content and context of any disclosures

regarding the Fund's internal controls.

107.    The Registration Statement's Prospectus disclosed the following related to the
FHI Fund's hedging and risk mitigation practices:

> The Fund may, but is not required to, use various strategic transactions (1) to seek
> *to reduce interest rate risks* arising from any use of financial leverage, (2) to
> facilitate portfolio management, (3) *to mitigate risks*, including interest rate and
> credit risks, and (4) to earn income.  The Fund may purchase and sell derivative
> investments such as exchange-listed and over-the-counter put and call options on
> securities, fixed-income and interest rate indices and other financial instruments,
> purchase and sell financial futures contracts and options thereon, and enter into
> various interest rate transactions such as swaps, caps, floors or collars or credit
> transactions, total rate of return swap transactions and credit derivative
> instruments.  The Fund also may purchase derivative instruments that combine
> features of these instruments.  Collectively, all of the above are referred to as
> "Strategic Transactions."  *The Fund generally seeks to use these instruments
> and transactions as a portfolio management or hedging technique to protect
> against possible adverse changes in the market value of securities held in or to
> be purchased for the Fund's portfolio, protect the value of the Fund's portfolio,
> facilitate the sale of certain securities for investment purposes, manage the
> effective interest rate exposure of the Fund, or establish positions in the
> derivatives markets as a substitute for purchasing or selling particular
> securities.*

<u>Defendants' Response</u>:  Answering Paragraph 107, admit that Plaintiffs purport to quote

a portion of the prospectus for the FHI Fund, and refer the Court to the prospectus for the full

content and context thereof.

108.    The FHI Fund's Registration Statement and amendments did not provide proper
disclosures.  For example, the FHI Registration Statement failed to disclose that the FHI Fund
lacked the adequate controls to manage and monitor the risks related to its exposure to mortgage-
backed, asset-backed and distressed securities and the FHI Fund's liquidity risk.  Defendants also
made untrue statements in the FHI Registration Statement concerning FHI's system of internal
controls and its ability to provide reasonable assurance that it would value these securities in
accordance with GAAP and in compliance with the books and records requirements under the
1940 Act.  Further, Defendants made untrue statements regarding FHI's use of hedging because
Defendants did not "generally seek" to use various instruments and transactions as a portfolio
management or hedging technique to protect against possible adverse changes to "reduce" the
inherent risks associated with its mortgage-related portfolio.

Defendants' Response:  Paragraph 108 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 108.

109.     On March 28, 2006, First Trust Portfolios accomplished the public offering of
shares in the FHY Fund to the public, which raised $188 million for the closed-end fund
managed by the Adviser and Valhalla.  The offering was accomplished pursuant to a Form N-2
Registration Statement and Prospectus and included a SAI.

Defendants' Response:  Deny the allegations in Paragraph 109, except admit that the

FHY Fund completed its public offering on March 28, 2006 and that the offering was made

pursuant to a registration statement, which included a prospectus and SAI.

110.     FHY's Prospectus and SAI disclosed the following Investment objectives:

Investment Strategy.  The Fund will seek to achieve its investment objectives by
investing in a diversified portfolio of below- investment grade and investment
grade debt securities, and equity securities that the sub-adviser believes offer
attractive yield and/ or capital appreciation potential.  The Fund may invest up to
100% of its managed assets in below-investment grade debt securities (commonly
referred to as "high-yield" or "junk" bonds).  High-yield bonds are considered
speculative with respect to the issuer's capacity to pay interest and repay
principal.

Defendants' Response:  Answering Paragraph 110, admit that Plaintiffs purport to quote

a portion of the prospectus and SAI for the FHY Fund, and refer the Court to the prospectus and

SAI for the full content and context thereof.

111.     The Registration Statement's Prospectus also asserted the following related to the
FHY Fund internal controls:

(j) The Company maintains, or causes its custodian, PFPC Trust Company, to
maintain, *a system of internal accounting controls sufficient to provide
reasonable assurances* that (i) *transactions are executed in accordance with
management's general or specific authorization and in accordance with the
1940 Act;* (ii) *transactions are recorded as necessary to permit preparation of
financial statements in conformity with generally accepted accounting
principles and to maintain accountability for assets and to maintain compliance
with the books and records requirements under the 1940 Act*; (iii) access to
assets is permitted only in accordance with management's general or specific
authorization; and (iv) the recorded accountability for assets is compared with

45

existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

Defendants' Response:  Deny the allegations in Paragraph 111, and refer the Court to the

FHY Fund's public filings with the SEC for the full content and context of any disclosures

regarding the Fund's internal controls.

112.     The Registration Statement's Prospectus disclosed the following related to the FHY Fund's hedging and risk mitigation practices:

> The Fund may, but is not required to, use various strategic transactions (1) to seek *to reduce interest rate risks* arising from any use of financial leverage, (2) to facilitate portfolio management, (3) *to mitigate risks*, including interest rate and credit risks, and (4) to earn income.  The Fund may purchase and sell derivative investments such as exchange-listed and over-the-counter put and call options on securities, fixed-income and interest rate indices and other financial instruments, purchase and sell financial futures contracts and options thereon, and enter into various interest rate transactions such as swaps, caps, floors or collars or credit transactions, total rate of return swap transactions and credit derivative instruments.  The Fund also may purchase derivative instruments that combine features of these instruments.  Collectively, all of the above are referred to as "Strategic Transactions."  *The Fund generally seeks to use these instruments and transactions as a portfolio management or hedging technique to protect against possible adverse changes in the market value of securities held in or to be purchased for the Fund's portfolio, protect the value of the Fund's portfolio, facilitate the sale of certain securities for investment purposes, manage the effective interest rate exposure of the Fund, or establish positions in the derivatives markets as a substitute for purchasing or selling particular securities.*

Defendants' Response:  Answering Paragraph 112, admit that Plaintiffs purport to quote

a portion of the prospectus for the FHY Fund, and refer the Court to the prospectus for the full

content and context thereof.

113.     The FHY Fund's Registration Statement and amendments did not provide proper disclosures.  For example, the FHY Registration Statement failed to disclose that the FHY Fund lacked the adequate controls to manage and monitor the risks related to its exposure to mortgage-backed, asset-backed and distressed securities and the FHY Fund's liquidity risk.  Defendants also made untrue statements in the FHY Registration Statement concerning FHY's system of internal controls and its ability to provide reasonable assurance that it would value these securities in accordance with GAAP and in compliance with the books and records requirements under the 1940 Act.  Further, Defendants made untrue statements regarding FHY's use of hedging because Defendants did not "generally seek" to use various instruments and transactions

as a portfolio management or hedging technique to protect against possible adverse changes to "reduce" the inherent risks associated with its mortgage-related portfolio.

Defendants' Response:  Paragraph 113 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 113.

114.    On March 28, 2007, First Trust Portfolios accomplished the offering of the FHO Fund, which raised $155 million for the closed-end fund managed by the Adviser and Valhalla. The offering was accomplished pursuant to a Form N-2 Registration Statement and Prospectus and included a SAI.

Defendants' Response:  Deny the allegations in Paragraph 114, except admit that the

FHO Fund completed its public offering on March 28, 2007 and that the offering was made

pursuant to a registration statement, which included a prospectus and SAI.

115.    FHO's Prospectus and SAI disclosed the following Investment Objectives and Investment Restrictions:

> Investment Strategy.  The Fund will seek to achieve its investment objectives by investing in a diversified portfolio of below-investment grade and investment grade debt securities and equity securities that the Sub-Adviser (as defined below) believes offer attractive yield and/or capital appreciation potential.  The Fund may invest up to 100% of its Managed Assets (as defined below) in below-investment grade debt securities (commonly referred to as "high-yield" or "junk" bonds). High-yield bonds are considered speculative with respect to the issuer's capacity to pay interest and repay principal.

Defendants' Response:  Answering Paragraph 115, admit that Plaintiffs purport to quote

a portion of the prospectus and SAI for the FHO Fund, and refer the Court to the prospectus and

SAI for the full content and context thereof.

116.    The Registration Statement's Prospectus asserted the following related to the FHO Fund internal controls:

> (j) The Company maintains, or causes its custodian, PFPC Trust Company, to maintain, *a system of internal accounting controls sufficient to provide reasonable assurances* that (i) *transactions are executed in accordance with management's general or specific authorization and in accordance with the 1940 Act;* (ii) *transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting*

***principles and to maintain accountability for assets and to maintain compliance with the books and records requirements under the 1940 Act***; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

Defendants' Response:  Deny the allegations in Paragraph 116, and refer the Court to the

FHO Fund's public filings with the SEC for the full content and context of any disclosures

regarding the Fund's internal controls.

117.    The Registration Statement's Prospectus disclosed the following related to the FHO Fund's hedging and risk mitigation practices:

The Fund may, but is not required to, use various strategic transactions (1) to seek ***to reduce interest rate risks*** arising from any use of financial leverage, (2) to facilitate portfolio management, (3) ***to mitigate risks***, including interest rate and credit risks, and (4) to earn income.  The Fund may purchase and sell derivative investments such as exchange-listed and over-the-counter put and call options on securities, fixed-income and interest rate indices and other financial instruments, purchase and sell financial futures contracts and options thereon, and enter into various interest rate transactions such as swaps, caps, floors or collars or credit transactions, total rate of return swap transactions and credit derivative instruments.  The Fund also may purchase derivative instruments that combine features of these instruments.  Collectively, all of the above are referred to as "Strategic Transactions."  ***The Fund generally seeks to use these instruments and transactions as a portfolio management or hedging technique to protect against possible adverse changes in the market value of securities held in or to be purchased for the Fund's portfolio, protect the value of the Fund's portfolio, facilitate the sale of certain securities for investment purposes, manage the effective interest rate exposure of the Fund, or establish positions in the derivatives markets as a substitute for purchasing or selling particular securities.***

Defendants' Response:  Answering Paragraph 117, admit that Plaintiffs purport to quote

a portion of the prospectus for the FHO Fund, and refer the Court to the prospectus for the full

content and context thereof.

118.    The FHO Fund's Registration Statement and amendments did not provide proper disclosures.  For example, the FHO Registration Statement failed to disclose that the FHO Fund lacked the adequate controls to manage and monitor the risks related to its exposure to mortgage-backed, asset-backed and distressed securities and the FHO Fund's liquidity risk.  Defendants also made untrue statements in the FHO Registration Statement concerning FHO's system of

internal controls and its ability to provide reasonable assurance that it would value these securities in accordance with GAAP and in compliance with the books and records requirements under the 1940 Act. Further, Defendants made untrue statements in the FHO Registration Statement regarding FHO's use of hedging because Defendants did not "generally seek" to use various instruments and transactions as a portfolio management or hedging technique to protect against possible adverse changes to "reduce" the inherent risks associated with its mortgage-related portfolio.

Defendants' Response: Paragraph 118 constitutes a legal conclusion to which no

responsive pleading is required. To the extent a response is required, deny the allegations in

Paragraph 118.

119. The facts, among others, which were omitted from the Registration Statements/Prospectuses for each of the Funds were as follows:

(a)     The Defendants did not "generally seek" and did not in fact implement effective hedges to mitigate or reduce the risks related to the Funds' investments in mortgage-related securities;

(b)     The Funds lacked effective internal controls to provide reasonable assurances that the Funds would value these securities in accordance with GAAP;

(c)     The Defendants were motivated to improperly value the Funds' investments in mortgage-related securities and inflate NAVs in order to inflate investment advisory fees; and

(d)     The Funds lacked effective internal controls to monitor and manage the risks inherent in the Funds' investments in mortgage-related securities.

Defendants' Response: Deny the allegations in Paragraph 119 and its subparagraphs.

120. The term "sub-prime" generally refers to "borrowers who do not qualify for prime interest rates because they exhibit one or more of the following characteristics: weakened credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-value ratios."[5]

Defendants' Response: Deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 120, and refer the Court to the quoted Congressional

testimony for the full content and context thereof.

---

[5] *See Subprime Mortgages: Testimony Before the Subcommittee on Financial Institutions and Consumer Credit, Committee on Financial Services*, 110th Cong. (2007) (Statement of Sandra F. Braunstein, Dir., Div. of Consumer and Cmty. Affairs, Fed. Reserve Bd.).

121.    Between 2003 and 2005, the prevalence of sub-prime loans among all mortgage originations more than doubled.  Many industry experts and regulators, including the Federal Deposit Insurance Corporation (the "FDIC"), have attributed the rapid growth in the sub-prime lending market to several factors that occurred in 2004 and 2005, including rising home prices, declining affordability, historically low interest rates, intense lender competition, innovations in the structuring and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors.[6]

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 121, and refer the Court to the cited Congressional testimony for the full content and context thereof.

122.    In order to take advantage of this new market, some lenders began weakening their underwriting standards, including reducing the minimum credit score borrowers need to qualify for certain loans and allowing borrowers to finance a greater percentage of a home's value or to carry a higher debt load (e.g., "no money down").[7]

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 122, and refer the Court to the cited newspaper articles for the full content and context thereof.

123.    In addition to lowering underwriting standards, lenders began offering novel loan products to entice borrowers.  Examples of typical sub-prime mortgages are:  interest-only mortgages, which allow borrowers to pay only interest for a period of time (typically 5–10 years); "pick a payment" loans, for which borrowers choose their monthly payment (full payment, interest only, or a minimum payment which may be lower than the payment required to reduce the balance of the loan); and initial fixed rate mortgages that quickly convert to variable rates.[8] These novel terms combined with the lowered lending standards increased the likelihood that many borrowers would default.

---

[6] *See Mortgage Market Turmoil: Causes and Consequence: Hearing Before the Senate Banking, Housing and Urban Affairs Committee*, 110th Cong. (2007) (Statement of, Sandra L. Thompson, Dir., Div. of Supervision and Consumer Prot.).

[7] *See* Ruth Simon, *Mortgage Lenders Loosen Standards - Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26, 2005, at D1; *see also* Noelle Knox, 43% of *First-time Home Buyers Put No Money Down*, USA Today, Jan. 17, 2006.

[8] *See* Liz Moyer, *Beware the Interest-Only Mortgage*, Forbes, July 6, 2005; *See also* Ruth Simon, *New Type of Mortgage Surges in Popularity*, Wall St. J., April 19, 2006, at D1 and Office of the Comptroller of the Currency Board of Governors of the Federal Reserve System, *Interagency Guidance on Nontraditional Mortgage Product Risks*, September 29, 2006, *available at* http://www.federalreserve.gov/BoardDocs/SRLetters/2006/SR0615a2.pdf.

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 123, and refer the Court to the cited newspaper articles

and the proposed "Interagency Guidance on Nontraditional Mortgage Product Risks" for the full

content and context thereof.

124.    As a result of these various incentives to sub-prime borrowers, sub-prime
mortgage originations grew from $120 billion in 2001 to $625 billion in 2005.[9]

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 124, and refer the Court to the cited newspaper article

for the full content and context thereof.

125.    Meanwhile, in late 2004 and early 2005, industry watchdogs began expressing
growing fears that relaxed lending practices had increased risks for borrowers and lenders in the
overheated housing markets.[10]

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 125, and refer the Court to the cited newspaper article

for the full content and context thereof.

126.    Then housing troubles emerged in 2005 when home values began to decline and
the Federal Reserve instituted a series of interest rate hikes which caused the interest rates on
variable rate loans, including mortgage loans, to rise.

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 126.

127.    In May 2005, bank regulators issued their first-ever guideline for credit-risk
management for home-equity lending and, in December 2005, issued new guidelines for
mortgage lenders.[11] The proposed "Interagency Guidance on Nontraditional Mortgage Product

---

[9] *See* Ruth Simon and James Hagerty, *More Borrowers With Risky Loans Are Falling Behind – Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount*, Wall St. J., Dec. 5, 2006.

[10] *See* Ruth Simon, *Mortgage Lenders Loosen Standards - Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26, 2005.

[11] *Id.*; *see also Mortgage Market Turmoil: Causes and Consequence: Hearing Before the Senate Banking, Housing and Urban Affairs Committee*, 110th Cong. (2007) (Statement of, Sandra L. Thompson, Dir., Div. of Supervision and Consumer Prot.).

Risks" sent a warning to the marketplace that bank regulators were concerned about the lessened underwriting standards and general lax risk management practices of sub-prime lenders.[12]

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 127, and refer the Court to the cited Congressional

testimony and the proposed "Interagency Guidance on Nontraditional Mortgage Product Risks"

for the full content and context thereof.

128.    However, most sub-prime lenders failed to heed these and other warnings. "Despite rising interest rates and general housing market cooling in 2005, many lenders continued to offer borrowers credit under weakened lending standards.  Many lenders kept introductory 'teaser' rates low even after short-term interest rates began rising in June 2005."[13] Sub-prime borrowers, in particular, had difficulty meeting their monthly payment obligations after their introductory "teaser" rate expired.  However, because housing prices were falling, borrowers could not readily sell or refinance the property when they could not pay their increased monthly payments, causing mortgage defaults to increase significantly.

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 128, and refer the Court to the quoted newspaper article

for the full content and context thereof.

129.    In 2006, sub-prime mortgage exposure grew even riskier as lenders originated a large number of "liar loans" (no-documentation and low-documentation loans).  This practice constituted as much as 40% of sub-prime mortgages issued in 2006, up from 25% in 2001.[14] Mortgage industry research reported in April 2006 revealed that 90% of borrowers had overstated their incomes by 5% or more and had inflated their incomes by more than half in 60% of the cases.[15]

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 129, and refer the Court to the cited newspaper article

for the full content and context thereof.

---

[12] *See* Office of the Comptroller of the Currency Board of Governors of the Federal Reserve System, *Interagency Guidance on Nontraditional Mortgage Product Risks*, September 29, 2006, *available at* http://www.federalreserve.gov/BoardDocs/SRLetters/2006/SR0615a2.pdf.

[13] *See* Ruth Simon and James Hagerty, *More Borrowers With Risky Loans Are Falling Behind – Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount*, Wall St. J., Dec. 5, 2006.

[14] Gretchen Morgenson, *Crisis Looms In Market for Mortgages*, N.Y. Times, Mar. 11, 2007.

[15] *Id.*

130.    The sub-prime mortgage crisis began with mortgages that were loaned to subprime borrowers, borrowers with low-rated credit history.  The loans were then packaged into security and debt obligations and sold into commercial paper markets.  Mortgage-backed securities are generally sold as commercial instruments, such as bonds and CDOs.  When the borrowers began to default on their mortgage payments, due to increasing interest rates, investment funds, including the Funds, began to feel the effects in the market on mortgage-backed securities.

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 130.

131.    Since 2005, the erosion of the market for securities linked to sub-prime mortgages has led to a global credit-market contraction.  Holdings of CDOs as well as its high-risk home loans and bonds are among the types of securities that have been suffering the most.  The Funds with their respective large investments in mortgage-backed securities, particularly residential mortgage-backed securities, suffered major hits due to, among other things: (i) the softening in housing demand that began in the summer of 2005 and led to a declining housing prices; (ii) substantial increasing adjustable rate lending to risky borrowers (in 2004, in light of low interest rates, more than 30% of new mortgages carried adjustable rates, up from 10% in 2001. In 2005, about 22% of new mortgages were classified as sub-prime—up from 8% in 2003);[16] and (iii) slippage in loan underwriting standards, including high loan-to-value ratios, no income verification mortgages, and higher debt-to-income ratios.  As interest rates climbed up, the housing market began to stall and delinquencies transitioned into ever-increasing default rates, indicating that a write-down was required.

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 131, and refer the Court to the cited article for the full

content and context thereof.

132.    The SEC's Staff Accounting Bulletin No. 59 ("SAB 59"), *Accounting for Noncurrent Marketable Equity Securities* (Sept. 5, 1985), specifies that declines in the value of investments in marketable securities caused by general market conditions or by specific information pertaining to an industry or an individual company, "require further investigation by management."  In this regard, SAB 59 states, "[a]cting upon the premise that a write-down may be required, management should consider all available evidence to evaluate the realizable value of its investment."  Below are some examples of the evidence that was available to First Trust regarding the CDO and the U.S. sub-prime ABS market.  According to an article in *euromoney.com*, entitled "Have Wall Street Banks Gone Subprime at the Wrong Time?," dated December 1, 2006:

"There is a story about delinquencies within the subprime market and to some extent the Alt A market.  It's a story about how origination quality has slipped

---

[16] *See* http://knowledge.wharton.upenn.edu/article.cfm?articleid=1985

over the past year to 15 months.  It comes back to the three Cs of underwriting: collateral, capacity and character," says Bear's Sinha.

He argues that it should be a surprise to no one that there will be delinquency problems when such a substantial proportion of borrowers are lent money without putting down any of their own and they are people who have not demonstrated an ability to pay bills in the past and who might well have lied about their incomes.

Sinha says: "The fact that they are going up at unprecedented rate is not surprising.  It's all in the loans.  A large part of the story about why 2005 and 2006 production is having such a hard time so early on is less about the overall housing market and more about the credit quality."

Defendants' Response:  Deny the allegations in Paragraph 132, except admit that

Plaintiffs purport to quote the SEC's Staff Accounting Bulletin No. 59 and a euromoney.com

article dated December 1, 2006, and refer the Court to those materials for the full content and

context thereof.

133.    By December 2006, defaults were already adversely impacting sub-prime mortgage indexes, with the expectation that the defaults would continue.  For example, a Reuters article entitled "ANALYSIS-Housing, Car Markets May Spark Credit Crunch," dated December 15, 2006 reported that "[t]he lowest rated 'BBB-' index of subprime mortgages fell to 95.26 this week, while spreads widened to about 400 basis points, increasing the costs for investors to buy protection against default . . . . The index traded at 242 basis points in July." Moreover, according to the same article, "[d]owngrades on subprime mortgage securities are expected to climb to a record 300 by the end of the year, twice as much as last year, and rise even more in 2007, Fitch Ratings said . . . ."  To be sure, there was ample evidence that the downgrades would continue and thus were not temporary.  SAB 59 states that the point at which management deems the decline to no longer be temporary triggers the obligation to write down the investment.

Defendants' Response:  Deny the allegations in Paragraph 133, except admit that

Plaintiffs purport to quote a Reuters article dated December 15, 2006, and refer the Court to that

article for the full content and context thereof.

134.    The following chart shows the ABX.HE.BBB- 6-2, a synthetic index based on credit default swaps (CDS).  The ABX index is a synthetic asset-backed credit derivative index that allows investors to gain broad exposure to the subprime market without holding the actual asset-backed securities.  The index is a series of credit default swaps based on 20 bonds that consist of subprime mortgages.  A decline in the price signifies investor sentiment that subprime mortgage holders will suffer increased financial losses.  The decline in price is also associated with an increase in the implied spread.  A decline in price represents a quantifiable, market-based

54

measure of the cost to insure against default on the underlying ABS based on investors' perception of the increased likelihood of loss. The decline began as early as December 2006, partly in response to the closing that month of Ownit Mortgage Solutions, a leading Californian sub-prime lender, which cited "the current unfavorable conditions of the mortgage industry" for its closure. By March 2007, other prominent lenders such as Fremont General Corporation and New Century Financial Corporation had also exited the subprime mortgage market; the latter company subsequently filed for Chapter 11 protection, as did Accredited Home Lenders Holding and Mortgage Lenders Network USA Inc. By March 2007, approximately 25 subprime lenders had declared bankruptcy, announced significant losses, or put themselves up for sale.



Data Source: Markit Group Limited

Defendants' Response: Deny the allegations in Paragraph 134 regarding the ABX index.

Deny knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 134.

135. A *New York Times* story entitled "Denial Over Risks Of Mortgage-Backed Securities," dated February 19, 2007, discusses:

> [T]he wreckage in the subprime market - lenders going bankrupt, stocks of issuers falling, default rates on new loans well above historical averages. Last year, Moody's Investors Service, for example, downgraded only 277 subprime home equity loan tranches, just 2 percent of the home equity securities rated by the agency. So far this year, the firm has issued 30 downgrades, mostly on mortgages issued from 2001 to 2004. Among the 2005 and 2006 issues, many of which are defaulting at high velocity, Moody's has put 62 tranches on review for possible downgrade. That is less than 1 percent of the total subprime deals rated in those years.

"Seeing weaknesses in collateral or subprime loans, we have increased our loss expectations by 25 to 30 percent," said Debashish Chatterjee, a senior analyst in the residential mortgage-backed securities area at Moody's. "We see the ratings outstanding on deals securitization in 2005 and 2006 and have taken steps to provide credit enhancement on them."

\*     \*     \*

***It is becoming clear, however, that subprime mortgages are not the only part of this market experiencing strain***.  Even paper that is in the midrange of credit quality - one step up from the bottom of the barrel - is encountering problems. That sector of the market is known as Alt-A, for alternative A-rated paper, and it is where a huge amount of growth and innovation in the mortgage world has occurred.

The Alt-A segment of the market used to consist of mortgages issued to professionals - like doctors - with unpredictable incomes.  Now Alt-A is dominated by so-called affordability mortgages - adjustable-rate interest-only loans, 40-year loans and silent- second loans.  You, dear risk-taking homeowner, know all about these loans that allowed people to buy a house that might have been beyond their means but looked attractive because they did not need to make payments on the principal in the early years.

In 2006, according to UBS, interest-only loans, 40-year mortgages and option-adjustable-rate mortgages comprised more than 75 percent of Alt-A issuance. These loans often have little documentation of a borrower's income and rack up higher mortgage debt against the value of the underlying collateral (i.e., the house).  UBS said that 76 percent of adjustable-rate interest-only loans written in 2006 had low documentation, while 57 percent had loan-to-value ratios greater than 80 percent.  No surprise, then, that 3.16 percent of these loans are already delinquent by two months or more.

Worried?

Last week, Standard & Poor's put 18 classes of securities from 11 residential mortgage pools on watch for a downgrade.  Alt-A loans were among those on the watch list, but S&P said its move to credit watch status on these mortgages would have no impact on outstanding CDO ratings.

<u>Defendants' Response</u>:  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 135, and refer the Court to the quoted newspaper article for the full content and context thereof.

136.     Wachovia, in its Economics Group publication, dated March 13, 2007, reported:

**Delinquencies Rise to High Since 2003**

Supporting the financial market worries about subprime market credit quality, mortgage delinquencies for the fourth quarter showed that loan delinquency rates on subprime debt hit their highest level since September 2002.  Total delinquencies on 1-4 unit mortgage debt rose 4.95 percent in the fourth quarter, from 4.67 percent in the third quarter, a level last recorded more than three years ago.

*          *          *

**Subprime Trouble**

Subprime adjustable rate mortgage delinquency was 14.44 percent of loans in the fourth quarter.  Meanwhile, subprime fixed mortgage delinquencies rose to 10.09 percent from 9.59 percent in the third quarter.

*          *          *

**Subprime Not Alone**

While subprime adjustable rate mortgages are certainly showing the greatest weakness, no matter which segment you pick, delinquencies are on the rise.  Even the most stable sector showed weakness in the fourth quarter.

*          *          *

**Will It Get Worse?**

Unfortunately, it appears delinquency rates will likely worsen before they improve.  Adjustable rate mortgages make up a greater share of mortgage outstanding than was the case several years ago, when delinquencies hit a peak.  Most adjustable rate mortgage market analysis indicates that the amount of loans set to reset in 2007 exceeds that of 2006.  The delinquency data released today only reflects the state of mortgage markets as of the end of 2006.  No wonder the equity market is unhappy.

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 136, and refer the Court to the quoted publication by

Wachovia's Economics Group for the full content and context thereof.

137.    According to a Reuters story entitled, "FUND VIEW-CDO Market To See 'Massive Default Cycle'-F&C," dated March 30, 2007, "'[a] massive wave of defaults is set to hit the CDO (collateralized debt obligation) market following the sub-prime mortgage meltdown in the U.S., although this could take a year to play out,' a fund manager told Reuters."

<u>Defendants' Response</u>:  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 137, and refer the Court to the quoted news report for the full content and context thereof.

138.    By early 2007, some of the top U.S. mortgage lenders with substantial sub-prime mortgage exposure including New Century Financial, Countrywide Financial and Washington Mutual, reported significant problems with default and large losses.  In fact, in March 2007, New Century Financial had exited the sub-prime residential real estate business, and soon after in April announced it was filing for Chapter 11 bankruptcy protection.

<u>Defendants' Response</u>:  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 138.

139.    As purported experts in the field under an obligation to carefully monitor the mortgage markets, Defendants had sufficient evidence that the Funds' ABS and CDO assets related to the U.S. residential sub-prime market were experiencing deteriorating financial conditions as early as December 2006 and that the decline was no longer temporary. Nevertheless, the Funds' portfolios did not properly account for the deterioration mortgage related securities resulting in an overstatement of each of the Fund's NAV.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 139.

140.    In June 2007, two Bear Stearns-managed funds suffered significant losses before eventually going belly up in July 2007.  The Bear Stearns-managed funds suffered losses related to securities linked to sub-prime loans, which were impaired from rising delinquencies and defaults.

<u>Defendants' Response</u>:  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 140.

141.    On July 17, 2007, *Reuters* reported, in an article entitled "Subprime weakness erodes higher-rated ABX indexes," the following:

A slew of downgrades and reviews of more than $12 billion in subprime mortgage securities originated in late 2005 through 2006 by Wall Street credit rating agencies triggered a downward spiral in the ABX to record lows last week.

\*       \*       \*

"These latest actions are only the beginning for the 2006 vintage.  We expect downgrades will expand to include over 80 percent of 2006 deals, and tranches will again experience multi-notch downgrades in the next series of ratings actions," said Christopher Flanagan, analyst at JP Morgan Securities.

<u>Defendants' Response</u>:  Deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 141, and refer the Court to the quoted news report for the

full content and context thereof.

142.    Indeed, the deterioration in the sub-prime markets was not expected to recover in
the near future, as reflected in a July 20, 2007 Bloomberg article quoting Chris Flanagan, head of
structured finance strategy at JPMorgan, "The worse is not over in the subprime mortgage
market . . . . We expect continued deterioration in subprime loan performance through the
balance of this year, and it is likely to be well into 2008 before the problems in securitized
portfolios begin to abate."

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 142, except admit that

Plaintiffs purport to quote a Bloomberg article dated July 20, 2007, and refer the Court to the

quoted article for the full content and context thereof.

143.    During the Class Periods, it was clear or should have been in the exercise of
reasonable, non-reckless care, to those directly monitoring and investing in the U.S. mortgage
markets that the following events had occurred: (a) mortgage interest rates were increasing;
(b) home prices had stagnated and began to fall; (c) sub-prime mortgage loans delinquency rates
dramatically rose; (d) early payment defaults on non-prime mortgage loans delinquency rates
significantly increased; and (e) sub-prime and Alt-A mortgage loan originators were closing or
decreasing their business in that area.  These factors all indicated to the Defendants that problems
with sub-prime lenders would greatly impact and create enormous losses for the Funds'
mortgage-backed securities.

<u>Defendants' Response</u>:  Paragraph 143 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 143.

144.    Despite this evidence, which was or should have been known to Defendants
absent reckless disregard of these facts or intentional blindness to them, of a sub-prime mortgage
market meltdown, Defendants failed to properly monitor and manage the risks the Funds faced
from the tremendously risky sub-prime mortgage portfolio.  The Funds maintained substantial
exposure to these toxic assets, including in the case of FHI Fund and FHY Fund the use of
leverage to buy these deteriorating investments on margin, during the Class Periods as the
following charts demonstrate.

| FHI, as % of Investments | 10/31/2005 | 4/30/2006 | 10/31/2006 | 4/30/2007 | 10/31/2007 | 4/30/2008 | 10/31/2008 |
|---|---|---|---|---|---|---|---|
| RMBS | 18.20% | 26.90% | 24.10% | 25.10% | 18.30% | 10.80% | 9.30% |
| CDO | 9.50% | 15.10% | 9.80% | 13.30% | 18.40% | 21.90% | 25.10% |
| Total | 27.70% | 42.00% | 33.90% | 38.40% | 36.70% | 32.70% | 34.40% |

| FHY, as % of Investments | 04/30/2006 | 10/31/2006 | 04/30/2007 | 10/31/2007 | 04/30/2008 | 10/31/2008 |
|---|---|---|---|---|---|---|
| RMBS | 21.60% | 25.00% | 24.80% | 19.80% | 10.60% | 12.00% |
| CDO | 9.00% | 8.50% | 11.20% | 20.00% | 22.50% | 25.50% |
| Total | 30.60% | 33.50% | 36.00% | 39.80% | 33.10% | 37.50% |

| FHO, as % of Investments | 04/03/2007 | 01/31/2008 | 07/31/2008 |
|---|---|---|---|
| RMBS | 17.40% | 27.70% | 23.90% |
| CDO | 7.50% | 38.70% | 44.50% |
| Total | 24.90% | 66.40% | 68.40% |

Defendants' Response: Deny the allegations in Paragraph 144, except admit that, during the Class Period, the Funds invested in securities with exposure to subprime mortgages and that the FHI and FHY Funds employed leverage as part of their investment strategies, and refer the Court to the Funds' public filings with the SEC for the full content and context of any disclosures regarding the percentage of each Funds' assets that was invested in CDOs and MBS.

145.    During the Class Periods, Defendants directed the Funds to acquire a large inventory of securities backed by mortgages made to sub-prime borrowers on leverage – compounding the risk.  Finally, despite the adverse affects of the sub-prime mortgage meltdown, Defendants failed to record losses incurred related to the Funds' mortgage-backed securities. Accordingly, during the Class Periods, Defendants overstated the Funds' investments in mortgage-related securities and thus also overstated each of the Fund's NAV.  As the price of the Funds' shares is tied to their respective overstated NAV, the value of the Funds' shares, too, were artificially inflated during the Class Periods.

Defendants' Response: Deny the allegations in Paragraph 145, except admit that, during the Class Period, the Funds invested in securities with exposure to subprime mortgages.

146.    Defendants compounded the risks to the Funds of its investment strategy by utilizing leverage to buy the riskiest of the structured finance securities on margin in a falling market, thereby incurring even larger losses.  In January 2007 when mortgage-related investments were deteriorating in value, calling for a defensive strategy, Defendants unanimously recommended to shareholders that the FHI Fund and FHY Fund increase their exposure to RMBS.  In order to implement such a strategy, the FHI Fund and FHY Fund began to use leverage at the beginning of 2007 and accelerated the purchase of mezzanine and equity tranches of mortgage-related securities, the ones most likely to suffer as delinquency and foreclosure mounted on the underlying collateral.  By the summer of 2008, realized losses mounted as the FHI Fund and FHY Fund were forced to liquidate assets at depressed prices in order to repay their revolving credit facilities which expired in August and November of that year.  As a result, from October 2007 to October 2008 the annual increase in accumulated realized losses was 1,519% for FHI Fund and 2,601% for FHY Fund.

Defendants' Response:  Deny the allegations in Paragraph 146, except admit that, during

the Class Period, the FHI and FHY Funds employed leverage as part of their investment

strategies.

147.     In December 2006, as the mortgage-related securities began to show the first
traces of deterioration, Defendants increased the leverage in the FHI Fund and FHY Fund.  The
following table shows the leverage as a dollar amount and as a percentage of NAV.

| in millions | 1/31/2007 | 4/30/2007 | 7/31/2007 | 10/31/2007 | 1/31/2008 | 4/30/2008 | 7/31/2008 | 10/31/2008 |
|---|---|---|---|---|---|---|---|---|
| FHI | | | | | | | | |
| Leverage | 50.00 | 65.00 | 72.00 | 61.20 | 50.00 | 44.00 | 34.00 | 15.00 |
| As % of NAV | 28.17% | 37.56% | 45.18% | 44.95% | 44.93% | 45.67% | 41.58% | 25.26% |
| FHY | | | | | | | | |
| Leverage | 77.00 | 77.00 | 77.00 | 67.00 | 58.00 | 54.00 | 12.00 | - |
| As % of NAV | 39.99% | 40.38% | 43.83% | 43.47% | 43.88% | 45.89% | 11.52% | 0.00% |

Defendants' Response:  Deny the allegations in Paragraph 147, except admit that, during

the Class Period, the FHI and FHY Funds employed leverage as part of their investment

strategies, and refer the Court to the Funds' public filings with the SEC for the full content and

context of any disclosures regarding the extent of leverage employed by each Fund.

148.     The combination of the negative macroeconomic developments in the real estate
market with the subordinated position of the Funds' investments in the mezzanine and equity
tranches of mortgage-related securities, the tranches most likely to suffer impairment due to the
rise in delinquency, default, and foreclosure, called for a reduction in risk by limiting the
purchase of the most toxic securities and/or utilizing hedging techniques to limit the losses or
potentially even gain from the decline in asset prices.  Defendants misrepresented that they were
pursuing this prudent defensive strategy, and to conceal the true extent of the Funds'
deteriorating NAV, Defendants instead opted to increase risk by accelerating the purchase of
toxic securities on margin.

Defendants' Response:  Deny the allegations in Paragraph 148, and refer the Court to the

Funds' public filings with the SEC for the full content and context of any disclosures regarding

the Funds' investment strategies and risks.

149.     As the true value of the Funds' mortgage-related securities collapsed, the FHI
Fund's and FHY Fund's use of leverage magnified the losses.  Defendants continued the
purchase of mortgage-related securities on margin in hopes of generating sufficient current
income and price appreciation to pay back the loans, but the continued price deterioration and
impending expiration of the Funds' credit facilities forced Defendants to sell the mortgage-
related securities and incur massive realized losses.  In effect, having failed, as Defendants

represented they would, to engage in defensive strategies to militate the effects of market risks to the Funds, Defendants had placed the Funds in serious financial jeopardy due to its exposure to low quality mortgage-backed securities.  Thus, in a last ditch attempt to save the FHI Fund and the FHY Fund, Defendants began using significant amounts of borrowed funds, which only increased the risk for those Funds and, consequently, their losses.

Defendants' Response:  Deny the allegations in Paragraph 149.

150.   Furthermore, Defendants represented that the Funds "generally seek" to use derivative instruments and transactions as a portfolio management or hedging technique to protect against possible adverse changes in the market value of securities held in the Fund's portfolio, but during the Class Periods, Defendants failed to implement these hedging strategies as evidenced by the material losses incurred by the Funds.  Indeed, having overstated the Funds' NAVs, and faced with devastating losses and liquidity problems, Defendants chose to "bet the ranch" by turning to leverage and representing to the Funds' investors that leverage presented opportunities for profits when, in fact, leverage merely delayed (and ultimately increased) the losses the Funds would incur.

Defendants' Response:  Deny the allegations in Paragraph 150, and refer the Court to the Funds' public filings with the SEC for the full content and context of any disclosures regarding the Funds' investment strategies and risks.

151.   During the Class Periods, Defendants issued and offered for sale shares of the FHY Fund and the FHO Fund.  The Registration Statements, including Prospectuses to register and offer shares of the Funds to Plaintiffs and the Class, SAIs and Annual and Semi-Annual and Quarterly Reports for the Funds issued throughout the Class Periods contained untrue statements of material facts and omitted material information necessary to make the statements therein not misleading.  Even though the Funds' public filings issued during the Class Periods were not identical, they contain many of the same untrue statements set forth below and were rendered misleading by the same omissions.

Defendants' Response:  Paragraph 151 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 151, except admit that the FHY and FHO Funds completed their public offerings during the Class Period.

152.   During the Class Periods, the Funds' public filings contained inflated values for the Funds' holdings of mortgage-backed assets and the Funds' NAV.  Further, the filings failed to disclose that they lacked adequate controls to manage and monitor the inherent risks in the portfolio.  Moreover, as a result of the inflated values, the advisory fees were overstated.  In addition, in 2008, by overstating the Funds' NAV, Defendants concealed from investors,

including Plaintiffs, the adverse impact on distribution to the Funds' shareholders that occurring as a result of losses on the underlying mortgage collateral.

Defendants' Response:  Deny the allegations in Paragraph 152.

153.    The statements in Registration Statements for the FHY Fund and FHO Fund, and the amendments thereafter, were inaccurate statements of material fact when made because of the following facts that existed at the time the Registration Statements became effective: (i) the Funds would heavily invested in risky mortgage-backed assets which required controls to effectively manage and monitor the risks; and (ii) based upon facts existing at that time concerning problems with the real estate and mortgage industries, the Funds would materially overstate the value of their portfolio and NAV by failing to properly value their investments in mortgage-related securities.  Additionally, statements in the Funds' annual, semi-annual, and quarterly reports were inaccurate statements of material fact because of the fact that: (i) many of the holdings of the Funds had declined in value and were continuing to at a very significant rate; and (ii) the Funds had materially overstated the value of their portfolios and NAV by failing to properly value their investments in mortgage-related securities.

Defendants' Response:  Paragraph 153 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 153.

154.    The Funds' Registration Statements stated that the Funds maintained a system of internal controls to ensure transactions are executed in accordance with management's authorization and in accordance with the 1940 Act and GAAP.  The FHY Fund and FHO Fund Registration Statements stated in pertinent part:

> ***a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorization and in accordance with the 1940 Act; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles*** and to maintain accountability for assets and to maintain compliance with the books and records requirements under the 1940 Act; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

Defendants' Response:  Deny the allegations in Paragraph 154, and refer the Court to the

Funds' public filings with the SEC for the full content and context of any disclosures regarding

the Funds' internal controls.

155.    The statements regarding the FHY Fund's and FHO Fund's internal controls were inaccurate statements of material fact because the Funds lacked effective internal controls to provide reasonable assurances that the Funds would value these securities in accordance with GAAP.  Additionally, the Funds lacked effective internal controls to monitor and manage the risks inherent in the Funds' investments in mortgage-related securities.

Defendants' Response:  Paragraph 155 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 155.

156.    The Funds' Registration Statements stated that the Funds "generally seek" to use hedging techniques to protect against possible adverse changes.  The FHI, FHY and FHO Registration Statements stated in pertinent part:

> The Fund generally seeks to use [derivative] instruments and transactions as a portfolio management or hedging technique to protect against possible adverse changes in the market value of securities held in or to be purchased for the Fund's portfolio, protect the value of the Fund's portfolio, facilitate the sale of certain securities for investment purposes, manage the effective interest rate exposure of the Fund, or establish positions in the derivatives markets as a substitute for purchasing or selling particular securities.

The statement regarding the Fund's use of hedging techniques was an inaccurate statement of material fact because Defendants did not "generally seek" and did not in fact implement effective hedges to mitigate the risks related to the Funds' mortgage-backed securities.

Defendants' Response:  Paragraph 156 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 156, except admit that Plaintiffs purport to quote a portion of the Funds' prospectuses,

and refer the Court to the Funds' prospectuses and SAIs for the full content and context of any

disclosures regarding the Funds' use of hedging techniques.

157.    The statements in the Funds' Registration Statements, and the amendments thereafter (to FHI and FHO Funds), were inaccurate statements of material fact when made because of the following facts that existed at the time the Registration Statements became effective: (i) The Funds lacked effective internal controls to provide reasonable assurances that the Funds would value these securities in accordance with generally accepted accounting principles ("GAAP"); (ii) Defendants did not "generally seek" and did not in fact implement effective hedges to mitigate the risks related to the Funds' mortgage-backed securities; and (iii) The Funds lacked effective internal controls to monitor and manage the risks inherent in the Funds' investments in mortgage-related securities

<u>Defendants' Response</u>:  Paragraph 157 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 157.

158.    On July 26, 2005, the FHI Fund commenced trading on the New York Stock Exchange ("NYSE").  The initial offering price was $20.00 per share and the NAV at inception was $19.10 per share.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 158, except admit that the initial offering price for shares in the FHI Fund was $20.00 per share and that the Fund's per-share NAV at inception was $19.10.

159.    On September 29, 2005, FHI Fund filed its first Form N-Q Quarterly Report period ended July 31, 2005, which stated FHI Fund commenced trading on July 27, 2005 and "had no portfolio holdings as of July 31, 2005."

<u>Defendants' Response</u>:  Admit the allegations in Paragraph 159.

160.    On January 6, 2006, the FHI Fund filed its Form N-CSR for year ended October 31, 2005.  In the Annual Report, the FHI Fund reported a NAV of $168.4 million or $19.13 per share and a net realized and unrealized loss on investments of $1.5 million for the year.  The NCSR also contained certifications required pursuant to SOX and were signed by defendants Bowen and Bradley.  The certifications[17] stated as follows:

1.      I have reviewed this report on Form N-Q of [the Fund];

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the schedules of investments included in this report fairly present in all material respects the investments of the registrant as of the end of the fiscal quarter for which the report is filed;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Rule 30a-3(c) under the Investment Company Act of 1940) for the registrant and have:

---

[17] All the SOX certification referenced herein contained almost identical language.

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      [Omitted]

(c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of a date within 90 days prior to the filing date of this report, based on such evaluation; and

(d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

(b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Defendants' Response:  Answering Paragraph 160, admit that the FHI Fund's annual shareholder report for the year ended October 31, 2005 reported an NAV of approximately $168.4 million (or $19.13 per share) and a net realized and unrealized loss on investments of approximately $1.5 million for the reporting period; admit that Plaintiffs purport to quote a portion of the certification pursuant to the Sarbanes-Oxley Act (the "SOX Certification") that was attached to the annual shareholder report; and refer the Court to the annual report for the full content and context thereof.

161.    The N-CSR also contained statements concerning FHI Fund's use of market value or fair value according to procedures adopted by FHI Fund's Board of Trustees in valuing its investments, and adherence to GAAP, and management's conclusion on the effectiveness of FHI Fund's disclosure controls and procedures.

Defendants' Response:  Deny the allegations in Paragraph 161, and refer the Court to the

FHI Fund's annual shareholder report for the year ended October 31, 2005 for the full content

and context of any disclosures regarding the policies and procedures used to value or price the

Fund's portfolio holdings.

162.    The letter to shareholders contained in the January 6, 2006 Annual Report provided in part:

> As you know, the Fund's primary investment objective is to seek a high level of current income and, as a secondary objective, the Fund seeks capital growth. The Fund currently pursues this strategy by investing at least 80% of its Managed Assets in a diversified portfolio of high income producing securities that Hilliard Lyons Asset Management ("HLAM") believes offer attractive yield and capital appreciation potential. The Fund's primary focus is on structured finance securities with limited exposure to corporate bonds and convertible securities. Investing in these securities provides greater diversification than corporate bonds alone by spreading risk across a broader range of asset classes, which include both corporate and consumer debt.
>
> HLAM's portfolio management team has been able to attain such a high yield without employing leverage because of their strategy of investing in multiple areas of the high-yield market, including structured finance securities. Currently, structured finance securities offer superior yield to corporate bonds.

Defendants' Response:  Answering Paragraph 162, admit that Plaintiffs purport to quote

a portion of the FHI Fund's annual shareholder report for the year ended October 31, 2005, and

refer the Court to the annual report for the full content and context thereof.

163.    The FHI Fund's January 6, 2006 Annual Report further provided in pertinent part the following concerning the fund's performance and outlook for the period:

PERFORMANCE REVIEW

> Performance to date has been solid with regard to NAV.  From inception through October 31, 2005, the Fund posted a +1.03% NAV total return.  Over the comparable period, the Lehman Brothers Ba U.S. High Yield Index posted a -1.18% total return.  Stable-to-improving collateral performance in many of its

structured finance positions helped drive the Fund's positive NAV move. Overall, the Fund's collateralized debt obligation ("CDO") positions, as well as its aircraft lease backed bonds, produced positive price performance. The Fund's corporate high-yield positions, in contrast, moved down in tandem with the overall market, despite a solid credit profile.

FHI's market-price performance did not keep pace with the NAV, as the Fund returned -5.28% for the period since inception. Steadily rising rates from late August through the end of October took a heavy toll on much of the closed-end fund universe, particularly those with a focus on below-investment grade debt. Investors, already anxious about the negative effects of leverage, seemed to paint most of the "high-yield" universe with the same brush and sell. We believe this contributed to FHI's decrease in market price from its initial $20.00 offering price to $18.79 at fiscal year-end. Over time, the absence of leverage, combined with a competitive yield, may help to differentiate the Fund from its competitors and bolster its market price performance.

*          *          *

***To insulate against these risks, the Fund remains broadly diversified in "seasoned" paper and maintains a significant allocation to floating-rate bonds. We believe, this selective exposure to both consumer and corporate balance sheets should help the Fund withstand a moderate downturn in credit trends, while its floating rate allocation serves as a hedge against sharply rising rates.***

<u>Defendants' Response</u>:  Answering Paragraph 163, admit that Plaintiffs purport to quote a portion of the FHI Fund's annual shareholder report for the year ended October 31, 2005, and refer the Court to the annual report for the full content and context thereof.

164.    On March 28, 2006, the FHY Fund commenced trading on the NYSE. The initial offering price was $20.00 per share and the NAV at inception was $19.10 per share.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 164, except admit that the initial offering price for shares in the FHY Fund was $20.00 per share and that the Fund's per-share NAV at inception was $19.10.

165.    On March 29, 2006, FHI filed its Form N-Q reflecting its NAV at $167,328,025. The N-Q also contained certifications required pursuant to SOX signed by defendants Bowen and Bradley. The N-Q also contained statements concerning FHY Fund's use of market value or fair value according to procedures adopted by FHY Fund's Board of Trustees in valuing its investments, and adherence to GAAP, and management's representations regarding the effectiveness of FHY Fund's disclosure controls and procedures.

68

Defendants' Response:  Deny the allegations in Paragraph 165, except admit that the FHI

Fund's quarterly disclosure of portfolio holdings filed on March 29, 2006 contained SOX

Certifications by Defendants Bowen and Bradley and reported a NAV of $167,328,025, and refer

the Court to the quarterly report for the full content and context of any disclosures regarding the

policies and procedures used to value or price the Fund's portfolio holdings.

166.    On July 7, 2006, the FHI Fund filed its Form N-CSRS for the six-month period
ended April 30, 2006.  In this Semi-Annual Report, the FHI Fund reported a NAV of
$169.1 million or $19.13 per share and a net realized and unrealized gain on investments of
$1.0 million for the period.  The N-CSRS also contained certifications required pursuant to SOX
that were signed by defendants Bowen and Bradley.  The N-CSRS also contained statements
concerning FHI Fund's use of market value or fair value according to procedures adopted by FHI
Fund's Board of Trustees in valuing its investments, and adherence to GAAP, and management's
conclusion on the effectiveness of FHI Fund's disclosure controls and procedures.

Defendants' Response:  Deny the allegations in Paragraph 166, except admit that the FHI

Fund's semi-annual shareholder report for the period ended April 30, 2006 reported a NAV of

approximately $169.1 million (or $19.13 per share) and a net realized and unrealized gain on

investments of approximately $1.0 million for the reporting period, and contained SOX

Certifications by Defendants Bowen and Bradley; and refer the Court to the semi-annual report

for the full content and context of any disclosures regarding the policies and procedures used to

value or price the Fund's portfolios holdings.

167.    The letter to shareholders contained in FHI Fund's July 7, 2006 Semi-Annual
Report provided in part:

During the six-month reporting period, the Fund produced positive performance
results based in both market price and net asset value ("NAV").  We are delighted
that the Fund's market price traded above the NAV in January and the Fund's
market price remains at a premium to its NAV.

*        *        *

As you know, the Fund's primary investment objective is to seek a high level of
current income.  As a secondary objective, the Fund seeks capital growth.  The
Fund currently pursues this high income strategy by investing at least 80% of its
managed assets in a diversified portfolio of high income producing securities that

Valhalla believes offer attractive yield and capital appreciation potential. The Fund's primary focus is on structured finance securities with limited exposure to corporate bonds and convertible securities. Investing in these securities provides greater diversification than corporate bonds alone by spreading risk across a broader range of asset classes, which include both corporate and consumer debt.

The emphasis on structured finance securities within the portfolio has helped to stabilize the NAV. Structured finance securities exhibited less volatility, in general, than the corporate holdings over this reporting period.

<u>Defendants' Response</u>: Answering Paragraph 167, admit that Plaintiffs purport to quote a portion of the FHI Fund's semi-annual shareholder report for the period ended April 30, 2006, and refer the Court to the semi-annual report for the full content and context thereof.

168.    The FHI Fund's July 7, 2007 Semi-Annual Report further provided in pertinent part the following concerning the fund's performance and outlook for the period:

PERFORMANCE REVIEW

The First Trust Strategic High Income Fund ("FHI" or the "Fund") benefited from these trends, which helped it post a solid six month performance. The total return performance based on net asset value ("NAV") was 6.43% for the six months ended April 30, 2006. The Fund's Benchmark, the Lehman Brothers Ba U.S. High Yield Index, produced a 2.90% total return over the same period. The Fund's outperformance was attributable to both its net, annualized yield advantage over the Index of roughly 3.30% and relative stability. This stability came from a mixed, but balanced price performance across some of the Fund's larger sectors. For example, aircraft leased-backed bonds and commercial mortgage-backed securities generally experienced positive movements over the six month period, while corporate bonds and residential mortgage-backed securities were flat to slightly negative. This was evidenced by the NAV which started the period at $19.13 and ended it at $19.13. In contrast, the Index declined 0.79% in value over the same time period. Most of the NAV stability came from [the] Fund's emphasis on structured finance securities, which exhibited less volatility, in general, than its corporate holdings.

The market price performance was also positive. Negative trends in the closed-end fund space reversed from the fourth quarter of 2005, helping the Fund produce an even stronger total return of 9.77% for the six months ended April 30, 2006. This was driven by a greater than 3.00% increase in the stock price. Near the end of January, the market price traded above the NAV, and the Fund remained at a premium for the rest of the calendar quarter. As of April 30, 2006, the yield stood at 9.91%, versus 10.38% at calendar year-end.

OUTLOOK

Favorable economic trends may keep yields depressed and prices high, making diversification critical to future performance.  The strong bid for riskier assets will remain intact only if investors maintain their confidence in the economy.  If the market's chief concern shifts from rising interest rates to deteriorating credit metrics, lower-rated assets will likely come under pressure.  With the preponderance of its portfolio in seasoned structured finance securities, the Fund is well-positioned for such an environment.

Defendants' Response:  Deny the allegations in Paragraph 168.

169.    On July 7, 2006, the FHY Fund filed its Form N-CSRS for the six-month period ended April 30, 2006.  In the Semi-Annual Report, the FHY Fund reported a NAV of $179.9 million or $19.13 per share and a net realized and unrealized loss on investments of $176,556 for the period.  The N-CSRS also contained certifications required pursuant to SOX that were signed by defendants Bowen and Bradley.  The N-CSRS also contained statements concerning the Fund's use of market value or fair value according to procedures adopted by FHY Fund's Board of Trustees in valuing its investments, and adherence to GAAP, and management's representations regarding the effectiveness of FHY Fund's disclosure controls and procedures.

Defendants' Response:  Deny the allegations in Paragraph 169, except admit that the

FHY Fund's semi-annual shareholder report for the period ended April 30, 2006 reported a NAV

of approximately $179.9 million (or $19.13 per share) and a net unrealized loss on investments

of $176,566 for the reporting period, and contained SOX Certifications by Defendants Bowen

and Bradley; and refer the Court to the semi-annual report for the full content and context of any

disclosures regarding the policies and procedures used to value or price the Fund's portfolios

holdings.

170.    On September 28, 2006, FHI Fund filed its Form N-Q for the period ended July 31, 2006 representing its net assets at $172,147,094.

Defendants' Response:  Admit the allegations in Paragraph 170.

171.    On September 28, 2006, FHY Fund also filed its Form N-Q for the period ended July 31, 2006 representing its net assets at $183,444,534.

Defendants' Response:  Admit the allegations in Paragraph 171.

172.    The foregoing N-Qs also contained certifications required pursuant to SOX and were signed by defendants Bowen and Bradley.  The N-Qs also contained statements concerning

the Funds' use of market value or fair value according to procedures adopted by the Funds' Board of Trustees in valuing its investments, and adherence to GAAP, and management's representations regarding the effectiveness of the Funds' disclosure controls and procedures.

Defendants' Response:  Deny the allegations in Paragraph 172, except admit that the FHI

and FHY Funds' quarterly disclosures of portfolio holdings for the period ended July 31, 2006

contained SOX Certifications by Defendants Bowen and Bradley, and refer the Court to the

quarterly reports for the full content and context of any disclosures regarding the policies and

procedures used to value or price the Funds' portfolio holdings.

173.    On January 5, 2007, the FHI Fund filed its Form N-CSR for year ended October 31, 2006.  In the Annual Report, the FHI Fund reported a NAV of $176.4 million or $19.82 per share and a net realized and unrealized gain on investments of $6.7 million for the year.  The NCSR also contained certifications required pursuant to SOX that were signed by defendants Bowen and Bradley.  The N-CSR also contained statements concerning FHI Fund's use of market value or fair value according to procedures adopted by FHI Fund's Board of Trustees in valuing its investments, and adherence to GAAP, and management's representations regarding the effectiveness of FHI Fund's disclosure controls and procedures.

Defendants' Response:  Deny the allegations in Paragraph 173, except admit that the FHI

Fund's annual shareholder report for the period ended October 31, 2006 reported a NAV of

approximately $176.4 million (or $19.82 per share) and a net realized and unrealized gain on

investments of approximately $6.7 million for the reporting period, and contained SOX

Certifications by Defendants Bowen and Bradley; and refer the Court to the annual report for the

full content and context of any disclosures regarding the policies and procedures used to value or

price the Fund's portfolios holdings.

174.    The January 5, 2007 FHI Fund's Annual Report further provided in pertinent part the following concerning the FHI Fund's performance and outlook for the period:

PERFORMANCE OVERVIEW

First Trust Strategic High Income Fund completed its first full fiscal year in excellent fashion as demonstrated by its absolute and relative performance, both of which have been solid based on NAV and market price.  From commencement of operation (July 19, 2005) through October 31, 2006, the Fund posted a 16.91%

NAV total return.  Over the comparable period, the Lehman Brothers Ba U.S. High Yield Index posted a 7.24% total return.

*       *       *

The first half of the Fund's fiscal year was a challenging environment for closed-end funds due to rising interest rates.  Investors were concerned that rising rates would erode returns on fixed-income securities and put fund dividends under pressure.  These concerns kept a downward pressure on closed-end funds' market prices, to which the Fund was not immune.  Consequently, its market price reached a low of $17.36 in December 2005.  ***This quickly changed, however, as investors saw the Fund's positive NAV performance and pushed the market price of the Fund up to $21.19 by fiscal year-end, October 31, 2006.  This was a 6.91% premium to the Fund's NAV of $19.82.  FHI's market-price performance exceeded that of the NAV and came in at 19.49% from the inception of the Fund through October 31, 2006.***

Defendants' Response:  Answering Paragraph 174, admit that Plaintiffs purport to quote a portion of the FHI Fund's annual shareholder report for the period ended October 31, 2006, and refer the Court to the annual report for the full content and context thereof.

175.    On January 5, 2007, the FHY Fund filed its Form N-CSR for year ended October 31, 2006.  In the Annual Report, the FHY Fund reported a NAV of $190.1 million or $20.18 per share and a net realized and unrealized gain on investments of $7.3 million for the year.  The NCSR also contained certifications required pursuant to SOX that were signed by defendants Bowen and Bradley.  The N-CSR also contained statements concerning FHY Fund's use of market value or fair value according to procedures adopted by FHY Fund's Board of Trustees in valuing its investments, and adherence to GAAP, and management's conclusion on the effectiveness of FHY Fund's disclosure controls and procedures.

Defendants' Response:  Deny the allegations in Paragraph 175, except admit that the FHY Fund's annual shareholder report for the period ended October 31, 2006 reported a NAV of approximately $190.1 million (or $20.18 per share) and a net realized and unrealized gain on investments of approximately $7.3 million for the reporting period, and contained SOX Certifications by Defendants Bowen and Bradley; and refer the Court to the annual report for the full content and context of any disclosures regarding the policies and procedures used to value or price the Fund's portfolios holdings.

176.    The January 7, 2007 FHY Fund's Annual Report further provided substantially similar statements concerning the FHY Fund's performance and outlook as were contained in the FHI Fund's Annual Report.

Defendants' Response:  Deny the allegations in Paragraph 176, and refer the Court to the

FHY Fund's annual shareholder report for the period ending October 31, 2006 for the full

content and context of any disclosures regarding the Fund's investment performance and

outlook.

177.    On or about March 28, 2007, the FHO Fund commenced trading on the NYSE. The initial offering price was $20.00 per share and the NAV at inception was $19.10 per share.

Defendants' Response:  Admit the allegations in Paragraph 177.

178.    On March 28, 2007, the FHI Fund filed its Form N-Q for the period ended January 31, 2007 representing its net assets at $177,513,634.

Defendants' Response:  Admit the allegations in Paragraph 178.

179.    On March 28, 2007, the FHY Fund filed its Form N-Q for the period ended January 31, 2007 representing its net assets at $192,570,421.

Defendants' Response:  Admit the allegations in Paragraph 179.

180.    The foregoing N-Qs also contained certifications required pursuant to SOX that were signed by defendants Bowen and Bradley.  The N-Qs also contained statements concerning the Funds' use of market value or fair value according to procedures adopted by the Funds' Boards of Trustees in valuing its investments, and adherence to GAAP, and management's conclusion on the effectiveness of the Fund's disclosure controls and procedures.

Defendants' Response:  Deny the allegations in Paragraph 180, except admit that the FHI

and FHY Funds' quarterly disclosures of portfolio holdings for the period ending January 31,

2007 contained SOX Certifications by Defendants Bowen and Bradley, and refer the Court to the

quarterly reports for the full content and context of any disclosures regarding the policies and

procedures used to value or price the Funds' portfolio holdings.

181.    In its Definitive Proxy Materials, Schedule 14A, filed on March 16, 2007 ("Proxy Materials") issued before the FHI Fund and FHY Fund shareholder vote scheduled for May 29, 2007, the FHI and FHY Funds provided the following information to its shareholders to encourage them to vote for the change in concentration:

At a meeting of the Board of Trustees of the Strategic Funds held on January 17, 2007, the Adviser and Valhalla Capital Partners, LLC ("Valhalla"), the sub-adviser to the Strategic Funds, recommended to the Board of Trustees that residential mortgage-backed securities be excluded from the 25% limitation with respect to industry concentration. ***According to Valhalla, residential mortgage-backed securities have historically offered very compelling risk/reward characteristics within the structured finance area. Valhalla believes that removing the limitation on residential mortgage-backed securities will bring the Strategic Funds in line with the original intent of their investment strategy***. At the same meeting, the Board of Trustees of the Strategic Funds, including a majority of the Board members who are not "interested persons" of the Strategic Funds, First Trust Advisors or Valhalla ("Independent Trustees"), unanimously determined that the changes in the industry concentration policies were in the best interests of the Strategic Funds and approved such changes, subject to approval by shareholders.

Defendants' Response:  Deny the allegations in Paragraph 181, except admit that

Plaintiffs purport to quote a portion of the joint proxy statement filed with the SEC by the FHI

and FHY Funds on March 29, 2007 (the "Joint Proxy Statement"), and refer the Court to the

Joint Proxy Statement for the full content and context thereof.

182.    The Proxy Materials further stated the following:

PROPOSAL 2:  APPROVAL OF CHANGE IN INDUSTRY CONCENTRATION POLICY

FIRST TRUST STRATEGIC HIGH INCOME FUND
FIRST TRUST STRATEGIC HIGH INCOME FUND II

Certain investment restrictions of the First Trust Strategic High Income Fund and the First Trust Strategic High Income Fund II (the "Strategic Funds") are matters of fundamental policy and may not be changed with respect to a Fund without the approval of that Fund's shareholders.  Under the 1940 Act, all funds are required to have a fundamental policy about the concentration of their investments in a particular industry or group of industries.  While the 1940 Act does not define "concentration in an industry," the staff of the Securities and Exchange Commission has taken the position that investment of 25% or more of a fund's total assets in one or more issuers conducting their principal activities in the same industry or group of industries constitutes concentration.

The following chart contains the Strategic Funds' current fundamental investment restriction with respect to industry concentration and its proposed replacement.

Current Fundamental
Investment Restriction
_____

The Fund may not purchase any
security if, as a result of the
purchase, 25% or more of the
Fund's total assets (taken at
current value) would be
invested in the securities of
borrowers and other issuers
having their principal business
activities in the same industry;
provided, that this

limitation shall not apply with
respect to obligations issued or
guaranteed by the U.S.
government or by its agencies
or instrumentalities.

Proposed Fundamental
Investment Restriction

_____

Under normal market
conditions, the Fund will invest
at least 25% of its total assets in
residential mortgage-backed
securities.  The Fund may not
purchase any security if, as a
result of the purchase, 25% or
more of the Fund's total assets

(taken at current value) would
be invested in the securities of
borrowers and other issuers
having their principal business
activities in the same industry;
provided, that this limitation
shall not apply with respect to
residential mortgage-backed
securities or obligations issued
or guaranteed by the U.S.
government or by its agencies
or instrumentalities

Defendants' Response:  Answering Paragraph 182, admit that Plaintiffs purport to quote

a portion of the Joint Proxy Statement, and refer the Court to the Joint Proxy Statement for the

full content and context thereof.

183.    The Proxy Materials further stated the following:

Currently, First Trust Strategic High Income Fund and First Trust Strategic High
Income Fund II may invest up to 80% and 100%, respectively, of each Fund's
managed assets in non-investment grade securities that are rated below "Baa3" by
Moody's Investors Service, Inc., below "BBB-" by Standard & Poor's, or
comparably rated by another nationally recognized statistical rating organization
or, if unrated, determined by Valhalla to be of comparable credit quality.

Risks.  Each Strategic Fund's total assets will be concentrated in residential mortgage-backed securities.  A fund concentrated in a single industry is likely to present more risks than a fund that is broadly diversified over several industries. Mortgage backed securities may have less potential for capital appreciation than comparable fixed income securities, due to the likelihood of increased prepayments of mortgages as interest rates decline.  If a Strategic Fund buys mortgage-backed securities at a premium, mortgage foreclosures and prepayments of principal by mortgagors (which usually may be made at any time without penalty) may result in some loss of the Strategic Fund's principal investment to the extent of the premium paid.  Alternatively, in a rising interest rate environment, the value of mortgage-backed securities may be adversely affected when payments on underlying mortgages do not occur as anticipated, resulting in the extension of the security's effective maturity and the related increase in interest rate sensitivity of a longer-term instrument.  The value of mortgage-backed securities may also change due to shifts in the market's perception of issuers and regulatory or tax changes adversely affecting the markets as a whole. In addition, mortgage-backed securities are subject to the credit risk associated with the performance of the underlying mortgage properties.  In certain instances, third-party guarantees or other forms of credit support can reduce the credit risk.

Below-investment grade debt instruments are commonly referred to as "high yield" or "junk" bonds, are considered speculative with respect to the issuer's capacity to pay interest and repay principal and are susceptible to default or decline in market value due to adverse economic and business developments.  The market values for high yield securities tend to be very volatile, and these securities are less liquid than investment grade debt securities.

Defendants' Response:  Answering Paragraph 183, admit that Plaintiffs purport to quote a portion of the Joint Proxy Statement, and refer the Court to the Joint Proxy Statement for the full content and context thereof.

184.    In Exhibit A to the Proxy Materials, the following information was provided regarding the Audit Committee's responsibilities:

A.      to oversee the accounting and financial reporting processes of each Fund and its internal controls and, as the Audit Committee deems appropriate, to inquire into the internal controls of certain third-party service providers;

B.      to oversee the quality and integrity of each Fund's financial statements and the independent audit thereof;

C.      to oversee, or, as appropriate, assist Board oversight of, each Fund's compliance with legal and regulatory requirements that relate to the Fund's accounting and financial reporting, internal controls and independent audits . . . .

<u>Defendants' Response</u>:  Answering Paragraph 184, admit that Plaintiffs purport to quote a portion of the Joint Proxy Statement, and refer the Court to the Joint Proxy Statement for the full content and context thereof.

185.    At the Joint Annual Meetings of FHI Fund and FHY Fund Shareholders on May 29, 2007, FHI Fund and FHY Fund shareholders approved a change in FHI and FHY's fundamental investment restriction to a "concentration in an industry," as follows:

> ***Under normal market conditions***, the Fund will invest at least 25% of its total assets in residential mortgage-backed securities.  The Fund may not purchase any security if, as a result of the purchase, 25% or more of the Fund's total assets (taken at current value) would be invested in the securities of borrowers and other issuers having their principal business activities in the same industry; provided, that this limitation shall not apply with respect to residential mortgage-backed securities or obligations issued or guaranteed by the U.S. government or by its agencies or instrumentalities.

<u>Defendants' Response</u>:  Admit the allegations in Paragraph 185.

186.    The facts, which were omitted from the Proxy Materials were as follows:

(a)     The Defendants did not in fact implement effective hedges to mitigate or reduce the risks related to the Funds' investments in mortgage-related securities;

(b)     The FHI Fund and FHY Fund lacked effective internal controls to provide reasonable assurances that the Funds would value these securities in accordance with GAAP;

(c)     The Defendants were motivated to improperly value the FHI Fund's and FHY Fund's investments in mortgage-related securities and inflate NAVs in order to inflate investment advisory fees, and had in fact materially overstated the value of their portfolios; and

(d)     The FHI Fund and FHY Fund lacked effective internal controls to monitor and manage the risks inherent in the Funds' investments in mortgage-related securities;

(e)     Many of the holdings has declined in value and were continuing to at a significant rate; and

(f)     There were no "normal market conditions" and the residential mortgage-backed securities market at the time of the change in the investment restriction would substantially increase the risks to the Funds.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 186 and its subparagraphs.

187.    As a result, shareholders of the FHI Fund and the FHY Fund were solicited for their proxies by false, misleading and incomplete information.

<u>Defendants' Response</u>:  Paragraph 187 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 187.

188.    On July 9, 2007, the FHI Fund filed its Form N-CSRS for the six-month period
ended April 30, 2007.  In this Semi-Annual Report, the FHI Fund reported a NAV of
$173.1 million or $19.33 per share and a net realized and unrealized loss on investments of
$4.7 million for the period.  The N-CSRS also contained certifications required pursuant to SOX
that were signed by defendants Bowen and Bradley.  The N-CSRS also contained statements
concerning FHI Fund's use of market value or fair value according to procedures adopted by FHI
Fund's Board of Trustees in valuing its investments, and adherence to GAAP, and management's
conclusion on the effectiveness of FHI Fund's disclosure controls and procedures.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 188, except admit that the FHI

Fund's semi-annual shareholder report for the period ended April 30, 2007 reported a NAV of

approximately $173.1 million (or $19.33 per share) and a net realized and unrealized loss of

approximately $4.7 million for the reporting period, and contained SOX Certifications by

Defendants Bowen and Bradley; and refer the Court to the semi-annual report for the full content

and context of any disclosures regarding the policies and procedures used to value or price the

Fund's portfolios holdings.

189.    In the July 9, 2007 FHI Fund Semi-Annual Report rather than admit the
deterioration in the value of the FHI Fund's mortgage-related securities, Defendants deceptively
tried to differentiate FHI Funds' portfolio from the "trouble" in sub-prime mortgages.
Defendants stated in pertinent part the following concerning the FHI Fund's performance and
outlook for the period:

FUND RECAP

Over the six-month period ending April 30, 2007, the primary news affecting the
Fund was the negative events surrounding sub-prime residential mortgage-backed
securities.  ***While the headlines generally made it appear that all sub-prime
mortgages were in trouble, the primary problems in sub-prime mortgages were
generally limited to those mortgages originated in late 2005 and throughout
2006.  The Fund had minimal exposure to these vintages and less than 15% of
its total holdings in the subprime mortgage market***.  However, the entire
subprime mortgage market was negatively impacted in sympathy to the problems
in those vintages.  In the end, this sell-off should create a number of buying

opportunities in oversold mortgage market segments that the Fund can take advantage of in the months to come.

*        *        *

**WILL THESE FACTORS CONTINUE TO HURT THE MARKET?**

***The downdraft in the sub-prime mortgage market did not affect the Fund's entire mortgage allocation.  Its prime mortgage holdings posted positive performance, as investors were quick to differentiate among the various segments of the residential mortgage sector***.  In addition, a number of other asset classes remained unaffected by the sub-prime wave.  Collateralized debt obligations (CDOs), corporate bonds, and commercial mortgage-backed securities (CMBS) all generally produced positive performance over the fiscal year-to-date period and continued to provide attractive yields and significant diversification to the Fund.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 189, except admit that

Plaintiffs purport to quote a portion of the FHI Fund's semi-annual shareholder report for the

period ended April 30, 2007, and refer the Court to the semi-annual report for the full content

and context thereof.

190.    On July 9, 2007, the FHY Fund filed its Form N-CSRS for the six-month period ended April 30, 2007.  In this Semi-Annual Report, the FHY Fund reported a NAV of $190.7 million or $20.19 per share and a net realized and unrealized loss on investments of $2.1 million for the period.  The N-CSRS also contained certifications required pursuant to SOX that were signed by defendants Bowen and Bradley.  The N-CSRS also contained statements concerning FHY Fund's use of market value or fair value according to procedures adopted by FHY Fund's Board of Trustees in valuing its investments, and adherence to GAAP, and management's representations regarding the effectiveness of FHY Fund's disclosure controls and procedures.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 190, except admit that the

FHY Fund's semi-annual shareholder report for the period ended April 30, 2007 reported a NAV

of approximately $190.7 million (or $20.19 per share) and a net realized and unrealized loss of

approximately $2.1 million for the reporting period, and contained SOX Certifications by

Defendants Bowen and Bradley; and refer the Court to the semi-annual report for the full content

80

and context of any disclosures regarding the policies and procedures used to value or price the

Fund's portfolios holdings.

191. The July 9, 2007 FHY Fund's Semi-Annual Report further provided substantially similar statements concerning the FHY Fund's performance and outlook as were contained in the FHI Fund's Semi-Annual Report. The following was stated:

**FUND RECAP**

Over the six-month period ending April 30, 2007, the primary news affecting the Fund was the negative events surrounding sub-prime residential mortgage-backed securities. While the headlines generally made it appear that all sub-prime mortgages were in trouble, the primary problems in sub-prime mortgages were generally limited to those mortgages originated in late 2005 and throughout 2006. The Fund had minimal exposure to these vintages and less than 15% of its total holdings in the sub-prime mortgage market. However, the entire sub prime mortgage market was negatively impacted in sympathy to the problems in those vintages. In the end, this sell-off should create a number of buying opportunities in oversold mortgage market segments that the Fund can take advantage of in the months to come.

\*      \*      \*

**WILL THESE FACTORS CONTINUE TO HURT THE MARKET?**

This downdraft in the sub-prime mortgage market did not affect the Fund's entire mortgage allocation. Its prime mortgage holdings posted positive performance, as investors were quick to differentiate among the various segments of the residential mortgage sector. In addition, a number of other asset classes remained unaffected by the sub-prime wave. Collateralized debt obligations, corporate bonds, and commercial mortgage-backed securities all generally produced positive performance over the fiscal year-to-date period and continued to provide attractive yields and significant diversification to the Fund.

Defendants' Response: Deny the allegations in Paragraph 191, except admit that

Plaintiffs purport to quote a portion of the FHY Fund's semi-annual shareholder report for the

period ended April 30, 2007, and refer the Court to the semi-annual report for the full content

and context thereof.

192. On July 9, 2007, the FHO Fund filed its Form N-CSRS for the six-month period ended April 30, 2007. In the Semi-Annual Report, the FHO Fund reported a NAV of $148.5 million or $19.15 per share and a net realized and unrealized loss on investments of $2,550 for the period. The N-CSRS also contained certifications required pursuant to SOX that

were signed by defendants Bowen and Bradley.  The N-CSRS also contained statements concerning FHO Fund's use of market value or fair value according to procedures adopted by FHO Fund's Board of Trustees in valuing its investments, and adherence to GAAP, and management's representations regarding the effectiveness of FHO Fund's disclosure controls and procedures.

Defendants' Response:  Deny the allegations in Paragraph 192, except admit that the

FHO Fund's semi-annual shareholder report for the period ended April 30, 2007 reported a NAV

of approximately $148.5 million (or $19.15 per share), and contained SOX Certifications by

Defendants Bowen and Bradley; and refer the Court to the semi-annual report for the full content

and context of any disclosures regarding the policies and procedures used to value or price the

Fund's portfolios holdings.

193.   The July 9, 2007 FHO Fund Semi-Annual Report further provided substantially similar statements concerning the FHO Fund's performance and outlook as were contained in the FHI Fund's Semi-Annual Report.  The Report stated the following:

**FUND RECAP**

Over the one-month period ending April 30, 2007 and during the offering period, the primary news affecting the Fund was the negative events surrounding subprime residential mortgage-backed securities.  While the headlines generally made it appear that all sub-prime mortgages were in trouble, the primary problems in sub-prime mortgages were generally limited to those mortgages originated in late 2005 and throughout 2006.  However, the entire sub-prime mortgage market was negatively impacted in sympathy to the problems in those vintages.  In the end, this sell-off should create a number of buying opportunities in oversold mortgage market segments that the Fund can take advantage of in the months to come.

*       *       *

**WHAT IS YOUR OUTLOOK FOR THE MARKET AND THE FUND?**

The overall economic outlook remains solid.  While the drag from housing could continue into the second half of the year, the potential impact on consumer spending is still the biggest cause for concern for 2007.  The Federal Reserve (the "Fed") may allow the consumer to feel some pain relating to housing, but it is unlikely to allow a prolonged slump to occur in that sector.  Even with inflation risk on the horizon, we believe the Fed may be likely to step in and lower rates if necessary to prevent a recession.  The challenge the Fund now faces is navigating

82

a fixed-income landscape of tight spreads, while safeguarding against highly susceptible credit positions should the economy pull back.

Defendants' Response:  Deny the allegations in Paragraph 193, except admit that

Plaintiffs purport to quote a portion of the FHO Fund's semi-annual shareholder report for the

period ended April 30, 2007, and refer the Court to the semi-annual report for the full content

and context thereof.

194.    In the first half of August 2007, the Funds' shares began to decline in tandem with other similar closed-end fund shares as the credit crunch exposed the poor underlying fundamentals of the financial sector's mortgage risk management and problems with structured finance vehicles.  For example, FHI Fund shares opened the month trading at $17.00 per share on August 1, 2007, and traded as low as $13.32 on August 15, 2007.  Thereafter, on August 17, 2007, as a result of positive actions taken by the Federal Open Market Committee in reducing the federal funds rate, the FHI Fund's shares began to climb, hitting the $15 range by the end of the month.  FHY Fund shares declined from $18 to as low as $12.64 over the same time period, and FHO Fund shares traded from $17.62 to $12.20; both ended the month close to $16.00 per share.

Defendants' Response:  Answering Paragraph 194, aver that each Fund's share price is a

matter of public record, and deny knowledge or information sufficient to form a belief as to the

truth of the remaining allegations in Paragraph 194.

195.    On or about the twentieth of every month, the Funds report their regularly scheduled monthly distribution and the NAV of the Funds.  The NAV of the Funds remained relatively consistent up until August 2007.  For example, from September 2005 through July 2007, the FHI Fund reported a NAV in the $18 to $19 per share range.  However, on August 20, 2007, the FHI Fund reported a NAV of $16.12 per share.  Thereafter, the FHI Fund continued to report a lower NAV each month.  By August 2008, the FHI Fund reported a NAV of $8.52 per share.

Defendants' Response:  Answering Paragraph 195, admit that, during the Class Period,

the Funds reported their monthly distributions and the NAV of the Funds on or about the

twentieth of every month, and deny knowledge or information sufficient to form a belief as to the

truth of the remaining allegations in Paragraph 195.

196.    On September 26, 2007, the FHI Fund filed its Form N-Q for the period ended July 31, 2007 representing its net assets at $173,072,603.

Defendants' Response:  Deny the allegations in Paragraph 196.

197.    On September 26, 2007, the FHY Fund filed its Form N-Q for the period ended July 31, 2007 representing its net assets at $175,689,907.

Defendants' Response:  Admit the allegations in Paragraph 197.

198.    On September 26, 2007, the FHO Fund filed its Form N-Q for the period ended July 31, 2007 representing its net assets at $148,495,186.

Defendants' Response:  Deny the allegations in Paragraph 198.

199.    The foregoing FHI Fund, FHY Fund, and FHO Fund N-Qs also contained certifications required pursuant to SOX that were signed by defendants Bowen and Bradley. These N-Qs also contained statements concerning Funds' use of market value or fair value according to procedures adopted by Funds' Boards of Trustees in valuing its investments, and adherence to GAAP, and management's conclusion on the effectiveness of Funds' disclosure controls and procedures.

Defendants' Response:  Deny the allegations in Paragraph 199, except admit that the

Funds' quarterly disclosures of portfolio holdings for the period ended July 31, 2007 contained

SOX Certifications by Defendants Bowen and Bradley, and refer the Court to the quarterly

reports to the full content and context of any disclosures regarding the policies and procedures

used to value or price the Funds' portfolio holdings.

200.    At the FHY Fund December 10, 2007 meeting, the Board of Trustees amended its policy to allow up to 20%, formerly 15%, of FHY Fund's Managed Assets to be invested in securities below "CCC" (or comparable rating), distressed securities.  The new policy would take effect March 1, 2008.

Defendants' Response:  Admit the allegations Paragraph 200.

201.    On January 2, 2008, the FHO Fund filed a Form 12b-25 Notification of Late Filing stating it was unable to complete its Form N-SAR within the prescribed time period without unreasonable effort or expense as the FHO Fund had changed its fiscal year end to January 31.

Defendants' Response:  Admit the allegations in Paragraph 201.

202.    On January 2, 2008, the FHO Fund filed its Form N-Q for the period ended October 31, 2007 representing its net assets at $131,127,295.  The N-Q also contained certifications required pursuant to SOX that were signed by defendants Bowen and Bradley.  The N-Q also contained statements concerning FHO Fund's use of market value or fair value according to procedures adopted by FHO Fund's Board of Trustees in valuing its investments,

and adherence to GAAP, and management's conclusion on the effectiveness of FHO Fund's disclosure controls and procedures.

Defendants' Response: Deny the allegations in Paragraph 202, except admit that the

FHO Fund's quarterly disclosure of portfolio holdings for the period ended October 31, 2007

reported net assets of $131,127,295 and contained SOX Certifications by Defendants Bowen and

Bradley; and refer the Court to the quarterly report for the full content and context of any

disclosures regarding the policies and procedures used to value or price the Fund's portfolio

holdings.

203.    On January 10, 2008, the FHI Fund filed its Form N-CSR for year ended
October 31, 2007.  In this Annual Report, the FHI Fund reported a NAV of $136.1 million or
$15.16 per share and a net realized and unrealized loss on investments of $43.5 million for the
year.  The NCSR also contained certifications required pursuant to SOX that were signed by
defendants Bowen and Bradley.  The N-CSR also contained statements concerning FHI Fund's
use of market value or fair value according to procedures adopted by FHI Fund's Board of
Trustees in valuing its investments, and adherence to GAAP, and management's conclusion on
the effectiveness of FHI Fund's disclosure controls and procedures.

Defendants' Response: Deny the allegations in Paragraph 203, except admit that the FHI

Fund's annual shareholder report for the period ended October 31, 2007 reported a NAV of

approximately $136.1 million (or $15.16 per share) and a net realized and unrealized loss of

approximately $43.5 million for the reporting period, and contained SOX Certifications by

Defendants Bowen and Bradley; and refer the Court to the annual report for the full content and

context of any disclosures regarding the policies and procedures used to value or price the

Fund's portfolios holdings.

204.    The January 10, 2008 FHI Fund's Annual Report further provided in pertinent
part the following concerning the FHI Fund's performance and outlook for the period:

**FUND RECAP**

The Fund was not immune to the massive downdraft in pricing across the credit
sectors.  The Fund's net asset value ("NAV") total return was -14.65% (1) for the
twelve-month period ended October 31, 2007.  The months of August and
September were the most severe.  Not surprisingly, RMBS experienced the

greatest price pressure; however, virtually every asset class in the Fund produced negative price performance during the second half of the period.  In the end, it was the Fund's diversification across multiple asset-backed sectors that helped offset the severe price declines in RMBS.  These negative market conditions, along with investor fear, also punished the Fund's market price total return, which was -25.30% (2) for the twelve month period covered by this report.  Since the Fund's fiscal year-end, the credit markets have continued to experience significant volatility.  These difficult conditions have continued to pressure market prices and have caused a significant decline in the Fund's NAV through December 28, 2007.  The duration of this difficult time period is uncertain.

*         *         *

**MANAGER Q&A**

**HOW DID THE NEGATIVE FACTORS IN THE CREDIT MARKETS HURT THE MARKET?**

The negative momentum, which started in the second quarter, picked up tremendous speed over the months of July and August and Continued through the Fund's fiscal year ended October 31, 2007.  Rating agencies announced that billions of dollars of mortgage-backed securities were being put on watch for a downgrade.  In addition, continued forced liquidations dramatically increased the amount of bonds offered in the secondary market, often without any bid available.  These trends significantly affected high yield fixed-income pricing and set the table for the subsequent meltdown.  Over the next ten weeks, several prominent banks around the world faced insolvency crises; central banks would inject billions into the financial system; the commercial paper markets would seize up; the Federal Reserve would cut both the discount rate and the Fed Funds rate; and Wall Street would begin to announce billions of dollars of write-downs.  We believe these events, among others, unleashed destructive forces in the mortgage and asset-backed sectors.

<u>Defendants' Response</u>:  Answering Paragraph 204, admit that Plaintiffs purport to quote

a portion of the FHI Fund's annual shareholder report for the period ended October 31, 2007, and

refer the Court to the annual report for the full content and context thereof.

205.    Despite the adverse news, Defendants only partially disclosed and accounted for the deterioration in the FHI Fund's mortgage-related securities.  Moreover, Defendants failed to disclose the potentially adverse impact losses in the FHI Fund's underlying mortgage collateral would have on distributions to investors in the FHI Fund.  Indeed, in 2008 the Funds started including return of capital as part of the distribution to investors because the underlying collateral was not generating sufficient current income – the Funds' primary objective.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 205, except admit that the

Funds included tax-basis return of capital as part of their periodic distributions to investors

beginning in 2008.

206.    Additionally, the January 10, 2008 FHI Fund Annual Report provided a Portfolio
Valuation description, which stated in pertinent part:

> The Fund's investments are valued daily at market value or, in the absence of
> market value with respect to any portfolio securities, at fair value according to
> procedures adopted by the Fund's Board of Trustees.  Securities for which market
> quotations are readily available are valued at market value, which is currently
> determined using the last reported sale price on the business day as of which such
> value is being determined or, if no sales are reported on such day (as in the case of
> some securities traded over-the-counter), the last reported bid price, except that
> certain U.S. government securities are valued at the mean between the last
> reported bid and ask prices.  ***The Fund values mortgage-backed securities and
> other debt securities not traded in an organized market on the basis of
> valuations provided by dealers who make markets in such securities or by an
> independent pricing service approved by the Board of Trustees which uses
> information with respect to transactions in such securities, quotations from
> dealers, market transactions for comparable securities, various relationships
> between securities and yield to maturity in determining value.  In the Fund's
> financial statements, the Statement of Assets and Liabilities includes
> investments with a value of $103,819,173 (56.9% of total investments) as of
> October 31, 2007, whose values have been determined based on prices supplied
> by dealers in the absence of readily determinable values.  These values may
> differ from the values that would have been used had a ready market for these
> investments existed, and the differences could be material.  The remaining
> investments, with a value of $78,610,786 (43.1% of total investments), were
> valued by an independent pricing service.***

<u>Defendants' Response</u>:  Answering Paragraph 206, admit that Plaintiffs purport to quote

a portion of the FHI Fund's annual shareholder report for the period ended October 31, 2007, and

refer the Court to the annual report for the full content and context thereof.

207.    The foregoing statements were materially misleading because Defendants knew
or recklessly disregard that the values based on prices supplied by dealers ignored various factors
that reflected material deterioration in the value of the FHI Fund's mortgage-related securities.

<u>Defendants' Response</u>:  Paragraph 207 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 207.

208.    In the January 10, 2008 FHI Fund's Annual Report, Defendants also represented
the following regarding FHI Fund's fair value:

> First Trust Advisors L.P. ("First Trust") may use a fair value method to value the
> Fund's securities.  As a general principle, the fair value of a security is the amount
> which the Fund might reasonably expect to receive for the security upon its
> current sale.  ***A variety of factors may be considered in determining the fair
> value of such securities including 1) the fundamental business data relating to
> the issuer; 2) an evaluation of the forces which influence the market in which
> these securities are purchased and sold; 3) type of holding; 4) financial
> statements of the issuer; 5) cost at date of purchase; 6) size of holding; 7) credit
> quality and cash flow of issuer based on external analysis; 8) information as to
> any transactions in or offers for the holding; 9) price and extent of public
> trading in similar securities of the issuer/borrower, or comparable companies;
> and 10) other relevant factors.***

<u>Defendants' Response</u>:  Answering Paragraph 208, admit that Plaintiffs purport to quote

a portion of the FHI Fund's annual shareholder report for the period ended October 31, 2007, and

refer the Court to the annual report for the full content and context thereof.

209.    The foregoing was materially false and misleading because Defendants did not
use "fair value" in valuing FHI Fund's mortgage-related investments, because Defendants ignored,
among other things, consideration and evaluation of the forces which influence the
market; the price and extent of public trading in similar securities; and the quality, value and
salability of collateral in contravention of GAAP, SEC Rules and its own disclosed valuation
policies as set forth in its Annual Report.

> The use of fair value pricing by the Fund is governed by valuation procedures
> adopted by the Fund's Board of Trustees, and in accordance with the provisions
> of the 1940 Act.  When fair value pricing of securities is employed, the prices of
> securities used by the Fund to calculate its NAV may differ from market
> quotations or official closing prices.  In light of the judgment involved in fair
> valuations, there can be no assurance that a fair value assigned to a particular
> security will be the amount which the Fund might be able to receive upon its
> current sale.

<u>Defendants' Response</u>:  Paragraph 209 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 209, except admit that Plaintiffs purport to quote a portion of the FHI Fund's annual

shareholder report for the period ended October 31 2007, and refer the Court to the annual report

for the full content and context thereof.

210.    The foregoing was materially false and misleading because Defendants knew that they were not complying with the provisions of the 1940 Act, as a result of the failure to value FHI Fund's mortgage-related securities in compliance with GAAP.  Moreover, because Defendants were ignoring the various factors that existed in the marketplace in valuing FHI Fund's mortgage-related securities, they knew or recklessly disregarded that the Fund would not receive the fair value assigned to the FHI Fund's mortgage-related securities upon a current sale.

Defendants' Response:  Paragraph 210 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 210.

211.    On January 10, 2008, the FHY Fund filed its Form N-CSR for year ended October 31, 2007.  In FHY Annual Report, the FHY Fund reported a NAV of $154.1 million or $16.31 per share and a net realized and unrealized loss on investments of $40.5 million for the year.  The N-CSR also contained certifications required pursuant to SOX that were signed by defendants Bowen and Bradley.  The N-CSR also contained statements concerning FHY Fund's use of market value or fair value according to procedures adopted by FHY Fund's Board of Trustees in valuing its investments, and adherence to GAAP, and management's conclusion on the effectiveness of FHY Fund's disclosure controls and procedures.

Defendants' Response:  Deny the allegations in Paragraph 211, except admit that the

FHY Fund's annual shareholder report for the period ended October 31, 2007 reported a NAV of

approximately $154.1 million (or $16.31 per share) and a net realized and unrealized loss of

approximately $40.5 million for the reporting period, and contained SOX Certifications by

Defendants Bowen and Bradley; and refer the Court to the annual report for the full content and

context of any disclosures regarding the policies and procedures used to value or price the

Fund's portfolios holdings.

212.    The January 10, 2008 FHY Fund Annual Report further provided substantially identical statements concerning the FHY Fund's performance and outlook as were contained in the FHI Fund's Annual Report, and also failed to disclose the potentially adverse impact losses in FHY Fund's underlying mortgage collateral would have on distribution to investors in the FHY Fund.

Defendants' Response:  Deny the allegations in Paragraph 212, and refer the Court to the

FHY Fund's annual shareholder report for the period ended October 31, 2007 for the full content

and context of any disclosures regarding the Fund's investment performance and outlook.

213.    On March 26, 2008, FHI Fund filed its Form N-Q for period ended January 31,
2008 representing its net assets at $111,278,013.

Defendants' Response:  Admit the allegations in Paragraph 213.

214.    On March 26, 2008, FHY Fund filed its Form N-Q for period ended January 31,
2008 representing its net assets at $132,179,872.

Defendants' Response:  Admit the allegations in Paragraph 214.

215.    The foregoing FHI Fund and FHY Fund N-Qs also contained certifications
required pursuant to SOX that were signed by defendants Bowen and Bradley.  These N-Qs also
contained statements concerning the FHY Fund's and the FHY Fund's use of market value or
fair value according to procedures adopted by the FHY Fund's Board of Trustees and the FHI
Fund's Board of Trustees in valuing its investments, and adherence to GAAP, and management's
conclusion on the effectiveness of the FHY Fund's and FHI Fund's disclosure controls and
procedures.

Defendants' Response:  Deny the allegations in Paragraph 215, except admit that the FHI

and FHY Funds' quarterly disclosures of portfolio holdings for the period ended January 31,

2008 contained SOX Certifications by Defendants Bowen and Bradley, and refer the Court to the

quarterly reports for the full content and context of any disclosures regarding the policies and

procedures used to value or price the Funds' portfolio holdings.

216.    On April 4, 2008, the FHO Fund filed its Form N-CSR for year ended January 31,
2008.[18] The FHO Fund Annual Report reported a NAV of $92.2 million or $10.29 per share,
representing a 62% decline in the FHO Fund's NAV in a nine-month period, and a net realized
and unrealized loss on investments of $79.5 million for the year.  The N-CSR also contained
certifications required pursuant to SOX that were signed by defendants Bowen and Bradley.  The
April 4, 2008 FHO Fund N-CSR also contained statements concerning FHO Fund's use of
market value or fair value according to procedures adopted by FHO Fund's Board of Trustees in
valuing its investments, and adherence to GAAP, and management's conclusion on the
effectiveness of FHO Fund's disclosure controls and procedures.

---

[18] The FHO Fund's original fiscal year end was October 31st.  In January 2008, the FHO Fund changed
its fiscal year end to January 31st.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 216, except admit that the

FHO Fund's annual shareholder report for the period ended January 31, 2008 reported a NAV of

approximately $92.2 million (or $10.29 per share) and a net realized and unrealized loss of

approximately $79.5 million for the reporting period, and contained SOX Certifications by

Defendants Bowen and Bradley; and refer the Court to the annual report for the full content and

context of any disclosures regarding the policies and procedures used to value or price the

Fund's portfolios holdings.

217.    The April 14, 2008 FHO Fund Annual Report further provided in pertinent part
the following concerning the FHO Fund's performance and outlook for the period:

**FUND RECAP**

The Fund's negative net asset value (NAV) performance (commencement of
operations to January 31, 2008) was driven by the unforgiving market conditions.
***FHO's NAV total return 1 was -40.91% versus the Lehman Brothers Ba Index
return of 5% over the same period.  The last three months of the reporting
period were among the worst for the Fund as the number of sellers increased
considerably.  This put pressure on every asset class in the portfolio.
Residential mortgage-backed securities were the hardest hit, followed by
collateralized debt obligations, and then corporate high-yield debt.***  In the
speculative-grade corporate bond universe, overall sentiment was negative as
well, despite liquidity that was immeasurably superior to that of structured
finance.  However, given the widespread fallout of the global liquidity strain,
corporate high-yield investors began to position their portfolios for a rise in
default rates, and spreads widened accordingly.

FHO's market price declined along with the NAV for most of the period,
finishing with a -33.09% market value total return 2 (commencement of
operations to January 31, 2008).  ***The Fund has traded at a premium a few times
since inception, but has spent most of the time at a discount.  At its low the
Fund's discount to NAV reached -17.3%, and the average for the period was
roughly -1.7% to NAV.  Given the breadth of the illiquidity effect, the periodic
discount applied by the market is not surprising and price volatility will likely
continue for the foreseeable future until the structured markets show they have
stabilized.***

***The Fund has taken a number of steps to shield itself from these damaging
trends.  First, it halted purchases of structured finance securities for a number
of months until prices had fallen sufficiently to justify re-entry into the
marketplace.  Second, it has maintained a large cash position over this***

*tumultuous period, finishing the fiscal year ended January 31, 2008, with a balance of roughly $17 million, or 18.3% of total assets.  Finally, the Fund has not employed any leverage since inception to avoid being forced to sell assets at greatly depressed prices.*

Defendants' Response:  Answering Paragraph 217, admit that Plaintiffs purport to quote

a portion of the FHO Fund's annual shareholder report for the period ended January 31, 2008,

and refer the Court to the annual report for the full content and context thereof.

218.     Despite the adverse news, Defendants only partially disclosed and accounted for the deterioration in the Funds' mortgage-related securities.  Moreover, Defendants failed to disclose the potentially adverse dividend impact as a result of losses in the underlying mortgage collateral.  Indeed, in 2008 the Funds started including return of capital as part of the distribution to investors because the underlying collateral was not generating sufficient current income – the Funds' primary objective.

Defendants' Response:  Deny the allegations in Paragraph 218, except admit that the

Funds included tax-basis return of capital as part of their periodic distributions to investors

beginning in 2008.

219.     On June 27, 2008, the FHO Fund filed its Form N-Q for the period ended April 30, 2008.  The FHO Fund reported its NAV at $80,781,778.  The June 27, 2008 N-Q also contained certifications required pursuant to SOX that were signed by defendants Bowen and Bradley.  The N-Q also contained statements concerning FHO Fund's use of market value or fair value according to procedures adopted by FHO Fund's Board of Trustees in valuing its investments, and adherence to GAAP, and management's conclusion on the effectiveness of FHO Fund's disclosure controls and procedures.

Defendants' Response:  Deny the allegations in Paragraph 219, except admit that the

FHO Fund's quarterly disclosure of portfolio holdings for the period ended April 30, 2008

reported a NAV of $80,781,778 and contained SOX Certifications by Defendants Bowen and

Bradley, and refer the Court to the quarterly report for the full content and context of any

disclosures regarding the policies and procedures used to value or price the Fund's portfolio

holdings.

220.     On July 7, 2008, the FHI Fund filed its Form N-CSRS for the six-month period ended April 30, 2007.  In this Semi-Annual Report, the FHI Fund reported a NAV of $96.33 million or $10.71 per share, representing a 44% decline in the FHI Fund's NAV in a one-

year period, and a net realized and unrealized loss on investments of $41.0 million for the year. Per the July 7, 2008 FHI Fund Semi-Annual Report, the FHI Fund, based on credit quality ratings of investments over 20% was still invested in distressed securities below CCC rating. The majority, over 60%, was invested in below "BBB" rated securities or below investment grade debt.  This FHI Fund's portfolio still did not appear to represent the defensive tactics in place to invest in higher credit quality investments and curtailing on investments in mortgage-related securities.  The July 7, 2008 FHI Semi-Annual Report further provided in pertinent part the following concerning the FHI Fund's performance and outlook for the period:

### PERFORMANCE ANALYSIS

These extraordinarily destructive market trends, along with underperformance in several asset sectors in the portfolio, caused negative net asset value (NAV) and market performance for FHI for the period.  *The Fund's NAV total return was -23.26% and its market-price performance, -2.61%.  In contrast, the Lehman Bros. Ba Index returned +0.23%.  The Fund's focus on structured finance securities caused the wide divergence in NAV performance from its stated benchmark, which is composed almost entirely of high-yield corporate debentures*.  In general, corporate debt has experienced less pricing pressure than the structured markets, which have been the focus of much of the fear plaguing financial systems worldwide.

This anxiety hit all of the Fund's holdings, but it was residential mortgage backed securities (RMBS) that declined the most in price.  Liquidity in this asset class remained far below normal for the period and further declines in housing prices led a growing number of obligors to stop paying their mortgages.  The result has been a rise in delinquencies and foreclosures nationwide and deterioration in the collateral profile of all types of mortgage-backed securities.  *The Fund's RMBS have experienced this strain as well, and over the coming quarters may see a reduction in cash flows.  While RMBS pricing already reflects a very negative outcome for the residential housing market, any potentially adverse dividend impact will be dictated by the resulting level and timing of losses on the underlying mortgage collateral.  Ultimately, the performance of the underlying loans will depend on a host of factors, not the least of which is an improving macroeconomic environment.*

Defendants' Response:  Deny the allegations in Paragraph 220, except admit that the FHI

Fund's semi-annual shareholder report for the period ended April 30, 2008 reported a NAV of

approximately $96.33 million (or $10.71 per share) and a net realized and unrealized loss of

approximately $41.0 million for the reporting period, and reported that greater than 20% of the

Fund's assets was invested invest in securities rated below CCC and greater than 60% of the

Fund's assets was invested in securities rated below BBB; admit that Plaintiffs purport to quote a

portion of the FHI Fund's semi-annual report; and refer the Court to the semi-annual report for

the full content and context thereof.

221.    On July 7, 2008, the FHY Fund filed its Form N-CSRS for the six-month period
ended April 30, 2007.  In this Semi-Annual Report, the FHY Fund reported a NAV of
$117.7 million or $12.44 per share, representing a 38% decline in the FHY Fund's NAV in a
one-year period, and a net realized and unrealized loss on investments of $37.9 million for the
year.  The Portfolio section of this Semi-Annual Report also showed that almost 50% of the FHY
Fund was invested in below-investment grade securities, below a BBB rating and over 30% was
invested in distressed securities below a CCC rating.  This FHY Fund Portfolio did not represent
a significant investment change to reflect the defensive tactics in place due to the tumultuous
investment market.  The July 7, 2008 FHY Fund Semi-Annual Report further provided
substantially identical statements concerning the FHY Fund's performance and outlook as were
contained in the FHI Fund's Semi-Annual Report.

Defendants' Response:  Deny the allegations in Paragraph 221, except admit that the

FHY Fund's semi-annual shareholder report for the period ended April 30, 2008 reported a NAV

of approximately $117.7 million (or $12.44 per share) and a net realized and unrealized loss of

approximately $37.9 million for the reporting period, and reported that greater than 30% of the

FHY Fund's assets was invested invest in securities rated below CCC; and refer the Court to the

semi-annual report for the full content and context thereof.

222.    As a result of these disclosures, the market prices of the Funds' shares collapsed.
For example, the FHI Fund's shares closed at $10.22 per share on July 7, 2008 at that time, an
all-time low for the FHI Fund's shares and a decline of over 52% from the FHI Class Period
high.  The Funds' shares have continued to decline.  FHI Fund shares have continued to slide and
have since closed as low as $3.11 per share.  FHY exhibited a similar decline from its FHY
Class Period high, with its shares closing at $10.52 on July 7, 2008, and since, closing as low as
$4.11 per share.  FHO Fund's closing price on July 7, 2008 was $8.46, a 57.7% decline from its
highest value, and the stock has since closed as low as $2.94 per share.

Defendants' Response:  Answering Paragraph 222, aver that each Fund's share price is a

matter of public record, and deny the remaining allegations in Paragraph 222.

223.    The statements in Funds' Forms N-CSRs and N-Qs throughout the Class Periods
were inaccurate statements of material fact when made because of the following facts that
existed at the time of such statements: (i) the Funds were heavily invested in risky mortgage-
backed assets, the risks from which the Funds lacked the required controls to effectively monitor
and manage; (ii) many of the holdings of the Funds had declined in actual (as opposed to
reported) value and were continuing to do so at a very significant rate; (iii) based upon facts

existing at that time concerning problems with the real estate and mortgage industries, the Funds materially overstated the value of their portfolio and NAV by failing to properly value their investments in mortgage-related securities.

Defendants' Response:  Paragraph 223 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 223.

224.    Additionally, the facts, which were known by the Defendants but concealed from the investing public during the Class Periods, were as follows:

(a)    The Defendants ignored observable market data in the valuation of the Funds' mortgage-related securities which showed that there was significant deterioration in the market in contravention of GAAP, SEC and the Funds' disclosed policies;

(b)    The Funds lacked effective internal controls to provide reasonable assurances that the Funds would value these securities in accordance with GAAP;

(c)    The Funds materially overstated the value of their portfolio and NAV by failing to properly value their investments in mortgage-related securities in contravention of GAAP and SEC Rules;

(d)    The Defendants compounded the risks of the FHI Fund's and FHY Fund's investment strategy by utilizing leverage to buy securities on margin in a falling market, thereby necessitating forced liquidation;

(e)    The Defendants did not "generally seek" and did not in fact implement effective hedges to mitigate the risks related to the Funds' mortgage-backed securities;

(f)    The Defendants were motivated to improperly value the Funds' investments in mortgage-related securities and inflate NAVs in order to inflate investment advisory fees;

(g)    The Funds lacked effective internal controls to monitor and manage the risks inherent in the Funds' investments in mortgage-related securities; and

(h)    Defendants failed to inform investors of the potential adverse impact on dividend income that would result from the Funds' deteriorating mortgage collateral, including from artificial inflation of the Funds' NAV that did not reflect the impairment of income that would have been apparent to investors from fair valuation of the Funds' mortgage-related securities.

Defendants' Response:  Deny the allegations in Paragraph 224 and its subparagraphs.

225.    During the Class Periods, Defendants represented that the Funds' financial statements when issued were prepared in conformity with GAAP.  However, Defendants used

improper accounting practices in violation of GAAP, SEC reporting requirements and their own publicly disclosed policies to falsely inflate the Funds' mortgage-related securities and NAV in the annual, semi-annual, and quarterly reports filed with the SEC during the Class Periods.

Defendants' Response:  Deny the allegations in Paragraph 225, and refer the Court to the

Funds' public filings for the full content and context of any disclosures regarding the policies

and procedures used to value or price the Funds' portfolio holdings.

226.    The materially false and misleading financial statements of the Funds resulted from a series of deliberate senior management decisions designed to conceal the truth regarding the Funds' investments in securitized sub-prime mortgage assets.  The Defendants caused the Funds to violate GAAP and SEC rules by, among other things:

•    disregarding that the value of the Funds' mortgage-related securities were experiencing deteriorating financial conditions, necessitating recognition of losses and reductions in expected income;

•    disregarding the adverse news and events that existed as early as December 2006, including significant defaults negatively impacting the U.S.  residential sub-prime market; and

•    improperly ignoring observable market data in valuing the mortgage-related securities.

Defendants' Response:  Paragraph 226 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 226 and its subparagraphs.

227.    As set forth in Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Concepts ("Concepts Statement") No. 1 (November 1978), one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented.  Concepts Statement No. 1, paragraph 42, states:

Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

Defendants' Response:  Answering Paragraph 227, admit that Plaintiffs purport to quote

a portion of the Financial Accounting Standards Board Statement of Financial Accounting

Concepts No. 1, and refer the Court to Statement of Financial Accounting Concepts No. 1 for the

full content and context thereof.  Deny knowledge or information sufficient to form a belief as to

the truth of the remaining allegations in Paragraph 227.

228.    As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).  Management is responsible for preparing financial statements that conform with GAAP.  As noted by the American Institute of Certified Public Accountants professional standards:

> financial statements are management's responsibility . . . . [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements.  The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management . . . .  Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

Defendants' Response:  Answering Paragraph 228, admit that Plaintiffs purport to quote

a portion of SEC Rule 4-01(a) of SEC Regulation S-X, and refer the Court to SEC Rule 4-01(a)

for the full content and context thereof.  Deny knowledge or information sufficient to form a

belief as to the truth of the remaining allegations in Paragraph 228.

229.    For a closed-end investment company fund, Net Asset Value (NAV) represents book value and is computed by subtracting the fund's liabilities (including accrued expenses, dividends payable and any borrowings of the fund) from the fund's total assets (the value of the securities and other investments the fund holds plus cash or other assets, including interest accrued but not yet received).  The resulting figure can also be divided by the total number of common shares outstanding to arrive at the NAV per share.  The market price per share, determined by the collective action of the fund's buyers and sellers, can trade at a premium to or a discount from the NAV per share depending on market participants' assessment of the future performance of the fund's assets and management.  It is therefore essential for buyers of a closed-end fund to have an accurate NAV figure so they know the value of the assets they are buying.

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 229, except admit that the NAV for a closed-end

investment company is computed by subtracting the company's liabilities from its total assets,

that the NAV can be reported on a per-share basis, and that the market price of the company's

shares can trade at a premium or a discount to the company's per-share NAV.

230.    An important component of calculating NAV of each of the Funds is determining
the value of the structured finance products held in their portfolios, including the various
mortgage-related securities such as RMBS, CMBS, CMOs, and CDOs.

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 230.

231.    Under SEC Rule 2a-4, where market quotations are readily available, securities
shall be valued accordingly.  However, for securities with no readily available market quotations,
a fund's trustees are to make a good faith determination of fair value, which is the amount which
the owner might reasonably expect to receive if the asset were sold.

Defendants' Response:  Paragraph 231 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 231, and refer the Court to SEC Rule 2a-4 for the full content and context thereof.

232.    According to the SEC's Accounting Series Release ("ASR") 118, fair value is
"the amount which the owner might reasonably expect to receive for [the securities] upon their
current sale."  In fair value pricing:

> It is incumbent upon the board of directors to satisfy themselves that all
> appropriate factors relevant to the value of securities for which market quotations
> are not readily available have been considered and to determine the method of
> arriving at the fair value of each such security . . .  The board must also, consistent
> with this responsibility, continuously review the appropriateness of the method
> used in valuing each issue of security in the company's portfolio.

Defendants' Response:  Answering Paragraph 232, admit that Plaintiffs purport to quote

a portion of the SEC's Accounting Series Release No. 118 ("ASR 118"), and refer the Court to

ASR 118 for the full content and context thereof.

233.    Closed-end funds are similar to mutual funds in that they are collective
investment vehicles, but, unlike open-end mutual investment companies, they have a fixed
number of shares.  Closed-end funds have initial public offerings in which the fund management
company raises the capital to start the fund, and after this additional shares are rarely issued.
After the IPO, the closed-end fund shares trade on the secondary market.  Potential investors can
typically purchase these shares from current holders who want to sell.  The price of a share is
determined by supply and demand which is in turn largely determined by the valuation of the

fund's investment portfolio with an adjustment in the form of a premium/discount set in the market.  When the share price is lower than the NAV, the fund is said to sell at a discount.  When the market price is higher than the NAV, the fund is said to sell at a premium.  For example, if a fund has an NAV per share of $100, based on the current value of its portfolio, but is priced at $90, it is selling at a 10 percent discount.  Viewed from another perspective, when a share is trading at a 10 percent discount to NAV, an investor can purchase a $100 share of the fund's assets for $90.

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 233.

234.     Although a closed-end fund's shares are not traded at NAV but at market value, the price of the shares do track the fund's NAV and, thus, accurate valuation of a closed-end fund's portfolio and the corresponding NAV are material to investors.  In an October 11, 2007 SEC staff speech, the SEC outlined several reasons for their importance:

> First, closed end fund market prices correlate, at least to some extent, with closed end funds' NAVs.  Thus NAVs can affect the market prices at which closed end fund investors purchase and redeem shares.  Consequently, it is essential that a closed end fund's NAV be accurate.

> Second, investment advisory and other asset based fees are calculated on the basis of a closed end fund's NAV, not its market price.  Thus, NAVs must be calculated accurately so that funds pay the correct amount in fees.

> The third concern relates to misleading statements.  Closed end funds typically publish their NAVs.  Miscalculated NAVs can be materially misleading statements, potentially subjecting the fund, its managers and/or its board to liability.

> The fourth concern comes directly from the Investment Company Act itself.  The Act has very particular provisions regarding the valuation of a fund's assets, including the role of the board in determining the fair value of a security for which market quotations are unavailable.  **The Act does not exclude closed end funds from this requirement.  It is a statutory mandate.**

Andrew J. Donohue, Speech by SEC Staff, 2007 ICI Closed End Fund Workshop (Oct. 11, 2007) http://www.sec.gov/news/speech/2007/spch101107ajd.htm

Defendants' Response:  Paragraph 234 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 234, except admit that Plaintiffs purport to quote an October 11, 2007 speech by

Andrew J. Donohue, and refer the Court to Mr. Donohue's speech for the full content and

context thereof.

235.    Beginning at each of the Funds' inceptions and continuing throughout the
respective Class Periods, Defendants represented for each of the Funds that "The Fund's
investments are valued daily at market value or, in the absence of market value with respect to
any portfolio securities, at fair value according to procedures adopted by the Fund's Board of
Trustees."

Defendants' Response:  Answering Paragraph 235, admit that Plaintiffs purport to quote

a portion of the Funds' public filings with the SEC, and refer the Court to those public filings for

the full content and context of any disclosures regarding the policies and procedures used to

value or price the Funds' portfolio holdings.

236.    ASR 118 sets forth the following factors be considered in making fair value
determinations:

Fundamental analytical data; (b) the nature and duration of any restrictions on
disposition; (c) and evaluation of the forces that influence the market in which the
securities are purchased and sold; and (d) specific factors, including (among
others) the type of security, financial statements, cost, size of holding, analysts'
reports, transactional information or offers, and public trading in similar securities
of the issuer or comparable companies.

Defendants' Response:  Answering Paragraph 236, admit that Plaintiffs purport to quote

a portion of ASR 118, and refer the Court to ASR 118 for the full content and context thereof.

237.    Although a "fair value" valuation is designed to produce accurate current security
valuations during the Class Periods, Defendants ascribed their own values to the Funds' security
portfolios that failed to give effect to the actual value of its mortgage-related securities, in order
to maintain a false impression of capital appreciation, one of the Funds' objectives.  In so doing,
Defendants completely ignored the valuation considerations set forth in ASR 118.

Defendants' Response:  Deny the allegations in Paragraph 237.

238.    As shown in the charts above, *see supra* ¶13, Defendants reported the Funds'
NAVs as remaining remarkably stable during the beginning of the Class Periods despite the
adverse events in the sub-prime mortgage market that existed as early as December 2006, which
are described more fully at *supra* ¶¶120-50 ("The Rise and Fall of Sub-Prime Mortgage Lending
and Securities").  The stability of the reported NAV reported by each of the Funds during the
Class Periods was a direct result of Defendants' improper valuations of the Funds' securities
portfolios.

Defendants' Response:  Answering Paragraph 238, repeat and reallege Defendants'

responses to the allegations in Paragraph 13 and Paragraphs 120 through 150 as if fully set forth

herein, and deny the remaining allegations in Paragraph 238.

239.    In this regard, the SEC has declared, as a general principle, the fair value of a
security is the price which one might reasonably expect to receive upon its current sale:

> Ascertaining fair value requires a determination of the amount that an arms length
> buyer, under the circumstances, would currently pay for the security.  Fair value
> cannot be based on what a buyer might pay at some later time, such as when the
> market ultimately recognizes the security's true value as currently perceived by
> the Trust manager.  Trusts also may not fair value price Trust securities at prices,
> which are not achievable on a current basis on the belief that the Trust would not
> currently need to sell those securities.  Thus, bond or similar Trusts generally may
> not fair value price Trust securities at par based on the expectation that the Trusts
> will hold those securities until maturity, if the Trusts could not receive par value
> upon the current sale of those securities. [19]

Defendants' Response:  Deny the allegations in Paragraph 239, except admit that

Plaintiffs purport to quote a portion of a letter December 8, 1999 letter from Douglas Scheidt,

and refer the Court to Mr. Scheidt's letter for the full content and context thereof.

240.    In valuing its mortgage-related securities so close to par (except in very limited
circumstances), Defendants accorded little or no weight to ASR 118 or the Funds' own valuation
procedures including, but not limited to, consideration of general economic conditions affecting
the U.S. residential sub-prime market and market prices at which identical and similar
investments were being sold.

Defendants' Response:  Deny the allegations in Paragraph 240.

241.    In fact, according to the Proxy Materials, for example, the Valuation Committee
for the FHI Fund met only four times and for the FHY Fund only a total of three times during the
fiscal year ended October 31, 2006 and during the calendar year ended December 31, 2007,
respectively, even though the Proxy Material stated that: "The market values for high yield
securities tend to be very volatile, and these securities are less liquid than investment grade debt
securities."

---

[19] "December 1999 Letter to the Investment Company Institute Regarding Valuation Issues," from
Douglas Scheidt Associate Director and Chief Counsel of the SEC Division of Investment, December 8,
1999.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 241, except admit that

Plaintiffs purport to quote a portion of the Joint Proxy Statement, and refer the Court to the Joint

Proxy Statement for the full content and context thereof.

242.    As such, Defendants' calculation of NAV, which was based on inflated values for the Funds' securities portfolio, resulted in a materially inflated NAV during the Class Periods. This inflated NAV was reported in the annual, semi-annual, and quarterly reports disseminated during the Class Periods rendering them materially false and misleading.  The Funds' valuation determinations were thus not in good faith, which led to a materially inflated NAV.  In turn, the materially inflated NAV caused the Funds' market price to trade in excess of what it would have been had the true value of the mortgage-related securities been accurately calculated and disclosed.

<u>Defendants' Response</u>:  Paragraph 242 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 242.

243.    In sum, Defendants did not adopt and employ "mark to market" pricing procedures for the Funds' investments in mortgage-related securities through their failure to determine in good faith the "fair value" of the Funds' mortgage-related securities by considering all indications of value based on what the Funds could actually receive for those securities from a current sale.  As a result, trading of the Funds' shares during the Class Periods was based on materially inflated values for mortgage-related securities and correspondingly inflated NAVs for the Funds.  The material inflation continued through the end of the Class Periods.  Plaintiffs and other members of the Classes purchased the Funds' shares justifiably relying, among other things, upon the promised (but not delivered) integrity of the Funds' valuations practices and have been damaged thereby.

<u>Defendants' Response</u>:  Paragraph 243 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 243.

244.    Defendants made the following representations about the valuation of the investment portfolio in disclosures about the Funds' accounting policies in the annual and semi annual reports during the Class Periods:

The Fund's investments are valued daily at market value or, in the absence of market value with respect to any portfolio securities, at fair value according to procedures adopted by the Fund's Board of Trustees.  Securities for which market quotations are readily available are valued at market value, which is currently determined using the last reported sale price on the business day as of which such

value is being determined or, if no sales are reported on such day (as in the case of some securities traded over-the-counter), the last reported . . . . ***The Fund values mortgage-backed securities and other debt securities not traded in an organized market on the basis of valuations provided by dealers who make markets in such securities or by an independent pricing service approved by the Board of Trustees which uses information with respect to transactions in such securities, quotations from dealers, market transactions for comparable securities, various relationships between securities and yield to maturity in determining value.***

Defendants' Response:  Deny the allegations in Paragraph 244, except admit that

Plaintiffs purport to quote a portion of the Funds' public filings with the SEC, and refer the Court

to the Funds' public filings for the full content and context of any disclosures regarding the

pricing or valuation of the Funds' portfolio holdings.

245.    As diversified, closed-end management investment companies registered with the SEC under the under the Investment Company Act of 1940 ("ICA"), the Funds' investment valuation was governed by § 2(a)(41) of the ICA which states:

"Value", with respect to assets of registered investment companies, except as provided in subsection (b) of section 28 of this title [15 USCS § 80a-28(b)], means—

A.      as used in sections 3, 5, and 12 of this title [15 USCS §§ 80a-3, 80a-5, 80a-12], (i) with respect to securities owned at the end of the last preceding fiscal quarter for which market quotations are readily available, the market value at the end of such quarter; (ii) ***with respect to other securities and assets owned at the end of the last preceding fiscal quarter, fair value at the end of such quarter, as determined in good faith by the board of directors***; and (iii) with respect to securities and other assets acquired after the end of the last preceding fiscal quarter, the cost thereof; and

B.      as used elsewhere in this title, (i) with respect to securities for which market quotations are readily available, the market value of such securities; and (ii) ***with respect to other securities and assets, fair value as determined in good faith by the board of directors***;

Defendants' Response:  Paragraph 245 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, admit that Plaintiffs

purport to quote a portion of Section 2(a)(41) of the Investment Company Act of 1940, and refer

the Court to Section 2(a)(41) for the full content and context thereof.

246.    In violation of this regulation, Defendants did not determine, in good faith, the fair value of investments not having readily available market quotations, but rather ignored or recklessly disregarded observable market data indicating the deteriorating value of such investments in order to artificially inflate the value of the mortgage-related securities and the Funds' corresponding NAV.

Defendants' Response:  Paragraph 246 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 246.

247.    In 1969 and 1970, the SEC, responding to a need to make clear what constituted "fair value .in good faith," published ASRs 113 and 118 (now codified within Section 403 and 404 of the Codification of Financial Reporting Policies), as a guideline to assist registrants having to deal with good faith valuation questions.  ASR 118 in pertinent part states:

To comply with Section 2(a)(41) of the [ICA] and Rule 2a-4 under the [ICA], it is incumbent upon the board of directors to satisfy themselves that **all appropriate factors relevant to the value of securities for which market quotations are not readily available have been considered and to determine the method of arriving at the fair value of each such security**.  The board must also, consistent with this responsibility, continuously review the appropriateness of the method used in valuing each issue of security in the company's portfolio.

No single standard for determining "fair value in good faith" can be laid down, since fair value depends upon the circumstances of each individual case.  As a general principle, the current "fair value" of an issue of securities being valued by the board of directors would appear to be the amount which the owner might reasonably expect to receive for them upon their current sale.  Methods which are in accord with this principle may, for example, be based on a multiple of earnings, or a discount from market of a similar freely traded security, or yield to maturity with respect to debt issues, or a combination of these and other methods.  **Some of the general factors which the directors should consider in determining a valuation method for an individual issue of securities include:  1) the fundamental analytical data relating to the investment, 2) the nature and duration of restrictions on disposition of the securities, and 3) an evaluation of the forces which influence the market in which these securities are purchased and sold**.  Among the more specific factors, which are to be considered are:  type of security, financial statements, cost at date of purchase, size of holding, discount from market value of unrestricted securities of the same class at time of purchase, special reports prepared by analysts, information as to any transactions or offers with respect to the security, . . .  and extent of public trading in similar securities of the issuer or comparable companies, and other relevant matters.

The above guidance does not purport to delineate all factors which may be considered.  **The directors should take into consideration all indications of value**

104

***available to them in determining the "fair value" assigned to a particular
security.*** The information so considered together with, to the extent practicable,
judgment factors considered by the board of directors in reach its decisions should
be documented in the minutes of the director's meetings and the supporting data
retained for the inspection of the company's independent accountant.

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 247, except admit that Plaintiffs purport to quote a

portion of ASR 118, and refer the Court to ASR 118 for the full content and context thereof.

248.    As detailed above, Defendants ignored numerous relevant factors with respect to
the sub-prime mortgage market in general in formulating their valuations of mortgage-related
investments.  As detailed below, Defendants also ignored other relevant factors with respect to
specific entities which had issued asset-backed securities, and these failures also contributed to
the overstatement of the mortgage-related investments and corresponding NAV of the Funds.
Indeed, Defendants' failures exemplified the concerns expressed by Andrew J.  Donohue,
Director of the SEC's Division of Investment Management, in the previously cited October 11,
2007 speech regarding the valuation of the assets of closed-end funds:

My concerns regarding the accurate valuation of portfolio securities owned by
closed end funds have only been heightened by recent events in the subprime
market, and their widespread effect on the broader market.  Certainly, market
events are impacting many of the securities held by closed end funds.  Fund
boards and fund managers cannot turn a blind eye to this impact when assessing
the net asset values of their closed end funds' shares.

Defendants' Response:  Paragraph 248 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 248, except admit that Plaintiffs purport to quote a portion of an October 11, 2007

speech by Andrew J.  Donohue, and refer the Court to Mr. Donohue's speech for the full content

and context thereof.

249.    Many of the ABS-issuing entities in Funds' portfolio indicated a high degree of
risk in the mortgage-related securities which the Funds purchased.  Defendants did not
incorporate these risks into their valuation of these investments and thereby materially overstated
the value of the mortgage-related securities and the corresponding NAV of the FHI Fund, FHY
Fund, and FHO Fund during their respective Class Periods.

Defendants' Response:  Answering Paragraph 249, deny knowledge or information

sufficient to form a belief as to the truth of the allegation that "[m]any of the ABS-issuing

entities in the Funds' portfolio indicated a high degree of risk in the mortgage-related securities

which the Funds purchased," and deny the remaining allegations in Paragraph 249.

250.     The FHI Fund and FHY Fund invested in several HarborView Mortgage Loan Trusts, classifying the debt securities in the CMO section of their Portfolio of Investments. The table below shows the FHI Fund's and FHY Fund's carrying value, as a percentage of par, of three tranches of debt from three such HarborView Trusts at quarterly intervals. The position sizes range from $1 million to $4 million face value.

FHI Fund, FHY Fund valuation of HarborView Mortgage Loan Trusts, as % of par

|  | Series 2005-9, Class B10 | Series 2004-2, Class B5 | Series 2004-8, Class B5 |
|---|---|---|---|
| 10/31/2005 | 82.93% | - | - |
| 01/31/2006 | 83.31% | - | - |
| 04/30/2006 | 81.48% | - | - |
| 07/31/2006 | 88.12% | - | - |
| 10/31/2006 | 88.89% | 87.36% | 87.94% |
| 01/31/2007 | 88.58% | 88.00% | 88.00% |
| 04/30/2007 | 86.73% | 89.00% | 89.00% |
| 07/31/2007 | 87.09% | 89.00% | 89.00% |
| 10/31/2007 | 81.56% | 87.00% | 86.50% |
| 01/31/2008 | 87.00% | 45.00% | 52.00% |
| 04/30/2008 | 60.00% | 45.00% | 50.00% |
| 07/31/2008 | 50.00% | 40.00% | 42.50% |
| 10/31/2008 | 20.00% | 20.00% | 20.00% |

Defendants' Response:  Deny the allegations in Paragraph 250, except admit that the FHI

and FHY Funds invested in certain HarborView Mortgage Loan Trusts, and refer the Court to the

Funds' annual and semi-annual shareholder reports and quarterly disclosures of portfolio

holdings for the full content and context of any disclosures regarding the face value and carrying

value of those investments.

251.     The FHI Fund's and FHY Fund's investments were situated at the bottom of the capital structure of these HarborView Trusts. The B-10 tranche was the lowest mezzanine piece, unrated by Moody's and rated BBB- by both Fitch and S&P, and the two B5 tranches were completely unrated equity tranches designed to over-collateralize the trusts by protecting the senior and mezzanine holders from defaults in the underlying mortgages. The mortgage originators for the trusts were as follows:

| | |
|---|---|
| Series 2004-2 Countrywide Home Loans | 100% |
| Series 2004-8 Countrywide Home Loans | 87.8% |
| Series 2005-9 Washington Mutual Bank | 100% |

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 251.

252.    Mortgages in the HarborView Trusts exhibited a high degree of risk as evidenced by geographical concentration, poor documentation of borrowers' income and assets, concentrated resets of adjustable interest rates, and a high proportion of the loans used for cashout refinancing as opposed to home purchase.  California and Florida accounted for 58.01%, 71.64%, and 80.91% of the originations for the Series 2004-2, Series 2004-8, and Series 2005-9 trusts, respectively.  Cash out refinancing was the purpose of the loans for 30.07%, 34.8%, and 56.87% respectively in these trusts, and full documentation of the borrower's employment, income, and assets accounted for only 28.77%, 24.23%, and 35.08% of the respective trusts' underlying mortgages.

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 252.

253.    In addition, materially negative news about Countrywide, the originator of nearly two thirds of the mortgages in these HarborView Trusts, emerged during the first half of 2007, a time when Defendants represented that the fair value of its low mezzanine and equity HarborView tranches was an average of about eighty-five cents on the dollar.  On July 24, 2007, Countrywide announced a $417 million impairment charge for 2Q:2007 "attributable to accelerated increases in delinquency levels and increases in the estimates of future defaults and loss severities on the underlying loans."  This impairment charge ballooned to $690 million for 3Q:2007, a quarter in which Countrywide recorded a net loss of $1.2 billion as it could no longer conceal its lax underwriting practices of giving shoddy loans to un-creditworthy borrowers.

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 253.

254.    To be sure, the high risk and material deterioration of these mortgages did not necessarily imperil the valuation of the so-called "super-senior" and senior tranches of the HarborView Trusts, which possessed credit enhancement in the form of over-collateralization by the equity tranches as well as prepayment penalties on the underlying loans.  The Funds, however, did not invest in these tranches, but rather in the lowest equity and mezzanine tranches, the very securities whose capital constituted the over-collateralization cushioning the senior debt from loss by absorbing the impact of delinquency, default, and foreclosure.  Defendants valued these tranches at an average price of eighty-five cents on the dollar as late as October 31, 2007,

ignoring the well publicized Countrywide write-downs.  Defendants thus failed to provide in good faith fair value valuations of investment securities using all appropriate factors relevant to such valuation and accordingly overstated the mortgage-related investments and corresponding NAV of the Funds during the Class Periods.

Defendants' Response:  Paragraph 254 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegation that "Defendants thus failed to provide in good faith fair value valuations of investment securities using all appropriate factors relevant to such valuation and accordingly overstated the mortgage-related investments and corresponding NAV of the Funds during the Class Periods"; deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 254; and refer the Court to the Funds' annual and semi-annual reports and quarterly disclosures of portfolio holdings for the full content and context of any disclosures regarding the Funds' investments in HarborView Mortgage Loan Trusts and the pricing or valuation of those investments.

255.    The Funds also invested in several ACE Securities Corp. Home Equity Loan Trusts, classifying the debt securities in the ABS section of their Portfolio of Investments. The table below shows the FHI Fund's carrying value, as a percentage of par, of six tranches of debt from five separate ACE Securities Corp. Home Equity Loan Trusts at quarterly intervals. Most of these investments in the table represent face value positions of $2 million or $3 million. The FHI Fund and FHO Fund had comparable, in some cases overlapping, positions in similar ACE Securities Corp. ABS, although typically larger positions in fewer tranches.

FHI Fund valuation of ACE Securities Corp. HEL Trusts Investments, as % of par

|            | Series 2003-OP1, Class B | Series 2004-HE4, Class M11 | Series 2005-HE5, Class B1 | Series 2005-HE5, Class M10 | Series 2005-SL1, Class M7 | Series 2007-HE4, Class M8 |
|------------|--------------------------|----------------------------|---------------------------|-----------------------------|----------------------------|----------------------------|
| 10/31/2005 | -       | -       | 80.05% | 92.24% | -      | -      |
| 01/31/2006 | 96.82%  | -       | -      | 89.99% | -      | -      |
| 04/30/2006 | 97.55%  | -       | -      | 91.95% | -      | -      |
| 07/31/2006 | 98.01%  | -       | -      | 93.15% | -      | -      |
| 10/31/2006 | 98.71%  | 90.83%  | -      | 93.47% | -      | -      |
| 01/31/2007 | 99.13%  | 96.77%  | -      | 94.77% | 66.76% | -      |
| 04/30/2007 | 98.94%  | 97.74%  | -      | 55.00% | 72.01% | 83.00% |
| 07/31/2007 | 20.24%  | 64.58%  | -      | 16.00% | 13.68% | 75.00% |
| 10/31/2007 | 16.10%  | 2.47%   | -      | 14.40% | 4.46%  | 35.25% |
| 01/31/2008 | 39.59%  | 18.12%  | -      | 7.00%  | 0.95%  | 11.75% |
| 04/30/2008 | 43.94%  | 3.27%   | -      | 7.00%  | -      | 8.75%  |

| 07/31/2008 | 18.37% | 1.17% | - | 3.00% | - | 2.00% |
| 10/31/2008 | 13.26% | - | - | 0.97% | - | 0.75% |

   _Defendants' Response_:  Deny the allegations in Paragraph 255, except admit that one or

more of the Funds invested in certain ACE Securities Corp. Home Equity Loan Trusts, and refer

the Court to the Funds' annual and semi-annual shareholder reports and quarterly disclosures of

portfolio holdings for the full content and context of any disclosures regarding the face value and

carrying value of those investments.

   256.    The Series 2005-HE5 Class M10 is one of the best examples of Defendants'
inflated valuations of its mortgage-related securities as FHI Fund was continuously invested in
this particular tranche during the entire FHI Class Period.

   _Defendants' Response_:  Deny the allegations in Paragraph 256, except admit that the FHI

Fund reported investments in the ACE Securities Corp. Home Equity Loan Trust Series 2005

HE5 Class M10 in its annual and semi-annual shareholder reports and quarterly disclosures of

portfolio holdings during the Class Period.

   257.    According to its August 2005 prospectus filed with the SEC, the assets of the
ACE 2005-HE5 Trust consisted of 7,212 first and second lien fixed-rate and adjustable-rate, one-
to-four-family, residential mortgage loans with total principal balance of $1.437 billion of which
only approximately half were required to conform to Freddie Mac loan limits.  Fremont
Investment & Loan, a well-known Californian sub-prime lender, originated 86.46% of the
mortgages.  ACE 2005-HE5's liabilities were the ABS issued to investors and consisted of 4
senior tranches, 10 mezzanine tranches, and 4 equity tranches.  The following table indicates the
size of each tranche and its initial rating from S&P and Moody's.

| TRANCHE | PRINCIPAL | RATING |
|---|---|---|
| Class A-1 | $549,265,000.00 | AAA/Aaa |
| Class A-2A | 333,119,000.00 | AAA/Aaa |
| Class A-2B | 135,251,000.00 | AAA/Aaa |
| Class A-2C | 68,780,000.00 | AAA/Aaa |
| Class M-1 | 57,482,000.00 | AA+/Aa1 |
| Class M-2 | 53,171,000.00 | AA/Aa2 |
| Class M-3 | 31,615,000.00 | AA/Aa3 |
| Class M-4 | 28,023,000.00 | AA-/A1 |
| Class M-5 | 25,149,000.00 | A+/A2 |
| Class M-6 | 23,711,000.00 | A/A3 |
| Class M-7 | 19,400,000.00 | A-/Baa1 |

| Class M-8 | 17,963,000.00 | BBB+Baa2 |
| Class M-9 | 15,808,000.00 | BBB/Baa3 |
| Class M-10 | 12,215,000.00 | BBB-/Ba1 |
| Class B-1 | 14,371,000.00 | unrated "equity" |
| Class B-2 | 25,149,000.00 | unrated "equity" |
| Class B-3 | 15,089,000.00 | unrated "equity" |
| Credit Enhancement | 11,496,688.00 | unrated "equity" |
| Total | $1,437,057,688.00 | |

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 257.

258.    FHI Fund invested heavily at the bottom end of the capital structure.  On
October 31, 2005 FHI Fund owned 21% of the unrated B-1 equity tranche ($3 million face value
out of $14.371 million total) and 16.3% of the lowest mezzanine rung M-10 ($2 million face
value out of $12.215 million total).  In fact, all of the Funds' ACE positions across FHI Fund,
FHY Fund, and FHO Fund were similarly situated:  either equity or among the bottom two
mezzanine tranches of the respective other trusts.

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 258.

259.    Analysis of the underlying mortgages and their risk characteristics, however,
demonstrates Defendants' valuation of these mortgage-related securities at so close to par
materially misstated the value of these assets.  In the case of the ACE 2005-HE5 Trust there was
no geographic diversification in terms of origination; three states (California, Florida, and New
York) accounted for 55.9% of the total.  Loan to value ratios exceeded 0.80 for 36.32% of the
mortgages, an indication of high risk due to excessive leverage on the part of the borrowers.
Only 58.15% of the mortgages had full documentation of the borrowers' income and assets; the
remainder relied on stated (37.03%), limited (3.72%), or in some cases no (1.1%) documentation
whatsoever.  The FICO scores of the borrowers were below 624 for 44.21% of the mortgages.
Furthermore, only 49.62% of the mortgages were intended for home purchases; an astonishing
49.69% were intended for cash-out refinancing according to the prospectus of the trust.

Defendants' Response:  Paragraph 259 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegation that the

Funds' pricing or valuation of investments in ACE Securities Corp. Home Equity Loan Trusts

materially misstated the value of those securities, and deny knowledge or information sufficient

to form a belief as to the truth of the remaining allegations in Paragraph 259.

260.    The risk of variable interest rate increases, however, exceeded all of these aforementioned risks for the mortgages in the ACE 2005-HE5 Trust.  Only 16.72% of the mortgages were fixed rate.  Not only were the remainder risky adjustable rate mortgages ("ARMs"), but the vast majority (90.35%) also had the initial interest rate re-set slated for May and June of 2007, thereby magnifying the risk.  It is true that ARMs can re-set lower as well as higher, but 29.20% of the loans were interest only, thereby necessitating an increase in monthly payments to allow the mortgage to fully amortize by the final payment date.

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 260.

261.    Despite these risks and documented deterioration in the credit quality of the mortgages in the ACE Securities Corp. Series 2005-HE5, Defendants continued to value its M-10 investment at 94.7% of par as late as its N-Q filing for the quarter ended January 31, 2007.  On November 17, 2006, however, Grant's *Interest Rate Observer*, a well-known investment newsletter, published an analysis of the ACE Securities Corp. Series 2005-HE5.[20] According to *Grant's*, in August of 2006, 14% of the mortgages in the trust were delinquent, in foreclosure, or accounted for as "real estate owned" (REO).  At the subsequent valuation date, April 30, 2007, Defendants marked down the M-10 investment from 94.7% of par to 55%.  Further reporting in the same periodical indicates that the percent of principal balance the delinquent/foreclosure/REO category climbed from 22.1% in April 2007, the month before the majority of the ARM resets, to 34.4% in August 2007.  At October 31, 2007, Defendants valued the M-10 tranche at 14.4% of par.

Defendants' Response:  Answering Paragraph 261, refer the Court to the Funds' annual and semi-annual shareholder reports and quarterly disclosures of portfolio holdings for the full content and context of any disclosures regarding the Funds' investments in of ACE Securities Corp. Home Equity Trusts and the pricing or valuation of those securities, and deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 261.

262.    Defendants thus failed to provide, in good faith, fair value valuations of investment securities using all appropriate factors relevant to such valuations and accordingly overstated the mortgage-related investments and corresponding NAV of the Funds during the Class Period.

---

[20] "Termites in the Foundation," *Grant' Interest Rate Observer*, Vol. 24, No. 22d.  *See also* "Inside ACE Securities' HEL Trust, Series 2005-HE5," *Grant' Interest Rate Observer*, Vol. 24, No. 17a.

Defendants' Response:  Paragraph 262 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 262.

263.    Following is a summary overview of an additional six ABS-issuing trusts further demonstrating that Defendants overstated its NAV during the Class Periods by its material inflation of its mortgage-related securities.  Furthermore, analysis of the underlying mortgages of the six trusts demonstrates that Defendants misrepresented the extent of its diversification.  Diversifications entails investing in uncorrelated or negatively correlated assets so that losses in one asset are offset by gains in another, thus reducing the volatility of investment returns.  The Funds, in contrast to this strategy, invested in highly correlated assets, namely the subordinated mezzanine and equity tranches of sub-prime ABS trusts where the underlying mortgages all faced similar risks.  The similarity of these risks and the subordinated position of the Funds' investments in the capital structure of the trusts meant that losses in one asset would be duplicated, not offset, by losses in other assets, thus belying Defendants' representations that FHI Fund, FHY Fund, and FHO Fund were "diversified closed –end management investment compan[ies]."

Defendants' Response:  Paragraph 263 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 263.

264.    The table below shows the carrying value, as a percentage of par, of six additional tranches of debt in the portfolios of the Funds.  These sizes of these investments were substantial in terms of the face value represented.  The Bear Stearns Asset Backed Security Trust Series 2007-HE3, Class M9 represented an original position of $13 million across the three Funds; the GSAMP Trust Series 2004-AR2, Class B4 represented an original position of $5 million in FHI; the three different Park Place Securities, Inc. ABS represented an aggregate original face value position of $23.25 million in FHI Fund and FHY Fund; and the Indymac Residential Asset Backed Trust Series 2005-B, Class M10 represented a $2.375 million face value position in FHI Fund.

Valuation of Additional ABS Trusts

| price as % of par | 4/30/2006 | 10/31/2006 | 4/30/2007 | 10/31/2007 | 4/30/2008 | 10/31/2008 |
|---|---|---|---|---|---|---|
| GSAMP Trust | | | | | | |
| Series 2004-AR2, Class B4 | 83.85% | 88.20% | 92.73% | 30.00% | 12.00% | 2.00% |
| Bear Stearns ABS Trust | | | | | | |
| Series 2007-HE3, Class M9 | - | - | 80.88% | 40.00% | 11.00% | 4.09% |
| Park Place Securities, Inc. | | | | | | |
| Series 2004-WCW1, Class M9 | - | - | 82.68% | 71.01% | 48.42% | 13.97% |
| Series 2005-WCW3, Class M11 | - | - | - | - | 10.00% | 1.00% |
| Series 2005-WCH1, Class M10 | 90.38% | 89.96% | 84.10% | 69.58% | 9.33% | 1.05% |

| Indymac Residential AB Trust | | | | | | |
|---|---|---|---|---|---|---|
| Series 2005-B, Class M10 | 91.63% | 93.09% | 77.04% | 63.63% | 19.26% | 9.75% |

<u>Defendants' Response</u>:  Answering Paragraph 264, admit that, during the Class Period, one or more of the Funds invested in GSAMP Trust Series 2004-AR2, Class B4, Bear Stearns ABS Trust Series 2007-HE3, Class M9, Park Place Securities, Inc. Series 2004-WCW1, Class M9, Park Place Securities, Inc. Series 2005-WCW3, Class M11, Park Place Securities, Inc. Series 2005-WCH1, Class M10, and Indymac Residential AB Trust Series 2005-B, Class M10; refer the Court to the Funds' annual and semi-annual shareholder reports and quarterly disclosures of portfolio holdings for the full content and context of any disclosures regarding the face value and carrying value of those securities; and deny knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 264.

265.    Each ABS in the chart above is either the lowest rated mezzanine tranche in the respective issuing trust or an unrated over-collateralization equity tranche.  The underlying mortgages all share similar and highly correlated risk characteristics in terms of their geographic concentration, use of stated documentation (i.e. so-called "liar loans") in the underwriting process, high LTV ratios, low FICO scores, utilization for cash-out refinancing, and concentration of interest rate adjustment dates.  The following bullet points summarize the risk characteristics for each trust.

### GSAMP Trust Series 2004-AR2

- Geographic concentration:  28.70% California, 11.25% Florida;

- Average original LTV Ratio:  88.53%;

- Mortgage loans having original LTV ratios in excess of 80%:  81.70%;

- Average Original FICO Score:  616;

- Underwriting based on stated income documentation:  36.14%;

- Mortgages used for cash-out refinance:  61.24%.

### Bear Stearns Asset Backed Security Trust Series 2007-HE3

- Geographic concentration:  35.07% California, 9.36% Florida;

- Mortgage loans with 100% LTV:  11.45%;

- Weighted average FICO score:  624;

- Mortgages used for cash-out refinance:  62.15%;

- Underwriting based on stated income documentation:  45.81%;

- Concentration of interest rate adjustments within 18 to 23 months:  57.82%.

**Park Place Securities, Inc. Series 2004-WCW1**

- Geographic concentration:  25.72% California, 9.04% Florida;

- Mortgage loans having original LTV ratios in excess of 80%:  63.9%;

- Average Original FICO Score:  621;

- Underwriting based on stated income documentation:  58.32%;

- Mortgages used for cash-out refinance:  59.56%;

- Concentration of interest rate adjustments:  March 2006, 26.83%, June 2006, 40.82%.

**Park Place Securities, Inc. Series 2005-WCW3**

- Geographic concentration:  20.10% California, 14.79% Florida;

- Mortgage loans having original LTV ratios in excess of 80%:  46.08%;

- Average Original FICO Score:  607;

- Underwriting based on stated income documentation:  37.97%;

- Mortgages used for cash-out refinance:  57.41%;

- Concentration of interest rate adjustments:  June 2007, 58.70%.

**Park Place Securities, Inc. Series 2005-WCH1**

- Geographic concentration:  33.12% California, 12.19% Florida;

- Mortgage loans having original LTV ratios in excess of 80%:  35.89%;

- Average Original FICO Score:  622;

- Mortgages used for cash-out refinance:  52.09%;

- Concentration of interest rate adjustments:  April 2007, 66.16%.

**Indymac Residential Asset Backed Trust Series 2005-B**

- Geographic concentration:  16.73% California, 8.83% Florida;

- Mortgage loans having original LTV ratios in excess of 80%:  22.76%;

- Borrowers with original FICO Score below 620:  46.19%;

- Mortgages used for cash-out refinance:  61.34%;

- Concentration of interest rate adjustments:  June 2007 32.84%, May 2007 22.64%.

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 265.

266.    The preceding risk factors in the underlying mortgages of the Funds' tranches of mortgage-related securities demonstrate the lack of diversification of the Funds' portfolio.  The high geographic concentration of mortgages in California and Florida meant that a decline in the residential real estate market in either state would have a correspondingly adverse impact on the Funds' portfolio compared to a geographically diversified portfolio.  Similarly, the temporal concentration of interest rate re-settings to a handful of months meant that the Funds exposed themselves to the risk that a recession or period of increased unemployment could coincide with an upwards adjustment in interest rates, thus imperiling many borrowers' ability to repay at the same time.  The high proportion of mortgages with low FICO scores, stated documentation, high LTV ratios, and use of the loans for cash-out refinancing as opposed to home purchase further contributed to credit risk in the underlying mortgages, and the Funds' concentration of investments at the bottom of the credit structure of the trusts ensured that most of these investments had correlated, undiversified risk if the cash flow of the underlying mortgage payments was insufficient to pay down all tranches.

Defendants' Response:  Deny the allegations in Paragraph 266.

267.    Indeed, these very credit risks did in fact manifest themselves starting as early as December 2006.  As previously mentioned, the lowest rated ABX BBB- index of subprime mortgages fell at that time while spreads widened to 400 basis points compared to 242 basis points the previous July.  As the ABX is a synthetic index consisting of credit default swaps on sub-prime ABS, its decline in price and increase in spread represent a quantifiable, market-based measure of the cost to insure against default on the underlying ABS based on investors' perception of the increased likelihood of loss.  The ABX, as previously mentioned, deteriorated throughout the course of 2007, well before Defendants meaningfully reduced the valuation of its ABS as percentage of par.  *See supra* chart ¶134.  Defendants thus failed to provide in good faith fair value valuations of investment securities using all appropriate factors relevant to such

valuation and accordingly overstated the mortgage-related investments and corresponding NAV of the Funds during the Class Periods.

Defendants' Response:  Paragraph 267 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, repeat and reallege Defendants' response to Paragraph 134 as if fully set forth herein, and deny the remaining allegations in Paragraph 267.

268.   From July 2007 until the end of the Class Periods in July 2008 the Funds experienced pronounced deterioration in both NAV and share price as their inflated mortgage-related investment valuations could no longer be maintained in light of the widening sub-prime crisis and subsequent turmoil in the credit markets.  Unrealized investment losses exploded as Defendants finally began incorporating the aforementioned risks facing their subordinated mezzanine investments into the valuations, risks that had existed since the beginning of 2007.  The annual increase in unrealized losses over this last year of the Class Periods was 252% for FHI Fund, 327% for FHY Fund, and 1,461% for FHO Fund.

Defendants' Response:  Deny the allegations in Paragraph 268, and refer the Court to the Funds' public filings with the SEC for the full content and context of any disclosures regarding the Funds' NAVs and gains or losses on investments.

269.   Realized losses also mounted as the Funds were forced to liquidate assets at depressed prices in order to repay revolving credit facilities which expired in August and November of 2008.  FHI Fund and FHY Fund had used these credit lines to implement leverage, thereby making their investment portfolios substantially exceed the value of net assets.  In this condition, any percentage decline in the market value of those Funds' investment portfolio had a magnifying effect on the percentage loss for those Funds' shareholders.  Indeed, Defendants touted the fact that FHO did not employ leverage and thus "avoid[ed] being forced to sell assets at greatly reduced prices."  The FHI Fund and FHY Fund thus incurred investment losses significantly higher than would have occurred in the absence of such leveraging.  From October 2007 to October 2008 the annual increase in accumulated realized losses was 1,519% for FHI Fund and 2,601% for FHY Fund.[21]

Defendants' Response:  Deny the allegations in Paragraph 269, except admit that the FHI and FHY Funds utilized leverage during the Class Period, and refer the Court to the Funds'

---

[21] FHO Fund did not use leverage and has a different fiscal year than the other two funds.  It did, however, have realized losses of $14.6 million at July 2008.

public filings with the SEC for the full content and context of any disclosures regarding the

Funds' use of leverage and gains or losses on investments.

270.    The combined effect of these realized and unrealized losses led to the following decline in NAV from July 2007 until the end of the Class Periods.

| in millions | 7/2007 NAV | 7/2008 NAV | Annual decline - |
|---|---|---|---|
| FHI Fund | 159.35 | 81.77 | 48.69% |
| FHY Fund | 175.69 | 104.15 | -40.72% |
| FHO Fund | 166.18 | 70.98 | -57.29% |

Defendants' Response:  Deny the allegations in Paragraph 270, and refer the Court to the

Funds' public filings with the SEC for the full content and context of any disclosures regarding

the Funds' NAVs.

271.    In addition to the accounting improprieties discussed above, the Funds presented their financial position and results in a manner which violated the following fundamental accounting principles:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated(FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise

performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

        (f)    The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

        (g)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

        (h)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

    <u>Defendants' Response</u>:  Paragraph 271 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 271 and its subparagraphs.

    272.    Throughout the Class Periods, the Funds issued Certified Reports to Shareholders of the Funds in the Forms N-Qs and N-CSR.  Each report discussed the performance of the Fund and its holdings.

    <u>Defendants' Response</u>:  Deny the allegations in Paragraph 272, except admit that the

Funds filed annual shareholder reports on Form N-CSR, semi-annual shareholder reports on

Form N-CSRS, and quarterly disclosures of portfolio holdings on Form N-Q; and refer the Court

to those reports for the full content and context thereof.

    273.    For example, on September 29, 2005, the FHI Fund filed its initial Form N-Q Quarterly Report for end date July 31, 2005, and filed identical statements in its public filings throughout the class period, as did FHY Fund and FHO Fund, which stated in pertinent part:

    The registrant's principal executive and principal financial officers, or persons performing similar functions, have concluded that the registrant's disclosure controls and procedures. . . are effective, as of a date within 90 days of the filing date of the report that includes the disclosure required by this paragraph, based on their evaluation of these controls and procedures. . .

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 273, except admit that

Plaintiffs purport to quote a portion of the FHI Fund's quarterly disclosure of portfolio holdings

for the period ended July 31, 2005, and refer the Court to the quarterly report for the full content

and context thereof.

274.    Attached to each report was a certification by Defendants Bowen and Bradley
certifying, pursuant to Rule 30A-2(A) under the 1940 Act and Section 302 of the Sarbanes Oxley
Act that:

1.    I have reviewed this report on Form N-Q of First Trust Strategic High
Income Fund;

2.    Based on my knowledge, this report does not contain any untrue statement
of a material fact or omit to state a material fact necessary to make the statements made,
in light of the circumstances under which such statements were made, not misleading
with respect to the period covered by this report;

3.    Based on my knowledge, the schedules of investments included in this
report fairly present in all material respects the investments of the registrant as of the end
of the fiscal quarter for which the report is filed;

4.    The registrant's other certifying officer(s) and I are responsible for
establishing and maintaining disclosure controls and procedures (as defined in Rule 30a-
3(c) under the Investment Company Act of 1940) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such
disclosure controls and procedures to be designed under our supervision, to ensure
that material information relating to the registrant, including its consolidated
subsidiaries, is made known to us by others within those entities, particularly
during the period in which this report is being prepared;

(b)    [Omitted]

(c)    Evaluated the effectiveness of the registrant's disclosure controls
and procedures and presented in this report our conclusions about the
effectiveness of the disclosure controls and procedures, as of a date within
90 days prior to the filing date of this report, based on such evaluation; and

(d)    Disclosed in this report any change in the registrant's internal
control over financial reporting that occurred during the registrant's most recent
fiscal quarter that has materially affected, or is reasonably likely to materially
affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Defendants' Response:  Answering Paragraph 274, admit that the Funds' annual and semi-annual reports and quarterly disclosures of portfolio holdings contained SOX Certifications by Defendants Bowen and Bradley, and refer the Court to the SOX Certifications for the full content and context thereof.

275.    The statements referenced in the certifications above were untrue statements of material fact when made because of the following facts that existed at the time of the certifications: (i) the Funds were heavily invested in risky mortgage related assets which made the risk of investing in the Funds significantly greater than what it represented; (ii) many of the holdings of the Funds had declined in value and were continuing to at a very significant rate; (iii) based upon facts existing at that time concerning problems with the real estate and mortgage industries, the Fund materially overstated the value of its portfolio and NAV by failing to properly value its investments in mortgage-related securities.  Additionally, the true facts, which were known by the Defendants but concealed from the investing public during the Class Periods, were as follows:

(a)    The Defendants ignored observable market data in the valuation of the Funds' mortgage-related securities which showed that there was significant deterioration in the market in contravention of GAAP, SEC and the Funds' disclosed policies;

(b)    The Funds lacked effective internal controls to provide reasonable assurances that the Funds would value these securities in accordance with GAAP;

(c)    The Funds materially overstated the value of their portfolios and NAV by failing to properly value their investments in mortgage-related securities in contravention of GAAP and SEC Rules;

(d)    The Defendants compounded the risks of the Funds' investment strategy by utilizing leverage to buy securities on margin in a falling market, thereby necessitating forced liquidation;

(e)     The Defendants did not "generally seek" and did not in fact implement effective hedges to mitigate the risks related to the Funds' mortgage-backed securities;

(f)     The Defendants were motivated to improperly value the Funds' investments in mortgage-related securities and inflate NAVs in order to inflate investment advisory fees;

(g)     The Funds lacked effective internal controls to monitor and manage the risks inherent in the Funds' investments in mortgage-related securities; and

(h)     Defendants failed to inform investors of the potential adverse impact on dividend income that would result from the Funds' deteriorating mortgage collateral, including from artificial inflation of the Funds' NAV that did not reflect the impairment of income that would have been apparent to investors from fair valuation of the Funds' mortgage-related securities.

Defendants' Response:  Paragraph 275 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 275 and its subparagraphs.

276.     By misrepresenting the Funds' NAVs, Defendants presented a misleading picture of the Funds' portfolios and financial conditions and prospects.  Thus, instead of truthfully disclosing during the Class Periods that the Funds' portfolios deteriorating values, Defendants made untrue statements of material fact as described above.  These misstatements and omissions of material fact caused and maintained the artificial inflation in the Funds' share prices throughout the Class Periods and until the truth was fully revealed to the market.  The FHI Fund reached the FHI Class Period high of $21.35 per share in October 2006.  The FHY Fund reached the FHY Class Period high of $21.42 per share in December 2006.  The FHO Fund reached the FHO Class Period high of $20.64 per share in April 2007.

Defendants' Response:  Paragraph 276 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, aver the each Fund's share

price is a matter of public record, and deny the remaining allegations in Paragraph 276.

277.     The truth about the Funds' portfolios, their true value, investing outlook and financial condition and prospects began to enter the market with a series of partial disclosures and revelations which were accompanied by denials and continuing misrepresentations by Defendants.  As a result, the artificial inflation in the Funds' respective shares prices did not come out of the shares all at once.  Rather, the artificial price inflation came out over time.

Defendants' Response:  Deny the allegations in Paragraph 277.

278.    As a direct result of Defendants' admissions and the public revelations regarding the truth about the Funds' portfolios, investing outlook and actual financial prospects going forward, the FHI Fund's share price plummeted 52%, falling from $21.35 per share in October 2006 – its all time FHI Class Period high – to $10.22 per share on July 7, 2008 – a drop of $11.13 per share.  The FHY Fund's share price plummeted 51%, falling from $21.42 per share in December 2006 – its all time FHY Class Period high – to $10.52 per share on July 7, 2008 – a drop of $10.90 per share.  The FHO Fund's share price plummeted 59%, falling from $20.64 per share in April 2007 – its all time FHO Class Period high – to $8.46 per share on July 7, 2008 – a drop of $12.18 per share.

Defendants' Response:  Paragraph 278 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, aver that each Fund's share

price is a matter of public record, and deny the remaining allegations in Paragraph 278.

279.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by a Defendant who knew that those statements were false when made.

Defendants' Response:  Paragraph 279 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 279.

280.    Plaintiffs Wolkstein and Duda repeat and reallege each and every allegation contained above in paragraphs 1 through 279 as if fully set forth herein.  This Count is founded solely on Defendants' negligence and Plaintiffs explicitly exclude any allegation that could be construed to allege intentional or reckless misconduct.

Defendants' Response:  Deny the allegations in Paragraph 280, and repeat and reallege

Defendants' responses to Paragraphs 1 through 279 as if fully set forth herein.

281.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the FHY Securities Act Subclass, against Defendants First Trust Portfolios, First Trust, FHY Fund, Bowen and Bradley.

<u>Defendants' Response</u>:  Answering Paragraph 281, admit that Plaintiffs purport to bring Count I pursuant to Section 11 of the Securities Act on behalf of the FHY Securities Act Subclass, as defined in the Complaint, against Defendants First Trust Portfolios, First Trust Advisors, FHY Fund, Bowen, and Bradley.

282.    The Registration Statement for the offering of the FHY Fund was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

<u>Defendants' Response</u>:  Paragraph 282 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 282.

283.    First Trust Portfolios is the registrant for the FHY Fund.  The Defendants named herein were responsible for the contents and dissemination of the Registration Statement for the FHY Fund.

<u>Defendants' Response</u>:  Paragraph 283 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 283.

284.    As issuers of the shares, the FHY Fund is strictly liable to Plaintiffs Wolkstein and Duda and members of the FHY Securities Act Subclass for the misstatements and omissions contained in the Registration Statement.

<u>Defendants' Response</u>:  Paragraph 284 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 284.

285.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement for the FHY Fund were true and without omissions of any material facts and were not misleading.

Defendants' Response:  Paragraph 285 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 285.

286.    By reasons of the conduct herein alleged, each Defendant named herein violated, and/or controlled a person who violated, §11 of the Securities Act.

Defendants' Response:  Paragraph 286 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 286.

287.    Plaintiffs Wolkstein and Duda acquired the FHY Fund's shares pursuant to the Fund's Registration Statement.

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 287.

288.    Plaintiffs Wolkstein and Duda and the members of the FHY Securities Act Subclass have sustained damages.  The value of the FHY Fund's shares declined substantially subsequent to and due to the herein-named Defendants' violations.

Defendants' Response:  Paragraph 288 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 288.

289.    At the times Plaintiffs Wolkstein and Duda purchased their FHY Fund's shares, these plaintiffs and other members of the FHY Securities Act Subclass were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to July 7, 2007.  Less than one year has elapsed from the time that Plaintiffs Wolkstein and Duda discovered or reasonably could have discovered the facts upon which this Complaint is based to the time a complaint was filed.  Less than three years has elapsed between the time that the securities upon which this Count is brought were sold to the public and the time a complaint was filed alleging the violations herein.

Defendants' Response:  Paragraph 289 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 289.

290.    Plaintiff CRC repeats and realleges each and every allegation contained above in paragraphs 1 through 279 as if fully set forth herein.  This Count is founded solely on Defendants' negligence and Plaintiffs explicitly exclude any allegation that could be construed to allege intentional or reckless misconduct.

Defendants' Response:  Deny the allegations in Paragraph 290, and repeat and reallege

Defendants' responses to Paragraphs 1 through 279 as if fully set forth herein.

291.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the FHO Securities Act Subclass, against Defendants First Trust Portfolios, First Trust, FHO Fund, Bowen and Bradley.

Defendants' Response:  Answering Paragraph 291, admit that Plaintiffs purport to bring

Count II pursuant to Section 11 of the Securities Act on behalf of the FHO Securities Act

Subclass, as defined in the Complaint, against Defendants First Trust Portfolios, First Trust

Advisors, FHO Fund, Bowen, and Bradley.

292.    The Registration Statement for the offering of the FHO Fund was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

Defendants' Response:  Paragraph 292 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 292.

293.    First Trust Portfolios is the registrant for the FHO Fund.  The Defendants named herein were responsible for the contents and dissemination of the Registration Statement for the FHO Fund.

Defendants' Response:  Paragraph 293 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 293.

294.    As issuers of the shares, the FHO Fund is strictly liable to Plaintiff CRC and members of the FHO Securities Act Subclass for the misstatements and omissions contained in the Registration Statement.

Defendants' Response:  Paragraph 294 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 294.

295.    None of the Defendants named herein made a reasonable investigation or
possessed reasonable grounds for the belief that the statements contained in the Registration
Statement for the FHO Fund were true and without omissions of any material facts and were not
misleading.

Defendants' Response:  Paragraph 295 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 295.

296.    By reasons of the conduct herein alleged, each Defendant named herein violated,
and/or controlled a person who violated, §11 of the Securities Act.

Defendants' Response:  Paragraph 296 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 296.

297.    Plaintiff CRC acquired the FHO Fund's shares pursuant to the Fund's
Registration Statement.

Defendants' Response:  Deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 297.

298.    Plaintiff CRC and the members of the FHO Securities Act Subclass have
sustained damages.  The value of the FHO Fund's shares declined substantially subsequent to
and due to the herein-named Defendants' violations.

Defendants' Response:  Paragraph 298 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 298.

299.    At the times Plaintiff CRC purchased their FHO Fund's shares, these plaintiffs
and other members of the FHO Securities Act Subclass were without knowledge of the facts
concerning the wrongful conduct alleged herein and could not have reasonably discovered those
facts prior to July 7, 2007.  Less than one year has elapsed from the time that Plaintiff CRC

discovered or reasonably could have discovered the facts upon which this Complaint is based to the time a complaint was filed. Less than three years has elapsed between the time that the securities upon which this Count is brought were sold to the public and the time a complaint was filed alleging the violations herein.

Defendants' Response:  Paragraph 299 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 299.

300.    Plaintiffs Wolkstein and Duda repeat and reallege each and every allegation contained above in paragraphs 1 through 279 and 280 through 289 as if fully set forth herein. This Count is founded solely on Defendants' negligence and Plaintiffs explicitly exclude any allegation that could be construed to allege intentional or reckless misconduct.

Defendants' Response:  Deny the allegations in Paragraph 300, and repeat and reallege

Defendants' responses to Paragraphs 1 through 279 and Paragraphs 280 through 289 as if fully

set forth herein.

301.    This Count is brought against Defendants First Trust Portfolios and FHY Fund pursuant to §12(a)(2) of the Securities Act on behalf of the FHY Securities Act Subclass.

Defendants' Response:  Answering Paragraph 301, admit that Plaintiffs purport to bring

Count III pursuant to Section 12(a)(2) of the Securities Act on behalf of the FHY Securities Act

Subclass, as defined in the Complaint, against Defendants First Trust Portfolios and FHY Fund.

302.    Defendants named herein were sellers and offerors and/or solicitors of purchasers of the shares offered pursuant to the FHY Funds Fund's Prospectus.

Defendants' Response:  Paragraph 302 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 302.

303.    The FHY Fund's Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.  The actions of solicitation of the Defendants named in this Count included participating in the preparation of the false and misleading Prospectus and participating in road shows to market the Fund to investors.

Defendants' Response:  Paragraph 303 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 303.

304.    The Defendants named herein owed to the purchasers of the FHY Fund's shares,
including Plaintiffs Wolkstein and Duda and the members of the FHY Securities Act Subclass
the duty to make a reasonable and diligent investigation of the statements contained in the
offering materials, including the FHY Fund's Prospectus, to ensure that such statements were
true and that there was no omission to state a material fact required to be stated in order to make
the statements contained therein not misleading.  Defendants named herein, in the exercise of
reasonable care, should have known of the misstatements and omissions contained in the offering
materials as set forth above.

Defendants' Response:  Paragraph 304 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 304.

305.    Plaintiffs Wolkstein and Duda and the members of the FHY Securities Act
Subclass purchased or otherwise acquired the FHY Fund's shares pursuant and/or traceable to
the defective Prospectus.  Plaintiff Wolkstein and Duda did not know, or in the exercise of
reasonable diligence could not have known, of the untruths and omissions contained in the
Prospectus.

Defendants' Response:  Paragraph 305 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 305.

306.    Plaintiffs Wolkstein and Duda, individually and representatively, hereby offers to
tender to Defendants those securities which Wolkstein and Duda and other FHY Securities Act
Subclass members continue to own, on behalf of all members of the FHY Securities Act
Subclass who continue to own such securities, in return for the consideration paid for those
securities together with interest thereon.  FHY Securities Act Subclass who have sold their FHY
Fund's shares are entitled to rescissory damages.

Defendants' Response:  Paragraph 306 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegation that

Plaintiffs or any members of the FHY Securities Act Subclass are entitled to rescissory damages,

and deny knowledge or information sufficient to form a belief as to the remaining allegations in

Paragraph 306.

307.    By reason of the conduct alleged herein, these Defendants violated, and/or controlled a person who violated, §12(a)(2) of the Securities Act.  Accordingly, Plaintiffs Wolkstein and Duda and members of the FHY Securities Act Subclass who hold the FHY Fund's shares purchased in the offering have the right to rescind and recover the consideration paid for their shares and hereby elect to rescind and tender their shares to the Defendants sued herein.  Plaintiffs Wolkstein and Duda and members of the FHY Securities Act Subclass who have sold their shares are entitled to rescissory damages.

Defendants' Response:  Paragraph 307 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 307.

308.    Plaintiff CRC repeats and realleges each and every allegation contained above in paragraphs 1 through 279 and 290 through 299 as if fully set forth herein.  This Count is founded solely on Defendants' negligence and Plaintiff explicitly exclude any allegation that could be construed to allege intentional or reckless misconduct.

Defendants' Response:  Deny the allegations in Paragraph 308, and repeat and reallege

Defendants' responses to Paragraphs 1 through 279 and Paragraphs 290 through 299 as if fully

set forth herein.

309.    This Count is brought against Defendants First Trust Portfolios and FHO Fund pursuant to §12(a)(2) of the Securities Act on behalf of the FHO Securities Act Subclass.

Defendants' Response:  Answering Paragraph 309, admit that Plaintiffs purport to bring

Count IV pursuant to Section 12(a)(2) of the Securities Act on behalf of the FHO Securities Act

Subclass, as defined in the Complaint, against Defendants First Trust Portfolios and FHO Fund.

310.    Defendants named herein were sellers and offerors and/or solicitors of purchasers of the shares offered pursuant to the FHO Fund's Prospectus.

Defendants' Response:  Paragraph 310 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 310.

311.     The FHO Fund's Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.  The actions of solicitation of the Defendants named in this Count included participating in the preparation of the false and misleading Prospectus and participating in road shows to market the Fund to investors.

Defendants' Response:  Paragraph 311 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 311.

312.     The Defendants named herein owed to the purchasers of the FHO Fund's shares, including Plaintiff CRC and the members of the FHO Securities Act Subclass the duty to make a reasonable and diligent investigation of the statements contained in the offering materials, including the FHO Fund's Prospectus, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants named herein, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the offering materials as set forth above.

Defendants' Response:  Paragraph 312 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 312.

313.     Plaintiff CRC and the members of the FHO Securities Act Subclass purchased or otherwise acquired the FHO Fund's shares pursuant and/or traceable to the defective Prospectus. Plaintiff CRC did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectus.

Defendants' Response:  Paragraph 313 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 313.

314.     Plaintiff CRC, individually and representatively, hereby offers to tender to Defendants those securities which CRC and other FHO Securities Act Subclass members continue to own, on behalf of all members of the FHO Securities Act Subclass who continue to own such securities, in return for the consideration paid for those securities together with interest thereon.  FHO Securities Act Subclass who have sold their FHO Fund's shares are entitled to rescissory damages.

Defendants' Response:  Paragraph 314 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegation that

Plaintiffs or any members of the FHO Securities Act Subclass are entitled to rescissory damages,

and deny knowledge or information sufficient to form a belief as to the remaining allegations in

Paragraph 314.

315.     By reason of the conduct alleged herein, these Defendants violated, and/or
controlled a person who violated, §12(a)(2) of the Securities Act.  Accordingly, Plaintiff CRC
and members of the FHO Securities Act Subclass who hold the FHO Fund's shares purchased in
the offerings have the right to rescind and recover the consideration paid for their shares and
hereby elect to rescind and tender their shares to the Defendants sued herein.  Plaintiff CRC and
members of the FHO Securities Act Subclass who have sold their shares are entitled to rescissory
damages.

Defendants' Response:  Paragraph 315 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 315.

316.     Plaintiffs Wolkstein and Duda repeat and reallege each and every allegation
contained above in paragraphs 1 through 279, 280 through 289, and 300 through 307 as if fully
set forth herein.  This Count is founded solely on Defendants' negligence and Plaintiffs explicitly
exclude any allegation that could be construed to allege intentional or reckless misconduct.

Defendants' Response:  Deny the allegations in Paragraph 316, and repeat and reallege

Defendants' responses to Paragraphs 1 through 279, Paragraphs 280 through 289, and

Paragraphs 300 through 307 as if fully set forth herein.

317.     This Count is brought pursuant to §15 of the Securities Act against Defendants
Bowen, Bradley and First Trust.

Defendants' Response:  Answering Paragraph 317, admit that Plaintiffs purport to bring

Count V pursuant to Section 15 of the Securities Act against Defendants First Trust Advisors,

Bowen, and Bradley.

318.     Each of the Defendants named herein was a control person of the FHY Fund,
within the meaning of Section 15 of the Securities Act, by virtue of their positions as of trustee
of the FHY Fund and/or by virtue of their position as officers of First Trust.  Defendants named

herein each had a series of direct and/or indirect business and/or personal relationships with other trustees and/or officers and/or major shareholders of the FHY Funds.  First Trust was the Fund's investment adviser and was responsible for selecting and supervising the Subadvisors, the ongoing monitoring of the Fund's investment portfolio, managing the Fund's business affairs and providing certain clerical and bookkeeping and other administrative services.  First Trust was also responsible for determining the Fund's overall investment strategy and overseeing its implementation.

<u>Defendants' Response</u>:  Paragraph 318 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 318, except admit that First Trust Advisors served as the FHY Fund's investment

adviser during the Class Period.

319.    Each of the Defendants named herein are liable pursuant to Section 15 of the Securities Act based on their ability to control FHY Fund, which also made them a culpable participant in the violations of §§11 and 12(a)(2) of the Securities Act as alleged in Counts I and III above.  This ability stems from their management positions and/or ability to control those persons in management positions, access to information regarding the Fund's operations and/or financial condition, ability to cause and direct the dissemination of that information, and/or the ability to prevent the issuance of, correct, or cause to be corrected, the misleading statements in the FHY Fund Registration Statement and documents incorporated therein and thereafter by reference and based on their having signed those Registration Statement and/or having otherwise participated in the process which allowed the FHY Fund's offerings to be successfully completed.

<u>Defendants' Response</u>:  Paragraph 319 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 319.

320.    Plaintiff CRC repeats and realleges each and every allegation contained above in paragraphs 1 through 279, 290 through 299, and 308 through 315 as if fully set forth herein.  This Count is founded solely on Defendants' negligence and Plaintiff explicitly excludes any allegation that could be construed to allege intentional or reckless misconduct.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 320, and repeat and reallege

Defendants' responses to Paragraphs 1 through 279, Paragraphs 290 through 299, and

Paragraphs 308 through 315 as if fully set forth herein.

321.    This Count is brought pursuant to §15 of the Securities Act against Defendants Bowen, Bradley, and First Trust.

Defendants' Response:  Answering Paragraph 321, admit that Plaintiffs purport to bring

Count VI pursuant to Section 15 of the Securities Act against Defendants First Trust Advisors,

Bowen, and Bradley.

322.    Each of the Defendants named herein was a control person of the FHO Fund,
within the meaning of Section 15 of the Securities Act, by virtue of their positions as of trustee
of the FHO Fund and/or by virtue of their position as officers of First Trust.  Defendants named
herein each had a series of direct and/or indirect business and/or personal relationships with other
trustees and/or officers and/or major shareholders of the FHO Funds.  First Trust was the Fund's
investment adviser and was responsible for selecting and supervising the Subadvisors, the
ongoing monitoring of the Fund's investment portfolio, managing the Fund's business affairs
and providing certain clerical and bookkeeping and other administrative services.  First Trust
was also responsible for determining the Fund's overall investment strategy and overseeing its
implementation.

Defendants' Response:  Paragraph 322 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 322, except admit that First Trust Advisors served as the FHO Fund's investment

adviser during the Class Period.

323.    Each of the Defendants named herein are liable pursuant to Section 15 of the
Securities Act based on their ability to control FHO Fund, which also made them a culpable
participant in the violations of §§11 and 12(a)(2) of the Securities Act as alleged in Counts II and
IV above.  This ability stems from their management positions and/or ability to control those
persons in management positions, access to information regarding the Fund's operations and/or
financial condition, ability to cause and direct the dissemination of that information, and/or the
ability to prevent the issuance of, correct, or cause to be corrected, the misleading statements in
the FHO Fund Registration Statement and documents incorporated therein and thereafter by
reference and based on their having signed those Registration Statement and/or having otherwise
participated in the process which allowed the FHO Fund's offerings to be successfully
completed.

Defendants' Response:  Paragraph 323 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 323.

324.    Plaintiff Duda repeats and realleges each and every allegation in paragraphs 1
through 279 as if set forth herein, but only to the extent that such allegations do not sound in
fraud, allege *scienter* or otherwise allege the intent of any Defendant named in this Count to

defraud Plaintiff Duda and/or any other members of the FHI DRIP Subclass that purchased shares pursuant to the Fund's Dividend Reinvestment Plans ("FHI Fund DRIP Plan").

Defendants' Response:  Deny the allegations in Paragraph 324, and repeat and reallege

Defendants' responses to Paragraphs 1 through 279 as if fully set forth herein.

325.    This Count is predicated exclusively upon the strict liability of Defendants First Trust Portfolios, First Trust, FHI Fund, Bowed and Bradley for making materially untrue and/or materially misleading statements and omissions in the July 26, 2005 FHI Form N-2 Registration Statement and Prospectus filed with the SEC and/or the documents incorporated therein and/or thereafter by reference (the "FHI DRIP Registration Statement" or "Prospectus").

Defendants' Response:  Paragraph 325 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 325.

326.    This Count is asserted by Plaintiffs Duda on behalf of himself and all other members of the FHI DRIP Subclass who acquired FHI Fund shares by virtue of participating in the FHI Fund DRIP Plan during the FHI Class Period authorized pursuant to the FHI DRIP Registration Statement against Defendants First Trust Portfolios, First Trust, FHI Fund, Bowen and Bradley.

Defendants' Response:  Answering Paragraph 326, admit that Plaintiffs purport to bring

Count VII on behalf of the FHI DRIP Subclass, as defined in the Complaint, against Defendants

First Trust Portfolios, First Trust Advisors, FHI Fund, Bowen, and Bradley.

327.    On July 26, 2005, the FHI Fund filed its Form N-2 DRIP Registration Statement. The FHI DRIP Registration Statement for the FHI Fund established the FHI Fund DRIP Plan to allow investors to buy additional shares of the FHI Fund through dividend reinvestment.  The purpose of the DRIP Plan was to provide investors with "reinvestment of Fund distributions, consisting of income dividends, returns of capital and capital gain distributions paid by the Fund, on behalf of all shareholders participating in the Plan."  Investors were automatically enrolled in the plan, as follows:

> If your Common Shares are registered directly with the Fund or if you hold your Common Shares with a brokerage firm that participates in the Fund's Dividend Reinvestment Plan (the "Plan"), unless you elect, by written notice to the Fund, to receive cash distributions, all dividends, including any capital gain dividends, on your Common Shares will be automatically reinvested by PFPC Inc. (the "Plan Agent"), in additional Common Shares under the Plan.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 327, and refer the Court to the

FHI Fund's prospectus for the full content and context of any disclosures regarding the FHI Fund

Dividend Reinvestment Plan ("DRIP").

328.    The FHI Fund Registration Statement was declared effective immediately upon
their filing on July 26, 2005.  The FHI DRIP Registration Statement for the FHI Fund stated, in
relevant part, the following:

> A Registration Statement on Form N-2, including amendments thereto, relating to
> the shares of the Fund offered hereby, has been filed by the Fund with the
> Securities and Exchange Commission.  The Fund's Prospectus and this Statement
> of Additional Information do not contain all of the information set forth in the
> Registration Statement, including any exhibits and schedules thereto.  For further
> information with respect to the Fund and the shares offered hereby, reference is
> made to the Fund's Registration Statement.  Statements contained in the Fund's
> Prospectus and this Statement of Additional Information as to the contents of any
> contract or other document referred to are not necessarily complete and in each
> instance reference is made to the copy of the contract or other document filed as
> an exhibit to the Registration Statement, each statement being qualified in all
> respects by such reference.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 328, and refer the Court to the

FHI Fund's prospectus for the full content and context of any disclosures regarding the FHI Fund

DRIP.

329.    The FHI DRIP Registration Statement also stated:

The Registrant undertakes that:

a.      For purposes of determining any liability under the Securities Act of 1933,
the information omitted from the form of prospectus filed as part of a registration
statement in reliance upon Rule 430A and contained in the form of prospectus
filed by the Registrant under Rule 497(h) under the Securities Act of 1933 shall
be deemed to be part of the Registration Statement as of the time it was declared
effective.

b.      For the purpose of determining any liability under the Securities Act of
1933, each post-effective amendment that contains a form of prospectus shall be
deemed to be a new registration statement relating to the securities offered
therein, and the offering of the securities at that time shall be deemed to be the
initial bona fide offering thereof.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 329, and refer the Court to the

FHI Fund's prospectus for the full content and context of any disclosures regarding the FHI Fund

DRIP.

330.    The FHI DRIP Prospectus for the FHI Fund DRIP Plan provides that plan participants will be able to use dividends received on their Shares to purchase additional Shares *while paying no brokerage fees, stating*:

> If you decide to participate in the Plan, the number of Common Shares you will receive will be determined as follows:
>
> (1)    the Common Shares are trading at or above NAV at the time of valuation, the Fund will issue new shares at a price equal to the greater of (i) NAV per Common Share on that date or (ii) 95% of the market price on that date.
>
> (2)    If Common Shares are trading below NAV at the time of valuation, the Plan Agent will receive the dividend or distribution in cash and will purchase Common Shares in the open market, on the NYSE or elsewhere, for the participants' accounts.  It is possible that the market price for the Common Shares may increase before the Plan Agent has completed its purchases.  Therefore, the average purchase price per share paid by the Plan Agent may exceed the market price at that time of valuation, resulting in the purchase of fewer shares than if the dividend or distribution had been paid in Common Shares issued by the Fund.  The Plan Agent will use all dividends and distributions received in cash to purchase Common Shares in the open market within 30 days of the valuation date except where temporary curtailment or suspension of purchases is necessary to comply with federal securities laws.  Interest will not be paid on any uninvested cash payments.
>
> ***There is no brokerage charge for reinvestment of your dividends or distributions in Common Shares***.  However, all participants will pay a pro rata share of brokerage commissions incurred by the Plan Agent when it makes open market purchases.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 330, and refer the Court to the

FHI Fund's prospectus for the full content and context of any disclosures regarding the FHI Fund

DRIP.

331.    Under the primary disadvantages of the FHI Fund DRIP Plan, the FHI DRIP Prospectus stated:

> ***The Plan Agent will act as Agent for Participants*** and will open an account for each Participant under the Dividend Reinvestment Plan in the same name as the

Participant's shares are registered, and will put into effect for each Participant the distribution reinvestment option of the Plan as of the first record date for a distribution to shareholders as set forth in the Fund's prospectus.  In the case of shareholders who hold shares for others who are the beneficial owners, the Plan Agent will administer the Plan on the basis of the number of Shares certified from time to time by the record shareholder as representing the total amount registered in the record shareholder's name and held for the account of beneficial owners who are Participants.

Defendants' Response:  Deny the allegations in Paragraph 331, and refer the Court to the

FHI Fund's prospectus for the full content and context of any disclosures regarding the FHI Fund

DRIP.

332.    Under the Terms and Conditions, the FHI DRIP Prospectus states:

Whenever the Fund declares a distribution payable in shares or cash at the option of the shareholders, each Participant shall take such distribution entirely in shares and the Plan Agent shall automatically receive such shares, including fractions, for the Participant's account, except in circumstances described in Paragraph 3 below.  Except in such circumstances, the number of additional shares to be credited to each Participant's account shall be determined by dividing the dollar amount of the distribution payable on the Participant's shares by the greater of net asset value or 95% of current market price per share on the payable date for such distribution.

Defendants' Response:  Deny the allegations in Paragraph 332, and refer the Court to the

FHI Fund's prospectus for the full content and context of any disclosures regarding the FHI Fund

DRIP.

333.    Under the Terms and Conditions, the FHI DRIP Prospectus, states:

If Common Shares are trading below NAV at the time of valuation, the Plan Agent will receive the dividend or distribution in cash and will purchase Common Shares in the open market, on the NYSE or elsewhere, for the participants' accounts.  It is possible that the market price for the Common Shares may increase before the Plan Agent has completed its purchases.  Therefore, the average purchase price per share paid by the Plan Agent may exceed the market price at that time of valuation, resulting in the purchase of fewer shares than if the dividend or distribution had been paid in Common Shares issued by the Fund. The Plan Agent will use all dividends and distributions received in cash to purchase Common Shares in the open market within 30 days of the valuation date except where temporary curtailment or suspension of purchases is necessary to

comply with federal securities laws.  Interest will not be paid on any uninvested cash payments.

Defendants' Response:  Deny the allegations in Paragraph 333, and refer the Court to the

FHI Fund's prospectus for the full content and context of any disclosures regarding the FHI Fund

DRIP.

334.    The FHI DRIP Prospectus for crediting shareholder's accounts state:

Any stock dividends or split shares distributed by the Fund on full and fractional shares held by the Plan Agent for a Participant will be credited to the Participant's account.  In the event that the Fund makes available to its shareholders rights to purchase additional shares or other securities, the shares held for each Participant under the Plan will be added to other shares held by the Participant in calculating the number of rights to be issued to that Participant.

Defendants' Response:  Deny the allegations in Paragraph 334, and refer the Court to the

FHI Fund's prospectus for the full content and context of any disclosures regarding the FHI Fund

DRIP.

335.    During the FHI Class Period, the FHI Fund declared the following dividends on the respective payable dates with the record date of shareholder in parentheses according to the First Trust Portfolios' website:

**FHI Fund**

**2005 dividends**: $0.1542 on October 17, 2005 (October 5, 2005); $0.1550 on November 15, 2005 (November 3, 2005); $0.16 on December 12, 2005 (December 5, 2005); and $0.23 on December 30, 2005 (December 12, 2005)

**2006 dividends**: $0.16 on January 17, 2006 (January 5, 2006), February 15, 2006 (February 3, 2006), March 15, 2006 (March 3, 2006), April 17, 2006 (April 5, 2006), May 15, 2006 (May 3, 2006), June 15, 2006 (June 5, 2006), July 17, 2006 (July 6, 2006), August 15, 2006 (August 3, 2005), September 15, 2006 (September 6, 2006), October 16, 2006 (October 4, 2006), November 15, 2006 (November 3, 2006), and December 12, 2006 (December 5, 2006); $0.067 on December 29, 2006 (December 22, 2006)

**2007 dividends**: $0.16 on January 10, 2007 (January 10, 2007), February 15, 2007 (February 5, 2007), March 15, 2007 (March 5, 2007), April 16, 2007 (April 4, 2007), May 15, 2007 (May 3, 2007), June 15, 2007 (June 5, 2007), July 16, 2007 (July 5, 2007), August 15, 2007 (August 3, 2007), September 17,

2007 (September 6, 2007), October 15, 2007 (October 3, 2007), November 15, 2007 (November 5, 2007) and December 12, 2007 (December 5, 2007)

**2008 dividends**: $0.16 on January 15, 2008 (December 31, 2007), February 15, 2008 (February 5, 2008), March 17, 2008 (March 5, 2008), April 15, 2008 (April 3, 2008), May 15, 2008 (May 5, 2008), June 16, 2008 (June 4, 2008) and July 15, 2008 (July 3, 2008)

Defendants' Response:  Admit the allegations in Paragraph 335.

336.    During each of the dividend distributions described above, the value of the FHI Fund's portfolio and NAV were materially overstated because the FHI Fund failed to properly value their investments in mortgage-related securities.

Defendants' Response:  Paragraph 336 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 336.

337.    The FHI DRIP Registration Statement stated that the Registration Statement and SAIs and documents they referenced including the FHI Fund DRIP Plan are incorporated by reference.  Therefore, all reports issued prior to each of the dividend distributions were incorporated by reference into the FHI DRIP Registration Statement.  Because the financial statements were false and misleading, for the reasons described above, the FHI DRIP Registration Statement incorporating these documents were also false and misleading as of the date of the financial statements.

Defendants' Response:  Paragraph 337 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 337.

338.    Plaintiff Duda participated in the FHI Fund DRIP Plan for the FHI Fund during the FHI Fund Class Period and received shares as dividend reinvestments pursuant to the FHI Fund DRIP Plan during the FHI Class Period.  Plaintiff Duda and the other members of the FHI DRIP Subclass who participated in the FHI Fund DRIP Plan for the FHI Fund purchased FHI Fund shares through the FHI Fund DRIP Plan pursuant and/or traceable to the July 26, 2005 FHI DRIP Registration Statement (and all documents incorporated therein and thereafter, including all of the FHI Fund's SEC filings issued during the FHI Fund's Class Period that were on record prior to each of the dividend distributions).  Plaintiff Duda and the other members of the FHI DRIP Subclass who participated in the FHI Fund DRIP Plan reinvested their dividends based on information in the FHI DRIP Registration Statement, the documents incorporated therein and the subsequent reports from the FHI Fund.  Therefore, Plaintiff Duda and members of the FHI DRIP Subclass who purchased FHI Fund shares through the FHI Fund DRIP Plan were damaged as a result of Defendants' wrongful conduct.  As issuers of their respective shares issued via the

139

materially untrue and misleading FHI DRIP Registration Statement, Defendants are strictly liable for each false and misleading statement contained therein and in those documents incorporated therein and thereafter by reference.

Defendants' Response:  Paragraph 338 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 338.

339.    Defendant Bowen and Bradley are each signatories of the FHI DRIP Registration Statement or documents incorporated therein or thereafter by reference, officers of the Funds and/or controlling persons of the issuer, who owed to holders of the FHI Fund shares obtained through the FHI Fund DRIP Plan the duty to make a reasonable investigation of the statements contained and/or incorporated by reference in the FHI DRIP Registration Statement to ensure that such statements were true and that there were no omissions of any material facts required to be stated in order to make the statements contained therein not misleading.  As such, Defendants Bowen and Bradley are liable to Plaintiff Duda and all other members of the FHI DRIP Subclass who participated in the FHI Fund DRIP Plan during the FHI Class Period.

Defendants' Response:  Paragraph 339 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 339, except admit that Defendants Bradley and Bowen were officers of the FHI Fund

during the Class Period.

340.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the FHI Fund DRIP Registration Statement or in the documents incorporated therein or thereafter by reference were true or that there were no omissions of material facts necessary to make the statements made therein not misleading.

Defendants' Response:  Paragraph 340 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 340.

341.    All Defendants named in this Count issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the FHI DRIP Registration Statement, which misrepresented or failed to disclose, among other things, the facts set forth above.  By reason of the conduct herein alleged, Defendants violated Section 11 of the Securities Act.

<u>Defendants' Response</u>:  Paragraph 341 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 341.

342.    This action is brought within one year after discovery of the untrue statements and omissions which should have been made through the exercise of reasonable diligence, and within three years of issuance of FHI Fund shares to Plaintiff Duda pursuant to the FHI DRIP Registration Statement.

<u>Defendants' Response</u>:  Paragraph 342 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 342.

343.    Because of the foregoing, Plaintiff Duda and other members of the FHI DRIP Subclass who participated in the FHI Fund DRIP Plan during the FHI Class Period are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from Defendants, each of them, jointly and severally, named in this Count.

<u>Defendants' Response</u>:  Paragraph 343 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 343.

344.    Plaintiff Duda repeats and realleges each and every allegation in paragraphs 1 through 279 as if set forth herein, but only to the extent that such allegations do not sound in fraud, allege *scienter* or otherwise allege the intent of any Defendant named in this Count to defraud Plaintiff Duda and/or any other members of the FHY DRIP Subclass that purchased shares pursuant to the FHY Fund DRIP Plan.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 344, and repeat and reallege

Defendants' responses to Paragraphs 1 through 279 as if fully set forth herein.

345.    This Count is predicated exclusively upon the strict liability of the Defendants First Trust Portfolios, First Trust, FHY Fund, Bowen and Bradley for making materially untrue and/or materially misleading statements and omissions in March 28, 2006 FHY Form N-2 Registration Statement and Prospectus, filed with the SEC and/or the documents incorporated therein and/or thereafter by reference.

Defendants' Response:  Paragraph 345 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 345.

346.    This Count is asserted by Plaintiff Duda on behalf of himself and all other
members of the FHY DRIP Subclass who acquired FHY Fund shares by virtue of participating in
the FHY Fund DRIP Plan during the FHY Class Period authorized pursuant to the FHY DRIP
Registration Statement against Defendants First Trust Portfolios, First Trust, FHY Fund, Bowen
and Bradley.

Defendants' Response:  Answering Paragraph 346, admit that Plaintiffs purport to bring

Count VIII on behalf of the FHY DRIP Subclass, as defined in the Complaint, against

Defendants First Trust Portfolios, First Trust Advisors, FHY Fund, Bowen, and Bradley.

347.    On March 28, 2006, the FHY Fund filed its Form N-2 DRIP Registration
Statement.  The FHY DRIP Registration Statement established the DRIP Plan to allow investors
to buy additional shares of the FHY Fund through dividend reinvestment.  The purpose of the
FHY Fund DRIP Plan was to provide investors with "reinvestment of Fund distributions,
consisting of income dividends, returns of capital and capital gain distributions paid by the Fund,
on behalf of all shareholders participating in the Plan."  Investors were automatically enrolled in
the plan, as follows:

> If your Common Shares are registered directly with the Fund or if you hold your
> Common Shares with a brokerage firm that participates in the Fund's Dividend
> Reinvestment Plan (the "Plan"), unless you elect, by written notice to the Fund, to
> receive cash distributions, all dividends, including any capital gain dividends, on
> your Common Shares will be automatically reinvested by PFPC Inc. (the "Plan
> Agent"), in additional Common Shares under the Plan.

Defendants' Response:  Deny the allegations in Paragraph 347, and refer the Court to the

FHY Fund's prospectus for the full content and context of any disclosures regarding the FHY

Fund DRIP.

348.    The FHY DRIP Registration Statement was declared effective immediately upon
its filing on March 28, 2006.  The FHY DRIP Registration Statement for stated, in relevant part,
the following:

> A Registration Statement on Form N-2, including amendments thereto, relating to
> the shares of the Fund offered hereby, has been filed by the Fund with the
> Securities and Exchange Commission.  The Fund's Prospectus and this Statement
> of Additional Information do not contain all of the information set forth in the

Registration Statement, including any exhibits and schedules thereto.  For further information with respect to the Fund and the shares offered hereby, reference is made to the Fund's Registration Statement.  Statements contained in the Fund's Prospectus and this Statement of Additional Information as to the contents of any contract or other document referred to are not necessarily complete and in each instance reference is made to the copy of the contract or other document filed as an exhibit to the Registration Statement, each statement being qualified in all respects by such reference.

Defendants' Response:  Deny the allegations in Paragraph 348, and refer the Court to the FHY Fund's prospectus for the full content and context of any disclosures regarding the FHY Fund DRIP.

349.    The FHY DRIP Registration Statement also stated:

The Registrant undertakes that:

a.    For purposes of determining any liability under the Securities Act of 1933, the information omitted from the form of prospectus filed as part of a registration statement in reliance upon Rule 430A and contained in the form of prospectus filed by the Registrant under Rule 497(h) under the Securities Act of 1933 shall be deemed to be part of the Registration Statement as of the time it was declared effective.

b.    For the purpose of determining any liability under the Securities Act of 1933, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of the securities at that time shall be deemed to be the initial bona fide offering thereof.

Defendants' Response:  Deny the allegations in Paragraph 349, and refer the Court to the FHY Fund's prospectus for the full content and context of any disclosures regarding the FHY Fund DRIP.

350.    The FHY DRIP Prospectus for the FHY Fund DRIP Plan provides that plan participants will be able to use dividends received on their shares to purchase additional shares *while paying no brokerage fees, stating*:

If you decide to participate in the Plan, the number of Common Shares you will receive will be determined as follows:

(1)    If the Common Shares are trading at or above NAV at the time of valuation, the Fund will issue new shares at a price equal to the greater of

(i) NAV per Common Share on that date or (ii) 95% of the market price on that date.

(2)      If Common Shares are trading below NAV at the time of valuation, the Plan Agent will receive the dividend or distribution in cash and will purchase Common Shares in the open market, on the NYSE or elsewhere, for the participants' accounts.  It is possible that the market price for the Common Shares may increase before the Plan Agent has completed its purchases.  Therefore, the average purchase price per share paid by the Plan Agent may exceed the market price at that time of valuation, resulting in the purchase of fewer shares than if the dividend or distribution had been paid in Common Shares issued by the Fund. The Plan Agent will use all dividends and distributions received in cash to purchase Common Shares in the open market within 30 days of the valuation date except where temporary curtailment or suspension of purchases is necessary to comply with federal securities laws.  Interest will not be paid on any uninvested cash payments.

***There is no brokerage charge for reinvestment of your dividends or distributions in Common Shares***.  *However*, all participants will pay a pro rata share of brokerage commissions incurred by the Plan Agent when it makes open market purchases.

Defendants' Response:  Deny the allegations in Paragraph 350, and refer the Court to the

FHY Fund's prospectus for the full content and context of any disclosures regarding the FHY

Fund DRIP.

351.     Under the primary disadvantages of the FHY Fund DRIP Plan, the FHY DRIP Prospectus stated:

***The Plan Agent will act as Agent for Participants*** and will open an account for each Participant under the Dividend Reinvestment Plan in the same name as the Participant's shares are registered, and will put into effect for each Participant the distribution reinvestment option of the Plan as of the first record date for a distribution to shareholders as set forth in the Fund's prospectus.  In the case of shareholders who hold shares for others who are the beneficial owners, the Plan Agent will administer the Plan on the basis of the number of Shares certified from time to time by the record shareholder as representing the total amount registered in the record shareholder's name and held for the account of beneficial owners who are Participants.

Defendants' Response:  Deny the allegations in Paragraph 351, and refer the Court to the

FHY Fund's prospectus for the full content and context of any disclosures regarding the FHY

Fund DRIP.

352.    Under the Terms and Conditions, the FHY DRIP Prospectus states:

Whenever the Fund declares a distribution payable in shares or cash at the option of the shareholders, each Participant shall take such distribution entirely in shares and the Plan Agent shall automatically receive such shares, including fractions, for the Participant's account, except in circumstances described in Paragraph 3 below.  Except in such circumstances, the number of additional shares to be credited to each Participant's account shall be determined by dividing the dollar amount of the distribution payable on the Participant's shares by the greater of net asset value or 95% of current market price per share on the payable date for such distribution.

Defendants' Response:  Deny the allegations in Paragraph 352, and refer the Court to the

FHY Fund's prospectus for the full content and context of any disclosures regarding the FHY

Fund DRIP.

353.    Under the Terms and Conditions, the FHY DRIP Prospectus, states:

If Common Shares are trading below NAV at the time of valuation, the Plan Agent will receive the dividend or distribution in cash and will purchase Common Shares in the open market, on the NYSE or elsewhere, for the participants' accounts.  It is possible that the market price for the Common Shares may increase before the Plan Agent has completed its purchases.  Therefore, the average purchase price per share paid by the Plan Agent may exceed the market price at that time of valuation, resulting in the purchase of fewer shares than if the dividend or distribution had been paid in Common Shares issued by the Fund. The Plan Agent will use all dividends and distributions received in cash to purchase Common Shares in the open market within 30 days of the valuation date except where temporary curtailment or suspension of purchases is necessary to comply with federal securities laws.  Interest will not be paid on any uninvested cash payments.

Defendants' Response:  Deny the allegations in Paragraph 353, and refer the Court to the

FHY Fund's prospectus for the full content and context of any disclosures regarding the FHY

Fund DRIP.

354.    The FHY DRIP Prospectus for crediting shareholder's accounts state:

Any stock dividends or split shares distributed by the Fund on full and fractional shares held by the Plan Agent for a Participant will be credited to the Participant's account.  In the event that the Fund makes available to its shareholders rights to purchase additional shares or other securities, the shares held for each Participant

under the Plan will be added to other shares held by the Participant in calculating the number of rights to be issued to that Participant.

Defendants' Response:  Deny the allegations in Paragraph 354, and refer the Court to the

FHY Fund's prospectus for the full content and context of any disclosures regarding the FHY

Fund DRIP.

355.   During the FHY Class Period, the FHY Fund declared the following dividends on the respective payable dates with the record date of shareholder in parentheses according to the First Trust Portfolios' website:

**FHY Fund**

**2006 dividends**:  $0.1667 on June 15, 2006 (June 5, 2006), July 17, 2006 (July 6, 2006), August 15, 2006 (August 3, 2005), September 15, 2006 (September 6, 2006), October 16, 2006 (October 4, 2006), November 15, 2006 (November 3, 2006), and December 12, 2006 (December 5, 2006)

**2007 dividends**:  $0.1667 on January 16, 2007 (January 4, 2007), February 15, 2007 (February 5, 2007), March 15, 2007 (March 5, 2007), April 16, 2007 (April 4, 2007), May 15, 2007 (May 3, 2007), June 15, 2007 (June 5, 2007), July 16, 2007 (July 5, 2007), August 15, 2007 (August 3, 2007), September 17, 2007 (September 6, 2007), October 15, 2007 (October 3, 2007), November 15, 2007 (November 5, 2007) and December 12, 2007 (December 5, 2007)

**2008 dividends**:  $0.1667 on January 15, 2008 (December 31, 2007), February 15, 2008 (February 5, 2008), March 17, 2008 (March 5, 2008), April 15, 2008 (April 3, 2008), May 15, 2008 (May 5, 2008), June 16, 2008 (June 4, 2008) and July 15, 2008 (July 3, 2008)

Defendants' Response:  Admit the allegations in Paragraph 355.

356.   During each of the dividend distributions described above, the value of the FHY Fund's portfolio and NAV were materially overstated because the FHY Fund failed to properly value their investments in mortgage-related securities.

Defendants' Response:   Paragraph 356 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 356.

357.   The FHY DRIP Registration Statement stated that the Registration Statement and SAIs and documents they referenced including the FHY Fund DRIP Plan are incorporated by reference.  Therefore, all reports issued prior to each of the dividend distributions were

146

incorporated by reference into the FHY DRIP Registration Statement.  Because the financial statements were false and misleading, for the reasons described above, the FHY DRIP Registration Statement incorporating these documents were also false and misleading as of the date of the financial statements.

Defendants' Response:   Paragraph 357 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 357.

358.    Plaintiff Duda participated in the FHY Fund DRIP Plan for the FHY Fund during the FHY Class Period and received shares as dividend reinvestments pursuant to the FHY Fund DRIP Plan during the FHY Class Period.  Plaintiff Duda and the other members of the FHY DRIP Subclass who participated in the FHY Fund DRIP Plan for the FHY Fund purchased FHY Fund shares through the FHY Fund DRIP Plan pursuant and/or traceable to the March 28, 2006 FHY DRIP Registration Statement (and all documents incorporated therein and thereafter, including all of FHY's SEC filings issued during the FHY Class Period that were on record prior to each of the dividend distributions).  Plaintiff Duda and the other members of the FHY DRIP Subclass who participated in the FHY Fund DRIP Plan reinvested their dividends based on information in the FHY DRIP Registration Statement, the documents incorporated therein and the subsequent reports from the Funds.  Therefore, Plaintiff Duda and members of the FHY DRIP Subclass who purchased FHY Fund shares through the FHY Fund DRIP Plan were damaged as a result of Defendants' wrongful conduct.  As issuers of their respective shares issued via the materially untrue and misleading FHY DRIP Registration Statement, Defendants are strictly liable for each false and misleading statements contained therein and in those documents incorporated therein and thereafter by reference.

Defendants' Response:   Paragraph 358 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 358.

359.    Defendants Bowen and Bradley are each signatories of the FHY DRIP Registration Statement or documents incorporated therein or thereafter by reference, officers of the FHY Fund and/or controlling persons of the issuer, who owed to holders of the FHI shares obtained through the FHY Fund DRIP Plan the duty to make a reasonable investigation of the statements contained and/or incorporated by reference in the FHY DRIP Registration Statement to ensure that such statements were true and that there were no omissions of any material facts required to be stated in order to make the statements contained therein not misleading.  As such, Defendants Bowen and Bradley are liable to Plaintiff and all other members of the FHY DRIP Subclass who participated in the FHY Fund DRIP Plan during the FHY Class Period.

Defendants' Response:   Paragraph 359 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 359, except admit that Defendants Bradley and Bowen were officers of the FHY Fund

during the Class Period.

360.    None of the Defendants named herein made a reasonable investigation or
possessed reasonable grounds for the belief that the statements contained in the FHY DRIP
Registration Statement or in the documents incorporated therein or thereafter by reference were
true or that there were no omissions of material facts necessary to make the statements made
therein not misleading.

Defendants' Response:   Paragraph 360 constitutes a legal conclusion to which no

responsive pleading is required.   To the extent a response is required, deny the allegations in

Paragraph 360.

361.    All Defendants named in this Count issued and disseminated, caused to be issued
and disseminated, and participated in the issuance and dissemination of, material misstatements
to the investing public which were contained in the FHY DRIP Registration Statement, which
misrepresented or failed to disclose, among other things, the facts set forth above.  By reason of
the conduct herein alleged, Defendants violated Section 11 of the Securities Act.

Defendants' Response:   Paragraph 361 constitutes a legal conclusion to which no

responsive pleading is required.   To the extent a response is required, deny the allegations in

Paragraph 361.

362.    This action is brought within one year after discovery of the untrue statements and
omissions which should have been made through the exercise of reasonable diligence, and within
three years of issuance of FHY Fund shares to Plaintiff Duda pursuant to the FHY DRIP
Registration Statement.

Defendants' Response:   Paragraph 362 constitutes a legal conclusion to which no

responsive pleading is required.   To the extent a response is required, deny the allegations in

Paragraph 362.

363.    Because of the foregoing, Plaintiff Duda and other members of the FHY DRIP
Subclass who participated in the FHY Fund DRIP Plan during the FHY Class Period are entitled
to damages under Section 11 as measured by the provisions of Section 11(e), from Defendants,
each of them, jointly and severally, named in this Count.

Defendants' Response:  Paragraph 363 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 363.

364.   Plaintiff CRC repeats and realleges each and every allegation in paragraphs 1 through 279 as if set forth herein, but only to the extent that such allegations do not sound in fraud, allege *scienter* or otherwise allege the intent of any Defendant named in this Count to defraud Plaintiff CRC, or any other members of the FHO DRIP Subclass that purchased shares pursuant to the FHO Fund DRIP Plan.

Defendants' Response:  Deny the allegations in Paragraph 364, and repeat and reallege Defendants' responses to Paragraphs 1 through 279 as if fully set forth herein.

365.   This Count is predicated exclusively upon the strict liability of Defendants First Trust Portfolios, First Trust, FHO Fund, Bowen and Bradley for making materially untrue and/or materially misleading statements and omissions in the March 27, 2007 FHO Form N-2 Registration Statement and Prospectus, filed with the SEC and/or the documents incorporated therein and/or thereafter by reference.

Defendants' Response:  Paragraph 365 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 365.

366.   This Count is asserted by Plaintiff CRC on behalf of itself and all other members of the FHO DRIP Subclass who acquired FHO Fund shares by virtue of participating in the FHO Fund DRIP Plan during the FHO Class Period authorized pursuant to the FHO DRIP Registration Statement against Defendants First Trust Portfolios, First Trust, FHO Fund, Bowen and Bradley.

Defendants' Response:  Answering Paragraph 366, admit that Plaintiffs purport to bring Count IX on behalf of the FHO DRIP Subclass, as defined in the Complaint, against Defendants First Trust Portfolios, First Trust Advisors, FHO Fund, Bowen, and Bradley.

367.   On March 27, 2007, the FHO Fund filed a Form N-2 DRIP Registration Statement.  The FHO DRIP Registration Statement established the FHO Fund DRIP Plan to allow investors to buy additional shares of the FHO Fund through dividend reinvestment.  The purpose of the DRIP Plan was to provide investors with "reinvestment of Fund distributions, consisting of income dividends, returns of capital and capital gain distributions paid by the Fund, on behalf of all shareholders participating in the Plan."  Investors were automatically enrolled in the plan, as follows:

If your Common Shares are registered directly with the Fund or if you hold your Common Shares with a brokerage firm that participates in the Fund's Dividend Reinvestment Plan (the "Plan"), unless you elect, by written notice to the Fund, to receive cash distributions, all dividends, including any capital gain dividends, on your Common Shares will be automatically reinvested by PFPC Inc. (the "Plan Agent"), in additional Common Shares under the Plan.

Defendants' Response:  Deny the allegations in Paragraph 367, and refer the Court to the

FHO Fund's prospectus for the full content and context of any disclosures regarding the FHO

Fund DRIP.

368.    The FHO DRIP Registration Statement was declared effective immediately upon its filing on March 27, 2007, respectively.  The FHO DRIP Registration Statement stated, in relevant part, the following:

A Registration Statement on Form N-2, including amendments thereto, relating to the shares of the Fund offered hereby, has been filed by the Fund with the Securities and Exchange Commission.  The Fund's Prospectus and this Statement of Additional Information do not contain all of the information set forth in the Registration Statement, including any exhibits and schedules thereto.  For further information with respect to the Fund and the shares offered hereby, reference is made to the Fund's Registration Statement.  Statements contained in the Fund's Prospectus and this Statement of Additional Information as to the contents of any contract or other document referred to are not necessarily complete and in each instance reference is made to the copy of the contract or other document filed as an exhibit to the Registration Statement, each statement being qualified in all respects by such reference.

Defendants' Response:  Deny the allegations in Paragraph 368, and refer the Court to the

FHO Fund's prospectus for the full content and context of any disclosures regarding the FHO

Fund DRIP.

369.    The FHO DRIP Registration Statement also stated:

The Registrant undertakes that:

a.      For purposes of determining any liability under the Securities Act of 1933, the information omitted from the form of prospectus filed as part of a registration statement in reliance upon Rule 430A and contained in the form of prospectus filed by the Registrant under Rule 497(h) under the Securities Act of 1933 shall be deemed to be part of the Registration Statement as of the time it was declared effective.

b.      For the purpose of determining any liability under the Securities Act of 1933, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of the securities at that time shall be deemed to be the initial bona fide offering thereof.

Defendants' Response:  Deny the allegations in Paragraph 369, and refer the Court to the

FHO Fund's prospectus for the full content and context of any disclosures regarding the FHO

Fund DRIP.

370.    The FHO DRIP Prospectus for the FHO Fund DRIP Plan provides that plan participants will be able to use dividends received on their shares to purchase additional shares *while paying no brokerage fees, stating*:

If you decide to participate in the Plan, the number of Common Shares you

will receive will be determined as follows:

(1)      If the Common Shares are trading at or above NAV at the time of valuation, the Fund will issue new shares at a price equal to the greater of (i) NAV per Common Share on that date or (ii) 95% of the market price on that date.

(2)      If Common Shares are trading below NAV at the time of valuation, the Plan Agent will receive the dividend or distribution in cash and will purchase Common Shares in the open market, on the NYSE or elsewhere, for the participants' accounts.  It is possible that the market price for the Common Shares may increase before the Plan Agent has completed its purchases.  Therefore, the average purchase price per share paid by the Plan Agent may exceed the market price at that time of valuation, resulting in the purchase of fewer shares than if the dividend or distribution had been paid in Common Shares issued by the Fund. The Plan Agent will use all dividends and distributions received in cash to purchase Common Shares in the open market within 30 days of the valuation date except where temporary curtailment or suspension of purchases is necessary to comply with federal securities laws.  Interest will not be paid on any uninvested cash payments.

***There is no brokerage charge for reinvestment of your dividends or distributions in Common Shares***.  However, all participants will pay a pro rata share of brokerage commissions incurred by the Plan Agent when it makes open market purchases.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 370, and refer the Court to the

FHO Fund's prospectus for the full content and context of any disclosures regarding the FHO

Fund DRIP.

371.    Under the primary disadvantages of the FHO Fund DRIP Plan, the FHO DRIP
Prospectus stated:

> ***The Plan Agent will act as Agent for Participants*** and will open an account for
> each Participant under the Dividend Reinvestment Plan in the same name as the
> Participant's shares are registered, and will put into effect for each Participant the
> distribution reinvestment option of the Plan as of the first record date for a
> distribution to shareholders as set forth in the Fund's prospectus.  In the case of
> shareholders who hold shares for others who are the beneficial owners, the Plan
> Agent will administer the Plan on the basis of the number of Shares certified from
> time to time by the record shareholder as representing the total amount registered
> in the record shareholder's name and held for the account of beneficial owners
> who are Participants.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 371, and refer the Court to the

FHO Fund's prospectus for the full content and context of any disclosures regarding the FHO

Fund DRIP.

372.    Under the Terms and Conditions, the FHO DRIP Prospectus states:

Whenever the Fund declares a distribution payable in shares or cash at the option
of the shareholders, each Participant shall take such distribution entirely in shares
and the Plan Agent shall automatically receive such shares, including fractions,
for the Participant's account, except in circumstances described in Paragraph 3
below.  Except in such circumstances, the number of additional shares to be
credited to each Participant's account shall be determined by dividing the dollar
amount of the distribution payable on the Participant's shares by the greater of net
asset value or 95% of current market price per share on the payable date for such
distribution.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 372, and refer the Court to the

FHO Fund's prospectus for the full content and context of any disclosures regarding the FHO

Fund DRIP.

373.    Under the Terms and Conditions, the FHO DRIP Prospectus, states:

If Common Shares are trading below NAV at the time of valuation, the Plan
Agent will receive the dividend or distribution in cash and will purchase Common
Shares in the open market, on the NYSE or elsewhere, for the participants'
accounts.  It is possible that the market price for the Common Shares may
increase before the Plan Agent has completed its purchases.  Therefore, the
average purchase price per share paid by the Plan Agent may exceed the market
price at that time of valuation, resulting in the purchase of fewer shares than if the
dividend or distribution had been paid in Common Shares issued by the Fund.
The Plan Agent will use all dividends and distributions received in cash to
purchase Common Shares in the open market within 30 days of the valuation date
except where temporary curtailment or suspension of purchases is necessary to
comply with federal securities laws.  Interest will not be paid on any uninvested
cash payments.

Defendants' Response:  Deny the allegations in Paragraph 373, and refer the Court to the

FHO Fund's prospectus for the full content and context of any disclosures regarding the FHO

Fund DRIP.

374.    The FHO DRIP Prospectus for crediting shareholder's accounts state:

Any stock dividends or split shares distributed by the Fund on full and fractional
shares held by the Plan Agent for a Participant will be credited to the Participant's
account.  In the event that the Fund makes available to its shareholders rights to
purchase additional shares or other securities, the shares held for each Participant
under the Plan will be added to other shares held by the Participant in calculating
the number of rights to be issued to that Participant.

Defendants' Response:  Deny the allegations in Paragraph 374, and refer the Court to the

FHO Fund's prospectus for the full content and context of any disclosures regarding the FHO

Fund DRIP.

375.    During the FHO Class Period, the FHO Fund declared the following dividends on
the respective payable dates with the record date of shareholder in parentheses according to the
First Trust Portfolios' website:

**FHO Fund**

**2007 dividends**:  $0.1584 on June 15, 2007 (June 5, 2007), July 16, 2007 (July 5,
2007), August 15, 2007 (August 3, 2007), September 17, 2007 (September 6,
2007), October 15, 2007 (October 3, 2007), November 15, 2007 (November 5,
2007) and December 12, 2007 (December 5, 2007)

**2008 dividends**:  $0.1584 on January 15, 2008 (December 31, 2007), February 15, 2008 (February 5, 2008), March 17, 2008 (March 5, 2008), April 15, 2008 (April 3, 2008), May 15, 2008 (May 5, 2008), June 16, 2008 (June 4, 2008) and July 15, 2008 (July 3, 2008)

Defendants' Response:  Admit the allegations in Paragraph 375.

376.    During each of the dividend distributions described above, the value of the FHO Fund's portfolio and NAV were materially overstated because the FHO Fund failed to properly value their investments in mortgage-related securities.

Defendants' Response:  Paragraph 376 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 376.

377.    The FHO DRIP Registration Statement stated that the Registration Statement and SAIs and documents they referenced including the FHO Fund DRIP Plan are incorporated by reference.  Therefore, all reports issued prior to each of the dividend distributions were incorporated by reference into the FHO DRIP Registration Statement.  Because the financial statements were false and misleading, for the reasons described above, the FHO DRIP Registration Statement incorporating these documents were also false and misleading as of the date of the financial statements.

Defendants' Response:  Paragraph 377 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 377.

378.    Plaintiff CRC participated in the FHO Fund DRIP Plan for the FHO Fund during the FHO Class Period and received shares as dividend reinvestments pursuant to the FHO Fund DRIP Plan during the FHO Class Period.  Plaintiff CRC and the other members of the FHO DRIP Subclass who participated in the FHO DRIP Plan purchased FHO Fund shares through the FHO Fund DRIP Plan pursuant and/or traceable to the March 27, 2007 FHO DRIP Registration Statement (and all documents incorporated therein and thereafter, including all of FHO Fund's SEC filings issued during the FHO Class Period that were on record prior to each of the dividend distributions).  Plaintiff CRC and the other members of the FHO DRIP Subclass who participated in the FHO Fund DRIP Plan reinvested their dividends based on information in the FHO DRIP Registration Statement, the documents incorporated therein and the subsequent reports from the FHO Fund.  Therefore, Plaintiff CRC and members of the FHO DRIP Subclass who purchased FHO Fund shares through the FHO Fund DRIP Plan were damaged as a result of Defendants' wrongful conduct.  As issuers of their respective shares issued via the materially untrue and misleading FHO DRIP Registration Statement, Defendants are strictly liable for each false and misleading statements contained therein and in those documents incorporated therein and thereafter by reference.

<u>Defendants' Response</u>:  Paragraph 378 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 378.

379.    Defendants Bowen and Bradley are each signatories of the FHO DRIP Registration Statement or documents incorporated therein or thereafter by reference, officers of the FHO Fund and/or controlling persons of the issuer, who owed to holders of the FHO shares obtained through the FHO Fund DRIP Plan the duty to make a reasonable investigation of the statements contained and/or incorporated by reference in the FHO DRIP Registration Statement to ensure that such statements were true and that there were no omissions of any material facts required to be stated in order to make the statements contained therein not misleading.  As such, Defendants Bowen and Bradley are liable to Plaintiff CRC and all other members of the FHO DRIP Subclass who participated in the FHO Fund DRIP Plan during the FHO Class Period.

<u>Defendants' Response</u>:  Paragraph 379 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 379, except admit that Defendants Bradley and Bowen were officers of the FHO Fund during the Class Period.

380.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the FHO DRIP Registration Statement or in the documents incorporated therein or thereafter by reference were true or that there were no omissions of material facts necessary to make the statements made therein not misleading.

<u>Defendants' Response</u>:  Paragraph 380 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 380.

381.    All Defendants named in this Count issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the FHO RIP Registration Statement, which misrepresented or failed to disclose, among other things, the facts set forth above.  By reason of the conduct herein alleged, Defendants violated Section 11 of the Securities Act.

<u>Defendants' Response</u>:  Paragraph 381 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 381.

382.     This action is brought within one year after discovery of the untrue statements and omissions which should have been made through the exercise of reasonable diligence, and within three years of issuance of FHO Fund shares to Plaintiff CRC pursuant to the FHO DRIP Registration Statement.

Defendants' Response:  Paragraph 382 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 382.

383.     Because of the foregoing, Plaintiff CRC and other members of the FHO DRIP Subclass who participated in the FHO Fund DRIP Plan during the FHO Class Period are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from Defendants, each of them, jointly and severally, named in this Count.

Defendants' Response:  Paragraph 383 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 383.

384.     Plaintiff Duda repeats and realleges each and every allegation in paragraphs 1 through 279 and paragraphs 324 through 343, above, as if set forth herein, but only to the extent that such allegations do not sound in fraud, allege *scienter* or otherwise allege the intent of Defendants First Trust Portfolios and FHI Fund to defraud Plaintiff Duda and members of the FHI DRIP Subclass that purchased FHI Fund shares pursuant and/or traceable to the FHI DRIP Registration Statement.

Defendants' Response:  Deny the allegations in Paragraph 384, and repeat and reallege

Defendants' responses to Paragraphs 1 through 279 and Paragraphs 324 through 343 as if fully

set forth herein.

385.     This Count is predicated exclusively upon the strict liability of Defendants First Trust Portfolios and FHI Fund for making materially untrue and/or materially misleading statements and omissions in the FHI DRIP Registration Statement and the documents incorporated therein or thereafter by reference.

Defendants' Response:  Paragraph 385 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 385.

386.    This Count is asserted by Plaintiff Duda on his own behalf as a FHI Fund DRIP Plan participant during the FHI Class Period and on behalf of all members of the FHI DRIP Subclass who acquired shares pursuant and/or traceable to the FHI DRIP Registration Statement against Defendants named herein.

Defendants' Response:  Answering Paragraph 386, admit that Plaintiffs purport to bring

Count X on behalf of the FHI DRIP Subclass, as defined in the Complaint, against Defendants

First Trust Portfolios and FHI Fund.

387.    Defendants named herein were the sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the FHI DRIP Registration Statement.

Defendants' Response:  Paragraph 387 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 387.

388.    The FHI DRIP Registration Statement and the documents incorporated therein and thereafter by reference contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.  Defendants named herein engaged in solicitation including participating in the preparation of the false and misleading FHI DRIP Registration Statement and the documents incorporated therein and thereafter by reference.

Defendants' Response:  Paragraph 388 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 388.

389.    Defendants named herein owed to the purchasers of FHI Fund shares pursuant to the FHI Fund DRIP Plan the duty to make a reasonable and diligent investigation of the statements contained in the FHI DRIP Registration Statement and the documents incorporated therein and thereafter by reference, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

Defendants' Response:  Paragraph 389 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 389.

390.     Plaintiff Duda and the other members of the FHI DRIP Subclass who participated in the FHI Fund DRIP Plan and acquired FHI Fund shares pursuant and/or traceable to the defective FHI DRIP Registration Statement did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions of material facts contained in the FHI DRIP Registration Statement and/or the documents incorporated therein and thereafter by reference.

Defendants' Response:  Paragraph 390 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 390.

391.     By reason of the conduct alleged herein, Defendants named herein violated and/or controlled a person who violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiff Duda and members of the FHI DRIP Subclass who hold FHI Fund shares acquired pursuant to the FHI Fund DRIP Plan have the right to rescind and recover the consideration paid for those FHI Fund shares and, hereby elect to rescind and tender their respective shares to Defendants named herein.  To the extent Plaintiff Duda and any other members of the FHI DRIP Subclass have sold any of their FHI Fund shares purchased pursuant to the FHI Fund DRIP Plan, they are entitled to rescissory damages.

Defendants' Response:  Paragraph 391 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 391.

392.     Plaintiff Duda, individually and representatively, hereby offers to tender to Defendants named herein those FHI Fund shares which he and all other members of the FHI DRIP Subclass continue to own that were acquired pursuant to the FHI Fund DRIP Plan during the FHI Class Period, in return for the consideration paid for those shares, together with interest thereon.  To the extent Plaintiff Duda and members of the FHI DRIP Subclass have sold any such shares, they are entitled to rescissory damages from Defendants named herein.

Defendants' Response:  Paragraph 392 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegation that

Plaintiffs or any members of the FHI DRIP Subclass are entitled to rescissory damages, and deny

knowledge or information sufficient to form a belief as to the remaining allegations in

Paragraph 392.

393.     Less than three years elapsed from the time that the securities upon which this Count is brought were sold to participants in the FHI Fund DRIP Plan to the time of the filing of

this action.  Less than one year elapsed from the time when Plaintiff Duda and other members of the FHI DRIP Subclass discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

<u>Defendants' Response</u>:  Paragraph 393 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 393.

394.    Plaintiff Duda repeats and realleges each and every allegation in paragraphs 1 through 279 and paragraphs 344 through 363, above, as if set forth herein, but only to the extent that such allegations do not sound in fraud, allege *scienter* or otherwise allege the intent of Defendants First Trust Portfolios and FHY Fund to defraud Plaintiff Duda and members of the FHY DRIP Subclass that purchased FHY Fund shares pursuant and/or traceable to the FHY Fund's DRIP Registration Statement.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 394, and repeat and reallege

Defendants' responses to Paragraphs 1 through 279 and Paragraphs 344 through 363 as if fully

set forth herein.

395.    This Count is predicated exclusively upon the strict liability of Defendants named herein for making materially untrue and/or materially misleading statements and omissions in the DRIP Registration Statement and the documents incorporated therein or thereafter by reference.

<u>Defendants' Response</u>:  Paragraph 395 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 395.

396.    This Count is asserted by Plaintiff Duda on his own behalf as a FHY Fund DRIP Plan participant during the FHY Class Period and on behalf of all members of the FHY DRIP Subclass who acquired shares pursuant and/or traceable to the FHY DRIP Registration Statement against Defendants named herein.

<u>Defendants' Response</u>:  Answering Paragraph 396, admit that Plaintiffs purport to bring

Count XI on behalf of the FHY DRIP Subclass, as defined in the Complaint, against Defendants

First Trust Portfolios and FHY Fund.

397.    Defendants named herein were the sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the FHY DRIP Registration Statement.

Defendants' Response:  Paragraph 397 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 397.

398.    The FHY DRIP Registration Statement and the documents incorporated therein
and thereafter by reference contained untrue statements of material facts, omitted to state other
facts necessary to make the statements made not misleading, and concealed and failed to disclose
material facts.  Defendants named herein engaged in solicitation including participating in the
preparation of the false and misleading FHY DRIP Registration Statement and the documents
incorporated therein and thereafter by reference.

Defendants' Response:  Paragraph 398 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 398.

399.    Defendants named herein owed to the purchasers of FHY Fund shares pursuant to
the FHY Fund DRIP Plan the duty to make a reasonable and diligent investigation of the
statements contained in the FHY DRIP Registration Statement(s) and the documents
incorporated therein and thereafter by reference, to ensure that such statements were true and that
there was no omission to state a material fact required to be stated in order to make the
statements contained therein not misleading.

Defendants' Response:  Paragraph 399 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 399.

400.    Plaintiff Duda and the other members of the FHY DRIP Subclass who
participated in the FHY Fund DRIP Plan and acquired FHY Fund shares pursuant and/or
traceable to the defective FHY DRIP Registration Statement did not know, or in the exercise of
reasonable diligence could not have known, of the untruths and omissions of material facts
contained in the FHY DRIP Registration Statement and/or the documents incorporated therein
and thereafter by reference.

Defendants' Response:  Paragraph 400 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 400.

401.    By reason of the conduct alleged herein, Defendants named herein violated and/or
controlled a person who violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiff

Duda and members of the FHY DRIP Subclass who hold FHY Fund shares acquired pursuant to the FHY Fund DRIP Plan have the right to rescind and recover the consideration paid for those FHY Fund shares and, hereby elect to rescind and tender their respective shares to Defendants named herein.  To the extent Plaintiff Duda and any other members of the FHY DRIP Subclass have sold any of their FHY Fund shares purchased pursuant to the FHY Fund DRIP Plan, they are entitled to rescissory damages.

Defendants' Response:  Paragraph 401 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 401.

402.    Plaintiff Duda, individually and representatively, hereby offers to tender to Defendants named herein those FHY Fund shares which he and all other members of the FHY DRIP Subclass continue to own that were acquired pursuant to the FHY Fund DRIP Plan during the FHY Class Period, in return for the consideration paid for those shares, together with interest thereon.  To the extent Plaintiff Duda and members of the FHY DRIP Subclass have sold any such shares, they are entitled to rescissory damages from Defendants named herein.

Defendants' Response:  Paragraph 402 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegation that

Plaintiffs or any members of the FHY DRIP Subclass are entitled to rescissory damages, and

deny knowledge or information sufficient to form a belief as to the remaining allegations in

Paragraph 402.

403.    Less than three years elapsed from the time that the securities upon which this Count is brought were sold to participants in the FHY Fund DRIP Plan to the time of the filing of this action.  Less than one year elapsed from the time when Plaintiff Duda and other members of the FHY DRIP Subclass discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

Defendants' Response:  Paragraph 403 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 403.

404.    Plaintiff CRC repeats and realleges each and every allegation in paragraphs 1 through 279 and paragraphs 364 through 383, above, as if set forth herein, but only to the extent that such allegations do not sound in fraud, allege *scienter* or otherwise allege the intent of any Defendant named in this Count to defraud Plaintiff CRC and members of the FHO DRIP

161

Subclass that purchased FHO Fund shares pursuant and/or traceable to the FHO DRIP
Registration Statement.

Defendants' Response:  Deny the allegations in Paragraph 404, and repeat and reallege

Defendants' responses to Paragraphs 1 through 279 and Paragraphs 364 through 383 as if fully

set forth herein.

405.    This Count is predicated exclusively upon the strict liability of Defendants First
Trust Portfolios and FHO Fund for making materially untrue and/or materially misleading
statements and omissions in the FHO DRIP Registration Statement and the documents
incorporated therein or thereafter by reference.

Defendants' Response:  Paragraph 405 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 405.

406.    This Count is asserted by Plaintiff CRC on his own behalf as a DRIP Plan
participant during the FHO Class Period and on behalf of all members of the FHO DRIP
Subclass who acquired shares pursuant and/or traceable to the FHO DRIP Registration Statement
against Defendants named herein.

Defendants' Response:  Answering Paragraph 406, admit that Plaintiffs purport to bring

Count XII on behalf of the FHO DRIP Subclass, as defined in the Complaint, against Defendants

First Trust Portfolios and FHO Fund.

407.    Defendants named herein were the sellers, offerors, and/or solicitors of purchasers
of the shares offered pursuant to the FHO DRIP Registration Statement.

Defendants' Response:  Paragraph 407 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 407.

408.    The FHO DRIP Registration Statement and the documents incorporated therein
and thereafter by reference contained untrue statements of material facts, omitted to state other
facts necessary to make the statements made not misleading, and concealed and failed to disclose
material facts.  Defendants named herein engaged in solicitation including participating in the
preparation of the false and misleading FHO DRIP Registration Statement and the documents
incorporated therein and thereafter by reference.

<u>Defendants' Response</u>:  Paragraph 408 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 408.

409.    Defendants named herein owed to the purchasers of FHO Fund shares pursuant to the FHO Fund DRIP Plan the duty to make a reasonable and diligent investigation of the statements contained in the FHO DRIP Registration Statement and the documents incorporated therein and thereafter by reference, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

<u>Defendants' Response</u>:  Paragraph 409 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 409.

410.    Plaintiff CRC and the other members of the FHO DRIP Subclass who participated in the FHO Fund DRIP Plan and acquired FHO Fund shares pursuant and/or traceable to the defective FHO DRIP Registration Statement did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions of material facts contained in the FHO DRIP Registration Statement and/or the documents incorporated therein and thereafter by reference.

<u>Defendants' Response</u>:  Paragraph 410 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 410.

411.    By reason of the conduct alleged herein, Defendants named herein violated and/or controlled a person who violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiff CRC and members of the FHO DRIP Subclass who hold FHO Fund shares acquired pursuant to the FHO Fund DRIP Plan have the right to rescind and recover the consideration paid for those FHO Fund shares and, hereby elect to rescind and tender their respective shares to Defendants named herein.  To the extent Plaintiff CRC and any other members of the FHO DRIP Subclass have sold any of their FHO Fund shares purchased pursuant to the FHO Fund DRIP Plan, they are entitled to rescissory damages.

<u>Defendants' Response</u>:  Paragraph 411 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 411.

412.    Plaintiff CRC, individually and representatively, hereby offers to tender to Defendants named herein those FHO Fund shares which it and all other members of the FHO DRIP Subclass continue to own that were acquired pursuant to the FHO Fund DRIP Plan during the FHO Class Period, in return for the consideration paid for those shares, together with interest thereon.  To the extent Plaintiff CRC and members of the FHO DRIP Subclass have sold any such shares, they are entitled to rescissory damages from Defendants named herein.

Defendants' Response:  Paragraph 412 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegation that

Plaintiffs or any members of the FHO DRIP Subclass are entitled to rescissory damages, and

deny knowledge or information sufficient to form a belief as to the remaining allegations in

Paragraph 412.

413.    Less than three years elapsed from the time that the securities upon which this Count is brought were sold to participants in the FHO Fund DRIP Plan to the time of the filing of this action.  Less than one year elapsed from the time when Plaintiff CRC and other members of the FHO DRIP Subclass discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

Defendants' Response:  Paragraph 413 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 413.

414.    Plaintiff Duda repeats and realleges each and every allegation in paragraphs 1 through 279, paragraphs 324 through 343, and paragraphs 384 through 393, above, as if set forth herein, but only to the extent that such allegations do not sound in fraud, allege *scienter* or otherwise allege the intent of Defendants Bowen, Bradley and First Trust to defraud Plaintiff Duda, or any other members of the FHI DRIP Subclass that acquired FHI Fund shares pursuant to FHI Fund DRIP Plan during the FHI Class Period.

Defendants' Response:  Deny the allegations in Paragraph 414, and repeat and reallege

Defendants' responses to Paragraphs 1 through 279, Paragraphs 324 through 343, and

Paragraphs 384 through 393 as if fully set forth herein.

415.    Each of the Defendants named herein was a control person of FHI Fund within the meaning of Section 15 of the Securities Act.

Defendants' Response:  Paragraph 415 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 415.

416.    Each of the Defendants named herein is liable pursuant to Section 15 of the
Securities Act based on his/its ability to control the FHI Fund which violated Section 11 of the
Securities Act as alleged above.  This ability stems from their management positions and/or
ability to control those persons in management positions, access to information regarding the
FHI Fund's operations and/or financial condition, ability to cause and direct the dissemination of
that information, and/or the ability to prevent the issuance of, correct, or cause to be corrected,
the misleading statements in the FHI DRIP Registration Statement and documents incorporated
therein and thereafter by reference.  First Trust was the Fund's investment adviser and was
responsible for selecting and supervising the Subadvisers, the ongoing monitoring of the FHI
Fund's investment portfolio, managing the FHI Fund's business affairs and providing certain
clerical and bookkeeping and other administrative services.  First Trust was also responsible for
determining the FHI Fund's overall investment strategy and overseeing its implementation.

Defendants' Response:  Paragraph 416 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 416, except admit that First Trust Advisors was the FHI Fund's investment adviser

during the Class Period.

417.    The Defendants named herein, by reason of their positions with the FHI Fund,
were controlling persons of the FHI Fund and are liable to Plaintiff Duda and the other members
of the FHI DRIP Subclass who participated in the FHI Fund DRIP Plan during the FHI
Class Period under Section 15 of the Securities Act.

Defendants' Response:  Paragraph 417 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 417.

418.    Plaintiff Duda repeats and realleges each and every allegation in paragraphs 1
through 279, paragraphs 344 through 363, and paragraphs 394 through 403, above, as if set forth
herein, but only to the extent that such allegations do not sound in fraud, allege *scienter* or
otherwise allege the intent of Defendants Bowen, Bradley and First Trust to defraud Plaintiff
Duda, or any other members of the FHY DRIP Subclass that acquired FHY Fund shares pursuant
to FHY Fund DRIP Plan during the FHY Class Period.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 418, and repeat and reallege

Defendants' responses to Paragraphs 1 through 279, Paragraphs 344 through 363, and

Paragraphs 394 through 403 as if fully set forth herein.

419.    Each of the Defendants named herein was a control person of FHY Fund within the meaning of Section 15 of the Securities Act.

<u>Defendants' Response</u>:  Paragraph 419 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 419.

420.    Each of the Defendants named herein is liable pursuant to Section 15 of the Securities Act based on his/its ability to control the FHY Fund which violated Section 11 of the Securities Act as alleged above.  This ability stems from their management positions and/or ability to control those persons in management positions, access to information regarding the FHY Fund's operations and/or financial condition, ability to cause and direct the dissemination of that information, and/or the ability to prevent the issuance of, correct, or cause to be corrected, the misleading statements in the FHY DRIP Registration Statement and documents incorporated therein and thereafter by reference.  First Trust was the FHY Fund's investment adviser and was responsible for selecting and supervising the Subadviser, the ongoing monitoring of the FHY Fund's investment portfolio, managing the Fund's business affairs and providing certain clerical and bookkeeping and other administrative services.  First Trust was also responsible for determining the FHY Fund's overall investment strategy and overseeing its implementation.

<u>Defendants' Response</u>:  Paragraph 420 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 420, except admit that First Trust Advisors was the FHY Fund's investment adviser

during the Class Period.

421.    The Defendants named herein, by reason of their positions with the FHY Fund, were controlling persons of the FHY Fund and are liable to Plaintiff Duda and the other members of the FHY DRIP Subclass who participated in the FHY Fund DRIP Plan during the FHY Class Period under Section 15 of the Securities Act.

<u>Defendants' Response</u>:  Paragraph 421 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 421.

422.     Plaintiff CRC repeats and realleges each and every allegation in paragraphs 1 through 279, paragraphs 364 through 383, and paragraphs 404 through 413, above, as if set forth herein, but only to the extent that such allegations do not sound in fraud, allege *scienter* or otherwise allege the intent of Defendants Bowen, Bradley and First Trust to defraud Plaintiff CRC, or any other members of the FHO DRIP Subclass that acquired FHO Fund shares pursuant to FHO Fund DRIP Plan during the FHO Class Period.

Defendants' Response:  Deny the allegations in Paragraph 422, and repeat and reallege

Defendants' responses to Paragraphs 1 through 279, Paragraphs 364 through 383, and

Paragraphs 404 through 413 as if fully set forth herein.

423.     Each of the Defendants named herein was a control person of FHO Fund within the meaning of Section 15 of the Securities Act.

Defendants' Response:  Paragraph 423 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 423.

424.     Each of the Defendants named herein is liable pursuant to Section 15 of the Securities Act based on his/its ability to control the FHO Fund which violated Section 11 of the Securities Act as alleged above.  This ability stems from their management positions and/or ability to control those persons in management positions, access to information regarding the FHO Fund's operations and/or financial condition, ability to cause and direct the dissemination of that information, and/or the ability to prevent the issuance of, correct, or cause to be corrected, the misleading statements in the FHO DRIP Registration Statement and documents incorporated therein and thereafter by reference.  First Trust was the FHO Fund's investment adviser and was responsible for selecting and supervising the Subadviser, the ongoing monitoring of the FHO Fund's investment portfolio, managing the FHO Fund's business affairs and providing certain clerical and bookkeeping and other administrative services.  First Trust was also responsible for determining the FHO Fund's overall investment strategy and overseeing its implementation.

Defendants' Response:  Paragraph 424 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 424, except admit that First Trust Advisors was the FHO Fund's investment adviser

during the Class Period.

425.     The Defendants named herein, by reason of their positions with the FHO Funds, were controlling persons of the FHO Fund and are liable to Plaintiff CRC and the other members of the FHO DRIP Subclass who participated in the FHO Fund DRIP Plan during the FHO Class Period under Section 15 of the Securities Act.

Defendants' Response:  Paragraph 425 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 425.

426.    Plaintiff Valenti Trust repeats and realleges each and every allegation in
paragraphs 1 through 279, above, emphasizing that such Plaintiff explicitly excludes any
allegation herein that could be construed to allege intentional or reckless misconduct.

Defendants' Response:  Deny the allegations in Paragraph 426, and repeat and reallege

Defendants' responses to Paragraphs 1 through 279 as if fully set forth herein.

427.    This Count is asserted by Plaintiff Valenti Trust on behalf of the FHI 14(a)
Subclass against Defendants First Trust, FHI Fund, Bowen and Bradley for violations of
Section 14(a) of the Exchange Act and Rule 14a-9.

Defendants' Response:  Answering Paragraph 427, admit that Plaintiffs purport to bring

Count XVI under Section 14(a) of the Exchange Act and SEC Rule 14a-9 on behalf of the FHI

14(a) Subclass, as defined in the Complaint, against Defendants First Trust Advisors, FHI Fund,

Bowen, and Bradley.

428.    On March 16, 2007, FHI Fund and FHY Fund filed their Joint Proxy Statement
with the SEC, which was mailed thereafter to FHI Fund and FHY Fund shareholders of record as
of February 12, 2007.  The Joint Proxy Statement solicited proxies from shareholders to be voted
in favor of a proposal to approve a change in FHI Fund's and FHY Fund's industry concentration
policy from non-concentrated to concentrated in residential mortgage-backed securities at a
meeting on May 29, 2007.

Defendants' Response:  Deny the allegations in Paragraph 428, except admit that the FHI

and FHY Funds filed the Joint Proxy Statement on March 16, 2007 and that the Joint Proxy

Statement was mailed to FHI and FHY Fund shareholders of record as of February 12, 2007, and

refer the Court to the Joint Proxy Statement for the full content and context thereof.

429.    The Joint Proxy Statement contained a unanimous Recommendation of the Board
of Trustees of both the FHI Fund and FHY Fund to vote "For" the proposal stating in pertinent
part:

At a meeting of the Board of Trustees of the Strategic Funds held on January 17,
2007, the Adviser and Valhalla Capital Partners, LLC, the sub-advisor to the

Strategic Funds, recommended to the Board of Trustees that residential mortgage-backed securities be excluded from the 25% limitation with respect to industry concentration. ***According to Valhalla, residential mortgage-backed securities have historically offered very compelling risk/reward characteristics within the structured finance area. Valhalla believes that removing the limitation on residential mortgage-backed securities will bring the Strategic Funds in line with the original intent of their investment strategy***. At the same meeting [January 17, 2007 meeting of the Board of Trustees], the Board of Trustees of the Strategic Funds, including a majority of the Board members who are not "interested persons" of the Strategic Funds, First Trust Advisors or Valhalla ("Independent Trustees"), unanimously determined that the changes in the industry concentration policies were in the best interests of the Strategic Funds and approved such changes, subject to approval by shareholders.

<u>Defendants' Response</u>:  Answering Paragraph 429, admit that Plaintiffs purport to quote a portion of the Joint Proxy Statement, and refer the Court to the Joint Proxy Statement for the full content and context thereof.

430.    The Joint Proxy Statement contained material misstatements and omissions because it failed to disclose material facts to FHI Fund shareholders necessary for them to cast fully informed votes with respect to the change in concentration to residential mortgage-backed securities.  The Joint Proxy Statement omitted to disclose the accelerating deterioration of the FHI Fund's residential mortgage-backed securities and otherwise failed to accurately portray how severe such deterioration actually had become.  Further, the Joint Proxy Statement failed to disclose that the First Trust's and the Board of Trustees of the FHI Fund and Valhalla's recommendation and other positive statements concerning the vote were made without adequate basis.

<u>Defendants' Response</u>:  Paragraph 430 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 430.

431.    According to the Joint Proxy Statement and 1940 Act, the vote to change the concentration required a majority of the outstanding voting securities of each Strategic Fund or the lesser of (i) 67% or more of the shares of the Fund entitled to vote thereon present at the Meeting if the holders of more than 50% of such outstanding share are present in person or represented by proxy; or (ii) more than 50% of such outstanding shares of the Fund.

<u>Defendants' Response</u>:  Admit the allegations in Paragraph 431, and refer the Court to the Joint Proxy Statement for the full content and context thereof.

432.     The Joint Annual Meeting of Shareholders of FHI Fund and FHY Fund scheduled on April 16, 2007 was later adjourned until May 29, 2007, to allow more shareholders to vote to meet the voting majority requirement and eventually approve the change in concentration.  In advance of the vote, Defendants named herein failed in their duty to update and correct the material misstatement and omissions in the Joint Proxy Statement.

Defendants' Response:  Paragraph 432 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 432, except admit that the Joint Annual Meeting of Shareholders of FHI Fund and

FHY Fund was scheduled to be held on April 16, 2007 and was adjourned until May 29, 2007.

433.     This Count is asserted against the Defendants named herein under Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder on behalf of Plaintiffs Valenti Trust and the members of the proposed FHI 14(a) Subclass who were damaged thereby.

Defendants' Response:  Answering Paragraph 433, admit that Plaintiffs purport to bring

Count XVI under Section 14(a) of the Exchange Act and SEC Rule 14a-9 on behalf of the FHI

14(a) Subclass, as defined in the Complaint, against Defendants First Trust Advisors, FHI Fund,

Bowen, and Bradley.

434.     Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), provides that "[it] shall be unlawful for any person by use of the mails or by any means of instrumentality of interstate commerce or any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to §14(a)" of the Exchange Act and provides that no Joint Proxy Statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading." 17 C.F.R. §240.14a-9(a).

Defendants' Response:  Paragraph 434 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, admit that Plaintiffs

purport to quote portions of Section 14(a) of the Exchange Act and SEC Rule 14a-9, and refer

the Court to Section 14(a) and SEC Rule 14a-9 for the full content and context thereof.

435.     In the Joint Proxy Statement, Plaintiff Valenti Trust and other members of the FHI 14(a) Subclass were solicited to vote to change the concentration of FHI Fund to residential mortgage-backed securities.  A shareholder was required to approve this proposal.

Consequently, the Joint Proxy Statement was an essential link in the accomplishment of this proposal.

Defendants' Response:  Paragraph 435 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 435, and refer the Court to the Joint Proxy Statement for the full content and context

thereof.

436.    Defendants named herein provided information that was contained in the Joint Proxy Statement, allowed their names to be used in conjunction with the Joint Proxy Statement and solicitation of votes, had a substantial financial interest in the outcome of the votes being sought by the Joint Proxy Statement, would have a continuing material relationship with FHI Fund following the vote on the concentration and other issues presented in the Joint Proxy Statement, solicited votes under the Joint Proxy Statement, and caused the Joint Proxy Statement to be disseminated to the Plaintiff and the other members of the FHI 14(a) Subclass through the use of the United States mails and the means and instrumentalities of interstate commerce. Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), prohibits any person soliciting a proxy from doing so "in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Defendants' Response:  Paragraph 436 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, admit that Plaintiffs

purport to quote a portion of Section 14(a) of the Exchange Act, refer the Court to Section 14(a)

for the full content and context thereof, and deny the remaining allegations in Paragraph 436.

437.    SEC Rule 14a-9, 17 C.F.R. 240.14a-9, promulgated pursuant to Section 14(a), prohibits the issuance of any Proxy Statement "which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

Defendants' Response:  Paragraph 437 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, admit that Plaintiffs

purport to quote a portion of SEC Rule 14a-9, refer the Court to SEC Rule 14a-9 for the full

content and context thereof, and deny the remaining allegations in Paragraph 437.

438.     Defendants solicited proxies from Plaintiff Valenti Trust and other members of the FHI 14(a) Subclass by means of a Joint Proxy Statement which contained false and misleading statements concerning, *inter alia*, change in concentration to residential mortgage-backed securities and its benefits to shareholders and FHI Fund's deteriorating financial profile and omitted to state material facts which were necessary to make their statements contained therein not false or misleading.

Defendants' Response:  Paragraph 438 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 438.

439.     The misrepresented or omitted facts are material because under all the circumstances, there is a substantial likelihood a reasonable shareholder would consider the false and misleading statements or omitted facts important in deciding how to evaluate the issues and opinions described in the Joint Proxy Statement or a material part of the mix of information available to the FHI 14(a) Subclass class members in determining how to exercise their voting rights.

Defendants' Response:  Paragraph 439 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 439.

440.     Plaintiff Valenti Trust and other members of the FHI 14(a) Subclass were denied the opportunity to make an informed decision when voting on the change in concentration.

Defendants' Response:  Paragraph 440 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 440.

441.     None of the materially false and misleading statements contained in the Joint Proxy Statement, or materials omitted from the Joint Proxy Statement, as described above, were known to the Plaintiffs Valenti Trust or the other members of the proposed FHI 14(a) Subclass at the time they voted on the matters presented to them in the Joint Proxy Statement.

Defendants' Response:  Paragraph 441 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 441.

442.    Plaintiff Valenti Trust and other members of the FHI 14(a) Subclass have suffered damages as a result of the change in concentration, which was approved through the use of the Joint Proxy Statement in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

Defendants' Response:  Paragraph 442 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 442.

443.    Defendants named herein violated §14(a) of the Exchange Act and Rule 14a-9 by issuing the false and misleading Joint Proxy Statement to solicit and obtain the votes of FHI Fund shareholders to approve the change in concentration.  In their Joint Proxy Statement, Defendants named herein made what they knew or should have known were untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading.

Defendants' Response:  Paragraph 443 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 443.

444.    As a consequence of the foregoing, Plaintiff Valenti Trust and the other members of the FHI 14(a) Subclass have been damaged.

Defendants' Response:  Paragraph 444 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 444.

445.    Plaintiff Wolkstein repeats and realleges each and every allegation in paragraphs 1 through 279, above, emphasizing that such Plaintiff explicitly excludes any allegation herein that could be construed to allege intentional or reckless misconduct.

Defendants' Response:  Deny the allegations in Paragraph 445, and repeat and reallege

Defendants' responses to Paragraphs 1 through 279 as if fully set forth herein.

446.    This Count is asserted by Plaintiff Wolkstein on behalf of the FHY 14(a) Subclass against Defendants First Trust, FHY Fund, Bowen and Bradley for violations of Section 14(a) of the Exchange Act and Rule 14a-9.

<u>Defendants' Response</u>:  Answering Paragraph 446, admit that Plaintiffs purport to bring

Count XVII under Section 14(a) of the Exchange Act and SEC Rule 14a-9 on behalf of the FHI

14(a) Subclass, as defined in the Complaint, against Defendants First Trust Advisors, FHY Fund,

Bowen, and Bradley.

447.    On March 16, 2007, FHI Fund and FHY Fund filed their Joint Proxy Statement with the SEC, which was mailed thereafter to FHI Fund and FHY Fund shareholders of record as of February 12, 2007.  The Joint Proxy Statement solicited proxies from shareholders to be voted in favor of a proposal to approve a change in FHI Fund's and FHY Fund's industry concentration policy from non-concentrated to concentrated in residential mortgage-backed securities at a meeting on May 29, 2007.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 447, except admit that the FHI

and FHY Funds filed the Joint Proxy Statement on March 16, 2007 and that the Joint Proxy

Statement was mailed to FHI and FHY Fund shareholders of record as of February 12, 2007, and

refer the Court to the Joint Proxy Statement for the full content and context thereof.

448.    The Joint Proxy Statement contained a unanimous Recommendation of the Board of Trustees of both the FHI Fund and FHY Fund to vote "For" the proposal stating in pertinent part:

> At a meeting of the Board of Trustees of the Strategic Funds held on January 17, 2007, the Adviser and Valhalla Capital Partners, LLC, the sub-advisor to the Strategic Funds, recommended to the Board of Trustees that residential mortgage-backed securities be excluded from the 25% limitation with respect to industry concentration.  ***According to Valhalla, residential mortgage-backed securities have historically offered very compelling risk/reward characteristics within the structured finance area.  Valhalla believes that removing the limitation on residential mortgage-backed securities will bring the Strategic Funds in line with the original intent of their investment strategy***.  At the same meeting [January 17, 2007 meeting of the Board of Trustees], the Board of Trustees of the Strategic Funds, including a majority of the Board members who are not "interested persons" of the Strategic Funds, First Trust Advisors or Valhalla ("Independent Trustees"), unanimously determined that the changes in the industry concentration policies were in the best interests of the Strategic Funds and approved such changes, subject to approval by shareholders.

Defendants' Response:  Answering Paragraph 448, admit that Plaintiffs purport to quote a portion of the Joint Proxy Statement, and refer the Court to the Joint Proxy Statement for the full content and context thereof.

449.    The Joint Proxy Statement contained material misstatements and omissions because it failed to disclose material facts to FHY Fund shareholders necessary for them to cast fully informed votes with respect to the change in concentration to residential mortgage-backed securities.  The Joint Proxy Statement omitted to disclose the accelerating deterioration of the FHY Fund's residential mortgage-backed securities and otherwise failed to accurately portray how severe such deterioration actually had become.  Further, the Joint Proxy Statement failed to disclose that the First Trust's and the Board of Trustees of the FHY Fund and Valhalla's recommendation and other positive statements concerning the vote were made without adequate basis.

Defendants' Response:  Paragraph 449 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 449.

450.    According to the Joint Proxy Statement and 1940 Act, the vote to change the concentration required a majority of the outstanding voting securities of each Strategic Fund or the lesser of (i) 67% or more of the shares of the Fund entitled to vote thereon present at the Meeting if the holders of more than 50% of such outstanding share are present in person or represented by proxy; or (ii) more than 50% of such outstanding shares of the Fund.

Defendants' Response:  Admit the allegations in Paragraph 450, and refer the Court to the Joint Proxy Statement for the full content and context thereof.

451.    The Joint Annual Meeting of Shareholders of FHI Fund and FHY Fund scheduled on April 16, 2007 was later adjourned until May 29, 2007, to allow more shareholders to vote to meet the voting majority requirement and eventually approve the change in concentration.  In advance of the vote, Defendants named herein failed in their duty to update and correct the material misstatement and omissions in the Joint Proxy Statement.

Defendants' Response:  Paragraph 451 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 451, except admit that the Joint Annual Meeting of Shareholders of FHI Fund and FHY Fund was scheduled to be held on April 16, 2007 and was adjourned until May 29, 2007.

452.    This Count is asserted against the Defendants named herein under Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder on behalf of Plaintiff Wolkstein and the members of the proposed FHY 14(a) Subclass who were damaged thereby.

Defendants' Response:  Answering Paragraph 452, admit that Plaintiffs purport to bring

Count XVII under Section 14(a) of the Exchange Act and SEC Rule 14a-9 on behalf of the FHY

14(a) Subclass, as defined in the Complaint, against Defendants First Trust Advisors, FHY Fund,

Bowen, and Bradley.

453.    Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), provides that "[it] shall be unlawful for any person by use of the mails or by any means of instrumentality of interstate commerce or any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to §14(a)" of the Exchange Act and provides that no Joint Proxy Statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading." 17 C.F.R. §240.14a-9(a).

Defendants' Response:  Paragraph 453 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, admit that Plaintiffs

purport to quote portions of Section 14(a) of the Exchange Act and SEC Rule 14a-9, and refer

the Court to Section 14(a) and SEC Rule 14a-9 for the full content and context thereof.

454.    In the Joint Proxy Statement, Plaintiff Wolkstein and other members of the FHY 14(a) Subclass were solicited to vote to change the concentration of FHY Fund to residential mortgage-backed securities.  A shareholder was required to approve this proposal. Consequently, the Joint Proxy Statement was an essential link in the accomplishment of this proposal.

Defendants' Response:  Paragraph 454 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 454, and refer the Court to the Joint Proxy Statement for the full content and context

thereof.

455.    Defendants named herein provided information that was contained in the Joint Proxy Statement, allowed their names to be used in conjunction with the Joint Proxy Statement and solicitation of votes, had a substantial financial interest in the outcome of the votes being

sought by the Joint Proxy Statement, would have a continuing material relationship with FHY Fund following the vote on the concentration and other issues presented in the Joint Proxy Statement, solicited votes under the Joint Proxy Statement, and caused the Joint Proxy Statement to be disseminated to the Plaintiff and the other members of the FHY 14(a) Subclass through the use of the United States mails and the means and instrumentalities of interstate commerce. Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), prohibits any person soliciting a proxy from doing so "in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Defendants' Response:  Paragraph 455 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, admit that Plaintiffs

purport to quote a portion of Section 14(a) of the Exchange Act, refer the Court to Section 14(a)

for the full content and context thereof, and deny the remaining allegations in Paragraph 455.

456.    SEC Rule 14a-9, 17 C.F.R. 240.14a-9, promulgated pursuant to Section 14(a), prohibits the issuance of any Proxy Statement "which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

Defendants' Response:  Paragraph 456 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, admit that Plaintiffs

purport to quote a portion of SEC Rule 14a-9, and refer the Court to SEC Rule 14a-9 for the full

content and context thereof, and deny the remaining allegations in Paragraph 456.

457.    Defendants solicited proxies from Plaintiff Wolkstein and other members of the FHY 14(a) Subclass by means of a Joint Proxy Statement which contained false and misleading statements concerning, *inter alia*, change in concentration to residential mortgage-backed securities and its benefits to shareholders and FHY Fund's deteriorating financial profile and omitted to state material facts which were necessary to make their statements contained therein not false or misleading.

Defendants' Response:  Paragraph 457 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 457.

458.     The misrepresented or omitted facts are material because under all the circumstances, there is a substantial likelihood a reasonable shareholder would consider the false and misleading statements or omitted facts important in deciding how to evaluate the issues and opinions described in the Joint Proxy Statement or a material part of the mix of information available to the FHY 14(a) Subclass class members in determining how to exercise their voting rights.

Defendants' Response:  Paragraph 458 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 458.

459.     Plaintiff Wolkstein and other members of the FHY 14(a) Subclass were denied the opportunity to make an informed decision when voting on the change in concentration.

Defendants' Response:  Paragraph 459 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 459.

460.     None of the materially false and misleading statements contained in the Joint Proxy Statement, or materials omitted from the Joint Proxy Statement, as described above, were known to the Plaintiff Wolkstein or the other members of the proposed FHY 14(a) Subclass at the time they voted on the matters presented to them in the Joint Proxy Statement.

Defendants' Response:  Paragraph 460 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 460.

461.     Plaintiff Wolkstein and other members of the FHY 14(a) Subclass have suffered damages as a result of the change in concentration, which was approved through the use of the Joint Proxy Statement in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

Defendants' Response:  Paragraph 461 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 461.

462.     Defendants named herein violated §14(a) of the Exchange Act and Rule 14a-9 by issuing the false and misleading Joint Proxy Statement to solicit and obtain the votes of FHY shareholders to approve the change in concentration.  In their Joint Proxy Statement, Defendants

named herein made what they knew or should have known were untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading.

Defendants' Response:  Paragraph 462 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 462.

463.    As a consequence of the foregoing, Plaintiff Wolkstein and the other members of the FHY 14(a) Subclasses have been damaged.

Defendants' Response:  Paragraph 463 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 463.

464.    Plaintiffs Valenti Trust and Duda repeat and reallege each and every allegation contained in paragraphs 1 through 279, paragraphs 385 through 393, and paragraphs 427 through 444 above as if fully set forth herein.

Defendants' Response:  Answering Paragraph 464, repeat and reallege Defendants'

responses to Paragraphs 1 through 279, Paragraphs 385 through 393, and Paragraphs 427

through 444 as if fully set forth herein.

465.    This Count is asserted by Plaintiffs Valenti Trust and Duda on behalf of the FHI 10(b) Class against Defendants First Trust Portfolios, First Trust, FHI Fund, Bowen and Bradley for violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

Defendants' Response:  Answering Paragraph 465, admit that Plaintiffs purport to assert

Count XVIII pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5 on behalf of

the FHI 10(b) Class, as defined in the Complaint, against Defendants First Trust Portfolios, First

Trust Advisors, FHI Fund, Bowen, and Bradley.

466.    During the FHI Class Period, Defendants named herein disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

Defendants' Response:  Paragraph 466 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 466.

467.     As alleged herein, Defendants named herein acted with scienter in that each of the
Defendants and the Non-Management Trustees and the Subadvisers knew that the public
documents and statements issued or disseminated in the name of the FHI Fund were materially
false and misleading; knew that such statements or documents would be issued or disseminated
to the investing public; and knowingly and substantially participated or acquiesced in the
issuance or dissemination of such statements or documents as primary violations of the federal
securities laws.  As set forth elsewhere herein in detail, Defendants named herein, by virtue of
their receipt of information reflecting the true facts regarding the FHI Fund, their control over,
and/or receipt and/or modification of the FHI Fund allegedly materially misleading
misstatements, and/or their associations with the FHI Fund, First Trust and/or First Trust
Portfolios, which made them privy to confidential proprietary information concerning the FHI
Fund, participated in the fraudulent scheme alleged herein.

Defendants' Response:  Paragraph 467 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 467.

468.     Specifically, Defendants Bowen and Bradley were the most senior executive and
financial officers of First Trust, and Bowen was a Trustee of the FHI Fund.  As such, they knew
about or recklessly disregarded the deteriorating subprime residential mortgage market and the
value of the Funds' mortgage-related investments.

Defendants' Response:  Paragraph 468 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 468, except admit that, during the Class Period, Bowen was the President of First

Trust and a member of the Board of Trustees of the FHI Fund and Bradley was the CFO of First

Trust.

469.     Defendants Bowen, Bradley and First Trust, and First Trust Portfolios had the
motive and opportunity to inflate the FHI Fund's mortgage-related assets and NAV.  According
to FHI Fund's 2007 N-CSR, "First Trust is responsible for the ongoing monitoring of the Fund's
investment portfolio" and "may use a fair value method to value the Fund's securities."  The FHI
Fund describes First Trust's role as follows:

First Trust serves as investment advisor to the Fund pursuant to an Investment Management Agreement.  First Trust is responsible for the ongoing monitoring of the Fund's investment portfolio, managing the Fund's business affairs and certain administrative services necessary for the management of the Fund.

Defendants' Response:  Paragraph 469 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 469, except admit that Plaintiffs purport to quote portion of the FHI Fund's annual shareholder report for the period ended October 31, 2007, and refer the Court to the annual report for the full content and context thereof.

470.    Defendants Bowen and Bradley were both senior executives of First Trust and thus had the ability to influence the valuations of the Funds' mortgage-related investments valued by First Trust and the FHI Fund's Board of Trustees.  Moreover, because Defendants Bowen and Bradley's compensation[22] were presumably linked, at least in part, to First Trust's performance, which was, in turn, linked to advisory fees received from the FHI Fund, Bowen and Bradley were motivated during the Class Periods to commit fraud by aggressively valuing the Funds' mortgage-related securities and thus inflating the Funds' NAVs and by improper use of leverage, all of which increased the advisory fees received by First Trust from the FHI Fund during the FHI Fund Class Period.  FHI Fund's 2007 N-CSR described First Trust advisor fees as follows:

First Trust is entitled to a monthly fee calculated at an annual rate of 0.90% of the Fund's Managed Assets (the value of the securities and other investments the Fund holds plus cash or other assets, including interest accrued but not yet received minus accrued liabilities other than the principal amount of any borrowings).

Defendants' Response:  Paragraph 470 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 470, except admit that, during the Class Period, Defendants Bowen and Bradley were the President and CFO, respectively, of First Trust, and that Plaintiffs purport to quote a portion of the FHI Fund's annual shareholder report on Form N-CSR for the period ended October 31, 2007, and refer the Court to the annual report for the full content and context thereof.

---

[22] At this time Plaintiffs are unable to determine the First Trust compensation structure for Bowen and Bradley. First Trust is a limited partnership with one limited partner, Grace Partners of DuPage L.P., and one general partner, The Charger Corporation and thus does not disclose compensation.

471.    Following is a break-down of Investment Advisory Fees incurred by the Funds:

| | Investment Advisory Fees | | | |
| --- | --- | --- | --- | --- |
| *in millions* | 2005 | 2006 | 2007 | 2008 |
| FHI | $0.39 | $1.52 | $1.98 | $1.25 |
| FHY | -- | 1.09 | 2.29 | 1.42 |
| FHO | | | | 1.41 |
| Total | $0.39 | $2.62 | $4.27 | $4.09 |

Defendants' Response:  Admit the allegations in Paragraph 471.

472.    Accordingly, because the monthly advisory fees were based on the value of each of the Fund's Managed Assets, defendants were motivated to inflate the value of the mortgage-related securities and NAV in order to increase their compensation.  Moreover, as a result of their positions in First Trust, defendants Bowen and Bradley had the opportunity to inflate the values of the FHI Fund's mortgage-related securities and NAV.

Defendants' Response:  Paragraph 472 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 472.

473.    Defendants were motivated to conceal the deterioration of the Funds mortgage-related investments in order to maintain compliance with applicable regulations and the Funds' disclosed policies.  Section 18(f)(1) of the 1940 Act allows funds to borrow only from banks and limiting bank loans to no more than 33 1/3 percent of the fund's total assets.  In this regard the Funds disclosed the following:

Leverage Risk.  The Fund may borrow an amount up to 33-1/3% (or such other percentage as permitted by law) of its Managed Assets (including the amount borrowed) less all liabilities other than borrowings.

Defendants' Response:  Paragraph 473 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 473, except admit that Plaintiffs purport to quote a portion of the FHI Fund's prospectus, and refer the Court to the prospectus for the full content and context of any disclosures regarding the Fund's use of leverage and the associated risks.

474.    The following table shows the asset coverage ratio and its component numerator and denominator of the FHI Fund and FHY Fund during the FHI Class Period and FHY Class Period respectfully.

| in millions | 01/31/07 | 04/30/07 | 07/31/07 | 10/31/07 | 01/31/08 | 04/30/08 | 07/31/08 | 10/31/08 |
|---|---|---|---|---|---|---|---|---|
| **FHI** | | | | | | | | |
| Unlevered Net Assets | $227.51 | $238.07 | $231.35 | $197.34 | $161.28 | $140.33 | $115.77 | $ 74.38 |
| Leverage | 50.00 | 65.00 | 72.00 | 61.20 | 50.00 | 44.00 | 34.00 | 15.00 |
| Asset Coverage | 455.03% | 366.27% | 321.32% | 322.46% | 322.56% | 318.94% | 340.49% | 495.87% |
| **FHY** | | | | | | | | |
| Unlevered Net Assets | 269.57 | 267.70 | 252.69 | 221.13 | 190.18 | 171.67 | 116.15 | 80.74 |
| Leverage | 77.00 | 77.00 | 77.00 | 67.00 | 58.00 | 54.00 | 12.00 | - |
| Asset Coverage | 350.09% | 347.66% | 328.17% | 330.05% | 327.90% | 317.91% | 967.91% | - |

Defendants' Response:  Deny the allegations in Paragraph 474, and refer the Court to the

FHI Fund's public filings for the full content and context of any disclosures regarding the FHI

Fund's use of leverage.

475.    As the table above demonstrates, the FHI Fund began to invest on margin at the beginning of 2007 as the adverse developments in the sub-prime mortgage market began to become evident.  At first the asset coverage ratio was well above the statutory minimum.  As 2007 progressed and as the adverse developments in the sub-prime mortgage market accelerated, however, the Funds' investment values began to deteriorate significantly while the leverage increased sharply.

Defendants' Response:  Deny the allegations in Paragraph 475.

476.    In the second half of 2007, FHI Fund reversed course and began deleveraging, but the rate in deterioration of those Fund's portfolio exceeded the deleveraging rate and the asset coverage ratio plunged to less than 20 basis points above the statutory minimum.  To be sure, the ratio would have been even worse had Defendants fairly valued its mortgage and other asset backed securities using all available criteria and information.  Indeed, a mere 6% hair cut in the valuation of FHI Fund's portfolio at April 30, 2009 would have sent the asset coverage ratio below 300%.  A 6% drop in value is also far less than a fair value valuation would warrant given the FHI Fund's concentration in the low mezzanine and subordinated equity tranches in which it invested.  The FHI Fund unlevered net assets dropped 18% during the subsequent three months, and only an accelerated reduction in leverage over that time span kept the asset coverage ratio above the 300% threshold.

Defendants' Response:  Deny the allegations in Paragraph 476.

477.    The FHI Fund's inflated investments during the FHI Fund's Class Period also served to overstate the investment advisory fees they paid to First Trust.  As the investment advisor, First Trust charged the FHI Fund a monthly advisory fee at an annual rate of 0.9% of managed assets of which Valhalla received 0.4% as the Subadvisor.

|  | Investment Advisory Fees | | | |
|---|---|---|---|---|
| in millions | 2005 | 2006 | 2007 | 2008 |
| FHI | $0.39 | $1.52 | $1.98 | $1.25 |

183

| | | | | |
|---|---|---|---|---|
| FHY | | 1.09 | 2.29 | 1.42 |
| FHO | | | | 1.41 |
| Total | $0.39 | $2.62 | $4.27 | $4.09 |

Defendants' Response:  Deny the allegations in Paragraph 477, except admit that the FHI

Fund paid First Trust Advisors an investment advisory (or management) fee at an annual rate of

0.90%, and that First Trust Advisors paid Valhalla a subadvisory fee at an annual rate of 0.40%.

478.    Defendants' fraudulent scheme to defraud investors by artificially inflating the
FHI Fund's investment portfolios is inextricably intertwined with the Defendants' desire to
inflate investment advisory fees paid by FHI Fund to First Trust during the FHI Class Period,
giving rise to an exceptionally strong inference that the Defendants acted with scienter to defraud
investors.

Defendants' Response:  Paragraph 478 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 478.

479.    Defendants named herein violated §10(b) of the Exchange Act and Rule 10b-5 in
that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state
material facts necessary in order to make the statements made, in light of the
circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as
a fraud or deceit upon plaintiff and others similarly situated in connection with their
purchases of shares in the FHI Fund during the FHI Class Period.

Defendants' Response:  Paragraph 479 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 479 and its subparagraphs.

480.    Plaintiffs Valenti Trust and Duda and the members of the FHI 10(b) Class have
suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated
prices for the FHI Fund's shares.  Plaintiffs Valenti Trust and Duda and the members of the FHI
10(b) Class would not have purchased the FHI Fund's shares at the prices they paid, or at all, if
they had been aware that the market prices had been artificially and falsely inflated by the herein
named Defendants' misleading statements.

Defendants' Response:  Paragraph 480 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 480.

481.    Plaintiffs Wolkstein and Duda repeat and reallege each and every allegation
contained in paragraphs 1 through 279, paragraphs 281 through 289, paragraphs 301 through
307, paragraphs 317 through 319, paragraphs 345 through 363, paragraphs 395 through 403,
paragraphs 419 through 421 and paragraphs 446 through 463, above as if fully set forth herein.

Defendants' Response:  Answering Paragraph 481, repeat and reallege Defendants'

responses to Paragraphs 1 through 279, Paragraphs 281 through 289, Paragraphs 301 through

307, Paragraphs 317 through 319, Paragraphs 345 through 363, Paragraphs 395 through 403,

Paragraphs 419 through 421, and Paragraphs 446 through 463 as if fully set forth herein.

482.    This Count is asserted by Plaintiffs Wolkstein and Duda on behalf of the FHY
10(b) Class against Defendants First Trust Portfolios, First Trust, FHY Fund, Bowen and
Bradley for violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated
thereunder.

Defendants' Response:  Answering Paragraph 482, admit that Plaintiffs purport to assert

Count XIX pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5 on behalf of the

FHY 10(b) Class, as defined in the Complaint, against Defendants First Trust Portfolios, First

Trust Advisors, FHY Fund, Bowen, and Bradley.

483.    During the FHY Class Period, Defendants named herein disseminated or
approved the false statements specified above, which they knew or deliberately disregarded were
misleading in that they contained misrepresentations and failed to disclose material facts
necessary in order to make the statements made, in light of the circumstances under which they
were made, not misleading.

Defendants' Response:  Paragraph 483 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 483.

484.    As alleged herein, Defendants named herein acted with scienter in that each of the
Defendants and the Non-Management Trustees and the Subadvisers knew that the public
documents and statements issued or disseminated in the name of the FHY Fund were materially

185

false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants named herein, by virtue of their receipt of information reflecting the true facts regarding the FHY Fund, their control over, and/or receipt and/or modification of the FHY Fund's allegedly materially misleading misstatements, and/or their associations with the FHY Fund, First Trust and/or First Trust Portfolios, which made them privy to confidential proprietary information concerning FHY Fund, participated in the fraudulent scheme alleged herein.

Defendants' Response:  Paragraph 484 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 484.

485.    Specifically, Defendants Bowen and Bradley were the most senior executive and financial officers of First Trust, and Bowen was a Trustee of the FHY Fund.  As such, they knew about or recklessly disregarded the deteriorating subprime residential mortgage market and the value of the FHY Fund's mortgage-related investments.

Defendants' Response:  Paragraph 485 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 485, except admit that, during the Class Period, Bowen was the President of First

Trust and a member of the Board of Trustees of the FHY Fund and Bradley was the CFO of First

Trust.

486.    Defendants Bowen, Bradley and First Trust, and First Trust Portfolios had the motive and opportunity to inflate the FHY Fund's mortgage-related assets and NAV.  According to FHY's 2007 N-CSR, "First Trust is responsible for the ongoing monitoring of the Fund's investment portfolio" and "may use a fair value method to value the Fund's securities."  The FHY Fund describes First Trust's role as follows:

> First Trust serves as investment advisor to the Fund pursuant to an Investment Management Agreement.  First Trust is responsible for the ongoing monitoring of the Fund's investment portfolio, managing the Fund's business affairs and certain administrative services necessary for the management of the Fund.

Defendants' Response:  Paragraph 486 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 486, except admit that Plaintiffs purport to quote portion of the FHY Fund's annual

shareholder report for the period ended October 31, 2007, and refer the Court to the annual report

for the full content and context thereof.

487.     Defendants Bowen and Bradley were both senior executives of First Trust and
thus had the ability to influence the valuations of the Funds' mortgage-related investments
valued by First Trust and the FHY Fund's Board of Trustees.  Moreover, because Defendants
Bowen and Bradley's compensation[23] were presumably linked, at least in part, to First Trust's
performance, which was, in turn, linked to advisory fees received from the Funds, Bowen and
Bradley were motivated during the FHY Class Period to commit fraud by aggressively valuing
the FHY Fund's mortgage-related securities and thus inflating the FHY Fund's NAV and by
improper use of leverage, all of which increased the advisory fees received by First Trust from
the FHY Fund during the FHY Fund Class Period.  FHY Fund's 2007 N-CSR described First
Trust advisor fees as follows:

> First Trust is entitled to a monthly fee calculated at an annual rate of 0.90% of the
> Fund's Managed Assets (the value of the securities and other investments the
> Fund holds plus cash or other assets, including interest accrued but not yet
> received minus accrued liabilities other than the principal amount of any
> borrowings).

Defendants' Response:  Paragraph 487 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 487, except admit that, during the Class Period, Defendants Bowen and Bradley were

the President and CFO, respectively, of First Trust, and that Plaintiffs purport to quote a portion

of the FHY Fund's annual shareholder report for the period ended October 31, 2007, and refer

the Court to the annual report for the full content and context thereof.

488.     Following is a break-down of Investment Advisory Fees incurred by the Funds:

|  | Investment Advisory Fees | | | |
| --- | --- | --- | --- | --- |
| in millions | 2005 | 2006 | 2007 | 2008 |
| FHI | $0.39 | $1.52 | $1.98 | $1.25 |
| FHY | -- | 1.09 | 2.29 | 1.42 |
| FHO |  |  |  | 1.41 |
| Total | $0.39 | $2.62 | $4.27 | $4.09 |

Defendants' Response:  Admit the allegations in Paragraph 488.

---

[23] At this time Plaintiffs are unable to determine the First Trust compensation structure for Bowen and
Bradley. First Trust is a limited partnership with one limited partner, Grace Partners of DuPage L.P., and
one general partner, The Charger Corporation and thus does not disclose compensation.

489.     Accordingly, because the monthly advisory fees were based on the value of each of the Fund's Managed Assets, Defendants named herein were motivated to inflate the value of the mortgage-related securities and NAV in order to increase their compensation.  Moreover, as a result of their positions in First Trust, Defendants Bowen and Bradley had the opportunity to inflate the values of the FHI Fund's mortgage-related securities and NAV.

Defendants' Response:  Paragraph 489 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 489.

490.     Defendants named herein were motivated to conceal the deterioration of the FHY Fund's mortgage-related investments in order to maintain compliance with applicable regulations and the FHY Fund's disclosed policies.  Section 18(f)(1) of the 1940 Act allows funds to borrow only from banks and limiting bank loans to no more than 33 1/3 percent of the fund's total assets. In this regard the FHY Fund disclosed the following:

Leverage Risk.  The Fund may borrow an amount up to 33-1/3% (or such other percentage as permitted by law) of its Managed Assets (including the amount borrowed) less all liabilities other than borrowings.

Defendants' Response:  Paragraph 490 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 490, except admit that Plaintiffs purport to quote a portion of the FHY Fund's

prospectus, and refer the Court to the prospectus for the full content and context of any

disclosures regarding the Fund's use of leverage and the associated risks.

491.     The following table shows the asset coverage ratio and its component numerator and denominator of the FHI Fund and FHY Fund during the FHI Class Period and FHY Class Period respectfully.

| in millions | 01/31/07 | 04/30/07 | 07/31/07 | 10/31/07 | 01/31/08 | 04/30/08 | 07/31/08 | 10/31/08 |
|---|---|---|---|---|---|---|---|---|
| FHI | | | | | | | | |
| Unlevered Net Assets | $227.51 | $238.07 | $231.35 | $197.34 | $161.28 | $140.33 | $115.77 | $ 74.38 |
| Leverage | 50.00 | 65.00 | 72.00 | 61.20 | 50.00 | 44.00 | 34.00 | 15.00 |
| Asset Coverage | 455.03% | 366.27% | 321.32% | 322.46% | 322.56% | 318.94% | 340.49% | 495.87% |
| FHY | | | | | | | | |
| Unlevered Net Assets | 269.57 | 267.70 | 252.69 | 221.13 | 190.18 | 171.67 | 116.15 | 80.74 |
| Leverage | 77.00 | 77.00 | 77.00 | 67.00 | 58.00 | 54.00 | 12.00 | - |
| Asset Coverage | 350.09% | 347.66% | 328.17% | 330.05% | 327.90% | 317.91% | 967.91% | - |

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 491, and refer the Court to the

FHY Fund's public filings for the full content and context of any disclosures regarding the

Fund's use of leverage.

492.    As the table above demonstrates, the FHY Fund began to invest on margin at the beginning of 2007 as the adverse developments in the sub-prime mortgage market began to become evident.  At first the asset coverage ratio was well above the statutory minimum.  As 2007 progressed and as the adverse developments in the sub-prime mortgage market accelerated, however, the FHY Fund's investment values began to deteriorate significantly while the leverage remained the same in the case of FHY Fund.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 492.

493.    In the second half of 2007, FHY Fund reversed course and began deleveraging, but the rate in deterioration of the FHY Fund's portfolios exceeded the deleveraging rate and the asset coverage ratio plunged to less than 20 basis points above the statutory minimum.  To be sure, the ratio would have been even worse had Defendants named herein fairly valued its mortgage and other asset backed securities using all available criteria and information.  Indeed, a mere 6% hair cut in the valuation of FHY Fund's portfolio at April 30, 2009 would have sent the asset coverage ratio below 300%.  A 6% drop in value is also far less than a fair value valuation would warrant given the FHY Fund's concentration in the low mezzanine and subordinated equity tranches in which it invested.  The FHY unlevered net assets dropped 32% during the subsequent three months, and only an accelerated reduction in leverage over that time span kept the asset coverage ratio above the 300% threshold.

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 493.

494.    The FHY Fund's inflated investments during the FHY Class Period also served to overstate the investment advisory fees they paid to First Trust.  As the investment advisor, First Trust charged the FHY Fund a monthly advisory fee at an annual rate of 0.9% of managed assets of which Valhalla received 0.4% as the Subadvisor.

|  | Investment Advisory Fees | | | |
| *in millions* | 2005 | 2006 | 2007 | 2008 |
| FHI | $0.39 | $1.52 | $1.98 | $1.25 |
| FHY |  | 1.09 | 2.29 | 1.42 |
| FHO |  |  |  | 1.41 |
| Total | $0.39 | $2.62 | $4.27 | $4.09 |

<u>Defendants' Response</u>:  Deny the allegations in Paragraph 494, except admit that the

FHY Fund paid First Trust Advisors an investment advisory (or management) fee at an annual

rate of 0.90%, and that First Trust Advisors paid Valhalla a subadvisory fee at an annual rate of

0.40%.

495.    Defendants' fraudulent scheme to defraud investors by artificially inflating the
FHY Fund's investment portfolio is inextricably intertwined with the Defendants' desire to
inflate investment advisory fees paid by the FHY Fund to First Trust during the FHY
Class Period, giving rise to an exceptionally strong inference that the Defendants named herein
acted with scienter to defraud investors.

Defendants' Response:  Paragraph 495 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 495.

496.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state
material facts necessary in order to make the statements made, in light of the
circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as
a fraud or deceit upon plaintiff and others similarly situated in connection with their
purchases of shares in the FHY Fund during the FHY Class Period.

Defendants' Response:  Paragraph 496 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 496 and its subparagraphs.

497.    Plaintiffs Wolkstein and Duda and the members of the FHY 10(b) Class have
suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated
prices for FHY Fund's shares.  Plaintiffs Wolkstein and Duda and the members of the FHY
10(b) Class would not have purchased the FHY Fund's shares at the prices they paid, or at all, if
they had been aware that the market prices had been artificially and falsely inflated by
Defendants' misleading statements.

Defendants' Response:  Paragraph 497 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 497.

498.     Plaintiff CRC repeats and realleges each and every allegation contained in paragraphs 1 through 279, paragraphs 291 through 299, paragraphs 309 through 315, paragraphs 321 through 323, paragraphs 365 through 383, paragraphs 405 through 413 and paragraphs 423 through 425, above as if fully set forth herein.

Defendants' Response:  Answering Paragraph 498, repeat and reallege Defendants'

responses to Paragraphs 1 through 279, Paragraphs 291 through 299, Paragraphs 309 through

315, Paragraphs 321 through 323, Paragraphs 365 through 383, Paragraphs 405 through 413, and

Paragraphs 423 through 425 as if fully set forth herein.

499.     This Count is asserted by Plaintiff CRC on behalf of the FHO 10(b) Class against Defendants First Trust Portfolios, First Trust, FHO Fund, Bowen and Bradley for violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

Defendants' Response:  Answering Paragraph 499, admit that Plaintiffs purport to assert

Count XX pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5 on behalf of the

FHO 10(b) Class, as defined in the Complaint, against Defendants First Trust Portfolios, First

Trust Advisors, FHO Fund, Bowen, and Bradley.

500.     During the FHO Class Period, Defendants named herein disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

Defendants' Response:  Paragraph 500 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 500.

501.     As alleged herein, Defendants named herein acted with scienter in that each of the Defendants and the Non-Management Trustees and the Subadvisers knew that the public documents and statements issued or disseminated in the name of the FHO Fund were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants named herein, by virtue of their receipt of information reflecting the true facts regarding the FHO Fund, their control over, and/or receipt and/or modification of the FHO Fund allegedly materially misleading misstatements, and/or their associations with the FHO Fund, First Trust and/or First Trust

Portfolios, which made them privy to confidential proprietary information concerning the FHO Fund, participated in the fraudulent scheme alleged herein.

Defendants' Response:  Paragraph 501 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 501.

502.    Specifically, Defendants Bowen and Bradley were the most senior executive and financial officers of First Trust, and Bowen was a Trustee of the FHO Fund.  As such, they knew about or recklessly disregarded the deteriorating subprime residential mortgage market and the value of the FHO Fund's mortgage-related investments.

Defendants' Response:  Paragraph 502 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 502, except admit that, during the Class Period, Bowen was the President of First

Trust and a member of the Board of Trustees of the FHO Fund and Bradley was the CFO of First

Trust.

503.    Defendants Bowen, Bradley and First Trust, and First Trust Portfolios had the motive and opportunity to inflate the FHO Fund's mortgage-related assets and NAV.  According to FHO Fund's N-CSR, "First Trust is responsible for the ongoing monitoring of the Fund's investment portfolio" and "may use a fair value method to value the Fund's securities."  The FHO Fund describes First Trust's role as follows:

> First Trust serves as investment advisor to the Fund pursuant to an Investment Management Agreement.  First Trust is responsible for the ongoing monitoring of the Fund's investment portfolio, managing the Fund's business affairs and certain administrative services necessary for the management of the Fund.

Defendants' Response:  Paragraph 503 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 503, except admit that Plaintiffs purport to quote portion of the FHO Fund's annual

shareholder report for the period ended January 31, 2008, and refer the Court to the annual report

for the full content and context thereof.

504.    Defendants Bowen and Bradley were both senior executives of First Trust and thus had the ability to influence the valuations of the FHO Fund's mortgage-related investments

valued by First Trust and the FHO Fund's Board of Trustees.  Moreover, because Defendants Bowen and Bradley's compensation[24] were presumably linked, at least in part, to First Trust's performance, which was, in turn, linked to advisory fees received from the FHO Fund, Bowen and Bradley were motivated during the FHO Class Period to commit fraud by aggressively valuing the FHO Fund's mortgage-related securities and thus inflating the FHO Fund's NAVs and by improper use of leverage, all of which increased the advisory fees received by First Trust from the FHO Fund during the FHO Class Period.  FHO Fund's N-CSR described First Trust Advisors L.P.  advisor fees as follows:

> First Trust is entitled to a monthly fee calculated at an annual rate of 0.90% of the Fund's Managed Assets (the value of the securities and other investments the Fund holds plus cash or other assets, including interest accrued but not yet received minus accrued liabilities other than the principal amount of any borrowings).

Defendants' Response:  Paragraph 504 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 504, except admit that, during the Class Period, Defendants Bowen and Bradley were the President and CFO, respectively, of First Trust, and that Plaintiffs purport to quote a portion of the FHO Fund's annual shareholder report for the period ended January 31, 2008, and refer the Court to the annual report for the full content and context thereof.

505.    Following is a break-down of Investment Advisory Fees incurred by the Funds:

|  | Investment Advisory Fees | | | |
|---|---|---|---|---|
| *in millions* | 2005 | 2006 | 2007 | 2008 |
| FHI | $0.39 | $1.52 | $1.98 | $1.25 |
| FHY | -- | 1.09 | 2.29 | 1.42 |
| FHO | | | | 1.41 |
| Total | $0.39 | $2.62 | $4.27 | $4.09 |

Defendants' Response:  Admit the allegations in Paragraph 505.

506.    Accordingly, because the monthly advisory fees were based on the value of each of the FHO Fund's Managed Assets, Defendants named herein were motivated to inflate the value of the mortgage-related securities and NAV in order to increase their compensation. Moreover, as a result of their positions in First Trust, Defendants Bowen and Bradley had the opportunity to inflate the values of the FHO Fund's mortgage-related securities and NAV.

---

[24] At this time Plaintiffs are unable to determine the First Trust compensation structure for Bowen and Bradley. First Trust is a limited partnership with one limited partner, Grace Partners of DuPage L.P., and one general partner, The Charger Corporation and thus does not disclose compensation.

Defendants' Response:  Paragraph 506 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 506.

507.    As 2007 progressed and as the adverse developments in the sub-prime mortgage market accelerated, however, the FHO Fund's investment values began to deteriorate.

Defendants' Response:  Answering Paragraph 507, aver that the FHO Fund's NAV and share price are a matter of public record, and deny knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 507.

508.    The FHO Fund's inflated investments during the FHO Class Period also served to overstate the investment advisory fees they paid to First Trust.  As the investment advisor, First Trust charged the FHO Fund a monthly advisory fee at an annual rate of 0.9% of managed assets of which Valhalla received 0.4% as the Subadvisor.

|  | Investment Advisory Fees | | | |
| --- | --- | --- | --- | --- |
| in millions | 2005 | 2006 | 2007 | 2008 |
| FHI | $0.39 | $1.52 | $1.98 | $1.25 |
| FHY | | 1.09 | 2.29 | 1.42 |
| FHO | | | | 1.41 |
| Total | $0.39 | $2.62 | $4.27 | $4.09 |

Defendants' Response:  Deny the allegations in Paragraph 508, except admit that the FHO Fund paid First Trust Advisors an investment advisory (or management) fee at an annual rate of 0.90%, and that First Trust Advisors paid Valhalla a subadvisory fee at an annual rate of 0.40%.

509.    Defendants' fraudulent scheme to defraud investors by artificially inflating the Funds' investment portfolios is inextricably intertwined with the Defendants' desire to inflate investment advisory fees paid by the FHO Fund to First Trust during the FHO Class Period, giving rise to an exceptionally strong inference that the Defendants named herein acted with scienter to defraud investors.

Defendants' Response:  Paragraph 509 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 509.

510.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of shares in the FHO Fund during the FHO Class Period.

Defendants' Response:  Paragraph 510 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 510 and its subparagraphs.

511.    Plaintiff CRC and the members of the FHO 10(b) Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Funds' shares.  Plaintiff CRC and the members of the FHO 10(b) Class would not have purchased the FHO Fund's shares at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

Defendants' Response:  Paragraph 511 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 511.

512.    Plaintiffs Valenti Trust and Duda repeat and reallege each and every allegation contained in paragraphs 1 through 279 and paragraphs 385 through 393, paragraphs 427 through 444, and paragraphs 464 through 480, above as if fully set forth herein.

Defendants' Response:  Answering Paragraph 512, repeat and reallege Defendants'

responses to Paragraphs 1 through 279, Paragraphs 385 through 393, Paragraphs 427 through

444, and Paragraphs 464 through 480 as if fully set forth herein.

513.    Plaintiffs Valenti Trust and Duda bring this Count against Defendants Bowen, Bradley and First Trust for violations of Section 20(a) of the Exchange Act.

<u>Defendants' Response</u>:  Answering Paragraph 513, admit that Plaintiffs purport to bring

Count XXI pursuant to Section 20(a) of the Exchange Act against Defendants First Trust

Advisors, Bowen, and Bradley.

514.    Defendants Bowen, Bradley and First Trust acted as controlling persons of the
Funds within the meaning of §20(a) of the 1934 Act.  By reason of their positions and
relationship with the FHI Fund, Defendants Bowen and Bradley and First Trust had the power
and authority to cause the FHI Fund to engage in the wrongful conduct complained of herein.
By virtue of their high-level positions, their participation in and/or awareness of the FHI Fund's
operations and/or intimate knowledge of the false financial statements filed by the FHI Fund
with the SEC and disseminated to the investing public, the Defendants named herein had the
power to influence and control and did influence and control, directly or indirectly, the decision-
making of the FHI Fund, including the content and dissemination of the various statements
which Plaintiffs contend were false and misleading.  Defendants Bowen and Bradley and First
Trust were provided with or had unlimited access to copies of the Funds' reports, public filings
and other statements alleged by Plaintiffs Valenti Trust and Duda to be misleading prior to
and/or shortly after these statements were issued and had the ability to prevent the issuance of the
statements or cause the statements to be corrected.  By reason of such conduct, the Defendants
named herein are liable pursuant to §20(a) of the Exchange Act.

<u>Defendants' Response</u>:  Paragraph 514 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 514.

515.    In particular, each of the Defendants named herein had direct and supervisory
involvement in the day-to-day operations of the FHI Fund, including preparation of financial
statements and supervision of accounting practices and activities, and, therefore, are presumed to
have had the power to control or influence the particular transactions giving rise to the securities
violations as alleged herein, and exercised the same.  First Trust was the FHI Fund's investment
adviser and was responsible for selecting and supervising the Subadvisors, the ongoing
monitoring of the FHI Fund's investment portfolio, managing the FHI Fund's business affairs
and providing certain clerical and bookkeeping and other administrative services.  First Trust
was also responsible for determining the FHI Fund's overall investment strategy and overseeing
its implementation.

<u>Defendants' Response</u>:  Paragraph 515 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 515, except admit that First Trust Advisors was the investment adviser for the FHI

Fund during the Class Period.

516.     As set forth above, First Trust and Defendants Bowen and Bradley violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Defendants named herein are liable pursuant to Section 20(a) of the Exchange Act.  Upon the revelation of the truth, the price of the FHI Fund fell in value.  Thus, as a direct and proximate result of Defendants' wrongful conduct, Plaintiffs Valenti Trust and Duda and other members of the FHI 10(b) Class suffered economic loss and damages in connection with their purchases of the FHI Fund during the FHI Class Period.

Defendants' Response:  Paragraph 516 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 516.

517.     Plaintiffs Wolkstein and Duda repeat and reallege each and every allegation contained in paragraphs 1 through 279, paragraphs 281 through 289, paragraphs 301 through 307, paragraphs 317 through 319, paragraphs 345 through 363, paragraphs 395 through 403, paragraphs 419 through 421, paragraphs 446 through 463 and paragraphs 481 through 497, above as if fully set forth herein.

Defendants' Response:  Answering Paragraph 517, repeat and reallege Defendants'

responses to Paragraphs 1 through 279, Paragraphs 281 through 289, Paragraphs 301 through

307, Paragraphs 317 through 319, Paragraphs 345 through 363, Paragraphs 395 through 403,

Paragraphs 419 through 421, Paragraphs 446 through 463, and Paragraphs 481 through 497 as if

fully set forth herein.

518.     Plaintiffs Wolkstein and Duda bring this Count against Defendants Bowen, Bradley and First Trust for violations of Section 20(a) of the Exchange Act.

Defendants' Response:  Answering Paragraph 518, admit that Plaintiffs purport to bring

Count XXII pursuant to Section 20(a) of the Exchange Act against Defendants First Trust

Advisors, Bowen, and Bradley.

519.     Defendants Bowen, Bradley and First Trust acted as controlling persons of the FHY Fund within the meaning of §20(a) of the Exchange Act.  By reason of their positions and relationship with the FHY Fund, Defendants Bowen and Bradley and First Trust had the power and authority to cause the FHY Fund to engage in the wrongful conduct complained of herein. By virtue of their high-level positions, their participation in and/or awareness of the FHY Fund's operations and/or intimate knowledge of the false financial statements filed by the FHY Fund with the SEC and disseminated to the investing public, the Defendants named herein had the power to influence and control and did influence and control, directly or indirectly, the decision-

making of the FHY Fund, including the content and dissemination of the various statements which Plaintiffs Wolkstein and Duda contend were false and misleading.  Defendants Bowen and Bradley and First Trust were provided with or had unlimited access to copies of the FHY Fund's reports, public filings and other statements alleged by Plaintiffs Wolkstein and Duda to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  By reason of such conduct, the Defendants named herein are liable pursuant to §20(a) of the Exchange Act.

Defendants' Response:  Paragraph 519 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 519.

520.    In particular, each of the Defendants named herein had direct and supervisory involvement in the day-to-day operations of the FHY Fund, including preparation of financial statements and supervision of accounting practices and activities, and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  First Trust was the FHY Fund's investment adviser and was responsible for selecting and supervising the Subadvisors, the ongoing monitoring of the FHY Fund's investment portfolio, managing the Fund's business affairs and providing certain clerical and bookkeeping and other administrative services.  First Trust was also responsible for determining the FHY Fund's overall investment strategy and overseeing its implementation.

Defendants' Response:  Paragraph 520 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 520, except admit that First Trust Advisors was the investment adviser for the FHY

Fund during the Class Period.

521.    As set forth above, First Trust and Defendants Bowen and Bradley violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Defendants named herein are liable pursuant to Section 20(a) of the Exchange Act.  Upon the revelation of the truth, the price of the FHY Fund shares fell in value.  Thus, as a direct and proximate result of Defendants' wrongful conduct, Plaintiffs Wolstein and Duda and other members of the FHY 10(b) Class suffered economic loss and damages in connection with their purchases of the FHY Fund during the FHY Class Period.

Defendants' Response:  Paragraph 521 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 521.

522.     Plaintiff CRC repeats and realleges each and every allegation contained in paragraphs 1 through 279, paragraphs 291 through 299, paragraphs 309 through 315, paragraphs 321 through 323, paragraphs 365 through 383, paragraphs 405 through 413, paragraphs 423 through 425 and paragraphs 498 through 511, above as if fully set forth herein.

Defendants' Response:  Answering Paragraph 522, repeat and reallege Defendants'

responses to Paragraphs 1 through 279, Paragraphs 291 through 299, Paragraphs 309 through

315, Paragraphs 321 through 323, Paragraphs 365 through 383, Paragraphs 405 through 413,

Paragraphs 423 through 425, and Paragraphs 498 through 511 as if fully set forth herein.

523.     Plaintiff CRC brings this Count against Defendants Bowen, Bradley and First Trust for violations of Section 20(a) of the Exchange Act.

Defendants' Response:  Answering Paragraph 523, admit that Plaintiffs purport to bring

Count XXIII pursuant to Section 20(a) of the Exchange Act against Defendants First Trust

Advisors, Bowen, and Bradley.

524.     Defendants Bowen, Bradley and First Trust acted as controlling persons of the FHO Fund within the meaning of §20(a) of the 1934 Act.  By reason of their positions and relationship with the FHO Fund, Defendants Bowen and Bradley and First Trust had the power and authority to cause the FHO Fund to engage in the wrongful conduct complained of herein. By virtue of their high-level positions, their participation in and/or awareness of the FHO Fund's operations and/or intimate knowledge of the false financial statements filed by the FHO Fund with the SEC and disseminated to the investing public, the Defendants named herein had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the FHO Fund, including the content and dissemination of the various statements which Plaintiff CRC contends were false and misleading.  Defendants Bowen and Bradley and First Trust were provided with or had unlimited access to copies of the FHO Fund's reports, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  By reason of such conduct, the Defendants named herein are liable pursuant to §20(a) of the Exchange Act.

Defendants' Response:  Paragraph 524 constitutes a legal conclusion to which no

responsive pleading is required.  To the extent a response is required, deny the allegations in

Paragraph 524.

525.     In particular, each of the Defendants named herein had direct and supervisory involvement in the day-to-day operations of the FHO Fund, including preparation of financial statements and supervision of accounting practices and activities, and, therefore, are presumed to

have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  First Trust was the FHO Fund's investment adviser and was responsible for selecting and supervising the Subadvisors, the ongoing monitoring of the FHO Fund's investment portfolio, managing the FHO Fund's business affairs and providing certain clerical and bookkeeping and other administrative services.  First Trust was also responsible for determining the FHO Fund's overall investment strategy and overseeing its implementation.

<u>Defendants' Response</u>:  Paragraph 525 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 525, except admit that First Trust Advisors was the investment adviser for the FHO Fund during the Class Period.

526.    As set forth above, First Trust and Defendants Bowen and Bradley violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Defendants named herein are liable pursuant to Section 20(a) of the Exchange Act.  Upon the revelation of the truth, the price of the FHO Fund fell in value.  Thus, as a direct and proximate result of Defendants' wrongful conduct, Plaintiff CRC and other members of the FHO 10(b) Class suffered economic loss and damages in connection with their purchases of the FHO Fund during the FHO Class Period.

<u>Defendants' Response</u>:  Paragraph 526 constitutes a legal conclusion to which no responsive pleading is required.  To the extent a response is required, deny the allegations in Paragraph 526.

## **DEFENSES**

Defendants allege the following defenses with respect to the causes of action asserted in the Complaint.  By designating the following matters "defenses," Defendants do not assume the burden of proof where the burden on proof rests on Plaintiffs.  Defendants reserve their right to assert other and additional defenses when and if they become appropriate or available.

## **First Defense**

The Complaint fails to state a claim upon which relief can be granted.

## Second Defense

Plaintiffs' disagreement with Defendants' and the Funds' subadvisers' business judgment and decision-making is not actionable under the federal securities laws.

## Third Defense

Plaintiffs' claims are barred in whole or in part by the applicable statutes of limitations and repose.

## Fourth Defense

Plaintiffs' claims are barred in whole or in part by the doctrines of laches, waiver, estoppel, unclean hands, or ratification.

## Fifth Defense

Plaintiffs and others alleged to be members of the putative classes and subclasses lack standing to maintain some or all of their claims.

## Sixth Defense

Defendants did not engage in any conduct that would constitute fraud.

## Seventh Defense

Defendants did not act with scienter or intent to defraud.

## Eighth Defense

Defendants acted with reasonable care and due diligence with respect to the matters Plaintiffs now contend were misrepresented by or omitted from the Funds' public filings.  After reasonable investigation, Defendants had reasonable ground to believe, and did believe, that the statements contained in the Funds' public filings were true and that there was no omission of material fact required to be stated therein or necessary to make statements contained therein not misleading.

## Ninth Defense

The Funds' public filings were not materially false or misleading, did not contain any material misrepresentations, and did not fail to disclose any material facts required to be stated therein or necessary to make any statement contained therein not misleading.

## Tenth Defense

Plaintiffs and the other members of the putative classes and subclasses have not sustained any legally cognizable damage by virtue of any misrepresentation or omission alleged in the Complaint.  Such alleged misrepresentations and omissions did not cause and were not a material causal factor in the decrease in the Funds' share prices of which Plaintiffs complain; rather, that decrease was caused by other factors, including, among others, adverse developments in the credit, housing, and subprime securities markets.

## Eleventh Defense

The Funds' public filings contained meaningful cautionary statements that preclude Plaintiffs and the other members of the putative classes and subclasses from prevailing on their claims.

## Twelfth Defense

The allegedly false and misleading statements in the Funds' public filings reflect Defendants' and the Funds' subadvisers' honestly held views on market conditions, the Funds' investments, performance, and outlook, and other matters of judgment or opinion.

## Thirteenth Defense

Plaintiffs and the other members of the putative classes and subclasses did not reasonably rely on any of the allegedly false and misleading statements in the Funds' public filings.

## Fourteenth Defense

Plaintiffs and the other members of the putative classes and subclasses were aware of the true facts and information that allegedly was omitted from or misrepresented in the Funds' public filings.

## Fifteenth Defense

Defendants did not have or exercise control over any person who may be primarily liable under the federal securities laws.

## Sixteenth Defense

Defendants did not culpably participate in any fraudulent scheme or the making of any misstatement of material fact by any person who may be primarily liable under the federal securities laws.

## Seventeenth Defense

Plaintiffs and the other members of the putative classes and subclasses did not purchase Fund shares pursuant to the Funds' registration statements, nor are the shares Plaintiffs purchased traceable to the Funds' registration statements.

## Eighteenth Defense

Plaintiffs and the other members of the putative classes and subclasses cannot prevail on their claims under Section 11 of the Securities Act to the extent Defendants were not the issuer of the Funds' shares, directors of the issuer or named in the Funds' registration statements as about to become directors of the issuer, signatories of the Funds' registration statement, named as having certified or prepared any part of the Funds' registration statement, or an underwriter of the Funds' shares.

## **Nineteenth Defense**

Plaintiffs and the other members of the putative classes and subclasses cannot prevail on

their claims under Section 12(a)(2) of the Securities Act to the extent Defendants did not offer or

sell the Funds' shares.

## **Twentieth Defense**

The claims asserted in the Complaint may not be pursued or maintained as a class action

pursuant to Rule 23 of the Federal Rules of Civil Procedure.

Dated: March 8, 2010                              Respectfully submitted,
       Chicago, IL


**BRYAN CAVE LLP**

/s/  Steven R. Smith_____
    Steven R. Smith
    Derek S. Holland
161 North Clark Street, Suite 4300
Chicago, IL 60601-3206
Tel:  (312) 602-5000
Fax:  (312) 602-5050

**MILBANK, TWEED, HADLEY & McCLOY LLP**
    James N. Benedict
    Sean M. Murphy (*pro hac vice*)
    Robert R. Miller
    Andrew W. Robertson
1 Chase Manhattan Plaza
New York, NY 10005-1413
Tel:  (212) 530-5000
Fax:  (212) 530-5219

*Attorneys for Defendants First Trust Advisors L.P.,*
*First Trust Portfolios L.P., First Trust Strategic*
*High Income Fund, First Trust Strategic High*
*Income Fund II, First Trust Strategic High Income*
*Fund III, James A. Bowen, and Mark R. Bradley*

## <u>CERTIFICATE OF SERVICE</u>

I, Steven R. Smith, an attorney, certify that I caused a copy of the foregoing Answer to the Consolidated Class Action Complaint to be served upon all counsel of record via the Court's CM/ECF system on this 8th day of March, 2010.


<u>        /s/ Steven R. Smith        </u>